**FILED**

OCT 1 8 2023

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Federico M. Bandi
Angela M. Bandi
3606 Chesapeake Street, NW
Washington, DC 20008
Telephone: 773.620.1932
Email: fbandi1@jhu.edu
      angela.bandi@yahoo.com

*Unsecured Judgment Creditors of*
*Touchstone Remodelers, LLC, filing Pro Se*


## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLUMBIA

In re:                                    |        Case No. 23-00116-ELG
                                          |
TOUCHSTONE REMODELERS, LLC,               |        Chapter 7
                  Debtor.                 |
                                          |
_____  |


## MOTION FOR ENTRY OF AN ORDER
## PURSUANT TO RULE 2004 AUTHORIZING EXAMINATIONS
## AND FOR THE PRODUCTION OF DOCUMENTS


Unsecured judgment creditors[1] Federico M. Bandi and Angela M. Bandi

(the "**Bandis**") of Touchstone Remodelers, LLC (the "**Debtor**") in the above-

---

[1] On September 2, 2022, the Bandis prevailed in an arbitration action against the Debtor. The arbitration award was subsequently confirmed and judgment was entered in favor of the Bandis. *See* Bandi et al. v. Touchstone Remodelers, LLC (Case No. 2022 CAB 005162, filed in the Superior Court of the District of Columbia, dated March 10, 2023) attached in **Appendix A**. The Debtor has not paid any portion of the judgment. The Bandis, who are listed as creditor 3.11 in Schedule E/F, have not yet filed a claim in the instant case as the petition was noticed with a "No Proof of Claim Deadline."

captioned case (the "**Case**") under Chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**") hereby move (the "**Motion**") this Court for entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("**Rule 2004**") and Local Rule 2004-1 of the United States Bankruptcy Court for the District of Columbia, authorizing the Bandis to seek documents from and/or conduct oral examinations of a responsible officer of the Debtor and related non-Debtor persons and entities. In support of the Motion, the Bandis respectfully state as follows:

## PRELIMINARY STATEMENT

The purpose of this Motion is to inquire into the acts, conduct, property, liabilities and financial condition of the Debtor for the possibility of obtaining assets for the benefit of the estate and its unsecured creditors. In furtherance of this goal, the Bandis require the ability to seek formal document production and oral examinations under Rule 2004 from the Debtor and from related non-Debtor parties and/or entities. This discovery sought fits squarely within the scope of Rule 2004, which allows a party in interest to seek discovery concerning all matters related to the financial affairs of a debtor and its estate. In addition, the Bandis have narrowly targeted their proposed discovery to those documents previously requested from the Debtor by the Trustee in this Case, or to similar documents which are in the spirit of such requests.

## RELEVANT BACKGROUND[2]

1. The Debtor in this Case is a residential remodeling contractor, formerly organized in the District of Columbia as a Limited Liability Company for the eleven (11) year period from November of 2011 through November of 2022, and effectively run by a single individual,[3] Benjamin Srigley. Mr. Srigley, by his own representations,[4] was the CEO and founder of the Debtor and at the time the Debtor's chapter 7 petition was filed, its sole managing member, officer and authorized representative. Mr. Srigley ran the Debtor's business. He was the person in charge, and, presumably, he controlled the Debtor's bank accounts and made its important operational decisions.

2. While the Debtor was a small business, it handled relatively large sums of money. Its stated revenue for 2021 was $1,708,116.00. *See* Petition at Official Form 207, Part 1. It had income tax obligations. It had employees for which it had payroll and associated employment tax obligations. It owned or

---

[2] Some facts described herein are the Debtor's own allegations and the Bandis have not verified their validity and are not admitting to their truth. Others are set forth upon the Bandis' own information and belief based upon their review of documents received from the Debtor to date. However, as noted herein, the Bandis have thus far received little information from the Debtor regarding its financial affairs. As such, we reserve the right to modify, clarify, or amend any factual assertions in this Motion.

[3] Mr. Srigley's wife, Cynthia Srigley, Ph.D, was also involved in the Debtor's business, but the degree of her involvement is not clear. At a minimum, Dr. Srigley held the position of Chief Operating Officer of the Debtor beginning in approximately May of 2021 through on or about early January of 2022. *See* screenshot of Cynthia Srigley's bio from the Debtor's former website, attached in **Appendix A**.

[4] *See* Petition at Official Form 201, Item 17; Debtor's Resolution; Official Form 202; Official Form 207, Part 14; and List of Creditors and Mailing Matrix. *See also* screenshot of Benjamin Srigley's bio from the Debtor's former website and three (3) screenshots of the Debtor's entity information, filed reports and beneficial owners from corponline.dcra.dc.gov, attached in **Appendix A**.

