Federico M. Bandi
Angela M. Bandi
3606 Chesapeake Street, NW
Washington, DC 20008
Telephone: 773.620.1932
Email: fbandi1@jhu.edu
        angela.bandi@yahoo.com

*Unsecured Judgment Creditors of*
*Touchstone Remodelers, LLC, filing Pro Se*



FILED

OCT 17 2024

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| In re: | | Case No. 23-00116-ELG |
| TOUCHSTONE REMODELERS, LLC, | | Chapter 7 |
| Debtor. | | |

**MOTION FOR AN ORDER GRANTING DERIVATIVE STANDING TO PROSECUTE
ON BEHALF OF THE ESTATE, CLAIMS AGAINST THE DEBTOR,
BENJAMIN ROBERT SRIGLEY, CYNTHIA TYBURCZY SRIGLEY,
AND SRIGLEY DEVELOPMENT COMPANY, LLC**

Federico M. Bandi and Angela M. Bandi (jointly, the "**Bandis**"), unsecured judgment

creditors of Touchstone Remodelers, LLC (the "**Debtor**") in the above-captioned case (the

"**Case**") under Chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**"), hereby

move this Court (the "**Motion**") for entry of an order authorizing derivative standing so that the

Bandis may prosecute, on behalf of the estate, claims against the Debtor, its current or former

owners, members and officers, Benjamin Robert Srigley and Cynthia Tyburczy Srigley, and its

apparent subsidiary or sister entity, Srigley Development Company, LLC ("**Srigley**

**Development Company**"). Such claims include, but are not limited to, avoidance of fraudulent

transfers pursuant to sections 544(b), 548(a)(1) and 550 of the Bankruptcy Code and pursuant to

D.C. Code § 28-3104(a), and other applicable federal and state statutory and common law

claims, as well as equitable remedies such as alter ego liability. In support of the Motion, the

Bandis respectfully state as follows:

## RELEVANT BACKGROUND

1.        On April 28, 2023 (the "**Petition Date**"), the Debtor filed a voluntary

petition for relief under Chapter 7 of the Bankruptcy Code (the "**Petition**"), and William Douglas

White was appointed to serve as the Chapter 7 trustee in the Case (the "**Trustee**"). The Debtor's

commencement of the Case as of the Petition Date created an estate (the "**Estate**"). *See* 11

U.S.C. § 541(a). Notice was provided on Official Form 309C and no proof of claim deadline was

initially set. A proof of claim deadline was later set for July 1, 2024.[1]

2.        As of the date of this Motion, the Case has been pending for more than 17

months. To the best of our knowledge, the Trustee has not taken any steps to pursue any action in

this Case for the purpose of recovering assets for the Estate.

3.        At the outset of the Case, both prior to and subsequent to the initial

meeting of creditors required by section 341(a) of the Bankruptcy Code and Bankruptcy Rule

2003 and held on June 1, 2023 (the "**Initial 341(a) Meeting**"), we provided the Trustee with

documentary evidence supporting our concerns that certain information contained in, or omitted

from, the Petition painted a misleading picture of the Debtor's financial situation in the several

years prior to its filing for bankruptcy. A true and correct copy of the statement we provided to

---

[1] The Bandis filed a proof of claim in the Case on June 25, 2024, reporting the amount as $954,928.26,
upon which post-judgment interest continues to accrue.

the Trustee prior to the Initial 341(a) Meeting, including exhibits and related correspondence, is

attached in **Appendix A** (the "**May 31, 2023 Statement**").

4.          Such information included, but was not limited to: the fact that the

Debtor's assets were very likely used in connection with the ownership and operation of a 1981

Mooney M20K aircraft (serial no. 25-0598; registration no. N233JB) (the "**M20K Aircraft**");

the existence of Srigley Development Company, which was the apparent former registered owner

of the M20K Aircraft and likely subsidiary or sister entity of the Debtor; the potential existence

of at least one other checking account owned by the Debtor that was not disclosed in the Petition;

and the fact that the Debtor likely had (or had within the two years prior to the Petition Date)

another owner, member and manager, Cynthia Srigley.

5.          Immediately after the Initial § 341(a) Meeting, we provided the Trustee

with a second written statement, informing him that certain testimony of Benjamin Srigley[2] at

the meeting both supported the concerns contained in our May 31, 2023 Statement and raised a

host of new issues, all of which required further investigation to ensure that the interests of

creditors were protected. The statement and related correspondence we sent to the Trustee after

hearing Mr. Srigley's testimony at the Initial 341(a) Meeting is attached in **Appendix B** (the

"**June 5, 2023 Statement**").

6.          In addition to the initial written concerns we expressed to the Trustee,

during the § 341(a) meeting process, we continued to voice our suspicions that potential

wrongdoing and fraud existed in this Case, both in writing and verbally. We had at least three

---

[2] Mr. Srigley was the Chief Executive Officer and founder of the Debtor, and at the time the Petition was
filed, represented himself as its sole managing member, officer and authorized representative. *See* Petition
at Official Form 201, Item 17; Debtor's Resolution; Official Form 202; Official Form 207, Part 14;
Exhibit 15 to May 31, 2023 Statement, attached in **Appendix A**.

private telephone conversations with him, on or about June 28, 2023, August 7, 2023 and

September 6, 2023, each of which roughly coincided with the dates of the multiple § 341(a)

meetings.[3]

7.       So, from the very beginning of this Case we informed the Trustee that we

strongly suspected wrongdoing on the part of the Debtor, or rather, by its current or former

owners, members and officers, Benjamin Srigley and Cynthia Srigley,[4] to include the fraudulent

transfer of assets out of the Debtor, and potentially more serious offenses. Throughout the

process, bolstered by the receipt of additional documentary evidence, we have continued to

apprise the Trustee accordingly.

8.       As discussed *infra*, and in our proposed draft complaint, attached hereto in

**Appendix C** (the "**Draft Complaint**"), further discovery has only served to strengthen our

conviction that colorable claims of wrongdoing and fraud against the Srigleys, the Debtor and

Srigley Development Company exist.

9.       Since the filing of the Petition, it has been an uphill battle gathering facts

and information from the Debtor in this Case, who has refused to comply with its duty to

cooperate with the Trustee, and "to surrender to the trustee all property of the estate and any

---

[3] The Initial § 341(a) Meeting was continued three times: (i) to July 11, 2023 (the meeting was not held since no documents had been produced); (ii) to August 9, 2023 (Mr. Srigley did not attend the meeting; only the Debtor's counsel attended on the Debtor's behalf); and (iii) to September 8, 2023. A "conference call" was then held on October 6, 2023, to which Mr. Srigley was a party, but was not obliged to testify under oath (despite our objection to the contrary, a § 341(a) meeting was not held due to the refusal of the Debtor's counsel and the Trustee's compliance). *See Motion for Entry of an Order Pursuant to Rule 2004 Authorizing Examinations and for the Production of Documents*, filed on October 18, 2023, at p.5.