3

controlled a number of financial, credit card and loan accounts. It had business
relationships with dozens of third parties, among them clients, subcontractors,
professional service providers and vendors. Presumably, numerous financial
transactions associated with these relationships occurred. A reasonable person
would assume that many documents concerning the Debtor's business activities
exist or existed and that those records would ordinarily have been maintained, at
least for some reasonable period of time.[5] In the event of a corporate dissolution
and the filing of a chapter 7 petition, a reasonable person would also assume that a
debtor would keep all of its business records until (at the very least) the bankruptcy
petition had been granted and the administration of the estate was complete. As
discussed below, the Trustee and the unsecured creditors are expected to believe
that neither applies in this Case.

    3.      On April 28, 2023 (the "**Petition Date**"), the Debtor filed a
voluntary petition for relief under chapter 7 of the Bankruptcy Code ("**Petition**"),[6]
and William Douglas White was appointed to serve as the chapter 7 trustee in the

---

[5] The Internal Revenue Service advises small business owners and self-employed individuals to keep
"records that support an item of income, deduction or credit shown on your tax return until the period of
limitations for that tax return runs out." At a minimum, this period is three years from the filing date for
income tax returns, four years for employment tax records, and indefinitely if a return is not filed. *See*
"How long should I keep records?" at https://www.irs.gov/businesses/small-businesses-self-employed.

[6] The Debtor was formally dissolved as a corporation on or about November 30, 2022. *See* references
from corponline.dcra.dc.gov cited in footnote 4, *supra*. At the time of dissolution, the Debtor did not
notify the Bandis (its largest creditor). The Bandis did not receive notification from the Debtor that it was
no longer in business until five months after its dissolution date, when they received notice of the Petition.
The Petition is also inaccurate on this point: Official Form 207, Part 1 indicates that the Debtor was
operating a business in 2023, when the Debtor instead had been dissolved the prior year.

Case (the "**Trustee**"). Notice was provided on Official Form 309C and no proof of claim deadline has been set.

      4.      The Trustee held the initial meeting of creditors, as required by section 341(a) of the Bankruptcy Code and Bankruptcy Rule 2003, on June 1, 2023 ("**Initial 341(a) Meeting**"). Mr. Srigley appeared at the meeting to be examined under oath. *See* 11 U.S.C. § 343. Based on the Debtor's repeated failure to produce requested documents as well as conflicting information revealed during questioning of Mr. Srigley, the 341(a) meeting was continued three times: (i) to July 11, 2023 (the meeting was not held since no documents had been produced); (ii) to August 9, 2023 (the meeting was held but Mr. Srigley did not appear; only the Debtor's counsel, Maurice VerStandig of The Belmont Firm, attended on the Debtor's behalf); and (iii) to September 8, 2023. At the end of the September 8th 341(a) meeting, the Trustee expressed his intent to continue the meeting a fourth time (the Bandis agreed with the proposed continuance). However, due to the objection of the Debtor's counsel, the Trustee scheduled instead a conference call, to take place on October 6, 2023. Mr. Srigley appeared at the call for the Debtor, but did not testify under oath.[7]

      5.      The Trustee has requested documents from the Debtor by providing its counsel, Mr. VerStandig, with a written list of requests on three

---

[7] The Bandis attended all of the 341(a) meetings and Mr. Bandi attended the October 6th conference call.

separate occasions, beginning as early as May of 2023. The Trustee also made

informal document requests during the course of the several meetings of creditors

held pursuant to section 341(a) of the Bankruptcy Code.

6.       Of the approximately fourteen (14)[8] individual written

document requests made by the Trustee to the Debtor, the Debtor has partially

produced documents in response to only four (4) of them.

7.       The Debtor has a duty to cooperate with the Trustee pursuant to

the Bankruptcy Code, even an affirmative duty "to surrender to the trustee all

property of the estate and any recorded information, including books, documents,

records, and papers, relating to property of the estate." *See* 11 U.S.C. §§ 521(a)(3)

and (4) and discussion *infra*. In this Case, with few exceptions (described herein)

over an extended period of more than 18 weeks,[9] and despite the Trustee's and the

Bandis' continued efforts to work cooperatively with the Debtor to obtain the

necessary documents, the Debtor has refused to comply with the Trustee's requests.