[4] In addition to being an owner of the Debtor, Cynthia Srigley held various positions with the Debtor at relevant times herein: she was the Chief Operations Officer from May of 2021 through the end of December 2021, the Director of Business Development (unofficial) from August of 2019 to May of 2021, and the Office Manager from December of 2021 to May of 2021. *See* May 31, 2023 Statement, at pp. 11-13, attached in **Appendix A**.

recorded information, including books, documents, records, and papers, relating to property of

the estate." *See* 11 U.S.C. §§ 521(a)(3) and (4). The facts are described in detail in our *Motion*

*for Entry of an Order Pursuant to Rule 2004 Authorizing Examinations and for the Production of*

*Documents*, filed on October 18, 2023 (the "**Rule 2004 Motion**"), so we will not revisit all of

them here.

        10.       That said, the Debtor did eventually produce a limited number of the

documents requested by the Trustee during the § 341(a) meeting process, including a portion of

the requested bank and credit card statements and the Debtor's 2020 and 2021 Schedule Cs.

Among other oddities, these documents evidenced that within the two-year period prior to the

Petition Date:

    (i)     approximately $141,410.38 in cash assets were apparently either withdrawn or transferred from the Debtor's Bank of America, N.A. checking account ending in 3252 (the "**Operating Account**"), which was the sole cash account disclosed in the Petition, to accounts not listed in the Petition and not likely owned by the Debtor, namely Bank of America, N.A. checking account ending in 6857 and Bank of America, N.A. savings account ending in 6378;

    (ii)    the Debtor's assets were apparently used to finance and maintain the M20K Aircraft not listed in the Petition. For example, at least four checks of $647.03 each, totaling $2,588.12, made out to US Aircraft Finance and two checks totaling $2,337.00 made out to US Aircraft Insurance were disbursed and paid from the Operating Account, and a charge in the amount of $339.86 to Aerox Aviation Oxygen was made from the Debtor's Bank of America Business Advantage credit card account ending in 9400 ("**BofA 9400**");[5]

---

[5] In our May 31, 2023 Statement, we informed the Trustee of other potential expenses relating to the M20K and likely paid for by the Debtor. These were payments to Air Power, Aircraft Owners, Banyan Air Services, Foreflight LLC, Seven Rivers Aviation and Skyport Services. After receiving documents from American Express National Bank in response to our Rule 2004 Subpoena, we determined that these charges were made using the Debtor's American Express "Business Platinum Card" account ending in 02002 ("**AmEx 02002**"). Notably, other than the October 2022 statement for this account (showing no new charges), the Debtor refused to turn over its AmEx 02002 statements.

(iii)   the signatory of checks written from the Operating Account less than nine months prior to the Petition Date was not Benjamin Srigley, but rather Cynthia Srigley, who was not disclosed in the Petition as either a current or former officer, director, managing member, general partner, member in control, or shareholder of the Debtor; and

(iv)   substantial depreciation expense deductions were claimed in the Debtor's 2020 and 2021 Schedule Cs filed with the Srigleys'[6] federal , $32,931.00 and $66,857.00 respectively. Yet, according to the Petition, the only fixtures, furniture, machinery, equipment or vehicles owned or leased by the Debtor were $5,000.00 in miscellaneous tools allegedly left at the Debtor's former warehouse address to which it no longer had access. In other words, the Schedule Cs evidenced a distinct discrepancy between the high level of depreciation expense deductions taken in 2020 and 2021 and the Debtor's claim in the Petition that it had no assets.

11.      The facts contained in these documents should have raised red flags, prompting further investigation by the Trustee, particularly combined with the facts and allegations described in our May 31 and June 5 Statements and with Mr. Srigley's own testimony at the § 341(a) meetings and generally obstructive behavior. Still, to the best of our knowledge, the Trustee took no further action to obtain from the Debtor the additional information needed to investigate its financial affairs.

12.      Instead, on October 18, 2023, we filed with this Court the Rule 2004 Motion, subsequently amended.[7] Prior to filing the Rule 2004 Motion, we asked the Trustee if he would be interested in joining us in the motion. He declined to do so.

13.      On January 24, 2024, this Court held a hearing on the Rule 2004 Motion. The Trustee did not attend.

---

[6] As we have not seen the full tax returns, we are relying on the Trustee's verbal representations that the 2020 and 2021 federal tax returns were filed jointly by the Srigleys (rather than solely by Mr. Srigley).

[7] *See Motion to Amend Motion for Entry of an Order Pursuant to Rule 2004 Authorizing Examinations and for the Production of Documents to Revise Certificate of Service, to Extend the Date upon which Objection to Motion Must Be Filed, and to Add Signature Page and Service List to Proposed Order*, filed October 23, 2023 (the "**Motion to Amend**").

14.     The Court granted our amended Rule 2004 Motion in part on January 25,

2024, authorizing us to issue a Subpoena for Rule 2004 Examination on the Debtor (the "**Rule

2004 Subpoena**"). On March 21, 2024, the Court granted the motion in full, authorizing us to

issue Rule 2004 subpoenas duces tecum on certain relevant third party entities.

15.     We attempted to conduct a Rule 2004 examination of the Debtor, but the

Debtor continued its practice of obstruction by refusing to cooperate with us in scheduling the

deposition.[8] Similarly, the Debtor refused to produce any documents in response to the requests

contained in the Rule 2004 Subpoena nor provide any explanation for not producing them. In

short, the Debtor ignored the Rule 2004 Subpoena altogether.

16.     Despite the Debtor's continued obstruction, we were able to obtain a

number of the documents requested from the Debtor in the Rule 2004 Subpoena from third party

entities. Once again, the additional documentary evidence we amassed from these third party

subpoena responses only strengthened our suspicions that this is a case of fraud, or at the very

least, one of serious wrongdoing, which has caused substantial harm to the Debtor's creditors.

17.     Since filing the Rule 2004 Motion, we have learned that none of the

addresses contained in the Petition for either the Debtor or for Benjamin Srigley, as "Managing

Member" and "Sole Member" of the Debtor, appear to be currently valid: neither the address for

the Debtor's principal place of business nor the location of its principal assets (both stated in

---

[8] *See* true and correct copy of email correspondence between Federico Bandi and Maurice VerStandig,
regarding "Deposition of Touchstone Remodelers, LLC - Case Number 23-00116-ELG," dated March 19,
2024 through April 7, 2024, attached in **Appendix D**.

Official Form 201, Item 4), and not Mr. Srigley's address as stated in Official Form 207.[9] We

have not received any notification that the Petition has been revised or amended to correct or

change the Debtor's address, as required by Rule 4002(a)(5) of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") and Local Rule 4002-1 of the United States Bankruptcy

Court for the District of Columbia (the "**Local Rules**"), nor any notification that the Debtor has

designated any other address in any other filed writing relating to this Case.