8.       It has been an uphill battle gathering facts and information in

this Case. First, the Debtor has not provided information in a timely manner. It

missed multiple deadlines for the production of documents: those of July 21, 2023,

---

[8] In this count of 14 requests, the Bandis are including written requests made by the Trustee on July 2, 2023 and September 28, 2023, listed in footnotes 10 and 11, *infra*. The Bandis are not including any of the written requests made to the Debtor prior to the Initial 341(a) Meeting. They do not have a copy of that document list and do not know whether the Debtor fully complied with the Trustee's requests or only responded in part.

[9] This time period is measured from the date of the Initial 341(a) Meeting through the October 6th conference call.

August 22, 2023, and September 15, 2023, and likely the initial May 2023 deadline as well. When the Debtor finally did respond to requests, it generally provided information well after the deadline had passed, and only days or hours in advance of scheduled 341(a) meetings at which the requested documents were to be discussed. Such occasions include:

    a)   documents requested prior to the Initial 341(a) Meeting, and received the morning of the meeting;

    b)   documents requested on July 2, 2023[10] to be provided by July 21, 2023, and produced in very limited part on August 5, 2023;

---

[10] The complete list of documents requested by the Trustee on July 2, 2023 is:

1. Specific description (make, model and value) of the individual pieces of equipment identified in Schedule B and the current location of those pieces of equipment (include any vehicles titled in the name of debtor after January 2021);
2. All Quickbooks records for 2021 through today or a working login and password for Touchstone's account;
3. The contracts and any correspondence with each contractor that owed Touchstone a receivable on the date of the bankruptcy or as of the date that Touchstone ceased operations;
4. The debtor's tax filings for calendar year 2022 (I already have 2020 and 2021 filings); the Bandis have asked to receive all those as well;
5. All statements for any financial account in which the debtor held an interest during the period of April 2021 through today including the Bank of America operating account;
6. All periodic statements for any credit cards or loan accounts in which the debtor held an interest during the period of April 2021 through today;
7. Debtor's payroll records for calendar year 2022;
8. All draws or transfers of the debtor to an insider from April 2021 to through today;
9. Documents reflecting any sale or transfer of assets in which the debtor held an interest after April 2021, including but not limited to, the Isuzu truck or other vehicle.

*See* e-mail correspondence of William Douglas White to Maurice VerStandig regarding Touchstone Remodeling, dated July 2, 2023 at 10:27 pm, attached in **Appendix A**.

c)   documents requested by August 22, 2023 and produced in very

limited part on September 4, 2023 (a single document) and

September 8, 2023 (two documents the morning of the meeting); and

d)   documents requested by September 15, 2023 and again on September

28, 2023,[11] and produced in very limited part on October 6, 2023

(two documents the morning of the meeting).

These multiple dates and requests relate, with very minor exceptions, to the very

same documents requested from the Debtor by the Trustee in writing as early as

July 2, 2023. Despite the Trustee's efforts, however, he has been unable to compel

the Debtor to voluntarily produce the majority of the information requested.

9.      Importantly, the Debtor's lack of timeliness applies to

documents which should have been in the Debtor's immediate possession, such as

---

[11] The complete list of documents requested by the Trustee on September 28, 2023 is:

1. A copy of the title and a loan statement for the Ram truck that is in the possession of Mr. Srigley.
2. Any available Quickbooks documents regarding Touchstone or the login and password information for the Quickbooks account.
3. A copy of the video taken by Mr. Srigley or associates of the contents of personal property left in the warehouse upon closing of the Touchstone business.
4. Any documents or information pertaining to the receivables owing to Touchstone by M. Electrical of Gaithersburg or Frank, Jr. Construction including any such records from Quickbooks or Microsoft.
5. Any additional tax filings, state or federal, regarding Touchstone for 2020 and 2021 including all depreciation schedules pertaining to such filings.
6. Any additional records not already provided including the login and password information for all Touchstone bank accounts, credit cards and loan accounts.

*See* e-mail correspondence of William Douglas White to Maurice VerStanding regarding Touchstone Remodelers, dated September 28, 2023 at 5:51 pm, attached in **Appendix A**.

bank statements for its apparent operating account, which the Debtor did not

provide to the Trustee until 65 days after his initial request.[12]

        10.      Second, only a very limited number of the documents requested

by the Trustee have been provided. The Debtor has refused to provide the majority

of the requested documents on the basis that they are not in "its possession,

custody and control."[13] This blanket assertion made on September 4, 2023 (several

months after the initial document requests) apparently applies to hard copies and

electronic documents in any format that were in the Debtor's immediate possession

but allegedly no longer are, as well as to any documents accessible electronically

to the Debtor through various online accounts, but allegedly no longer are.