18.     As we have no reason to believe the Trustee has any intention of filing an

adversary action in this Case, on July 5, 2024, we requested from him in writing, consent for

derivative standing to file a complaint against the Srigleys and the Debtor (the "**July 5, 2024

Request for Consent**").[10]

19.     In the July 5, 2024 Request for Consent, we informed the Trustee that we

would be pursuing claims that would advance the interests of the entire Estate, not solely our

personal interests, and that the claims included, but were not necessarily limited to, the

following: avoidance of fraudulent transfers under 11 U.S.C. § 548(a); avoidance of fraudulent

transfers under D.C. Code §§ 28-3101, *et seq.*; breach of fiduciary duties to the Debtor pursuant

to D.C. Code § 29-804.09, and other applicable provisions of the Uniform Limited Liability

---

[9] *See* Motion to Amend at ¶1; *see also Affidavit of Non-Service*, signed by Vincent Buckey, Process
Server, dated March 27, 2024 (filed on April 1, 2024). According to the Affidavit of Non-Service, "all
reasonable inquiries suggest the defendant moved to an undetermined address… [no] forwarding
information available for Srigley." Mr. Buckey was equally unsuccessful in finding a home address in
South Carolina for the Srigleys using a skip trace. We additionally reached out to Debtor's counsel to
confirm Mr. Srigley's correct address, but never received a response from him. *See* true and correct copy
of email correspondence from Angela Bandi to Maurice Verstandig dated February 14, 2024 (Zillow
screenshots attached to correspondence omitted), attached in **Appendix D**.

[10] *See* true and correct copy of July 5, 2024 letter and related email correspondence from Angela Bandi to
William Douglas White, attached in **Appendix E**.

Company Act of 2010, D.C. Code §29-801.01, *et seq.*; and any other applicable federal or state common law claims, as well as equitable remedies such as alter ego liability.

20.    We shared with the Trustee that we had identified potentially avoidable fraudulent transfers of not less than $223,736.30 made during the two-year period prior to the Petition Date which included the following categories: (1) $141,410.38 in cash withdrawals or transfers made from the Operating Account to accounts apparently not owned by the Debtor; (2) $43,589.29 in credit card charges or payments made out of the Operating Account for the Srigleys' personal expenses or those of Srigley Development Company (the majority of which related to the M20K Aircraft); and (3) $38,736.63 in net proceeds from the sale of the M20K Aircraft, which was purchased, financed and maintained using the Debtor's cash assets.

21.    We further informed the Trustee that, applying the four-year "look back" period applicable to fraudulent conveyances pursuant to District of Columbia law, we had identified an additional $246,163.78[11] in potentially avoidable fraudulent transfers, for a sum total of $469,900.08.

22.    We explained to the Trustee that the overarching basis for recovery on behalf of the Estate is that the Srigleys were the alter egos of the Debtor, and that the Debtor was a sham used by the Srigleys to disguise their fraudulent or otherwise wrongful conduct. "The Srigleys, who exercised complete day to day operational and financial control of and domination over the entity, inadequately capitalized the Debtor, such that it was in a persistent state of insolvency; they extensively commingled assets; they shielded the Debtor's assets from creditors

---

[11] We only have a limited portion of the relevant documents for the period from April 28, 2019 through April 28, 2021, none of which recorded behavior which occurred more than 3 years and 4 months prior to the Petition Date.

by fraudulently transferring assets to themselves; they did not bother to maintain corporate formalities or deal with the Debtor at arm's length, as they viewed the Debtor as an extension of themselves." *See* July 5, 2024 Request for Consent at 3, attached in **Appendix E**. We noted that the Srigleys took all of these actions for their sole personal financial benefit and enjoyment, and at the same time, caused substantial financial injury to the Debtor's creditors.

23.       Finally, we stated our belief to the Trustee that the Srigleys' potentially fraudulent behavior included taking out additional credit in the Debtor's name with full knowledge and understanding that the Debtor no longer had incoming revenue, the means to obtain new revenue, or any other means of repaying its debt, as well as potential tax improprieties. *See id.* at 3.

24.       On July 28, 2024, the Trustee responded to our July 5, 2024 Request for Consent, indicating that he had "identified several issues on these questions." Among the eight points he listed in his response were the following suggestions:

(i)    that "[t]he estate could seek to transfer or sell certain causes of action under Section 363(b) of the Bankruptcy Code to a creditor";

(ii)   had we "considered at all that [we] might be willing to fund the efforts of the bankruptcy estate to file an avoidance action"; and

(iii)  that "[a]nother option could be to employ you under Section 327(c) of the Bankruptcy Code to authorize you to act as special counsel (as a member of the D.C. bar) for the bankruptcy estate to bring avoidance actions. It is unclear if this approach however could run into an objection because you could be argued as a counsel representing yourself."[12]

25.       As in our previous communications, the Trustee's July 28th email curiously did not address the substance of our potential claims against the Debtor and the

---

[12] *See* true and correct copy of July 28, 2024 email correspondence from William Douglas White to Angela Bandi and Federico Bandi, attached in **Appendix E**.

Srigleys. He also did not state whether he was willing to consent to our request or whether he

refused to consent.

26.       On August 10, 2024, we responded to the issues raised by the Trustee in

his July 28th email and asked him whether he intended to bring any claims in this Case or

whether he had decided to abandon all assets and claims of the Estate. We expressed our belief

that our approach would be the most efficient and cost-effective option for the Estate to fairly

resolve the bankruptcy proceedings and that our goal was to recover assets for the benefit of the

entire Estate. We reiterated our request that he consent to our filing a complaint in this Case,

explaining that our next step would be to file a motion with this Court to formally request

derivative standing. [13]

27.       With respect to the three options suggested by the Trustee, described *supra*

in ¶ 24, we explained again to him that we would not be hiring an attorney, but that we would be

representing ourselves *pro se*; we would not be requesting compensation for attorney's fees from

the Estate, [14] and thus, at effectively no cost to the Estate, we would bear the burden of litigation

for the benefit of all creditors. Given the necessary hours of document review alone, the cost of

funding an attorney for the Estate would almost certainly be at or near the six-figure range. So,

the Trustee's suggestion that we fund an attorney for the Estate would not maximize the benefit

to the Estate, as (assuming judgment in our favor) the cost of such attorney's fees would

---

[13] *See* true and correct copy of August 10, 2024 email correspondence from Angela Bandi to William
Douglas White, attached in **Appendix E**.

[14] Presuming we prevail in litigation and the Court agrees, we may request compensation for minor costs
allowable under section 503(b)(3)(B) of the Bankruptcy Code.

dramatically reduce the size of the Estate available for distribution.[15]

28.       Similarly, with respect to the Trustee's proposal that we purchase causes of action from the Estate (or that they are somehow transferred to us), we pointed out that he did not provide sufficient detail as to how this would work, how the causes of action would be priced, whether an auction would be held, etc. In any case, we explained that we were not interested in buying causes of action from the Estate, but rather that we were proposing to spend substantial amounts of our personal time and resources in pursuit of litigation to recover assets for the benefit of the entire Estate.