        11.      Yet, particularly regarding accounts for which electronic

records should be easily accessible to the Debtor as a practical matter, and which

the Debtor should also have a legal right to obtain,[14] such as bank and credit card

account statements and its own bookkeeping and accounting records, the Debtor

has not taken even minimal steps to obtain or access the requested documents. The

Debtor has not stated, nor provided any evidence to indicate, that it has attempted

---

[12] With the exception of the January 2023 statement produced on June 1, 2023, the Trustee did not receive copies of statements for the Debtor's Bank of America account ending in 3252 until August 5, 2023, sixty-five (65) days after his initial request.

[13] *See* e-mail correspondence of Maurice VerStandig to William Douglas White, regarding In re Touchstone Remodelers-, dated September 4, 2023 at 9:04 pm, attached in **Appendix A**.

[14] The accounts are those with the following related non-Debtor entities: American Express National Bank, Bank of America, N.A., Capital One, N.A., and Intuit Inc.

to contact any of the entities with which it held accounts, by telephone, e-mail or otherwise, to request access to any of the accounts, to obtain new passwords or login information, or to directly obtain any of the records at issue. In this regard, the Debtor has not cooperated with the Trustee on even the most basic level, completely ignoring the Trustee's multiple requests for passwords and login information for the above-referenced accounts.[15] In essence, the Debtor has not made a reasonable effort to obtain the requested documents, nor really, any effort whatsoever.

12.     Similarly, with respect to the Debtor's bookkeeping and accounting records, it has not provided a single such record to the Trustee. However, in this instance as well, the Debtor has not stated, nor provided any evidence to indicate, that it has attempted even once to contact its former accountant and/or bookkeeper, RY CPA, LLC,[16] to obtain the Debtor's own business records or to request access thereto.

13.     Most incredible, however, is the nature of the documents the Debtor has claimed are not within its possession, custody or control: all of its QuickBooks records for 2021 through the present date; its contracts and any

---

[15] Further, at the September 8th 341(a) meeting, both the Trustee and the Bandis requested that the Trustee be provided with written authorizations permitting the Trustee to directly access the Debtor's QuickBooks accounts and the bank and credit card accounts the Debtor is claiming it cannot access. The Debtor has refused to provide those authorizations.

[16] RY CPA, LLC is listed as the Debtor's accountant and/or bookkeeper from mid-to-late 2021 through the present, in Official Form 207 of the Petition, at Part 13, Item 26.

correspondence with former subcontractors of the Debtor who may have owed the

Debtor receivables; statements for credit cards routinely used in the Debtor's

business; and the Debtor's payroll records for calendar year 2022, to name just

some. The Debtor has also refused to provide to the Trustee any additional state or

federal tax filings for calendar years 2020 and 2021, including the depreciation

schedules and all other forms, schedules, statements or other supporting documents

pertaining to and filed with the returns for those calendar years.[17]

14.      In other words, the Debtor, who is in the midst of chapter 7

proceedings, is alleging that it does not currently possess, nor is it able to access or

obtain, virtually any of what should be its ordinary business records. Is the Debtor

asking the Trustee and its unsecured creditors to believe that, as a matter of

practice during its eleven years in business managing hundreds of thousand of

dollars, it did not routinely maintain its business records? Or is the Debtor claiming

that once it was dissolved as an entity and its Petition was filed, it just disposed of

its records?

15.      The critical issue with the Debtor's failure to cooperate with the

Trustee is that the Debtor has not provided virtually any information evidencing its

financial condition over the last two years. Pertaining to calendar year 2022, the

year prior to the filing of the Petition and the year during which the Debtor was

---

[17] The basis for the Debtor's refusal to produce these tax records is not clear.

11

dissolved,[18] the Debtor's failure to produce documents is particularly egregious as it has not even produced the limited information contained in a Schedule C tax filing.[19] However, for both 2021 and 2022, the Debtor has failed to produce the vast majority of documents evidencing its financial transactions, such as its credit card statements and QuickBooks records. Based on the information the Debtor has provided to the Trustee to date, it is impossible to ascertain the true nature of the Debtor's financial condition.

16.     Obtaining the requested documents is fundamental to the fair and proper administration of this Case. In addition to not being forthcoming with respect to document production, it appears that the Debtor has not been entirely forthcoming in the schedules and statements contained in the Petition. The Debtor may have improperly failed to disclose all of its assets in the Petition, creating a misleading picture of its financial condition.[20] Potential undisclosed assets fall within the following three categories: (1) undisclosed cash assets; (2) undisclosed physical assets; and (3) unexplained or undocumented assets. The Debtor

---

[18] *See supra* footnote 6. Moreover, even in calendar year 2022, based on our knowledge and belief, the Debtor was not operational as a home remodeling business. It had laid off all of its field employees in November of 2021 and did not take on any new clients in 2022.