29.       As to the option raised by the Trustee that we be employed as special counsel for the Estate, we assume he is referring to Angela Bandi, who has a law degree. Mrs. Bandi left her position as an in-house securities lawyer in 2008 and is not currently practicing law. She is not a member of the District of Columbia Bar, nor is she currently admitted to practice before the United States District Court for the District of Columbia or any other court. In addition to potential conflicts of interest that may be raised by other creditors or that may disadvantage the Bandis, the requirements of Local Rule 2090-1 would seem to render this question moot. Indeed, this subject came up during our first or second telephone conversation with the Trustee and he immediately dismissed the possibility. We are not sure why he is continuing to raise this issue. *See* ¶ 33, *infra*.

30.       As we had not yet received a definitive response from the Trustee, on August 23, 2024, we again followed up with him regarding our request for consent.[16]

---

[15] Of course, if we do not prevail, the Trustee's suggestion would mean that we, a family who is owed more than $950,000.00 from by the Debtor, would bear the entire additional cost of the attorney's fees.

[16] *See* true and correct copy of August 23, 2024 email correspondence from Federico Bandi to William Douglas White, attached in **Appendix E**.

31.     On September 13, 2024, the Trustee responded.[17] Once again, he side-stepped the issue and declined to state explicitly whether he was willing to consent to derivative standing or whether he refused to do so. He did indicate that "[his] understanding from the Office of the U.S. Trustee [was] that currently the use of derivative standing is not permitted in cases in the District of Columbia." In addition, he did not explicitly state whether he would or would not be bringing any action in this Case.

32.     Strangely, in his September 13th email, the Trustee said that he recalled that he "did not find assets that [he] thought would be of value to the estate except for any undisclosed assets or avoidance actions that you all might identify pursuant to the 2004 discovery." However, as discussed in ¶¶ 10-11 *supra*, the existence of $146,675.36 in transfers of cash or other value and the existence of the M20K Aircraft, as well as oddities in the Debtor's depreciation expense deduction claims in its Schedule Cs were all apparent in documents the Trustee possessed at the time of the § 341(a) meetings,[18] well before our 2004 discovery had commenced.

33.     Also in his September 13th email, he again raised the possibility of a special counsel appointment, stating, "you indicated that you did not want to pursue an appointment of special counsel" and asking us to let him know "if you decide to pursue a special counsel role." It is not clear whether he is referring to Mrs. Bandi acting as special counsel or to his suggestion that we fund an attorney for the Estate. In any case, neither is a viable option. *See* discussion in ¶¶ 27 and 29, *supra*.

---

[17] *See* true and correct copy of September 13, 2024 email correspondence from William Douglas White to Angela Bandi and Federico Bandi, attached in **Appendix E**.

[18] Even if the Trustee had not examined the documents, our own communications with him during the § 341(a) meeting process conveyed similar information.

34.    The Debtor and the Srigleys do not want to be held accountable for the impact of their actions on the Debtor's creditors. They have not been remotely forthcoming during this Case, not even with respect to providing a currently accurate address for the Debtor. Rather, they have acted with complete and total disregard of and disrespect for the bankruptcy process, using it as a shield for the Debtor's and their bad behavior.

35.    We strongly believe that the interests of equity require further action in this Case so that assets may be collected from the Srigleys for the benefit of the Estate and for appropriate distribution to the Debtor's unpaid creditors.

36.    Again, based on our experience in this Case, we have received no indication to believe that the Trustee independently intends to pursue any of the potential claims which exist for the benefit of the Estate and its unsecured creditors. It is not clear to us what else needs to take place before the Trustee takes action of his own accord. Given the Trustee's inaction, we have no alternative but to pursue this Motion.

37.    As we stated to the Trustee in our July 5, 2024 Request for Consent, we are particularly familiar with the facts of this Case and with the relevant parties to an eventual adversary proceeding. As such, we are in a unique position to bring an action addressing the claims described in this Motion and in our Draft Complaint.

38.    Moreover, we would be pursuing this action in a *pro se* capacity, so potential costs to the Estate would be minimal to none.

39.    As we believe the action we intend to bring would be "in the best interest of the bankruptcy estate" and "necessary and beneficial to the fair and efficient resolution of the

14

bankruptcy proceedings",[19] we are requesting that this Court grant us derivative standing to

allow us to step into the shoes of the Trustee and file an adversary complaint against the Srigleys,

the Debtor, and Srigley Development Company, in a form substantially similar to our Draft

Complaint, attached hereto in **Appendix C**.

## BASIS FOR RELIEF

### A.    Legal Standard for Authorizing Derivative Standing

40.    We realize that, pursuant to Chapter 5 of the Bankruptcy Code,

"[t]ypically, only the trustee of a bankruptcy estate has standing to pursue claims on behalf of the

bankruptcy debtor." *Plan Committee v. PricewaterhouseCoopers LLP*, Civ. No. 02-01487 (TFH)

at 11 (D.D.C. Apr. 20, 2007) (citing *Plan Committee v. Pricewaterhouse Coopers, LLP*, 335 B.R.

234, 242 (D.D.C. 2005) (other citations omitted).[20] *See also* 11 U.S.C. § 323(b) ("The trustee in a

case under this title has capacity to sue and be sued."); 11 U.S.C. § 541, *et seq.*

41.    However, as an exception to this general rule, some circuits[21] have

interpreted the Bankruptcy Code and the equitable purposes of bankruptcy law to authorize

derivative standing on creditors' committees and individual creditors under certain limited

circumstances, thus allowing the creditor to bring claims in place of the trustee. *See Plan*

---

[19] *See In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001). *See also In re Baltimore Emergency Services II, Corp.*, 432 F.3d 557, 561 (4th Cir. 2005); *Plan Committee v. PricewaterhouseCoopers LLP*, Civ. No. 02-01487 (TFH) at 11-12 (D.D.C. Apr. 20, 2007).

[20] Two cases in this Court have recognized that courts have authorized creditors to pursue a trustee's avoidance claims using a theory of derivative standing. While derivative standing was not ultimately granted, the facts in these cases differed from those at issue in this Case. *See In re Smith*, No. 04-01581, 2006 WL 1234965 (Bankr. D.D.C. Feb. 27, 2006) (finding, *inter alia*, that derivative standing was not appropriate where Chapter 7 creditor had not first sought approval from the bankruptcy court); *In re Yelverton*, Case No. 09-00414, 2012 WL 1229752 (Bankr. D.D.C. Apr. 11, 2012) (finding that Chapter 7 debtor did not have direct or derivative standing to pursue avoidance claims).

[21] We have not yet found a D.C. Circuit case addressing the issue of derivative standing.

*Committee v. PricewaterhouseCoopers LLP*, Civ. No. 02-01487 (TFH) at 11; *Plan Committee v.*

*PricewaterhouseCoopers, LLP*, 335 B.R. at 242. While this exception has been viewed with

skepticism by some courts, there is ample support for its exercise, particularly when concerns of

equity warrant its use.