[19] The Debtor has not produced any of its income tax or employment tax filings for calendar year 2022 on the basis that the filings have not yet been made.

[20] At a minimum, based on documents produced thus far, testimony at the 341(a) meetings, information acquired during their previous arbitration with the Debtor, as well as on their personal knowledge and belief, the Bandis take issue with statements made in the following: Official Form 201, Items 13, 15 and 17; Official Form 202; Official Form 206Sum, Parts 1 and 2; Official Form 206 A/B, Parts 1, 3 and 8; Official Form 206 E/F, Part 2, 3.11 and Part 4; Official Form 207, Part 1, Item 1; Part 2, Item 4; Part 3, Item 7; Part 6, Item 13; Part 13, Items 25, 29, 30 and 31; and Part 14.

additionally did not disclose the existence of a sister entity, Srigley Development

Company, LLC,[21] with which the Debtor was seemingly under the common control

and ownership of Mr. Srigley, and with which the Debtor shared, or may have

shared assets. Given that the Debtor has claimed it has no physical assets other

than roughly $5,000.00 in tools and equipment no longer in its possession

(discussed in ¶ 18 *infra*) and that this Case has been positioned as one of "no

assets," investigating the nature of these shared assets is critical to understanding

certain reported expenses of the Debtor, including but not limited to its claimed

depreciation expenses of $32,931.00 and $66,857.00.[22]

      17.      Regarding the first category of assets, the Debtor disclosed in

the Petition a single Bank of America checking account (ending in 3252) with a

stated value of $0.00 (the "**Operating Account**").[23] The Bandis are aware of at

least *three* additional Bank of America accounts other than the Operating Account

in which the Debtor may have had an interest: one account into which funds

intended for the Debtor were received and two accounts into which funds from the

Debtor's Operating Account were transferred. The former account is Bank of

---

[21] Srigley Development Company, LLC, was a Maryland Limited Liability Company, which has been
dissolved and for which Articles of Cancellation were filed on May 2, 2023. *See* screenshots of Srigley
Development Company, LLC from https://egov.maryland.gov, attached in **Appendix A**.

[22] These are the deprecation and section 179 expense deductions reported on Line 13 of Part II of the
2020 and 2021 Debtor-related Schedule Cs. As the Debtor was allegedly a pass-through entity, it did not
directly file federal tax returns, but rather Mr. Srigley filed Schedule Cs relating to the Debtor for calendar
years 2020 and 2021.

[23] *See* Schedule A/B of the Petition, at Part 1, Item 1.

America checking account which Mr. Srigley held out to them as an account of the Debtor and into which, pursuant to Mr. Srigley's request, the Bandis made a wire transfer in the amount of $280,000.00.[24] The latter two accounts are a checking account described by the Debtor as an Owner's Draw account[25] and an unexplained savings account into which at least one sizable transfer from the Operating Account was made during the two-year period prior to the Petition Date. The ownership of all three of these accounts is unclear.

18.     With respect to category two, the only physical assets listed in the Petition are tools, equipment, and other personal property left in a warehouse previously leased by the Debtor, which the Debtor estimated in the Petition as having a current value of $5,000.00 ("**warehouse items**"). *See* Schedule A/B, at Part 8, Item 50. However, through discussion and testimony of Mr. Srigley at the 341(a) meetings, the Debtor revealed the potential existence of other assets which had not been disclosed in the Petition but in which the Debtor may have had an interest, specifically vehicles. The sparse information provided by the Debtor concerning the possibility of other physical assets does not shed light on their financing nor related expenses, nor does it provide any explanation as to how proceeds of any sale were used. It further does not clarify the disproportionate size

---

[24] The purpose of the wire transfer was an initial deposit for a home renovation contract between the Bandis and the Debtor, executed in March of 2021.

[25] This description was provided by the Debtor to the Bandis during the course of our arbitration proceedings. *See also* Operating Account activity relating to CHK 6857, attached in **Appendix A**.

of the Debtor's claimed depreciation expenses as compared to its claimed assets. *See* ¶ 16 *supra*. Again, additional investigation seems warranted.