42.    The Fourth Circuit in *In re Baltimore Emergency Services II, Corp.*, 432

F.3d 557 (4th Cir. 2005), has recognized two limited sets of circumstances in which bankruptcy

courts have granted derivative standing to a creditor or creditors' committee. In the first instance,

derivative standing has been acknowledged as proper when the trustee or debtor-in-possession

unreasonably refuses to bring suit on its own. *Id.* at 560 (citing *Smart World Techs., LLC v. Juno*

*Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 (2d Cir. 2005); *Official*

*Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330

F.3d 548, 583 (3d Cir. 2003) (en banc) ("*Cybergenics II*"); *Fogel v. Zell*, 221 F.3d 955, 965 (7th

Cir. 2000); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66

F.3d 1436, 1440-1441 (6th Cir. 1995); *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233,

247-248 (5th Cir. 1988)). *See also In re Racing Services, Inc.*, 540 F.3d 892, 904-05 (8th Cir.

2008) (holding that a creditor "may obtain derivative standing to pursue avoidance actions under

circumstances in which the [Chapter 7] trustee (or debtor-in-possession) either unjustifiably

refuses to bring the creditor's proposed claims or consents to the creditor pursuing such claims in

his stead.")

43.    In the second instance, creditor derivative actions have been permitted

when the trustee or debtor-in-possession grants consent. *Baltimore Emergency Services*, 432 F.3d

at 560 (citing *In re Smart World Techs.*, 423 F.3d at 176 n. 15; *Avalanche Mar., Ltd. v. Parekh (In*

*re Parmetex, Inc.)*, 199 F.3d 1029, 1031 (9th Cir. 1999). *See also In re Racing Services*, 540 F.3d

at 902 ("a creditor may proceed derivatively when the [Chapter 7] trustee (or debtor-in-

possession) consents (or does not formally oppose) the creditor's suit.").

44.     The latter situation was at issue in *Baltimore Emergency Services*. In

making its determination as to whether the consent-based derivative standing suit was

permissible, the Fourth Circuit considered the following strict conditions:

> 'A creditors' committee [or secured creditor] may acquire standing to pursue the
> debtor's claims if (1) the committee [or creditor] has the consent of the debtor in
> possession or trustee, and (2) the court finds that suit by the committee [or creditor] is
> (a) in the best interest of the bankruptcy estate, and (b) is necessary and beneficial to
> the fair and efficient resolution of the bankruptcy proceedings.'

*Id.* at 561 (alterations in original) (quoting *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir.

2001)) (other citations omitted).

45.     Assuming a finding that consent exists, the analysis turns to whether the

derivative standing suit is "in the best interest of the estate." The Second Circuit found that such

was the case where the estate incurred no risk of loss since the creditor was required to pay for

all litigation expenses and the estate lacked the resources to bring the action on its own. *Glinka v.*

*Murad (In re Housecraft Industries, USA, Inc.)*, 310 F.3d 64, 71 (2d Cir. 2002). While the action

did not guarantee the estate any recovery, the estate could not have recovered anything in its

absence. Thus, the litigation was "'necessary and beneficial' to the fair and efficient resolution of

the bankruptcy proceedings" as, without the derivative suit, the trustee would not have been able

to recover any part of the fraudulent transfers. *Id.* at 71-72 (citing *In re Commodore Int'l Ltd.*,

262 F.3d at 100**).**

46.    Alternatively, in situations in which the trustee or debtor-in-possession

unreasonably refuses to bring suit on its own, several circuits which have addressed the issue

have found that a creditor must establish the following to obtain derivative standing:

> (1) it petitioned the trustee to bring the claims and the trustee refused; (2) its claims
> are colorable;[22] (3) it sought permission from the bankruptcy court to initiate an
> adversary proceeding; and (4) the trustee unjustifiably refused to pursue the claims.

*In re Racing Services*, 540 F.3d at 900. *See also In re Gibson Group*, 66 F.3d at 1446; *La. World*

*Exposition v. Fed. Ins. Co., 858 F.2d at 247-248; Unsecured Creditors Committee v. Noyes (In re*

*STN Enter.), 779 F.2d 901, 905 (2nd Cir. 1985).*

47.    Whether a colorable claim existed was considered by the Sixth Circuit in

*Gibson Group*. The Court concluded that the creditor committee's proposed complaint, seeking

to avoid pre-petition transfers as preferential and fraudulent, stated a colorable claim under 11

U.S.C. §§ 547 and 548, "[o]n the face of the complaint," without requiring or considering

whether evidence supported the claims stated in the complaint. *Id., 66 F.3d at 1439. See also In*

*re Dzierzawski*, 518 B.R. 415, 419 (Bankr. E.D. Mich. 2014) (granting derivative standing to an

unsecured creditor in a Chapter 7 case). "[O]ther courts have held that a creditor's claims are

'colorable' in this context if they would survive a motion to dismiss under Fed.R.Civ.P 12(b)(6)."

*In re Dzierzawski*, 518 B.R. at 419-20 (citing *In re Racing Services*, 540 F.3d at 900). Moreover,

neither the existence of facts which may defeat the creditor's proposed claims nor the fact that

the proposed claims will be vigorously contested is relevant to the finding of whether the creditor

has alleged a "colorable claim." The creditor need not establish that the colorable claims it pleads

---

22 The Eighth Circuit further noted that a creditor's claims are colorable if they would survive a motion to
dismiss. *In re Racing Services*, 540 F.3d at 900.

are likely to prevail ultimately, in order to meet the "colorable claim" requirement. *In re Dzierzawski*, 518 B.R. at 420.

48.      Some courts have also required that the "colorable claim" the creditor has alleged would benefit the estate if successful, based on a cost-benefit analysis performed by the bankruptcy court. *In re Dzierzawski*, 518 B.R. at 420 (citing *In re Gibson Group*, 66 F.3d at 1438-39, 1446). In other words, if the claims are successful and would result in a money judgment or avoidance of a transfer of cash or other property that would become property of the estate, the court should consider whether the value of the assets obtained would exceed the fees and expenses of obtaining them. *See In re Dzierzawski*, 518 B.R. at 420-21.

49.      If the result of granting derivative standing would not result in any net loss or net cost to the bankruptcy estate, but rather, such derivative standing would result only in a net financial benefit to the bankruptcy estate, or at worst, no net financial effect, positive or negative, "granting derivative standing to [the creditor would] give the estate a no-risk chance of recovering additional money." *Id.* at 422-23. Assuming these conditions exist, the "benefit-to-the-estate requirement for derivative standing" would be satisfied. *Id.* at 423. *See also In re STN Enter.*, 779 F.2d at 905-06.

50.      As to the question of whether a trustee's refusal is unjustified, most courts agree that this is the case when allowing a creditor to assert the claim would clearly benefit the estate. *See In re Racing Services*, 540 F.3d at 900.

> At one end of the spectrum, a trustee almost certainly abuses his discretion by refusing to bring a creditor's claim that, if successful, would *clearly* benefit the estate. At the other end, a trustee certainly does not abuse his discretion by refusing to bring a claim that would yield insignificant benefits to the estate.

*Id.* at 900-901 (citing *In re STN Enter.*, 779 F.2d at 906 (suggesting that a trustee's refusal to pursue claims might be unjustified when a creditor (or creditors' committee) is willing to shoulder the costs of litigation and the fee arrangement imposes no net burden on the bankruptcy estate); *William B. Tanner Co. v. United States (In re Automated Business Sys., Inc.)*, 642 F.2d 200, 201-202 (6th Cir. 1981) (holding that a creditor had standing to file an avoidance action where trustee refused to bring suit due to lack of funds)).