19.        We also note that, as the warehouse items are the only assets the Debtor has declared, its failure to collect them from the warehouse suggests total disregard for the interests of its unsecured creditors. At the very least, the Debtor should have, of its own accord, removed its property from the premises, sold the warehouse items and used the proceeds to compensate, for example, the management company or warehouse owner for the Debtor's unpaid rent.[26] Incidentally, if the Debtor had collected $5,000.00 from the sale of the warehouse items (their value as estimated by the Debtor), the Debtor could not only have paid its outstanding rent, but also all of the debts owing to its next eight smallest unsecured creditors.[27] Instead, the Debtor burdened the already under-compensated warehouse owner and presumably forced it to bear additional costs. Similarly, to the best of our knowledge, no attempts were made by the Debtor to collect the receivables referenced in the Petition as of an "unknown" amount. This Debtor has

---

[26] *See* Investors Warren Street Limited Partnership v. Benjamin Srigley, et al. (Case No. D061LT23001080, filed January 23, 2023 in Rockville District Court, Montgomery County, Maryland) (this is a "failure to pay rent" action to commence eviction proceedings against Tenants/Defendants Touchstone Remodelers, LLC (the Debtor) and Benjamin Srigley; case status is closed). The Landlord/ Plaintiff, Investors Warren Street Limited Partnership and Kossow Management Corporation, the property manager, share the same principal office and resident agent and are presumably under common control. The Debtor has named Kossow Management Corporation as an unsecured creditor in 3.12 of Schedule E/ F of the Petition.

[27] As well as Kossow Management Corporation listed as 3.12, this includes unsecured creditors 3.1, 3.8, 3.9, 3.10, 3.13, 3.14, 3.15 and 3.16. This example is for illustrative purposes only. The Bandis are not suggesting that the Debtor should have made any improper transfers to creditors prior to filing its Petition.

abdicated all responsibilities toward its unsecured creditors. Consistent with this behavior, it has even abdicated its duty to be forthcoming with its unsecured creditors about its financial condition.

20.    As for category three, the Debtor indicated in the Petition that it may have certain accounts receivables, but that the amount was "Unknown." *See* Schedule A/B, at Part 3. Despite multiple requests for relevant documents and clarity on this issue, to date, the Debtor has not provided the dollar amount of this asset. We maintain that further inquiry is warranted to fully understand the facts, make a fair determination as to whether additional assets of the Debtor exist, and ensure that the interests of all of the unsecured creditors in this Case are protected.

21.    After more than 18 weeks of working diligently with the Debtor to voluntarily obtain meaningful information pertaining to its financial affairs, it has become clear to the Bandis that the Debtor is refusing to cooperate with the Trustee in the hope that the Case will be closed and its Petition granted without further investigation. To allow the Debtor to prevail in its strategy would harm its unsecured creditors.

22.    Importantly, by refusing repeatedly to produce the records requested by the Trustee, records which should reasonably have been maintained by the Debtor in the ordinary course of business, let alone for its pending chapter 7

proceeding, the Debtor is forcing the Bandis and third party non-Debtor entities, as well as this Court, to bear the cost and burden of discovery.

23.     However, its unsecured creditors did not choose to benefit from the bankruptcy laws; the Debtor made that choice. The Debtor sought the protections of the bankruptcy laws and should bear at least some burden of establishing that its acts and conduct, assets (or lack thereof) and liabilities, and state of its financial affairs merit such relief. Instead, the Debtor has refused to comply with the obligations prescribed by the bankruptcy laws. Given the Debtor's refusal to cooperate, the Bandis have no alternative but to pursue this Motion.

### BASIS FOR RELIEF

A.     Legal Standard to Obtain Discovery Under Rule 2004

24.     Rule 2004 provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. § 2004(a). While in this instance the discovery sought by the Bandis is narrowly tailored, it is well established that the scope of an examination under Rule 2004 is unfettered and broad. *In re GHR Energy Corp.*, 33 B.R. 451, 453 (Bankr. D. Mass. 1983); *see also In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. E.D. Wis. 1984). Indeed, the examination can be "in the nature of a fishing expedition." *See In Re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983) and cases cited therein. *See also In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991).