51.     "At bottom, the determination of whether the trustee unjustifiably refuses to bring a creditor's proposed claims will require bankruptcy courts to perform a cost-benefit analysis." *In re Racing Services*, 540 F.3d at 901 (citing *In re STN Enter.*, 779 F.2d at 905). Among the factors courts should consider in determining whether a trustee's (or debtor in possession's) refusal is unjustifiable include: (1) the "probabilities of legal success and financial recovery in event of success"; (2) the creditor's proposed fee arrangement; and (3) the "anticipated delay and expenses to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *See In re STN Enter.*, 779 F.2d at 905-906. *See also In re Racing Services*, 540 F.3d at 901.

> We do not mean to suggest that the court need undertake a mini-trial…to determine likelihood of success in such a suit or the attendant fees and expenses involved. But it should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expenses to the bankruptcy estate that the initiation and continuation of litigation will likely produce. Of course, if the…fee arrangement… will in no event impose a net burden on the bankruptcy estate (because the [creditors'] committee will pay the fee and seek reimbursement only out of any recovery), then the preliminary inquiry can be limited to ascertaining whether the proposed lawsuit has a colorable basis on which to proceed.

*In re STN Enter.*, 779 F.2d at 905-906 (citing *Eisen v. Carlisle Jacquelin*, 417 U.S. 156, 177-178,

94 S. Ct. 2140, 40 L.Ed.2d 732 (1974) (no mini-trial in class actions). *See also In re Racing*

*Services*, 540 F.3d at 901.

52.     "A trustee's decision to decline the pursuit of a colorable claim is only

justified if there is a legal or practical impediment to prosecution. While the cost to the estate is a

valid consideration for a trustee, the mere lack of funds will not justify a decision not to

prosecute." *In re Home Casual LLC*, 534 B.R. 350, 354 (Bankr. W.D. Wis. 2015) (finding

derivative standing appropriate in Chapter 7 action where creditors stood to recover almost

$470,000 in avoidable transfers at a low cost and risk to the estate) (citing *In re Gibson Group*,

66 F.3d at 1442-43).

53.     When a Chapter 7 Trustee refuses to pursue a claim because there are

inadequate funds in the bankruptcy estate to pay litigation fees and expenses, that refusal can be

viewed as unjustified. *See In re Trailer Source*, 555 F.3d at 243-44). *See also In re Dzierzawski*,

518 B.R. at 423-24; *In re Full Spectrum Mgmt.*, 621 B.R. 421, 428-29 (Bankr. W.D. Mich. 2020).

> The Supreme Court has long recognized that bankruptcy courts are courts of equity
> with the power to apply flexible equitable remedies in bankruptcy proceedings. *See
> Young v. United States*, 535 U.S. 43, 50, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002)
> ("[B]ankruptcy courts . . . are courts of equity and 'appl[y] the principles and rules of
> equity jurisprudence.'") (quoting *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238,
> 84 L.Ed. 281 (1939) (second alteration in original)); *United States v. Energy
> Resources Co.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990)
> ("[Bankruptcy courts, as courts of equity, have broad authority to modify creditor-
> debtor relationships."); *Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 78
> L.Ed. 1230 (1934) ("[C]ourts of bankruptcy are essentially courts of equity, and their
> proceedings inherently proceedings in equity."); *see also* H.R. Rep. No. 95-595, at
> 359 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6315 (stating that under the new
> Bankruptcy Code "[t]he bankruptcy court will remain a court of equity").

*In re Trailer Source*, 555 F.3d 231, 242 (6th Cir. 2009) (holding that granting derivative standing

to creditors to pursue avoidance actions on behalf of the estate is available in both Chapter 11

and Chapter 7 proceedings). *See also Cybergenics II*, 330 F.3d at 567.

54.    "A paramount duty of a trustee or debtor in possession in a bankruptcy

case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors." *In re*

*Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) ("*Cybergenics I*").

55.    In the Chapter 7 context, maximization of the estate is one of the primary

goals of liquidation. See 11 U.S.C. §§ 701-766.  Thus, where a trustee refuses to bring an action

that would benefit the estate, the trustee is effectively violating his fiduciary duty to maximize

the estate's value. "[T[he ability to confer derivative standing . . . is a straightforward application

of bankruptcy courts' equitable powers. In § 544(b), Congress made clear that it intended for the

estate to recover property fraudulently transferred by the debtor.... [and vested] in the trustee (or

the debtor-in possession) both the power to bring an avoidance action and the duty to bring one if

it would likely benefit the estate. Congress clearly envisioned that the trustee or debtor would

avoid fraudulent transfers, thus maximizing the value of the estate and allowing creditors to

recover their claims from that estate." *Cybergenics II*, 330 F.3d at 568 (citations omitted). *See*

*also In re Trailer Source*, 555 F.3d at 242-43.

56.    "However, when the trustee unjustifiably refuses to bring an avoidance

action under § 544(b), the system 'breaks down.' 'It is in precisely this situation that bankruptcy

courts' equitable powers are most valuable, for the courts are able to craft flexible remedies that,

while not expressly authorized by the Code, effect the result the Code was designed to obtain.'

When the trustee is delinquent, the bankruptcy court — or the district court of which it is a unit

22

— should be able to exercise its equitable powers to authorize a creditor to pursue recovery of fraudulently transferred property for the benefit of the estate. In so doing, this equitable remedy effectuates Congress's intent that fraudulently transferred property be recovered for the bankruptcy estate." *In re Trailer Source*, 555 F.3d at 242-43 (citing *Cybergenics II*, 330 F.3d at 568) (footnote omitted).

57.    "[The public policy concerns underlying chapter 7 are consistent with the use of the court's equitable powers. Two primary goals of the Bankruptcy Code are to maximize the value of the estate for the benefit of creditors and to provide for the equality of treatment of creditors. In a corporate chapter 7 case, such as this one, it is hard to imagine other, or at least any more important goals." *Claridge Assoc., LLC v. Schepis (In re Pursuit Capital Mgmt., LLC)*, 595 B.R. 631, 659 (Bankr. D. Del 2018) (finding that "*Cybergenics II* can be extended to cases under chapter 7 and that individual creditors may be permitted to assert avoidance actions in appropriate circumstances with court approval").

58.    In contrast to Chapter 11 cases, Chapter 7 cases often have no liquid assets, consequently, Chapter 7 trustees may decline to pursue meritorious and/or potentially sizeable claims simply because there are inadequate funds in the estate to pursue them. *See In re Trailer Source*, 555 F.3d at 244; *In re Pursuit Capital Mgmt., LLC*, 595 B.R. at 660. "[T]he need for derivative standing could be particularly great in the context of Chapter 7 proceedings where there may be 'no funds remain[ing] to divide among creditors or to finance a suit to set aside a fraudulent conveyance.'" *In re Trailer Source*, 555 F.3d at 243 (quoting *William B. Tanner Co. v. United States (In re Automated Bus. Sys., Inc.)*, 642 F.2d 200, 202 (6th Cir. 1981)).