25.      "The purpose of a Rule 2004 examination is 'to show the condition of the estate and to enable the Court to discover its extent and whereabouts, and to come into possession of it, that the rights of the creditor may be preserved.'" *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (*citing Cameron v. United States*, 231 U.S. 710, 717 (1914)). "Rule 2004 necessarily permits a broad investigation into the financial affairs of debtors to assure the proper administration of bankruptcy estates." *In re Symington*, 209 B.R. 678, 683-684 (Bankr. D. Md. 1997) (citations omitted). "Its obvious purposes are the discovery of assets of the estate and the exposure of fraudulent conduct." *Id.* at 684 (*citing In re Foerst;* 93 F. 190 (S.D.N.Y. 1899)). *See also In re Kelton*, 389 B.R. 812, 820 (Bankr. S.D. Ga. 2008) (*citing In re Enron Corp.,* 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (internal quotations and citations omitted)) (The primary purpose of a Rule 2004 examination is for 'revealing the nature and extent of the bankruptcy estate, and for discovering assets, examining transactions, and determining whether wrongdoing has occurred.'). Accordingly, examinations under Rule 2004 may be used to obtain information relating to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate." *See* Fed. R. Bank. P. 2004(b).

26.      Any party in interest may conduct an examination under Rule

2004, not solely the Trustee. *See In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514

(Bankr. E.D.N.Y. 1991) (*citing In re Summit Corp.,* 891 F.2d 1 (1st Cir. 1989)). *See*

*also In re Mittco, Inc.,* 44 B.R. 35, 37 (Bankr. E.D. Wis. 1984). Although it is not

explicitly defined in the Bankruptcy Code, section 1109(b) applies the term "party

in interest" to creditors. *See* 11 U.S.C. § 1109(b) ("A party in interest, including the

debtor, the trustee, a creditors' committee, an equity security holders' committee, *a*

*creditor*, an equity security holder, or any indenture trustee, may raise and may

appear and be heard on any issue in a case under this chapter.") (*emphasis added*).

*See also* 9 COLLIER ON BANKRUPTCY ¶ 2004.02[6] (Alan N. Resnick & Henry J.

Sommer eds., 16th ed. 2018) ("Parties in interest generally include the trustee,

creditors, the debtor and entities related to the debtor, and persons obligated to the

debtor.")

27.      Moreover, investigations under Rule 2004 are not limited to

examinations of a debtor. "Because the purpose of the Rule 2004 investigation is to

aid in the discovery of assets, any third party who can be shown to have a

relationship with the debtor can be made subject to a Rule 2004 investigation." *In*

*re Ionosphere Clubs, Inc.,* 156 B.R. 414, 432 (S.D.N.Y. 1993), *affd,* 17 F.3d 600

(2d Cir. 1994). *See also In re Mittco Inc.,* 44 B.R. 35 (Bankr. E.D. Wis. 1984)

19

(permitting creditor to conduct Rule 2004 discovery of debtor's accountant to investigate the possibility of obtaining assets for the benefit of the bankruptcy estate); *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016) ("Potential examinees include 'third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate'") (*citations omitted*).

28.      The decision to grant or deny a discovery request pursuant to Bankruptcy Rule 2004 rests within the discretion of the bankruptcy court. *See, e.g., In re Hammond*, 140 B.R. 197, 200 (Bankr. S.D. Ohio 1992). Courts authorize discovery under Rule 2004 to assist in recovering assets for the benefit of a debtor's creditors. *See In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983).

**B.      Application of Rule 2004 to the Present Facts**

29.      In the instant case, the discovery sought by the Bandis falls squarely within the scope of Rule 2004 because it directly relates to the acts or conduct of the Debtor, to any property owned by the Debtor, to its liabilities, and to the financial condition of the Debtor. As creditors of the Debtor, the Bandis are parties in interest and have standing to pursue this Motion.

30.      The Bandis are not making broad and unfettered discovery requests, even though such exploratory discovery is within the scope of Rule

2004.[28] Instead, the Bandis have sought to limit discovery to those requests

consistent with or very closely related to those previously made by the Trustee to

the Debtor, with which the Debtor did not comply. The Bandis would additionally

like to examine the Debtor under oath with respect to the requested documents.

The form subpoena attached hereto as **Exhibit A** sets forth the requests to the

Debtor. As discussed below, the Bandis strongly believe that it is the Debtor's

responsibility to produce the documents requested. However, in the event of further

noncompliance on the part of the Debtor, the Bandis would like to request any

documents that the Debtor fails to produce from certain non-Debtor entities with

which the Debtor had business relationships, as set forth in the form subpoena

attached as **Exhibit B**.