23

59.     In these instances, the fundamental bankruptcy goal of maximizing the

estate, and thus recoveries for creditors, is jeopardized. "Just as conflicts of interest may lead to

under-enforcement of avoidance claims by debtors-in-possession in Chapter 11 proceedings, a

lack of available funds may lead to under-enforcement by trustees in Chapter 7 proceedings." *In

re Trailer Source*, 555 F.3d at 244; *In re Pursuit Capital Mgmt., LLC*, 595 B.R. at 660.[23]

**B.      Application of Relevant Case Law to the Present Facts**

60.     In the instant case, the Trustee has neither expressly consented to the

Bandis' request for derivative standing to file a complaint in this Case, nor has he expressly

refused to consent to their request. Similarly, he has recently stated that he has "not formally

abandoned any assets of the estate,"[24] but has not confirmed whether he intends to pursue any

action on behalf of the Estate.

61.     The facts show, however, that the Trustee is not taking any steps to move

forward in this Case, thus we seem to be at an impasse. Yet action, particularly in the form of an

adversary proceeding, is necessary to ensure that the wrongdoing of the Srigleys and the Debtor

is appropriately addressed. Such action should also take place in the very near future to ensure

that the claims of the Estate are not jeopardized by the tolling of relevant statutes of limitations.

---

[23] Other courts have similarly extended *Cybergenics II* to both Chapter 7 and Chapter 13 cases. *See In re Pursuit Capital Mgmt., LLC*, 595 B.R. at 660 (citing *In re Rosenblum*, 545 B.R. 846 (Bankr. E.D. Pa. 2016) (analyzing *Cybergenics II* and granting derivative standing to a creditor in a Chapter 13 case); *In re Racing Services*, 540 F.3d 892 (concluding that derivative standing is available to a creditor in Chapter 7 case); *In re Rim*, Civ. No. 10-1066 (DMC), 2010 WL 4615174, at *2 (D.N.J. Nov. 3, 2010) ("While the Third Circuit has not addressed derivative standing for Chapter 7 creditors, other courts have permitted individual creditors to bring derivative avoidance actions where the Trustee has declined to do so"); *In re Sandenhill, Inc.*, 304 B.R. 692, 694 (E.D. Pa. 2004) (although *Cybergenics* was a Chapter 11 case, "we frankly cannot imagine that the Third Circuit would employ a different rationale in a Chapter 7 matter").

[24] *See* true and correct copy of September 13, 2024 email correspondence from William Douglas White to Angela Bandi and Federico Bandi, attached in **Appendix E**.

62.      As the Trustee has chosen not to explicitly state his position on the issue of consent, we will analyze the facts under the two sets of circumstances laid out in *Baltimore Emergency Services,* 432 F.3d at 561.  See ¶¶ 42-46, *supra.*

### 1.      Consent-Based Derivative Standing Suit

63.      In a consent-based derivative standing suit, courts have generally used a two-prong test:

(1)  Does the creditor have the consent of the trustee, and

(2)  Does the court find that suit by the creditor is (a) in the best interest of the bankruptcy estate, and (b) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.

*See Baltimore Emergency Services,* 432 F.3d at 561.

64.      If, by not expressly refusing to consent, the Trustee has tacitly consented to the Bandis' request for derivative standing, then the first prong of this test is met.

65.      With respect to the second prong, there are two conditions that need to be satisfied. First, are the Bandis' claims "in the best interest of the bankruptcy estate?" Since the Bandis would be pursuing the action in a *pro se* capacity and are covering the costs of litigation, the cost to the Estate would be minimal to none.[25] Regardless of whether the suit is eventually successful, granting derivative standing to the Bandis would give the Estate a no-risk chance of recovering additional money. As the Estate will incur no risk of loss in this situation, the Bandis' suit is in the best interests of the Estate. *See In re Housecraft Industries, USA, Inc.*, 310 F.3d at 71; *In re STN Enter.*, 779 F.2d at 905-06; *In re Dzierzawski*, 518 B.R. at 422-23.

---

[25] *See* ¶ 27, *supra.*

66.    Moreover, if the Bandis' suit is successful, any money judgment or other assets recovered would benefit the interests of the entire Estate and not merely their personal interests. *See* ¶¶ 19, 26 and 28, *supra*.

67.    The second condition of the second prong is whether the Bandis' suit is "necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings." While the Bandis' potential action does not guarantee the Estate any recovery, the Estate will not recover anything in the absence of their action. *See In re Housecraft Industries, USA, Inc.*, 310 F.3d at 71. The derivative suit is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings as, without it, the Trustee will not be able to recover any part of the Debtor's and the Srigleys' potentially fraudulent transfers, nor recover any assets for the benefit of the Estate using other theories of recovery. *See id.* at 71-72.

68.    Furthermore, if the Bandis are permitted to file their proposed complaint, the possibility of a substantial benefit to the Estate exists. According to the Petition, there are no assets in the Estate available for distribution to unsecured creditors. *See* Petition at Official Form 309C, Item 8 and Official Form 201, Item 13. In contrast, the Bandis anticipate alleging that the Srigleys and the Debtor fraudulently transferred more than $450,000.00 in assets in the four-year period prior to the Petition Date. We will further allege that the full amount of the debt should be recovered from the Srigleys directly under a theory of alter ego liability. *See* Draft Complaint, attached in **Appendix C**.

### 2.    Derivative Standing Suit in Cases in which the Trustee Refuses to Bring Claims

69.    In situations in which a trustee refuses to bring suit on its own, courts have

found that a creditor must satisfy the following four conditions for derivative standing to be

authorized:

> (1) the creditor petitioned the trustee to bring the claims and the trustee refused; (2)
> the creditor's claims are colorable; (3) the creditor sought permission from the
> bankruptcy court to initiate an adversary proceeding; and (4) the trustee unjustifiably
> refused to pursue the claims.

*See In re Racing Services*, 540 F.3d at 900. *See also In re Gibson Group*, 66 F.3d at 1446; *La.*

*World Exposition v. Fed. Ins. Co., 858 F.2d at 247-248*; *In re STN Enter.*, 779 F.2d at 905.

70.     In this Case, the Trustee has not explicitly refused to bring potential claims

on behalf of the Estate, but neither has he taken any apparent action in this regard. Instead, over

the last 17 months,[26] he has not expressed any interest in pursuing claims in this Case.

71.     The Trustee declined to file a Rule 2004 Motion in this Case despite the

Debtor's refusal to cooperate in the process and produce requested documents, and despite the

evidence of potential wrongdoing we have presented to him. He chose not to participate in the

Rule 2004 Motion or even attend the related hearing. He has not even inquired about the

substance of the claims we are proposing. If these facts are viewed as the Trustee's tacit refusal

to bring claims on behalf of the Estate, then the first prong of the above test is met.