      31.     As discussed above, the Bandis have strong reasons to believe

that the Debtor did not disclose all of its assets in the Petition. Their purpose in

seeking such discovery is to determine whether any assets of the Debtor are not

accounted for or are otherwise undisclosed in order to determine potential claims

which may exist for the purpose of securing additional assets for the benefit of the

bankruptcy estate and its unsecured creditors. The Bandis further assert that the

information they seek is the minimum necessary to reasonably evaluate the

Debtor's financial condition, and to determine if any such assets or potential claims

---

[28] *See In re GHR Energy Corp.*, 33 B.R. 451, 453 (Bankr. D. Mass. 1983)(recognizing the established scope of a Rule 2004 examination as unfettered and broad).

thereto exist. Under Rule 2004, a creditor may investigate the circumstances

surrounding the financial affairs of the Debtor. *See In re Symington*, 209 B.R. at

683-684 (recognizing that legitimate goals of Rule 2004 examinations include

discovering assets, examining transactions, and determining whether fraudulent

conduct has occurred). In this regard, the Bandis seek to request the production of

documents from, and to depose the Debtor. *See* attached **Exhibit A**.

32.      In addition, if the Debtor fails to produce the documents

requested as indicated in **Exhibit A**, the Bandis seek an order for the production of

those documents, attached hereto as **Exhibit B**, from certain non-Debtor entities

with whom the Debtor had business relationships, only as necessary, to minimize

the burden and cost on these third parties. These non-Debtor entities are: American

Express National Bank, Bank of America, N.A., and Capital One, N.A.,[29] as well

as Intuit Inc.[30] and RY CPA, LLC (or its successor).[31] All of the documents sought

from these non-Debtor entities are limited in scope to records kept within the

ordinary course of business by the relevant entities. As the Court will note, the

---

[29] American Express National Bank, Bank of America, N.A., and Capital One, N.A. are the issuers of credit card accounts (and in the case of Bank of America, N.A., financial accounts) in which the Debtor has or had an interest. All three of these entities are also listed as unsecured creditors in Schedule E/F of the Petition (at 3.2, 3.3, 3.4, 3.5 and 3.7) and as such, are also parties in interest to this Case.

[30] The Debtor had a business relationship with Intuit Inc. as the owner of the QuickBooks platform and related account in which the Debtor had an interest.

[31] We believe that RY CPA, LLC may currently be doing business as OneSource by Aldridge Borden & Company following a 2023 merger of the two entities.

proposed subpoenas in **Exhibit B** request information which is a small subset of that requested from the Debtor.

## JURISDICTION

33.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are Bankruptcy Rule 2004 and Local Rule 2004-1.

## NOTICE

34.    Notice of this Motion has been served upon the following parties: (i) the Debtor; (ii) the Debtor's counsel; (iii) the Trustee; (iv) the Office of the United States Trustee for Region 4: Eastern District of Virginia (Alexandria Division) and the District of Columbia; and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1. In light of the nature of the relief requested herein, the Bandis submit that such notice is adequate and sufficient and that no other or further notice is necessary. The Bandis reserve their right to seek additional discovery from any individual or entity.

A copy of the Notice and Opportunity to Object is attached hereto as **Exhibit D**.

No prior request for the relief sought in this Motion has been made to this or to any other Court.

## **CONCLUSION**

WHEREFORE, the Bandis respectfully request that this Court grant this Motion in its entirety and enter an order substantially in the form attached hereto as **Exhibit C**, permitting the following:

(i)      the Bandis may issue the subpoenas attached hereto as **Exhibit A** and **Exhibit B** ("**Subpoenas**") requiring the Debtor and related non-Debtor entities to produce documents responsive to the document requests contained in the Subpoenas within 30 days after service of such Subpoenas;

(ii)      the Bandis may serve additional subpoenas seeking documents that are related to the topics set forth in this 2004 Motion, provided that the recipient of any such subpoena within fourteen (14) days of receipt may seek a protective order if such recipient asserts that the requests contained in such additional subpoena are beyond the scope of Rule 2004;

(iii)      the Bandis may schedule an oral examination of the Debtor on the topics set forth in the subpoena attached as **Exhibit A** to occur in person or by remote video means, e.g., Zoom (as may be mutually agreed upon by the Bandis and the Debtor) within thirty (30) days of service of such Subpoena (or such date as may be mutually agreed upon by the parties), with the parties to meet

and confer within seven (7) days of service of the Subpoena to schedule the date of

the examination and to finalize its location; and

               (iv)       granting such other and further relief to the Bandis as

this Court deems appropriate.

Dated:     October 18, 2023
           Washington, DC

Respectfully submitted by:

FEDERICO M. BANDI
3606 Chesapeake Street, NW
Washington, DC. 20008
Telephone: 773-612-4163
Email: fbandi1@jhu.edu

-and-

ANGELA M. BANDI
3606 Chesapeake Street, NW
Washington, DC. 20008
Telephone: 773-620-1932
Email: angela.bandi@yahoo.com

*Filing Pro Se*