72.     As to whether our proposed claims are colorable, courts have answered

this question by determining whether the claims are sufficiently plausible to survive a motion to

dismiss under Fed.R.Civ.P 12(b)(6). *See In re Racing Services*, 540 F.3d at 900: *In re*

*Dzierzawski*, 518 B.R. at 419-20. The court may make this determination "[o]n the face of the

complaint," without requiring or considering whether evidence supported the claims stated in the

---

[26] The length of this period is not irrelevant to the interests of the Estate. The Bandis would like to bring
their claims against the Debtor and the Srigleys before the relevant statutory limitations periods expire.

complaint. *See In re Gibson Group*, 66 F.3d at 1439; *In re Dzierzawski*, 518 B.R. at 419 The

creditor need not establish that the colorable claims that it pleads are likely to prevail ultimately,

in order to meet the "colorable claim" requirement. *In re Dzierzawski*, 518 B.R. at 420. As

evidenced by the claims stated with particularity in the Draft Complaint, and the specific facts

and evidence referenced therein, we respectfully suggest that our claims would survive a motion

to dismiss and are thus, colorable. *See* Draft Complaint, attached in **Appendix C**.

73.     With respect to the colorable claim element, some courts have also

considered whether the claims benefit the estate. In other words, assuming the claims are

successful and would result in a money judgment or avoidance of a transfer of cash or other

property that would become property of the estate, the court should consider whether the value of

the assets obtained would exceed the fees and expenses of obtaining them. *See In re Dzierzawski*,

518 B.R. at 420-21. For the reasons stated *supra* in ¶¶ 65-68, we believe our claims would

benefit the Estate in this Case.

74.     As to the third question, whether we have sought permission from the

bankruptcy court to initiate an adversary proceeding, the filing of the Motion should satisfy this

condition.

75.     The final part of the analysis is whether the Trustee unjustifiably refused

to pursue the claims. This determination will require the Court to perform a cost-benefit analysis,

considering factors such as: (1) '[the] probabilities of legal success and financial recovery in

event of success'; (2) the creditor's proposed fee arrangement; and (3) 'the anticipated delay and

expense to the bankruptcy estate that the initiation and continuation of litigation will likely

produce.' *See In re STN Enter.*, 779 F.2d at 905-906.

76.     The Trustee in the instant case has not explicitly refused to pursue the claims we have proposed, and consequently has not provided us with a specific reason for not moving forward.[27] We hesitate to speculate as to the reasons for his inaction. However, one possibility is the lack of funds currently existing in the Estate.

77.     "[W]hen a Chapter 7 Trustee's refusal to pursue a claim is because there are inadequate funds in the bankruptcy estate to pay litigation fees and expenses, that refusal can be viewed as 'unjustified.'" *In re Dzierzawski*, 518 B.R. at 423-24 (citing *In re Trailer Source*, 555 F.3d at 243-44). *See also In re Gibson Group*, 66 F.3d at 1442-43; *In re Automated Business Sys., Inc.*, 642 F.2d at 201-02 (holding that a creditor had standing to file an avoidance action where trustee refused to bring suit due to lack of funds); *In re Full Spectrum Mgmt.*, 621 B.R. at 428-29; *In re Home Casual LLC*, 534 B.R. at 354.

78.     To our knowledge, there is no real legal or practical impediment to prosecution in this Case, thus, if the Trustee's refusal to prosecute is largely based on a lack of funds, we believe it is unjustified. *See In re Home Casual LLC*, 534 B.R. at 354.

79.     In addition, "a trustee almost certainly abuses his discretion by refusing to bring a creditor's claim that, if successful, would *clearly* benefit the estate." *In re Racing Services*, 540 F.3d at 900-01 (citing *In re STN Enter.*, 779 F.2d at 906). If successful, our claims would certainly benefit the Estate, possibly even resulting in a windfall. *See ¶¶* 65-68, *supra*. The Trustee's refusal to bring claims which would be beneficial to all creditors in this Case is not justified.

---

[27] In his September 13, 2024 email, the Trustee implies that we only recently identified potential causes of action that could generate recoveries for the Estate. We disagree with this representation of the facts. *See* discussion in ¶ 32, *supra;* **Appendix E**.

### 3.    Equitable Remedies

80.        One of the primary goals of Chapter 7 liquidation is maximization of the

estate. We believe that the Trustee's failure to pursue claims in this Case for the purpose of

recovering funds for the Estate is effectively a violation of his fiduciary duty to satisfy this goal.

81.        In requesting derivative standing to bring an adversary proceeding in this

Case, we are attempting to maximize the Estate's value, which is in the interest of all the

Debtor's creditors, so as to avoid an otherwise unjust result.

82.        As has been long recognized by the Supreme Court, bankruptcy courts are

courts of equity with the power to apply flexible equitable remedies in bankruptcy proceedings.

*In re Trailer Source*, 555 F.3d at 242 (citing *Young v. United States*, 535 U.S. 43, 50, 122 S.Ct.

1036, 152 L.Ed.2d (2002) (other citations omitted).

83.        "It is in precisely [the] situation [of a delinquent trustee] that bankruptcy

courts' equitable powers are most valuable, for the courts are able to craft flexible remedies that,

while not expressly authorized by the Code, effect the result the Code was designed to obtain."

*Cybergenics II*, 330 F.3d at 568; *see also In re Trailer Source*, 555 F.3d at 242-43.

84.        Given the Trustee's unjustifiable inaction in this case, we believe that the

Court should exercise its equitable powers to authorize us to pursue, for the benefit of the Estate,

recovery of the Debtor's property fraudulently transferred by the Srigleys, as well as other

applicable theories of recovery. This equitable remedy would serve the purpose of effectuating

Congress's intent that fraudulently transferred property be recovered for the bankruptcy estate.

*See In re Trailer Source*, 555 F.3d at 242-43; *Cybergenics II*, 330 F.3d at 568.

## JURISDICTION

85.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue

of this proceeding and this Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

## NOTICE

86.      Notice of this Motion has been served upon the following parties: (i) the

Debtor; (ii) the Debtor's counsel; (iii) the Trustee; (iv) the Office of the United States Trustee for

Region 4: Eastern District of Virginia (Alexandria Division) and the District of Columbia; (iv)

any party that has timely filed a proof of claim in this Case; and (v) any party that has requested

notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1. In light of the

nature of the relief requested herein, the Bandis submit that such notice is adequate and sufficient

and that no other or further notice is necessary.

87.      A copy of the Notice and Opportunity to Object is attached hereto as

**Exhibit A**. No prior request for the relief sought in this Motion has been made to this or to any

other Court.

## CONCLUSION

WHEREFORE, the Bandis respectfully request that this Court grant this Motion in its

entirety and enter an order substantially in the form attached hereto as **Exhibit B**.

Dated:      October 17, 2024

Respectfully submitted by:

FEDERICO M. BANDI
3606 Chesapeake Street, NW
Washington, DC 20008
Telephone: 773-612-4163
Email: fbandi1@jhu.edu

-and-

ANGELA M. BANDI
3606 Chesapeake Street, NW
Washington, DC 20008
Telephone: 773-620-1932
Email: angela.bandi@yahoo.com

*Filing Pro Se*