## APPENDIX A



**From: Federico Bandi** fbandi1@jhu.edu 📎
**Subject:** Touchstone Remodelers, LLC bankruptcy proceedings (case number 23-00116-ELG) - document
**Date:** May 31, 2023 at 8:09 PM
**To:** William Douglas White wdw@mccarthywhite.com
**Cc:** Angela Bandi angela.bandi@yahoo.com

Good evening Trustee White,

Thank you for this information. As you requested, we will attend on mute until the Touchstone case is called.

As promised, please find enclosed a document with information that is relevant to the case. I am sorry for not being able to send it to you earlier in the day but we wanted to reference all of our sources and that process took a fair amount of time.

To this extent, you will see a list of exhibits at the end. While we cannot attach them to an e-mail, we are ready to set up a Dropbox folder containing all of them and send you an invitation to the folder. Please let us know if that would be helpful or if you have another preferred method for sharing materials.

In the meantime, I trust you will find the document helpful. Needless to say, we have a lot more information.

Kind regards,
Federico Bandi

==========================================
Federico M. Bandi
Johns Hopkins University


**From:** William Douglas White <wdw@mccarthywhite.com>
**Date:** Wednesday, May 31, 2023 at 2:06 PM
**To:** Federico Bandi <fbandi1@jhu.edu>
**Cc:** Angela Bandi <angela.bandi@yahoo.com>
**Subject:** RE: Touchstone Remodelers, LLC bankruptcy proceedings (case number 23-00116-ELG)

**Mr. Bandi**
        I wanted to let you know that I plan to call the Touchstone case at the end of the docket and expect that will be close to 11:30.  You are welcome to join anytime you prefer, but there will be 7 or 8 other cases before that.  Whenever you do join, please put your phone on mute during the other cases.  Whenever the Touchstone case is called, you will be given the opportunity to speak or ask questions.
        As to information you may be able to provide me,  anything relevant information is appropriate, but information supported by any documents you may have is most valuable.

William Douglas White
McCarthy & White, PLLC

McCarthy & White, PLLC
8205 Pettit Court
McLean, VA 22102
Voice: 703-770-9265
Fax:  703-770-9266
Email: wdw@mccarthywhite.com
Admitted only in DC, MD & FL

Confidentiality Notice: This electronic mail transmission is intended for the use of the individual or entity to which it is addressed and may contain confidential information belonging to the sender that is protected by the attorney-client privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please notify the sender immediately by e-mail and delete the original message. Thank you for your cooperation.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Federico Bandi <fbandi1@jhu.edu>
**Sent:** Wednesday, May 31, 2023 7:34 AM
**To:** William Douglas White <wdw@mccarthywhite.com>
**Cc:** Angela Bandi <angela.bandi@yahoo.com>
**Subject:** Re: Touchstone Remodelers, LLC bankruptcy proceedings (case number 23-00116-ELG)

Good morning Trustee White,

Thank you for letting us know.

We had an opportunity to review the debtor's Petition and the various schedules.

The filing contains false and misleading statements as well as omissions. We are working to get the information to you (in a concise, but informative way) by about 2pm today.

Best regards,
Federico Bandi


========================================
Federico M. Bandi
James Carey Endowed Professor
Professor of Finance
Johns Hopkins University


**From:** William Douglas White <wdw@mccarthywhite.com>
**Date:** Tuesday, May 30, 2023 at 4:56 PM
**To:** Federico Bandi <fbandi1@jhu.edu>

**Cc:** Angela Bandi <angela.bandi@yahoo.com>
**Subject:** RE: Touchstone Remodelers, LLC bankruptcy proceedings (case number 23-00116-ELG)

**Mr. Bandi**

Thank you for your email.  We typically do not have problems with people connecting to the UST conference line.  Hopefully it will be the same for you.

Unfortunately, I have received none of the requested documents from the Debtor as of today.  I have reached out counsel to find our why.

In the meantime I am attaching here a copy of the Schedule of Assets & Liabilities and the Statement of Financial Affairs filed by Debtor at the beginning of the case.  I believe the two documents begin on page 7 after the Petition.  If you are able to review them before the meeting, it would be helpful if you could let me know whether you are aware of anything missing that Debtor should have disclosed in answering or if there are any inaccuracies in the manner in which the questions were answered.  Thank you.

William Douglas White
McCarthy & White, PLLC
8205 Pettit Court
McLean, VA 22102
Voice: 703-770-9265
Fax:  703-770-9266
Email: wdw@mccarthywhite.com
Admitted only in DC, MD & FL

Confidentiality Notice: This electronic mail transmission is intended for the use of the individual or entity to which it is addressed and may contain confidential information belonging to the sender that is protected by the attorney-client privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please notify the sender immediately by e-mail and delete the original message. Thank you for your cooperation.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Federico Bandi <fbandi1@jhu.edu>
**Sent:** Tuesday, May 30, 2023 11:36 AM
**To:** William Douglas White <wdw@mccarthywhite.com>
**Cc:** Angela Bandi <angela.bandi@yahoo.com>
**Subject:** Touchstone Remodelers, LLC bankruptcy proceedings (case number 23-00116-ELG)

Dear Trustee White,

My wife and I are Touchstone's largest creditor based on Touchstone's 309C filing of April

28, 2023.

I am writing to alert you that we will be attending the meeting of creditors on June 1. However, we have had technical issues with conference calls in the past (i.e., we have had problems connecting to certain systems with an Iphone). Because of the importance of this specific meeting, we would not want the meeting to end quickly while we are struggling to connect. If that is the case, should we contact you directly at (703) 770 9265?

Hopefully, the system will work without any issues. Just in case, please be so kind as to keep in mind that we will certainly be attending. We have a large amount of information regarding Touchstone's operations and financial position obtained during the arbitration discovery process. We believe that our information will benefit all creditors.

Thank you.

Best regards,
Federico M. Bandi


==========================================
Federico M. Bandi
James Carey Endowed Professor
Professor of Finance
Johns Hopkins University




Touchstone's
   filing.pdf

Case number:        **23-00116-ELG**
Debtor:             **Touchstone Remodelers, LLC**
Filed:              **4/28/2023**

**Statement of Creditors Federico M. Bandi and Angela M. Bandi in Response to Official Form 309C (the "Petition")**

The Petition contains <u>false and misleading statements</u> regarding the timeline of Touchstone Remodelers, LLC's ("Touchstone") operations and its profitability.

The information provided paints the picture of a sole proprietorship which struggled in 2023, struggled in 2022 and operated with limited, if any, profitability in 2021. This picture does not correspond to reality.

<u>**We refer you to Official Form 207, Part 1:**</u>

- **Calendar year 2023.** Touchstone represents that between 1/1/2023 and 4/28/23 it was <u>operating as a business</u> with revenues of $0.00. This is a false statement. We understand that Touchstone was dissolved in 2022 and was not legally permitted to do business in 2023. *See* discussion of "Calendar year 2022" below.

- **Calendar year 2022.** Touchstone claims that between 1/1/2022 and 12/31/2022 it was <u>operating as a business</u> with revenues of $4,115.80. We believe that this statement is misleading (at best) and false (at worst).

First, the $4,115.80 figure reported is almost certainly a receivable from a 2021 contract. This is the same figure reported to us by Touchstone in Table 3 (the 2021 Backlog Table) to its responses to our interrogatories during the arbitration discovery process. *See* Exhibit 1 (Touchstone Remodelers' Response to Interrogatories). In Table 3, Touchstone lists $4,115.80 as an unbilled amount as of 12/21/2021 under the Eliason Residence contract (an agreement made as of 4/26/2021) *(Note that Touchstone provided us with copies of its 2021 contracts)*. If our belief is correct, $4,115.80 is a 2021 revenue both logically and based on the Generally Accepted Accounting Standards, not a 2022 revenue.

Second, to the best of our knowledge, Touchstone was <u>not operational</u> during 2022. Touchstone represented this fact to us, under oath, during our June 2022 arbitration hearing. In its 3/23/2022 response to our request for documents (in its Response 38g to Item 38), it claimed in writing, again under oath, that it was "non-operational while going through arbitration." *See* Exhibit 2 (Touchstone Remodelers' Production of Requested Documents).

With respect to the period of the arbitration, note that we filed our claim against Touchstone on 12/28/2021, the arbitration hearing was held in June of 2022 (6/21/2022 through 6/24/2022) and

the arbitration award was entered on 9/2/2022. During this timeframe, Touchstone failed to file its biennial report with DCRA, which was likely due in the spring or summer of 2022. By 11/11/2022, its status as a corporation was revoked by the department due to an apparent failure to file such report. *See* Exhibit 3 (Screenshot dated 11/11/2022 of DCRA's CorpOnline webpage showing Touchstone's status as "Revoked"). At some later date in 2022, it appears that Touchstone did file its biennial report or other documentation, and then was formally dissolved as a corporation. *See* Exhibit 4 (Screenshots dated 5/31/2023 of DCRA's CorpOnline webpage showing Touchstone's status as "Dissolved" and list of biennial reports); *Note further that we first discovered Touchstone's dissolution in December of 2022, but are currently unable to locate the screenshot taken at that time.* Touchstone was also registered to do business in Maryland (as a foreign LLC). Its status as of 11/20/2022 was "forfeited," due to department action. In Maryland as well, Touchstone failed to file its requisite annual report. *See* Exhibit 5 (Screenshots dated 5/31/2023 of Maryland's egov.maryland.gov webpage showing Touchstone's status as "Forfeited").

Even despite the arbitration, it is unclear how Touchstone could have conducted its home renovation business in 2022. Per its statements under oath, Touchtone laid off all of its field employees in November of 2021. Touchstone made these statements in its 2/22/2022 arbitration defense and counterclaim, in responses to interrogatories and in responses to request for documents, as well as verbally during the June 2022 arbitration hearing. *See* Exhibits 1, 2 and 6. At the end of 2021, the Chief Operating Officer of the company, Dr. Cynthia Srigley, returned to her federal job at the FDA. We will discuss Dr. Srigley below.

Moreover, Touchstone apparently did not attempt to seek new clients for 2022. In its 2/2/2022 arbitration defense and counterclaim, Touchstone stated that, between 11/1/2021 and 12/17/2021, it did not bid on two home remodel projects due to the "strain and distress" Touchstone was experiencing as a company as a result of the arbitration. Further, in January of 2022, Touchstone claimed it was unable to start construction on a project for which it was the DCRA contractor on record "because of the arbitration and concerns for putting client funds at risk." *See* Item 9 of Appendix IX in Exhibit 6. Touchstone confirmed this in its response to interrogatories. *See* Response to Interrogatory 4 in Exhibit 1.

<u>Thus, the company effectively ceased to operate at the end of 2021. Touchstone's representation that it operated as a business in 2022 (with revenues of $4,115.80) is – at best – misleading.</u>

- **Calendar year 2021.** Touchstone represents that between 1/1/2021 and 12/31/2021 it was operating as a business with gross revenues of $1,708,116.00. Information disclosed during arbitration indicates that 2021 revenue, based on projects under contract, might have been higher, at $1,739,563.79 ($1,981,219.59 less unbilled amounts of $241,655.80). *See* Table 3 in Exhibit 1. It is, therefore, close but not the same as the figure provided in the Petition. More importantly, we have reasons to believe – again based on information obtained in arbitration - that net income (i.e., profit) for that year was between $160,000 and $240,000. (Because a portion of expenses for 2021 was likely covered by credit/debit

card debt that was not repaid, the actual net cash flow into Touchstone in 2021 was perhaps higher than profit.)

Below, we provide details:

**Calendar Year 2021**

**Table 1:**

| | |
|---|---|
| Revenue: | $1,708,116.00* |
| Expenses: | $1,193,407.14** |
| Owner Draws: | $85,800*** |
| Payroll: | $257,273.78**** |
| | — — — — — — — — |
| Net income: | $171,636.08***** |

*Per Touchstone's response to Part 1 of Official Form 201, its 2021 revenue for operating a business was $1,708,116.00. We cannot verify this exact figure, however, based on Touchstone's 2021 Backlog Table (Table 3 in Exhibit 1), Touchstone received $1,981,219.59 in revenue. After subtracting unbilled amounts of $241,655.80, Touchstone's 2021 revenue seemed to have been $1,739,563.79.

Touchstone did not include an additional $440.11 (Scarboro Residence contract) as revenue in Table 3. This amount was disclosed in its Sales by Client Summary (March 18 – December 17, 2021). *See* Exhibit 7.

Further, Touchstone seems to have received at least one PPP loan in either 2020, 2021 or both. We believe any PPP loans Touchstone received were forgiven (based on handwritten notes we received from Touchstone). We are not sure how/if/in what year Touchstone accounted for these loan proceeds. We provide more information on the loan below.

That said, we will note that one of the contracts included in Table 3 of Exhibit 1 (Stom-Stoesen Residence contract) was signed in the fall of 2020. It is not clear when the work on that contract began and not clear in which year(s) Touchstone accounted for this $159,276.89 in revenue.

**During arbitration, Touchstone produced an "Expenses by Vendor Summary," for the period of 3/18/2021 through 12/17/2021. See Exhibit 8. We cannot verify the dates of all of the individual expenses, and Touchstone may have incurred additional expenses for the remaining periods of 2021. That said, the information we have regarding Touchstone's projects under contract indicates that it only had one contract carry over from 2020 to 2021. Most of its 2021 contracts were signed in the spring of 2021, or thereafter. <u>Thus, the balance on the "Expenses by Vendor Summary" ($1,193,407.14) is likely reflective of their expenses for the year.</u>

We also believe that some of the expenses attributed to Touchstone were not proper business expenses. Specifically, we question the expenses relating to the aircraft and piloting (many of these are included in the category of "Not Specified"). Below, we provide more information.

Finally, it is very likely that much of the credit card debt Touchstone currently has ($213,883.48), as reported in the Petition, relates to its 2021 expenses. In other words, the calculation in Table 1 above assumes that Touchstone paid all of its 2021 expenses. Even it had paid all of its expenses, Touchstone likely turned a profit in its last year of operations (2021). Given that Touchstone likely did not pay all of these expenses (due to its unpaid credit card bills), we believe that even more of Touchstone's funds should be available to compensate creditors.

We note that, if some of the corporate credit card debt relates to the 2022 and 2023 period - rather than to the 2021 period - then it would relate to a period during which Touchstone was not conducting operations. (Handwritten notes obtained in arbitration suggest that Touchstone was considering/negotiating increases in some/all of its lines of credit precisely at the time when it was closing shop.)

***Touchstone provided us with a report evidencing "Owner's Distributions" from January through December of 2021. The total was $85,800. *See* Exhibit 9.

****Per Touchstone's quarterly 2021 Form 941 filings, we believe its 2021 payroll totaled $257,273.78. *See* Exhibit 10.

*****Again, this figure assumes Touchstone paid all of its claimed 2021 expenses, which is very likely not the case.

The PPP loan

It seems that Touchstone has/had at least one loan, based on the following journal entry described in its Unspecified Expenses Transaction Report as "Interest Expense":

- 5.31.21 Journal Entry "To true up the loan balance" -$254.97 (Split)*

See Exhibit 11 (Touchstone Remodelers Unspecified Expenses Transaction Report).

The referenced loan balance may be a PPP loan received by Touchstone. Our internet research revealed that Touchstone received the following PPP loan in 2020. Unfortunately, we do not recall the website at which we found this information.

Loan amount:       $47,520.00
Recipient address: 2214 Distribution Cir.
                   Silver Spring, MD 20910
NAICS code:        236118

| | |
|---|---|
| Jobs reported: | 4 |
| Date approved: | 5/1/2020 |
| Lender: | Bank of America, N.A. |
| | Code MD-08 |
| Source file: | 03 PPP Sub 150K through 11-24-20 |

We do not know if Touchstone received additional PPP loans, Federal Prime Grants, or similar. However, handwritten notes we received from Touchstone seemed to indicate the existence of loan proceeds in excess of the $47,520.00 reported above. In those same notes, Touchstone referenced 2021 disbursements of the loan proceeds. Again, per its notes, it seems that the PPP loan was forgiven. It is not clear whether Touchstone included PPP loan proceeds as 2021 (or 2020) income, or whether it should have done so.

In sum, <u>Touchstone is likely not a company that struggled in 2023 and 2022 (with close to zero revenues) and had unspecified costs (leading to limited – or no - profitability) in 2021</u>.

Touchstone is, instead, a company that willfully laid off all of its field employees at the end of 2021 and whose owner/COO left the company at the end of 2021. The company ceased operating at the end of 2021. It did so in a fiscal year during which its net income was somewhere around $200,000 (not counting unpaid liabilities towards a number of financial institutions which are claimants in this proceeding).

Anecdotally, Touchstone made a settlement offer to us in July of 2022, immediately after our arbitration hearing. Its offer was to buy our house (in the condition in which they had left it). Even at that point in time (i.e., before the completion of the renovation), the market value of the house was larger than that of their total debt, as reported in the Petition.

Here is the language they used.

> *Alternate Resolution*
> *Touchstone Remodelers is putting forward an alternate resolution to AAA Case No. 01-21-0018-1548. The Bandi Residence project still requires significant design work and many months ahead of construction. The Bandis mentioned that they are in a "permanent solution" regarding their housing arrangement. Therefore, Touchstone would like to make a cash offer on the property, which would allow the Bandis to walk away from the property and the stress associated with completing the project. To do so, Touchstone would require a inspection to confirm conditions of the property (based on 11/1/21 status), and engagement with an attorney for negotiations related to property acquisition.*

We can provide you with the full document upon request.

**I refer you to Official Form 206A/B and Official Form 206 Sum:**

These forms provide (at best) a representation of Touchstone's assets and liabilities as of 4/28/2023, the time of filing. They do not say anything about Touchstone's assets and liabilities at the time when Touchstone decided to cease operations (the end of 2021).

Not only do we have information suggesting that Touchstone was profitable in 2021 (and possibly a lot more profitable in cash terms than suggested by Table 1 above due to unpaid credit/debit card debt), we also have information suggesting that Touchstone may have had physical and non-physical assets (i.e., additional bank accounts) in 2021.

**Physical assets**

In its response to Part 8 of Official Form 206A/B, Touchstone states that it only has physical assets valued at $5,000.00 (with a net book value of $0.00). Such assets consist of a table saw, scaffolding, power washers and various other machinery, fixtures and equipment that were left at its previous warehouse address (and possibly legally abandoned).

Touchstone's response may be inconsistent with the fact that, in 2021, Touchstone may have had two depreciation expenses. If Touchstone no longer owns depreciable assets, we would like to understand what happened to those assets. Were they sold or transferred? If so, where are the proceeds of the relevant sale(s)?

Specifically, in its Unspecified Expenses Transaction Report (Exhibit 11) Touchstone reported monthly Journal Entry Expenses described as "Other Operating Expenses: Depreciation" which were recorded the last day of each month (our data begins 3/3/2021 and ends 11/30/2021):

| | |
|---|---|
| Depreciation expense | $62.42 (Split)* |
| Depreciation expense** | $802.67 (Split) |

Assuming Touchstone accounted for these expenses throughout the 2021 calendar year, they would have totaled $10,381.08 ($62.42 x 12 = $749.04; $802.67 x 12 = $9,632.04; $749.04 + $9,632.04 = $10,381.08).

*The reference to "Split" is not defined in the documents provided to us.

**We suspect that this expense may relate to an airplane (specifically a 1981 Mooney M20K, discussed further below) based on handwritten notes that we received from Touchstone discussing accumulated depreciation and a $77K NBV (presumably net book value) in the context of a "airplane." We can provide you with a copy of these notes upon request.

Below are the physical assets which may have been owned/controlled by Touchstone or its Managing Members:

<u>Automobiles, trucks</u>:

- Truck with Touchstone emblem (pictured in front of its warehouse). *See* Exhibit 12.
- Bobcat digger (abandoned at our house and subsequently – apparently retrieved). *See* Exhibit 13.
- Porsche Cayenne S/GTS, likely 2018 or earlier (Maryland license plate no. 3DE7012). This may have been Mr. Srigley's personal car, rather than a corporate car. *See* Exhibit 14.

<u>Aircraft and accessories</u>:

We believe that Touchstone controlled, and was the effective owner, of the following aircraft (the "Mooney M20K"):

> 1981 Mooney M20K
> Serial number: 25-0598
> Registration number: N233JB

As discussed below, Touchstone assets may have been used to pay for expenses relating to the ownership and operation of the Mooney M20K, as well as expenses related to pilot training and education (likely those of Mr. Srigley, who is apparently a pilot). According to his bio on Touchstone's former website, Mr. Srigley "holds an instrument-rated, multiengine commercial pilot's license and on weekends he enjoys flying his four-seat Mooney...." *See* Exhibit 15. As indicated above, Touchstone may also have depreciated the Mooney M20K on its balance sheet and income statement.

With respect to the actual ownership of the Mooney M20K, its official former owner was:

> Srigley Development Co LLC
> 2214 Distribution Cir
> Silver Spring, MD 20910-1259
> Registered agent: Benjamin R. Srigley

Srigley Development Co LLC is an active Maryland LLC. It is, however, not in good standing for its failure to file 2022 and 2023 annual reports.

The Mooney M20K was sold/transferred by Srigley Development Co LLC to its current owner, N233JB LLC*. We believe the sale/transfer occurred on - or about - August 4, 2022.

According to FlightAware, as of 9/25/2017, Srigley Development Co LLC was the registered owner of the Mooney M20K. On 8/4/2022, the registration was listed as "pending." N233JB LLC subsequently became the registered owner of the Mooney M20K on

1/17/2023. https://flightaware.com/resources/registration/N233JB. We also verified the 1/17/2023 registration date with the Federal Aviation Administration. https://registry.faa.gov/aircraftinquiry/Search/NNumberResult?NNumberTxt=233JB

*N233JB LLC, is a Maryland LLC formed on 2/17/2022. Its registered agent is:

> Thomas Francis Barrett LLL
> 6237 Walhonding Rd
> Bethesda MD 20816

We do not know if Srigley Development Co LLC was formally a subsidiary or other affiliate of Touchstone. If not, we are unclear as to why the plane was likely depreciated on Touchstone's books. In its response to item 31 of Official Form 207, Touchstone stated that it has not been a member of any consolidated group for tax purposes within 6 years before the filing of the Petition.

We also do not understand why the nature of Touchstone's former business, a general contractor for residential remodeling, would necessitate the use of a private plane. To the best of our knowledge, Touchstone's business was local. We believe it was only licensed to do business as a general contractor in the District of Columbia and in Maryland.

**Expenses related to physical assets**

Aircraft, flight and piloting-related expenses:

Touchstone reported the following expenses in its Expenses by Vendor Summary (Exhibit 8):

| | |
|---|---|
| Aerox Aviation Oxygen | $339.86 |
| Air Power | $1,890.00 |
| Aircraft Owners | $189.00 |
| Skyport Services | $98.09 |
| US Aircraft Finance | ($2,128.98) |
| US Aircraft Insurance | $2,143.00 |
| ---------------------------------------------------------- | |
| Total: | $2,530.97 |

In its Unspecifed Expenses Transaction Report (Exhibit 11), it reported additional aircraft and piloting-related expenses, described as "Other Operating Expenses: Auto/Truck: M20K Repair & Maintenance" and "Other Operating Expenses: Education and Training."

| | |
|---|---|
| Banyan Air Service* | $510.89 |
| "Customer Withdrawal Image"** | $11,945.52 |
| Foreflight LLC*** | $399.01 |

| | |
|---|---|
| "Pilot Proficiency" | $150.00 |
| Seven Rivers Aviation**** | $1,079.23 |
| Total: | $14,084.65 |
| Combined total: | $16,615.62 |

*Banyan Air Service (Ft. Lauderdale, FL) https://www.banyanair.com/: "Our 24-hour, full-service fixed base operation is conveniently located in South Florida and has been serving aircraft owners, charter operators, corporate flight departments, flight schools and governmental agencies since 1979."

**The withdrawal references a Bank of America account ending 3252. Based on Touchstone's Petition, this is its corporate account.

*** ForeFlight LLC (Houston, TX) https://foreflight.com/: "ForeFlight formed in 2007 with one guiding mission: Create software that makes flight planning easier.... We serve the needs of pilots and flight departments all over the world, and across all segments of aviation including personal, business, military, commercial, and education."

****Seven Rivers Aviation (Georgetown, SC) https://sevenriversaviation.com/: Seven Rivers Aviation, LLC is the full-service Fixed Base Operator (FBO) for the Georgetown County Airport.

Auto/Truck maintenance expenses:

These expenses may be legitimate, but we are including them in the event that they are improper or relate to undisclosed physical assets.

| | |
|---|---|
| Light Truck Service Co. | $1,728.23 |
| Speed Auto Service | $1,250.71 |
| Total: | $2,978.94 |

*See* Exhibits 8 and 11.

Uncategorized expense:

In its Unspecifed Expenses Transaction Report (Exhibit 11), Touchstone references the following "Uncategorized Expense":

- 12/8/2021: MD TLR cash withdrawal from CHK 3252      $4,400.00 (BofA 3252)

We would like to understand the nature of this expense.

**Non-physical assets (cash and cash equivalents)**

In its Petition, in Part 1 of Official Form 206A/B, as cash or cash equivalents owned or controlled by the debtor, Touchstone reports a single checking account with a current value of $0.00. This is the Bank of America checking account ending in 3252. We know that Touchstone had at least one other bank account in March of 2021. We do not know whether this account still exists.

The account reported in the Petition is the following:

**BofA 3252 (Disclosed Checking Account):**
- Checking Account #--------3252*
  Routing #054001204
- As of 6/13/2022, the balance was $7,667.60.
- We have bank statements and copies of checks pertaining to this account for the period of March 2021 to December 2021. They have been heavily redacted, particularly from September 2021 onward.
- Importantly, based on the average daily ledger balances, the statements do not contain any evidence that our initial wire transfer to Touchstone of $280,000.00 (see below) was ever transferred into this account (at least not in a lump sum).

Again, in 2021, Touchstone also had – at least – a second account.

**BofA 6490 (Undisclosed Checking Account):**
- Checking Account #--------6490*
  Routing #026009593
- The account existed in March of 2021.
- We made a wire transfer in the amount of $280,000.00 into this account on 3/19/2021, after receiving wire transfer instructions from Mr. Srigley. *See* Exhibit 16.
- On 3/20/2021 Mr. Srigley confirmed by email that the $280,000.00 had posted and was "safely in our business account." *See* Exhibit 17.

*We have the full checking account numbers, if they are needed.

We do not know if the BofA 6490 account, the BofA 3252 account, or any other account was used to receive any or all of our other payments to Touchstone (or those of other clients). All of our remaining payments to Touchstone were made through Intuit QuickBooks.

**Finally, I refer you to Official Form 207 again:**

Question 28, 29, and 30 are about control of the company and payments to insiders. The form suggests that Benjamin Srigley was the sole Managing Member and Officer of Touchstone and the sole person who received distributions from the company.

We have information indicating that Dr. Cynthia Srigley (Benjamin's wife) was both a Managing Member and an Officer of Touchstone at the time the company ceased operations (the end of 2021).

As late as December 21, 2021, Dr. Srigley was an owner of Touchstone as well as its Chief Operations Officer (COO). *See* Exhibit 1; an excerpt discussing Dr. Srigley's ownership position is cited below. It was public knowledge at the time that Dr. Srigley was the COO. This information was clearly disclosed on Touchstone's former website. *See* Exhibit 18.

Dr. Srigley, to the best of our knowledge, is currently employed full-time as a Research Chemist at the Food and Drug Administration. She may no longer be an owner of Touchstone. If that is the case, we wonder whether either Touchstone or Mr. Srigley bought out her ownership of the company.

According to Touchstone, Dr. Srigley fulfilled several roles at Touchstone in recent years. Most of these roles were described by Touchstone as "unofficial, uncompensated." However, in May of 2021, Dr. Srigley assumed her first official role for Touchstone, that of COO. She assumed this position after taking an unpaid leave of absence from her position at the FDA (in Exhibit 1, Touchstone's Response to Interrogatories, cited below, Touchstone states that Dr. Srigley resigned from her FDA position. This statement is inaccurate; she took a leave of absence).

With respect to compensation as COO, it is unclear if, how and/or in what amount Dr. Srigley was compensated. In its February 2, 2022 arbitration counterclaim (Exhibit 6; in particular Item 8 of Appendix IX), Touchstone claimed damages both for Dr. Srigley's salary during the period of time she worked as COO for Touchstone (5/3/2021 through 12/31/2021) and for costs to replace her as an employee in 2022 (she returned to her FDA position at the beginning of 2022). Touchstone based the amount of its damages on the implied claim that it had paid Dr. Srigley an annual salary of $138,866.00.

Subsequently, in its response to interrogatories, Touchstone claimed that Dr. Srigley was not paid directly by Touchstone, that Touchstone had never paid her an annual salary of $138,866.00. Rather, Touchstone claimed that her pay was accounted for as a $73,645.09 contribution the Srigley family made by not taking regular paychecks from the FDA between 5/3/2021 and 12/31/2021. This amount of $73,645.09 was reinvested back into Touchstone.

Excerpts from Touchstone's Response to Interrogatories *See* Exhibit 1 for the full text.

11

14. As of each of the following dates, set out the names of those persons comprising Touchstone's entire staff (including full-time employees, part-time employees, consultants, and 1099 contractors, and as to each such person, state whether the person was a full-time employee, a part-time employees, a consultant, or a 1099 contractor: March 18, 2021, August 1, 2021, November 1, 2021, and December 21, 2021.

*Response: Table 2 lists Touchstone Remodelers' staff on the specified dates.* [Italics added]

*Table 2. Listing of Touchstone Remodelers' staff on specified dates* [Note that this is a partial list; all references to other staff have been removed]

| Date | Name | Affiliation | Relationship |
|------|------|-------------|--------------|
| 3/18/21 | Cynthia Srigley | Touchstone Remodelers | Consultant |
| 8/1/21 | Cynthia Srigley | Touchstone Remodelers | Owner |
| 11/1/21 | Cynthia Srigley | Touchstone Remodelers | Owner |
| 12/21/21 | Cynthia Srigley | Touchstone Remodelers | Owner |

19. Identify and describe all positions, paid or unpaid, that Cindy Srigley has held in Touchstone, and for each such position, state the start and end dates, the duties she performed, and her salary or compensation.

*Response:*

- *Direct of Business Development (unofficial, uncompensated): 8/1/19–5/3/2021; In August 2019, Ben and Cindy began a marketing initiative to rebrand and grow Touchstone Remodelers into a thriving business. Cindy was directly involved in creating the new logo and helping to build the new website. She sourced new sales and marketing collateral, steered marketing initiatives, and assisted with recruiting activities to hire an Office Manager, Outside Sales Manager, and Estimator. She led weekly Business Development meetings from May–October 2020. Cindy became more and more involved in daily conversations relating to Touchstone operations, but still maintained her position at the FDA. Her outside activities with Touchstone Remodelers have been documents in FDA HHS-520 and HHS-521 reports since September 2020.*
- *Office Manager (unofficial, uncompensated): 12/18/2020–5/2/2021; Cindy assumed the role of Office Manager after the current Office Manager was laid off because of the Covid-19 pandemic. Ben trained Cindy to perform his system of AR/AP and she assumed procurement responsibilities.*
- *Chief Operations Officer (official): 5/3/21–12/31/21; At the end of April 2021, Cindy resigned from her 10-year career at the FDA to join the Touchstone Remodelers as COO. Her*

12

*responsibilities included oversight of human resources, marketing, business development, procurement, and accounting. She also led weekly Microsoft Project and Production meetings. Cindy was not paid directly by Touchstone Remodelers. Rather, her pay was accounted for as the contribution the Srigley family made by not taking regular paychecks from FDA between 5/3– 12/31/21. Cindy's annual salary at the time of contract signing was $138,866 and, in 2021, she was paid a total $65,220.91 by FDA; the difference of $73,645.09 is Cindy's compensation for working at Touchstone Remodelers. This amount was reinvested back into Touchstone.*

## Miscellanea

The form contains other omissions/misstatements. For example:

1. Official Form 206E/F: As of the Petition filing date our claim is not $876,707.21. Interest on $852,503.52 of the arbitration award/judgment should be calculated from September 2, 2022 (the award date).
2. Official Form 207. Contrary to Touchstone's representation, our Motion to Confirm Arbitration Award was not pending as of the Petition filing date. Touchstone was notified in March of 2023 that the arbitration award was confirmed as a judgment by the Superior Court of the District of Columbia. The order of judgment was issued on March 10th, 2023.

## LIST OF EXHIBITS

Exhibit 1:  Touchstone Remodelers' Response to Interrogatories (AAA Case No. 01-21-0018-1548)

Exhibit 2: Touchstone Remodelers' Production of Requested Documents

Exhibit 3: Screenshot dated 11/11/2022 of DCRA's CorpOnline webpage showing Touchstone's status as "Revoked"

Exhibit 4: Screenshots dated 5/31/2023 of DCRA's CorpOnline webpage showing Touchstone's status as "Dissolved" and list of biennial reports

Exhibit 5: Screenshots dated 5/31/2023 of Maryland's egov.maryland.gov webpage showing Touchstone's status as "Forfeited"

Exhibit 6: Touchstone Remodelers' Defense and Counterclaim (Federico M. Bandi and Angela M. Bandi vs. Touchstone Remodelers, LLC; AAA Case Number 01-21-0018-1548) filed February 2, 2022; Appendix IX to Defense and Counterclaim

Exhibit 7: Touchstone Remodelers Sales by Client Summary (March 18 - December 17, 2021).

Exhibit 8: Touchstone Remodelers Expenses by Vendor Summary (March 18 - December 17, 2021)

Exhibit 9: Touchstone Remodelers Owner's Distributions Account Quick Report (January - March 2021)

Exhibit 10: Touchstone's 2021 quarterly Form 941 filings

Exhibit 11: Touchstone Remodelers Unspecified Expenses Transaction Report (March 18 - December 17, 2021)

Exhibit 12: Photo of truck with Touchstone emblem parked in front of its warehouse

Exhibit 13: Photo of Bobcat digger left at our house when the property was abandoned

Exhibit 14: Photo of Porsche Cayenne S driven by Mr. Srigley, parked in the rear of our property

Exhibit 15: Screenshot of Benjamin Srigley's bio from Touchstone's former website (www.touchstoneremodelers.com)

Exhibit 16: March 18, 2021 email from Benjamin Srigley to Federico Bandi containing wire transfer instructions for initial deposit

Exhibit 17: March 20, 2021 email from Benjamin Srigley to Angela Bandi confirming receipt of wire transfer into "our business account"

Exhibit 18: Screenshot of Cynthia Srigley's bio from Touchstone's former website (www.touchstoneremodelers.com)

## Touchstone Remodelers' Response to Interrogatories
AAA Case No. 01-21-0018-1548

1.    In Table 5 of Appendix 9, Touchstone identifies components of its claimed overhead expenses of $106,096 "over the period of the active project of March 18–December 17, 2021." State the basis of your contention that the Bandis' are responsible for Touchstone's overhead expense "over the period of the active project of March 18–December 17, 2021" and state why Touchstone has not reduced the $106,096 by the portion of overhead already recovered by Touchstone from the Bandis' payments under the Contract. (See the definition of "state the basis" above.)

**Response:** The Bandi Residence project was under contract between March 18–December 17, 2021. During this time, Touchstone Remodelers incurred indirect overhead expenses to maintain the construction office/warehouse, information technology (IT) services, insurance, licensure, and vehicle expenses, and indirect labor expenses to pay salaries for the Chief Executive Officer (CEO), Chief Operations Officer (COO), Administrative Assistant, and Outside Sales Manager. Total overhead costs for March 18–December 17, 2021 were $260,425.37.

Total sales for March 18–December 17, 2021 were $1,555,335.90. The Bandis' contracted work ($645,693.55) accounted for 41.5% of this volume. We applied a 41.5% adjustment to the total overhead costs to obtain the portion attributable to the Bandi Residence project (i.e., $106,095.65).

In our Counterclaim document submitted on 2/2/22, we calculate $992,471 in total expenses, overhead, and damages applicable to the property. This amount was reduced by the sum of payments made by the Bandis ($645,693.55), leaving a counterclaim amount of $346,777.45. Overhead costs were accounted for only once in these calculations.

2.    Touchstone identifies $16,065 in "Additional Cost Incurred" in Table 6 of Appendix 9, which Touchstone describes as "[u]nbilled fees for design services." As to each individual fee (or cost) listed in the table, state (a) the date on which Touchstone performed the service, (b) the date on which your communicated to the Bandis that Touchstone intended to charge them for such service (or that they were responsible for such service), and (c) whether the Bandis agreed in writing to pay Touchstone for the service.

**Response:** The Bandis hired Touchstone Remodelers based on a specific set of construction documents. The drawings lacked in detail and required additional design information to be provided (e.g., the window and door schedule was incomplete and showed inconsistencies with the plans). Touchstone did not have a design contract with the Bandis but we provided additional design services, at no extra cost to the Clients, in order to move the project forward and keep on schedule. The additional work was significant and caused tremendous strain on the executive team.

Touchstone had originally not intended to bill for the additional design services. However, after dedicating dozens of hours on window, siding, and electrical design discussions, we recognized

that the Bandis were taking advantage of our generosity and ignoring the project timeline. We started declining to participate in design discussions and ultimately maintained our assertion that we would not provide an electrical plan for the Clients.

Touchstone Remodelers provided 119 hours of unbilled design services on the Bandi Residence project. **Table 1** lists the services performed, the date specified and the resulting emails and Microsoft Teams communications. Touchstone informed the Bandis of our $135/hour billable rates for design services on 1026/21.

Touchstone is claiming $16,065 in additional costs incurred for design fees. The hours we applied to these services, primarily by the CEO and COO, could have been applied to other sales, marketing, or business development activities.

3.  In Table 1 to Touchstone's Defense and Counterclaim, Touchstone lists "Employee Replacement Costs" of $218,866 ("100% of COO and Senior Project Manager annual salaries"). State the basis of your contention that the Bandis are responsible for such Employee Replacement Costs and set forth how Touchstone calculates such costs. (See the definition of "state the basis" above.)

**Response:** Touchstone Remodelers' field crew were laid off on 11/19/21 due to a lack of work on the Bandi Residence project. We performed all work as we could on the project and documented progress in our Weekly Update emails. On 11/1/21, and only when we had no more work to perform on the Project did we stop work. We anticipated that the Bandis would provide the requested design information quickly, but after almost three weeks without work, we found ourselves unable to continue funding employee payroll. We had intended to have the field crew working on the Bandi Residence project from November 2021 through January 2022, focusing first on the main house remodel, so that the Bandis could move back in, and then transition to the garage and patio area work. This schedule would have bridged the gap until the start of the Smothergill-Maniko Residence project in late January 2022. Adam Metzger's taking employment elsewhere was a direct result of his layoff on 11/19/21.

As for Cindy Srigley, after resigning from her Research Chemist position at the Food and Drug Administration (FDA) in April 2021, Cindy's supervisors offered her an alternate extended leave of absence through the end of December 2021. She and Ben had dreams of growing Touchstone into a thriving business, but the delays caused by the Bandis left her and Ben feeling insecure about the short-term financial outlook for the company. With the Bandi Residence project on hold and the Smothergill-Maniko Residence project still several weeks out, Cindy and Ben made the difficult decision of giving up on their dreams; Cindy would have to return to her previous appointment at the FDA.

Employee replacement costs are estimated at 100% of the employees' salaries for these key positions. Replacement costs take into consideration recruiting, training, knowledge transfer, current state of the job market, and inflation.

Reference: Enrich Financial Wellness. 2022. The Cost of Replacing an Employee. January 11, accessed at https://www.enrich.org/blog/The-true-cost-of-employee-turnover-financial-wellness-enrich.

4.      In Touchstone's Appendix 9, it states as follows: "On January 21, 2022, Touchstone informed the architect that we were unable to begin construction because of the arbitration and concerns for putting client funds at risk." Set out the all the reasons for Touchstone's "concerns for putting client funds at risk" and why such reasons caused Touchstone to be unable to begin construction.

Response:  Anticipating arbitration, Touchstone Remodelers informed Architect Kevin Winkler that we were unable to begin construction on the Smothergill-Maniko Residence project in late January as planned. At that time, we were anticipating the arbitration case to proceed relatively quickly and expected the evidentiary hearing to occur in February/March 2022. We expected to spend a significant time preparing for arbitration and did not have the labor resources to manage a large construction project at the same time. With the Senior Project Manager having taken employment elsewhere, Ben anticipated having to manage the project himself and assume Cindy's COO responsibilities after her return to the FDA. Touchstone did not have the bandwidth to manage this project and the arbitration case, putting at risk our process and quality standards. We therefore declined to take on the project.

5.      Identify the schedule that Touchstone contends is the baseline schedule for performing the Work, and state the date on which Touchstone communicated this schedule to the Bandis.

Response:  The original schedule was established in the home renovation Contract, which specified the approximate start and completion dates as 3/18/21 and 8/9/21, respectively. The Selections Schedule, also included in the Contract, laid out the timeline for design decisions and onsite due dates for fixtures, cabinets, appliances, tile, and countertop materials. The signed Contract indicated the Bandis' acknowledgement of the timeline.

The Helical Pier Foundation Change Order extended the approximate completion date to 11/19/21 and a new Selections Schedule was provided in a separate Excel workbook. The revised Selections Schedule timeline was discussed with the Bandis during a virtual meeting with the CEO and COO on 6/25/21.

Touchstone continually informed the Bandis of the Project schedule in Weekly Update emails. Here, we reported work accomplished that week, planned work for the following week, requests for information, and questions for the architect/technical issues. Tasks on the critical path were noted as directly impacting the Project schedule.

6.      Describe the process by which Touchstone prepared its schedules for performing the Work and the dates on which it communicated each schedule to the Bandis. Include in your answer how Touchstone determined activity durations and logic ties between activities.

Response:  Touchstone Remodelers uses Microsoft Project for project scheduling. Cindy Srigley, who holds a Master's Certificate in Project Management, initiated the Microsoft Project program at Touchstone Remodelers in October 2020. She, Senior Project Manager, Adam Metzger, and Project Manager, Rob Shearin, all took a 5+ hour LinkedIn Learning course on Microsoft Project and applied this knowledge to managing project timelines for Touchstone

Remodelers. Cindy Srigley and Rob Shearin also held weekly Microsoft Project meetings, starting in May 2021, to manage employee and material resources across job sites. They consulted with the production experts, Ben Srigley and Adam Metzger, to ensure that activity durations were accurate and dependencies properly captured.

The Microsoft Project files were kept internal to Touchstone and not shared with the Bandis. Rather, we used the Gantt Charts and timescales to plan work for the upcoming weeks and coordinate additional 1099 subcontractors as needed. Touchstone maintained its responsibility to adhere to the Project schedule and informed the Bandis of tasks impacting the critical path in our Weekly Update emails (see response to # 5).

7.   If Touchstone provided any schedules to its subcontractors, identify which schedules Touchstone provided to which subcontractors and when Touchstone provided them. If Touchstone did not provide any schedules to its subcontractors, then state so.

Response: Touchstone does not provide formal project schedules to its subcontractors. Rather, we schedule our subcontractors by email, typically coordinated by the COO, Senior Project Manager, or Superintendent. While the Bandi Residence project was under contract, we held weekly Production meetings to discuss the project schedule and coordination of subcontractor labor.

8.   If Touchstone received any schedules or schedule input from its subcontractors, identify each schedule or schedule input provided. If Touchstone did not receive any schedules or schedule input from its subcontractors, then state so.

Response:  As noted in our response to # 7, Touchstone schedules its subcontractors by email, and this typically occurs one week in advance. For the Bandi Residence project, the only subcontractor who was unable to meet the one-week initial scheduling request was BMC Installation Heating & Air Conditioning LLC. The HVAC work was an open topic for several weeks and by the time the Bandis had made a final decision on scope, we learned that BMC was scheduling work for two weeks out. We accepted their timeframe, and it would end up not having any impact on the Project schedule because of the incomplete electrical plan which prevented us from getting a close-in inspection and moving on to insulation and drywall.

9.   In Cindy Srigley's May 7, 2021 email to Michael Sewell, she describes the "18–20 week lead time" associated with the Oko Skin siding. Identify the dates on which (a) Touchstone first learned of the lead time for the Oko Skin siding and (b) communicated the lead time to the Bandis.

Response:  Touchstone first learned of the 18–20 week lead time for the Oko Skin siding on 5/6/21. We informed the Bandis' Architect of this lead time on 5/7/21 and worked together to learn more information about product availability options. We had additional communications with the vendor on 5/11–5/12/21 to discuss issues related to the installation over wood furring strips.

The 18–20 week lead time was not the main issue with the Oko Skin siding. Rather, the siding could not be built the way it was drawn. The plans called for the installation of Oko Skin siding over wood furring strips with ¼" gaps. The ¼" gaps were carefully designed to line up with the windows, doors, and trim features. The manufacturer advised against the installation over wood furring strips because of the tendency for wood to swell/shrink with seasonal changes. In addition, the manufacturer would not warranty the product if the gaps fell below ¼", and therefore Touchstone declined to warranty the installation. The manufacturer proposed an alternate installation using metal hat channels which were quoted at an additional $9,104 before markup. Rather than paying for the metal hat channels, the Bandis wanted to investigate alternate siding options.

A detailed discussion of the Oko skin siding topic is provided in Touchstone's Counterclaim document submitted on 2/2/22.

10. State the basis of Touchstone's claiming lost profits against the Bandis, and explain how Touchstone calculates its claimed lost profits. (See the definition of "state the basis" above.)

**Response:** Touchstone Remodelers is claiming lost profits as a result of the Bandis being in material breach of the home renovation Contract for not providing critical design information. According to our 3/13/21 estimate, which was used to build the Construction Proposal, the expected profits were $76,211.32, or 9% of the contract amount. We typically aim for 10–18% profits but reduced our margins to win the Project.

Gross profit margin for construction projects in the United States averaged 17–23.5% in 2020, with profits reaching as high as 42% for remodeling projects. We therefore included an 18% profit margin in the calculation of total expenses, overhead, and damages in our 2/2/22 Counterclaim document.

Reference: Next Insurance. 2022. Typical contractor overhead and profit margin – calculate your business potential. January 11, accessed at https://www.nextinsurance.com/blog/typical-contractor-overhead-profit-margin/.

11. State whether Touchstone contends that sediment- and erosion-control issues delayed completion of the Project (i.e., critical-path delays), the basis of your contention, and whether Touchstone or the Bandis are or were responsible for any such delay. (See the definition of "state the basis" above.)

**Response:** Touchstone Remodelers is not claiming any delays to the Project schedule due to sediment and erosion-control issues. The project timeline was reset on 6/18/21 with the Helical Pier Foundation Change Order, after the sediment and erosion-control issues had occurred. The new approximate completion date was 11/19/21. This document was signed by Federico Bandi, acknowledging receipt.

12.     Identify and describe all delays to completion of the Project (i.e., critical-path delays) caused by Touchstone (or its subcontractors, suppliers, or other contractees) or for which Touchstone is responsible and state the duration of each such delay.

**Response:**  Touchstone Remodelers is not responsible for any delays to the Project timeline. Project delays were caused by the Bandis. Their failure to provide a complete electrical plan and front door design information impacted the critical path and ultimately halted the project. There were additional delays related to tile shipping and cabinets installation, but neither impacted the critical path because the Project could not advance beyond rough-in stage without the electrical plan and front door design.

13.     List the dates on which Touchstone was first informed or learned that Adam Metzger, Don Fink, and Rob Shearin, respectively, had decided to disassociate with Touchstone (or the date on which Touchstone decided to terminate each person's employment), and for each such person, set out the all the reasons for such disassociation (or termination).

**Response:**
*   Adam Metzger was laid off on 11/19/21 due to a lack of work on the Bandi Residence project. Cindy Srigley spoke with Adam on 1/7/22 and learned that he had taken employment elsewhere. Adam was an employee of Touchstone Remodelers since 12/26/13 and had previously been laid off in 2020 because of the Covid-19 pandemic. We believe that this second layoff and the financial uncertainty of the company, due to lack of work on the Bandi Residence project and the imminent arbitration case, caused Adam to seek employment elsewhere.
*   Don Fink was laid off on 11/19/21 due to a lack of work on the Bandi Residence project. Executive Assistant, Jennifer Doss, received a text message from Don on 3/8/22 informing her that he had taken employment elsewhere because it was "what he had to do". Don was an employee of Touchstone Remodelers since 10/5/15 and had previously been laid off in 2020 because of the Covid-19 pandemic. We believe that this second layoff and the resulting financial hardship on his family caused Don to seek employment elsewhere.
*   Rob Shearin submitted his letter of resignation on 10/1/22. Rob's reason for disassociation was that he was taking a position with his former employer, which was more in line with his educational background and better for his family and career trajectory.

14.     As of each of the following dates, set out the names of those persons comprising Touchstone's entire staff (including full-time employees, part-time employees, consultants, and 1099 contractors, and as to each such person, state whether the person was a full-time employee, a part-time employees, a consultant, or a 1099 contractor: March 18, 2021, August 1, 2021, November 1, 2021, and December 21, 2021.

**Response:**  **Table 2** lists Touchstone Remodelers' staff on the specified dates.

15.     As of each of the following dates, describe and quantify Touchstone's backlog, as represented by the dollar value of work under signed contract: March 18, 2021, August 1, 2021, November 1, 2021, and December 21, 2021.

       **Response: Table 3** lists Touchstone Remodelers' backlog on the specified dates.

16.     Identify all proposals or quotes that Touchstone received from M Electrical LLC, including but not limited to proposals or quotes received in September and October 2021, relating to the Project.

       **Response:** M Electrical LLC submitted four proposals related to the Bandi Residence Project.
- M Electrical submitted their first proposal on 2/23/21. The total amount was $24,635.00 for the interior work (excluding exterior landscaping and garage), which was captured in the home renovation Contract with the Bandis.
- The Bandis provided a revised electrical plan on 9/20/21. It contained several inconsistencies and ambiguities. An onsite meeting was held on 9/22/21 between Touchstone's Senior Project Manager, M Electrical owner, and Angela Bandi to try to resolve the discrepancies. M Electrical LLC submitted a proposal on 9/24/21 to quantify the requested changes. The total amount was $31,630.00, or $6,995.00 more than the original proposal.
- M Electrical submitted the third proposal on 9/28/21, at the request of Touchstone, to capture specific changes from the revised electrical plan and 9/22/21 onsite meeting. The total amount was $6,995.00 and we confirmed by email that the 200-amp service upgrade would cost $2,800. Cindy Srigley attempted to reconcile the 9/28/21 proposed changes with the original and revised electrical plans and scheduled a call with M Electrical on 10/1/21 to discuss. A major issue was that the revised electrical plan showed outlet locations that were different than existing (Angela confirmed by email that she indicated outlet locations by memory). If we were to proceed with the revised plan, then the outlets that were being relocated would need to be rewired as new, versus just replacing the outlets per the original construction documents. The new outlets were a major contributor to the upgrade cost. A second onsite meeting was scheduled for 10/6/21.
- M Electrical submitted the fourth proposal on 10/11/21. Cindy again attempted to reconcile differences between the original and revised electrical plans and onsite meetings, and scheduled another call with M Electrical on 10/12/21 to discuss. Touchstone sent the Bandis an Electrical Update Change Order on 10/19/21 in the amount of $2,200. Federico Bandi responded that a change order was premature because he wanted to make sure that "the new plan" correctly incorporated all changes and because there was disagreement in the contract language. Touchstone responded that it was the Bandis' responsibility to produce a final, complete electrical plan, not Touchstone's. Our team dedicated substantial hours attempting to reconcile the electrical scope. This effort was not captured on any change order, rather Touchstone offered to provide the electrical changes at no additional markup.

17.     Set forth all the reasons why Touchstone did not direct Piedmont Geotechnical to test the soil in the patio area at the same time Piedmont Geotechnical tested the soil in the area of the addition.

        **Response:**  Soil testing was performed for the new addition after the discovery of soft soil conditions on the property during excavation. Touchstone declined to perform soil testing for the patio area at the same time because soil testing would also be required for the new garage area, and the garage work had yet to be permitted. The garage permit involved a modification to the erosion control plan and relocation of the silt fence to fit within limits for maximum total area of disturbance. Touchstone could not excavate the garage area to test the soil until the permit was approved and the silt fence relocated. Therefore, we knew that Piedmont Geotechnical would have to return to test the garage area and so we had planned to have the patio area tested at the same time.

18.     Identify all outstanding payment claims by any of Touchstone's subcontractors, suppliers, or other contractees against Touchstone relating to the Project.

        **Response:**  There is one outstanding payment claim on the project. Coutts Plumbing requested payment of $20,800 for completion of rough ins. Touchstone Remodelers paid $14,300 toward this bill. The remaining balance of $6,500 was withheld to cover expenses related to a plumbing insurance claim on a separate project.

19.     Identify and describe all positions, paid or unpaid, that Cindy Srigley has held in Touchstone, and for each such position, state the start and end dates, the duties she performed, and her salary or compensation.

        **Response:**
        - Direct of Business Development (unofficial, uncompensated):  8/1/19–5/3/2021; In August 2019, Ben and Cindy began a marketing initiative to rebrand and grow Touchstone Remodelers into a thriving business. Cindy was directly involved in creating the new logo and helping to build the new website. She sourced new sales and marketing collateral, steered marketing initiatives, and assisted with recruiting activities to hire an Office Manager, Outside Sales Manager, and Estimator. She led weekly Business Development meetings from May–October 2020. Cindy became more and more involved in daily conversations relating to Touchstone operations, but still maintained her position at the FDA. Her outside activities with Touchstone Remodelers have been documents in FDA HHS-520 and HHS-521 reports since September 2020.
        - Office Manager (unofficial, uncompensated):  12/18/2020–5/2/2021; Cindy assumed the role of Office Manager after the current Office Manager was laid off because of the Covid-19 pandemic. Ben trained Cindy to perform his system of AR/AP and she assumed procurement responsibilities.
        - Chief Operations Officer (official):  5/3/21–12/31/21; At the end of April 2021, Cindy resigned from her 10-year career at the FDA to join the Touchstone Remodelers as COO. Her responsibilities included oversight of human resources, marketing, business development, procurement, and accounting. She also led weekly Microsoft Project and Production meetings. Cindy was not paid directly by Touchstone Remodelers. Rather,

her pay was accounted for as the contribution the Srigley family made by not taking regular paychecks from FDA between 5/3–12/31/21. Cindy's annual salary at the time of contract signing was $138,866 and, in 2021, she was paid a total $65,220.91 by FDA; the difference of $73,645.09 is Cindy's compensation for working at Touchstone Remodelers. This amount was reinvested back into Touchstone.

**Table 1.** Additional costs incurred for unbilled design services

| Topic | Email Title | Date Start | Date End | Hours | Comments |
|-------|-------------|-----------|----------|-------|----------|
| Siding | RE: Quote request | 5/6/2021 | 8/18/2021 | 8 | On 8/18/21: Our clients are now interested in installing concrete skin panels (4'x10') |
| | RE: Oko Skin Siding: 18-20 Week Lead Times | 5/7/2021 | 5/7/2021 | 2 | Siding cannot be installed as designed |
| | RE: Questions About Oko Skin Siding | 5/11/2021 | 5/12/2021 | 3 | Additional design discussion |
| | OKO skin take-offs/for information only | 5/11/2021 | 5/11/2021 | 0.5 | Additional design discussion |
| | OKO skin siding (Teams Message) | 5/26/2021 | 6/7/2021 | 0.25 | Additional design discussion |
| | Bandi Coordination Meetings | 6/25/2021 | 7/2/2021 | 1 | Additional design discussion |
| | Exterior siding alternatives | 6/28/2021 | 6/28/2021 | 0.5 | Client considering alternate manufacturers and styles |
| | Bandi Coordination Meeting | 7/2/2021 | 7/2/2021 | 0.25 | Discussion of siding topics |
| | RE: EQUITONE Inquiry | 7/15/2021 | 8/11/2021 | 1 | Product research and samples sourcing |
| | Re: << 5-3/4" PRODUCT REQUEST >> | 7/16/2021 | 7/19/2021 | 1 | Product research and samples sourcing |
| | RE: SIDING INFO | 7/21/2021 | 7/21/2021 | 1 | Product research and samples sourcing |
| | FW: Request for Pricing Fiber Cement Siding - Touchstone Remodelers | 7/21/2021 | 9/7/2021 | 3 | Product research and samples sourcing |
| | Cindy, your siding samples are shipping soon! | 7/22/2021 | 7/22/2021 | 0.5 | Product research and samples sourcing |
| | Nichiha Order Confirmation | 7/22/2021 | 7/22/2021 | 1 | Product research and samples sourcing |
| | RE: #176885 Contact Form: Largo Fiber Cement Panel - Gravial Finish | 7/23/2021 | 7/23/2021 | 1 | Product research and samples sourcing |
| | Re: Siding Options - Bandi Residence | 7/23/2021 | 7/25/2021 | 5 | Provided additional design information for Clients |
| | RE: Request for Pricing - Touchstone Remodelers | 7/23/2021 | 8/3/2021 | 3 | Product research |
| | RE: Meeting Tuesday August 9 | 8/6/2021 | 8/11/2021 | 1 | Onsite meeting with Client |
| | Re: Bandi Renovation 8/23 Meeting Discussion Topics | 8/24/2021 | 8/31/2021 | 4 | Email correspondences capturing design discussions |
| | RE On the siding | 9/6/2021 | 9/9/2021 | 2 | Design discussion |
| | Fwd Bandi project stucco_0914-0916 | 9/14/2021 | 9/16/2021 | 1 | Stucco pricing |
| | Fwd: Intex Plastering: Bandi project stucco | 9/15/2021 | 9/17/2021 | 2 | Stucco pricing |
| | Re: Bandi stucco | 9/28/2021 | 9/28/2021 | 2 | Stucco pricing |
| | RE PROPOSAL STUCCO-1 | 10/5/2021 | 10/6/2021 | 3 | Stucco pricing |
| | RE PROPOSAL STUCCO-2 | 10/5/2021 | 10/6/2021 | 0.25 | Stucco pricing |
| | FW: Bandi Exterior Siding/Stucco Discussion | 10/19/2021 | 10/19/2021 | 1 | Stucco pricing |
| Windows | Updated Quote from Window & Door Showplace | 3/24/2021 | 3/30/2021 | 1 | Contractor asked to procure samples |
| | Samples are ordered for Windows | 3/29/2021 | 3/31/2021 | 1 | Sample procurement |
| | Window selection | 4/2/2021 | 4/4/2021 | 1 | Design discussion |
| | Window Order Due Today | 4/2/2021 | 4/19/2021 | 8 | Design discussion, rereview of schedules and quotes |

| | | | | | |
|---|---|---|---|---|---|
| | Window order—final issues | 4/8/2021 | 4/14/2021 | 2 | Design discussion |
| | Window order | 4/14/2021 | 4/15/2021 | 0.5 | Design has yet to be finalized |
| | Fwd: 3606 Chesapeake St. NW Project | 3/23/2021 | 4/2/2021 | 4 | Quote review |
| | FW: Window order | 4/15/2021 | 4/16/2021 | 6 | Design discussion |
| | RE Window finish samples_033021 | 3/30/2021 | 3/30/2021 | 0.25 | Sample procurement |
| | Fwd: Touchstone Remodelers Bandi Res. | 4/13/2021 | 4/16/2021 | 0.5 | Automatic operators |
| | RE: Bandi Window Order Estimate | 4/13/2021 | 4/13/2021 | 1 | Design discussion |
| | RE: Lead Time for Custom Clad Exterior Windows | 4/16/2021 | 4/16/2021 | 1 | Design discussion |
| | RE: Samples for Touchstone Remodelers-Bandi Res. | 3/31/2021 | 4/2/2021 | 1 | Sample procurement |
| | Re: Window order etc. | 4/5/2021 | 4/6/2021 | 4 | Assistance in finalizing window schedule |
| Electrical | Bandi Coordination Meeting | 6/25/2021 | 6/25/2021 | 0.5 | Discussed electrical fixture specification deadline of 8/2 |
| | RE: Meeting Tuesday August 9 | 8/6/2021 | 8/11/2021 | 0.5 | Electrical plan discussion and blank document preparation |
| | Re: Sub-panel schedule | 8/11/2021 | 8/11/2021 | 0.25 | Subpanel schedule |
| | Re: Lighting plan | 9/20/2021 | 9/20/2021 | 0.25 | Receipt of Client-provided electrical plan hard copy |
| | RE: Extras for Bandi Residence | 9/28/2021 | 10/4/2021 | 12 | Interpretation of Client-provided electrical plan; reconciliation with original scope and updated subcontractor proposal |
| | Re: Electrical recommendations | 10/1/2021 | 10/1/2021 | 1 | Fixture recommendations |
| | RE: Revised pricing for Bandi Residence | 10/12/2021 | 10/12/2021 | 2 | Communications with Electrician |
| | RE: Revised Electrical Plan - Bandi Residence | 10/13/2021 | 10/18/2021 | 3 | Electrical discussions with Client |
| | FW: The lighting plan | 10/21/2021 | 10/28/2021 | 4 | Electrical discussions with Client |
| | Fwd: The change orders | 10/21/2021 | 10/21/2021 | 1 | Electrical discussions with Client |
| | RE: Revised Electrical Plan | 10/27/2021 | 11/1/2021 | 1 | Contractor outreach to Architect |
| Tile | RE: Bandi tile | 3/30/2021 | 3/31/2021 | 4 | Incomplete tile design |
| HVAC | Bandi Coordination Meeting | 6/25/2021 | 6/25/2021 | 6 | Alternate pricing and outstanding decisions for HVAC work |
| Front Door | Bandi Coordination Meeting | 6/25/2021 | 6/25/2021 | 4 | Vendor coordination, design discussion, incomplete design |
| | | | Total Hours | 119 | |
| | | | Total Cost (@ $135/hr) | $16,065 | |

**Table 2.** Listing of Touchstone Remodelers' staff on specified dates

| Date | Name | Affiliation | Relationship |
|---|---|---|---|
| 3/18/21 | Benjamin Srigley | Touchstone Remodelers | Owner |
| | Cynthia Srigley | Touchstone Remodelers | Consultant |
| | Adam Metzger | Touchstone Remodelers | Full-time employee |
| | Robert Barnes | Touchstone Remodelers | Full-time employee |
| | Donald Fink | Touchstone Remodelers | Full-time employee |
| | Robert Shearin | Touchstone Remodelers | Full-time employee |
| | Marleanda Brown | Touchstone Remodelers | Full-time employee |
| | Ana Barillas | Ana Barillas Cleaning | 1099 Contractor |
| | Darel Coutts | Coutts Plumbing Inc | 1099 Contractor |
| | Kevin Denchfield | Daylight Construction Inc | 1099 Contractor |
| | Francisco Delgado | Frank Jr Construction | 1099 Contractor |
| | John Kellco | Kellco Painting Inc | 1099 Contractor |
| | Murphy Hill, Brima | M Electrical LLC | 1099 Contractor |
| | Mario Argueta | Mario's Argueta Tile & Stone | 1099 Contractor |
| | Alvaro Tapia | Mr. T's Contracting LLC | 1099 Contractor |
| | Michael Kaperst | Sterling Mirror Company LLC | 1099 Contractor |
| | Tim Allen | Universal Floors | 1099 Contractor |
| 8/1/21 | Benjamin Srigley | Touchstone Remodelers | Owner |
| | Cynthia Srigley | Touchstone Remodelers | Owner |
| | Adam Metzger | Touchstone Remodelers | Full-time employee |
| | Robert Barnes | Touchstone Remodelers | Full-time employee |
| | Donald Fink | Touchstone Remodelers | Full-time employee |
| | Robert Shearin | Touchstone Remodelers | Full-time employee |
| | Marleanda Brown | Touchstone Remodelers | Full-time employee |
| | Gerber Martinez | Touchstone Remodelers | Full-time employee |
| | Carlos Mendoza | Touchstone Remodelers | Full-time employee |
| | Jennifer Doss | Touchstone Remodelers | Full-time employee |
| | Ana Barillas | Ana Barillas Cleaning | 1099 Contractor |
| | Darel Coutts | Coutts Plumbing Inc | 1099 Contractor |
| | Kevin Denchfield | Daylight Construction Inc | 1099 Contractor |
| | Pedro, Eduardo, Gabriel, Erick, Edgar, Marvin | Fuentes Renovations LLC | 1099 Contractor |
| | Francisco Delgado | Frank Jr Construction | 1099 Contractor |
| | John Kellco | Kellco Painting Inc | 1099 Contractor |
| | Murphy Hill, Brima | M Electrical LLC | 1099 Contractor |
| | Mario Argueta | Mario's Argueta Tile & Stone | 1099 Contractor |
| | Alvaro Tapia | Mr. T's Contracting LLC | 1099 Contractor |
| | Michael Kaperst | Sterling Mirror Company LLC | 1099 Contractor |
| | Tim Allen | Universal Floors | 1099 Contractor |
| | Beto, Ben | Z&R Carpentry | 1099 Contractor |
| 11/1/21 | Benjamin Srigley | Touchstone Remodelers | Owner |
| | Cynthia Srigley | Touchstone Remodelers | Owner |
| | Adam Metzger | Touchstone Remodelers | Full-time employee |
| | Robert Barnes | Touchstone Remodelers | Full-time employee |
| | Donald Fink | Touchstone Remodelers | Full-time employee |
| | Jennifer Doss | Touchstone Remodelers | Full-time employee |
| | Ana Barillas | Ana Barillas Cleaning | 1099 Contractor |
| | Darel Coutts | Coutts Plumbing Inc | 1099 Contractor |
| | Kevin Denchfield | Daylight Construction Inc | 1099 Contractor |
| | Francisco Delgado | Frank Jr Construction | 1099 Contractor |
| | John Kellco | Kellco Painting Inc | 1099 Contractor |
| | Murphy Hill, Brima | M Electrical LLC | 1099 Contractor |
| | Alvaro Tapia | Mr. T's Contracting LLC | 1099 Contractor |
| | Tim Allen | Universal Floors | 1099 Contractor |

| 12/21/21 | Benjamin Srigley | Touchstone Remodelers | Owner |
|---|---|---|---|
| | Cynthia Srigley | Touchstone Remodelers | Owner |
| | Robert Barnes | Touchstone Remodelers | Full-time employee |
| | Donald Fink | Touchstone Remodelers | Full-time employee |
| | Jennifer Doss | Touchstone Remodelers | Full-time employee |
| | Ana Barillas | Ana Barillas Cleaning | 1099 Contractor |
| | Murphy Hill, Brima | M Electrical LLC | 1099 Contractor |
| | Alvaro Tapia | Mr. T's Contracting LLC | 1099 Contractor |

**Table 3.** Listing of Touchstone Remodelers' backlog on specified dates

| Date | Project Name | Contract Amount[1] | Paid Amount | Unbilled Amount |
|---|---|---|---|---|
| 3/18/21 | Stom-Stoesen Residence | $159,276.89 | $125,408.00 | $33,868.89 |
| | Pasarew-Reiff Residence | $66,804.52 | $36,000.00 | $30,804.52 |
| | Shesol-Epstein Decking | $101,563.91 | $23,000.00 | $78,303.91 |
| | Bandi Residence | $881,733.55 | $280,000.00 | $601,733.55 |
| 8/1/21 | Stom-Stoesen Residence | $159,276.89 | $153,624.8 | $5,652.09 |
| | Shesol-Epstein Decking | $101,563.91 | $77,720.87 | $23,843.04 |
| | Nickerson Residence | $434,294.69 | $394,326.69 | $39,968.00 |
| | Eliason Residence | $229,670.33 | $192,195.31 | $37,475.02 |
| | Palacios Siding | $58,156.25 | $9358.00 | $48,798.25 |
| | Bandi Residence | $881,733.55 | $309,659.00 | $572,074.55 |
| 11/1/21 | Nickerson Residence | $434,294.69 | $394,326.69 | $39,968.00 |
| | Eliason Residence | $229,670.33 | $223,706.53 | $5,963.8 |
| | Bowen Residence Interior | $49,719.45 | $48,694.35 | $1,025.10 |
| | Bandi Residence | $881,733.55 | $542,673.55 | $339,060.00 |
| 12/21/21 | Nickerson Residence | $434,294.69 | $432,794.69 | $1,500.00 |
| | Eliason Residence | $229,670.33 | $225,554.53 | $4,115.80 |
| | Bandi Residence | $881,733.55 | $645,693.55 | $236,040.00 |

[1]Contract amounts include the original contract amount and all signed change orders

# American Arbitration Association

Federico M. Bandi and Angela M. Bandi

      Claimants / Counter-Respondents

v.

Touchstone Remodelers, LLC

      Respondent / Counter-Claimant

AAA Case No. 01-21-0018-1548
Arbitrator Judith Ittig

## Touchstone Remodelers' Production of Requested Documents

1.    All documents comprising the contract (or contracts) and amendments or modifications to the contract (or contracts) between Touchstone and the Bandis relating to the Project.

    a.  Contract

    b.  Change order asbestos abatement

    c.  Change order helical pier

    d.  Helical pier allowance reconciliation and receipts

2.    All documents comprising the Contract. (See *Definitions and Instructions* above.).

    a.  Contract/Construction Proposal/Draw Schedule/Selections Schedule (Combined)

    b.  CONTRACT SET - 3606 Chesapeake Street IFC Combined

    c.  Garage Plans: Reduced Size Study titled "Garage_1" and "Garage_2"

3.    All proposed change orders sent by Touchstone to the Bandis.

    a.  Change Order_Bandi Residence_Electrical Updates

4.    All documents comprising Touchstone's changes, change-order, or extra-work files.

    a.  Additional design work relevant communications

    b.  Design work costs incurred workbook

1

5.    All notes, memoranda, and other documents relating to contract negotiations between Touchstone and the Bandis relating to the Project.

    a.   Contract negotiation emails

    b.   Construction Proposal 3/24/20

    c.   Construction Proposal 9/9/20

    d.   Construction Proposal 2/26/21

    e.   Construction Proposal 3/14/21

    f.   Draft Contract 3/3/21

6.    All contracts between Touchstone and any professional, subcontractor, or vendor.

    a.   Subcontractor proposals

    b.   Vendor contracts

7.    All licenses, certificates, filed home-improvement contracts, surety bonds, home-improvement salesperson designations, and other documents indicating Touchstone's status as a licensed contractor (of whatever type or designation) in good standing before, during, and after Touchstone's involvement in the Project.

    a.   DCRA current license 12/1/21-11/30/2023

    b.   DCRA Contract Rating

    c.   License Renewal Documents 12/6/21

8.    All documents evidencing Touchstone's having submitted to its sample contract form to the Director of the District of Columbia Department of Consumer and Regulatory Affairs, and all documents evidencing that the Director approved such sample contract form. These documents include but are not limited to the sample contract form (or forms).

    a.   Sample contract (12/7/2011) submitted with initial application in 2011

    b.   Sample contracts (7/27/2012 and 4/3/2013) submitted with license renewal application in 2013

9.    All documents concerning scheduling, timing, sequencing, C.P.M. schedules, bar charts, timetables, daily plans, look-ahead schedules, and any updates, revisions, or amendments thereto.

    a.   MS Project Review meetings were held weekly from 5/2021–10/2021; meeting documentation lost upon removal of the recurring event from Outlook

    b.   Production meeting agendas

    c.  Bandi Residence Preliminary Schedule

    d.  Minutes from MS Project review meeting (10/11/21)

    e.  Original Selections Schedule

10.  All electronic native files relating to scheduling the work on the Project, which native electronic files include but are not limited to Primavera and Microsoft Project files.

    a.  Microsoft Project files

11.  All documents relating to any proposed, requested, or suggested extensions to the construction schedule or deadlines dates under the Contract.

    a.  Contract containing original Selections Schedule

    b.  Change Order Helical Pier

    c.  Selections Schedule AB updated

    d.  Selections Schedule AB updated email

    e.  Weekly Updates emails and Microsoft Teams messages

12.  All documents relating to the progress or delay of construction of the Project, including but not limited to subcontractor billings and progress reports, site-observation notes, daily or other periodic reports, and time sheets.

    a.  Subcontractor bills

    b.  Production Staffing Tracker for Fuentes Renovations and Z&R Carpentry (hourly subcontractors)

    c.  Weekly Update emails

    d.  Superintendent Daily Rounds Checklists

13.  All photographs or other imagery related to the Project.

    a.  Project photos

    b.  Additional basement door photos

    c.  Additional video files available upon request

14.  All documents relating to or evidencing Touchstone's pre-March 15, 2021 estimate of the cost to perform the Contract, including but not limited to Touchstone's bid estimate, worksheets, takeoff sheets, and analyses. Such costs include but are not limited to Touchstone's overhead costs.

    a.  Bandi Residence Estimate 2/6/21

    b.  Bandi Residence Garage Estimate 2/27/21

    c.  Bandi Residence Estimate 3/12/21

    d.  Bandi Residence Estimate 3/13/21

15.  All documents relating to or evidencing Touchstone's post-March 15, 2021 estimate of the cost to perform the Contract. Such costs include Touchstone's overhead costs.

    a.  Bandi Residence Project Expenses

16.  All documents upon which Touchstone relied in drafting its March 15, 2021 proposal, including but not limited to all bids, quotes, estimates, and proposals of professionals, subcontractors, and vendors.

    a.  Bandi Residence Estimate 3/13/21

    b.  Subcontractor proposals

    c.  Tile takeoffs

17.  All bids, quotes, estimates, and proposals from professionals, subcontractors, and vendors, regardless of whether Touchstone contracted with or retained the professional, subcontractor, or vendor, including but not limited to Intex Plastering.

    a.  Subcontractor proposals (See # 16)

    b.  Additional subcontractor proposals (work not performed)

18.  All documents that reflect Touchstone's costs for performing the Contract, including but not limited to Touchstone's job-cost report and accounting records.

    a.  Expenses by Vendor Summary_Bandi Residence Project

    b.  Touchstone Expenses by Vendor Summary_All Projects

    c.  Unspecified Expenses Transaction Report

    d.  See reports in #30–#34

19.  All documents that contain financial data pertaining to the Project, including but not limited to job-cost accounting records, "in-house" financial records, and audits pertaining to job costs.

    a.  None to report

20.  All comparisons, summaries, tabulations, and analyses comparing costs that Touchstone actually incurred on the Project with costs it originally anticipated incurring for the Project.

    a.  Requesting extension

21.  All comparisons, summaries, tabulations, and analyses comparing costs that Touchstone actually incurred—or would have incurred absent termination—on the Project with costs it originally anticipated incurring for the Project.

    a.   Requesting extension

22.  All invoices sent by any of Touchstone's subcontractors or vendors or professionals to Touchstone.

    a.   Subcontractor bills (See # 12 for additional)

23.  All documents evidencing Touchstone's payments to its subcontractors or vendors or any professionals.

    a.   Expenses by Vendor Summary_Bandi

    b.   See # 31–32

24.  All payroll records or other evidence of payments actually made to or on behalf of Touchstone employees or subcontractors.

    a.   Touchstone Payroll Summary By Employee

25.  All documents relating to the damages Touchstone alleges it suffered, including but not limited to documents relating to Touchstone's calculation of those damages.

    a.   Bandi Residence Project Expenses

    b.   Counterclaim document and appendices

26.  All documents on which Touchstone intends to rely to demonstrate the damages it alleges it suffered.

    a.   Bandi Residence Project Expenses

    b.   Counterclaim document and appendices (See # 25)

27.  All documents demonstrating the portion of Touchstone's damages resulting from "galloping price increases, labor shortages, and supply chain disruptions".

    a.   TW Perry price lists

    b.   Indeed Carpenters and Tile Installers job posting reports

    c.   Relevant communications

28.  All documents relating to or evidencing the cost Touchstone would have incurred to complete the Project, had Touchstone not terminated the Contract. These documents include but are not limited to Touchstone's estimates for the remaining portion of the Project that Touchstone did not perform, including any additional costs associated with the change in season and economic conditions (COVID-19). And the costs include, but are not limited to, all supervision and overhead associated with completing the Project.

    a.   Requesting extension

29. All documents relating to or evidencing that $236,040 is sufficient to cover the expenses to complete the Project, not including additional costs associated with the change in season and economic conditions (COVID-19).

    a.  Requesting extension

30. All documents relating to Touchstone's claim for "Employee Labor," which documents include but are not limited to all timesheets or time records of such employees.

    a.  Employee project expenses spreadsheet

    b.  Touchstone Payroll Summary By Employee

31. All document relating to Touchstone's claim for "Subcontractor Labor," which documents include but are not limited to all contracts, invoices, and Touchstone's payments.

    a.  Production Staffing Tracker for Fuentes Renovations and Z&R Carpentry

    b.  Subcontractor project expenses spreadsheet

    c.  Expenses by Vendor Summary_Bandi

32. All document relating to Touchstone's claim for "Professional Services," which documents include but are not limited to all contracts, invoices, and Touchstone's payments.

    a.  Professional services expenses spreadsheet

    b.  Supporting payments and reports

33. All document relating to Touchstone's claim for "Job Materials," which documents include but are not limited to all contracts, invoices, and Touchstone's payments.

    a.  Job material expenses spreadsheet

    b.  Supporting payments and reports

34. All document relating to Touchstone's claim for "Overhead," which documents include but are not limited to all invoices and Touchstone's payments, all invoices relating to Touchstone's office overhead, invoices Relevant to automobile or vehicle overhead, and other accounting records reflecting Touchstone's "Overhead," including but not limited to records of Touchstone's indirect labor expenses.

    a.  Overhead expenses spreadsheet

    b.  Supporting payments and reports

35. All documents showing, for the time period over which Touchstone calculates its "Overhead" damages, all construction projects Touchstone was working on, which

documents include but are not limited to the contracts for those projects and the schedules of performance for those projects.

 a. Overhead Expenses Calculations spreadsheet

 b. Report of Sales by Client for the time period

 c. MS Project files

 d. Contracts

36. All documents relating to Touchstone's claim for "Additional Costs Incurred," which documents include all agreements for Touchstone to perform design services and time records for such services.

 a. See # 4

37. All documents relating to Touchstone's claim for "Lost Profits on Project," which documents include but are not limited to estimates of Touchstone's anticipated profit on the Project at the time of bidding the Project, at the time of signing the Contract, and thereafter.

 a. Bandi Residence Estimate 3/13/21 – expected profit margin was $76,211.32

38. All documents relating to Touchstone's claim for "Employee Replacement Costs," which documents include but are not limited to documents demonstrating the annual salaries of Touchstone's COO (Cynthia Srigley) and Senior Project Manager (Adam Metzger), documents relating to the reasons why the COO (Cynthia Srigley) and Senior Project Manager (Adam Metzger) are no longer employed by Touchstone, job-performance evaluations from March 1, 2021 through the date on which each of them disassociated with Touchstone, communications relating to reasons for Touchstone's terminating their employment or the COO's or Senior Project Manager's reasons for disassociating with Touchstone, and documents demonstrating Touchstone's efforts to replace its COO and Senior Project Manager.

 a. C.Srigley Letter of Resignation and Leave of Absence emails

 b. C.Srigley returned to her previous career at the FDA due to financial uncertainty with the company SPM offer letter

 c. COO documentation of return to FDA

 d. A.Metzger Offer Letter

 e. A.Metzger, D.Fink Temporary Layoff Notifications

 f. A.Metzger, D.Fink Termination Letters

 g. Touchstone is non-operational while going through arbitration; no efforts to replace COO, SPM, or Superintendent have been made at this time

h.   The Cost of Replacing an Employee - Enrich Financial Wellness

39.  All documents relating to Touchstone's claim for "Lost Opportunities," which documents include but are not limited to all documents evidencing that Touchstone was selected as the contractor for one or more construction projects, the project owner's offer for Touchstone to perform work or acceptance of Touchstone's offer to perform work, the draft and signed contracts for such projects, Touchstone's bid estimate for each such project, and documents evidencing how Touchstone calculates its expected profit for each such project, and the reasons why Touchstone declined to perform any such project, and communications between Touchstone and the owners of such projects addressing Touchstone's decision to decline performing each such project.

   a.   Relevant communications

   b.   Draft contract

   c.   Construction proposal

   d.   Estimate worksheet

40.  All documents relating to Touchstone's claim for "Professional Services," which documents include but are not limited to all invoices and Touchstone's payments.

   a.   See # 32

41.  All invoices sent by Touchstone to the Bandis.

   a.   Bandi Invoice Sales Transactions

42.  All payments by the Bandis recognized by Touchstone.

   a.   Bandi Invoice Payment Transactions

43.  All documents relating to meetings concerning the Project, which documents include but are not limited to notes, minutes, and correspondence.

   a.   Bandi Coordination Meeting minutes

   b.   Relevant communications

   c.   Production meeting agendas (See # 9)

   d.   Production meeting minutes (See # 71)

   e.   Weekly Updates and Microsoft Teams messages (See # 11)

44.  All video recordings and audio recordings relating to the Project. These documents include but are not limited to recordings of Zoom and Microsoft Teams meetings and telephone conferences.

   a.   None to report

45. All Project-Relevant communications between Touchstone and any of the following: Angela Bandi, Federico Bandi, Sewell, APAC, the District of Columbia government or any of its agencies or departments (including but not limited to the Department of Energy and Environment and the Department of Consumer and Regulatory Affairs), Touchstone's subcontractors, Touchstone's vendors, professionals retained by Touchstone, and subcontractors, vendors, and professionals with which Touchstone did not ultimately enter into a contract or otherwise retain.

    a. Relevant communications

46. All of Touchstone's internal Project-Relevant communications, including but not limited to all communications sent by one of Touchstone's owners, managers, executives, officers, employees, agents, or representatives to at least one of Touchstone's other owners, managers, executives, officers, employees, agents, or representatives.

    a. Relevant communications

47. All documents relating to the Project or Contract sent by Touchstone to any of Touchstone's former owners, former managers, former executives, former officers, former employees, former agents, or former representatives. Such former personnel include but are not limited to Cynthia Srigley, Adam Metzger, Rob Shearin, and Marleanda Brown.

    a. See #46 and #49

48. All documents relating to the Project or Contract sent to Touchstone by any of Touchstone's former owners, former managers, former executives, former officers, former employees, former agents, or former representatives. Such former personnel include but are not limited to Cynthia Srigley, Adam Metzger, Rob Shearin, and Marleanda Brown.

    a. See #46 and #49

49. All message posts, chats, documents, files, "activities", and any other information that are currently posted on or were previously posted on the Touchstone—Bandi Residence Project shared site on Microsoft Teams.

    a. Bandi Team posts

    b. Bandi Internal Communications (IC) Team posts

    c. Planner board screen shots

50. The electrical-plan change order referenced in Touchstone's October 20, 2021 communication to the Bandis.

    a. Electrical plan proposed change order

    b. Revised electrical plan

51. All proposed or draft electrical-plan change orders.

      a.   Draft electrical plan change order

52. All documents relating to procuring Project permits.

      a.   Relevant communications

53. All permits for the Project.

      a.   Project permits

54. All documents relating to testing the soil at the Project site.

      a.   Relevant communications

      b.   Bandi Soil Report

      c.   1919 Baist Map

55. All documents relating to Touchstone's initial site preparation.

      a.   Planner board completed tasks

56. All documents relating to the soil Erosion and Sediment Control plan for the Project.

      a.   Erosion and Sediment Control plan

      b.   Relevant communications

57. All documents relating to inspections or proposed inspections of the Project or the real property on which the Project is located by the District of Columbia or any of its agencies or departments (including but not limited to the Department of Energy and Environment and the Department of Consumer and Regulatory Affairs) or by private third-party inspectors. These documents include but are not limited to documents relating to scheduling or attempts to schedule such inspections.

      a.   Inspections

      b.   Relevant communications

58. All documents relating to the electrical plan for the Project, including changes to the electrical plan.

      a.   Contract/Proposal

      b.   CONTRACT SET - 3606 Chesapeake Street IFC Combined

      c.   M Electrical original proposal

      d.   M Electrical changes proposals

      e.   AB Revised Electrical plan with takeoffs

      f.   Relevant communications

59. All documents relating to the exterior siding for the Project, including changes to the exterior siding.

    a.  Relevant communications

    b.  Meeting agendas relating to exterior siding

    c.  Subcontractor proposals

    d.  Weekly Updates (See # 11)

60. All documents relating to the front door, stoop, and walkway of the Project, including changes to the front door, stoop, and walkway.

    a.  Frank Jr Construction proposal

    b.  Updated design documents

    c.  Relevant communications

61. All documents relating to the bath-accessory layout for the Project, including changes to the bath-accessory layout.

    a.  Bath accessory layout files

    b.  Relevant communications

62. All documents relating to the Bandis' alleged demands for work outside of Touchstone's contractual scope.

    a.  Relevant communications

    b.  Counterclaim document and appendices (See # 25)

63. All documents relating to the Bandis' alleged constant scope changes.

    a.  Relevant communications

    b.  Counterclaim document and appendices (See # 25)

64. All documents relating to the Bandis' alleged bullying behavior.

    a.  Relevant communications

    b.  Counterclaim document and appendices (See # 25)

65. All indices to Touchstone's files relating to the Project.

    a.  Not applicable

66. Touchstone's internal memoranda relating to the Project.

    a.  Production meeting agendas (See # 9)

    b.  Production meeting minutes (See # 71)

67. All documents evidencing the date on which Cynthia Srigley and Rob Shearin began working for Touchstone.

    a.  C.Srigley Big News Teams Announcement

    b.  Welcome Rob Shearin Teams Announcement

    c.  RS Offer Letter

68. All documents evidencing Cynthia Srigley's education or training or prior experience in the construction industry before working for Touchstone.

    a.  Project Management certification

    b.  Landlord rental agreements (2015–2019)

    c.  SDC Properties of Ohio, LLC operating information – C.Srigley was 50% owner of this renovation company which flipped three houses and owned one duplex rental property

    d.  Cornell University BS, MS, and PhD degrees

    e.  Microsoft Project training certificate

69. With respect to each of the following people, all documents relating to the reasons why the person is no longer employed by or associated with Touchstone, why Touchstone terminated the person's employment, and why the person is no longer associated with Touchstone: Cynthia Srigley, Adam Metzger, Rob Shearin, and Marleanda Brown.

    a.  C.Srigley returned to her previous career at the FDA due to financial uncertainty with the company

    b.  Termination letter for AM

    c.  Resignation letters for RS and MB

    d.  Termination letter for DF

70. All documents reflecting the current location and contact information (telephone numbers, home address, current employer, work address, etc.) for Adam Metzger, Rob Shearin, and Marleanda Brown.

    a.  A.Metzger – T: (240) 310-2906; 3308 Lowell Ln, Ijamsville, MD 21754; Bowers Design Build; 6715 Whittier Ave, #200, McLean, VA 22101

    b.  R.Shearin – T: (336) 675-7492; 10609 Huntley Ave, Silver Spring, MD 20902; Hargrove; 1 Hargrove Dr, Lanham, MD 20706

    c.  M.Brown – T: (919) 601-8548; 11824 Morning Star Drive, Germantown, MD 20876; current employer unknown

    d.   D.Fink – T: (703) 798-3152; 12226 Grassy Hill Ct, Fairfax, VA 22033;
current employer unknown

71. All documents prepared by or for Touchstone to administer, monitor, or review
the Project, which documents include but are not limited to periodic (daily, weekly,
monthly, etc.) reports, journals, or diaries.

    a.   Production Meeting minutes

72. All reports or analyses relating to the Project produced by any expert or outside
consultant for the benefit or at the request of Touchstone.

    a.   None to report

73. All documents relating to Touchstone's decision to issue its stop-work notice
and notice of termination of the Contract.

    a.   Relevant communications

74. All documents relating to Touchstone's claims asserted against the Bandis.

    a.   Counterclaim document and appendices (See # 25)

75. All documents upon which Touchstone intends to rely to establish proof of
claims or damages or to refute the Bandis' claims.

    a.   Counterclaim document and appendices (See # 25)

    b.   Weekly Updates (See # 11)

    c.   Financial reports (See # 18)

76. All documents relating to the allegations in Touchstone's Defense and
Counterclaim (to the extent not included in the Appendices to Touchstone's Defense and
Counterclaim).

    a.   See # 1–75

77. All documents referred to or used in preparing your responses to the Bandis'
Interrogatories or identified in your answers to the Bandis' Interrogatories.

    a.   Not applicable

9:28 AM  Fri Nov 11

corponline.dcra.dc.gov

71%

Home

Edit Account Sign Out

# TOUCHSTONE REMODELERS LLC - Initial File Number: L00000056666

Main    Reports    Trade Names    Beneficial Owners

## Entity Info

**Business Name**
TOUCHSTONE REMODELERS

**Suffix**
LLC

**Registration / Effective Date**
11/16/2011

**Commencement Date**
11/16/2011

**Entity Status**
Revoked

**Foreign Name**

**Date of Organization**
11/16/2011

**State**
District of Columbia

**Country**
USA

8:40 AM  Wed May 31    ···    🔒 corponline.dcra.dc.gov    AA    🔋 100%    DLCP | Depa···

# LLC - Initial File Number: L0000056666

Main    Reports    Trade Names    Beneficial Owners

## Entity Info

**Business Name**
TOUCHSTONE REMODELERS

**Suffix**
LLC

**Registration / Effective Date**
11/16/2011

**Commencement Date**
11/16/2011

**Entity Status**
Dissolved

**Foreign Name**

**Date of Organization**
11/16/2011

**State**
District of Columbia

**Country**
USA



Home

Edit Account Sign Out

# TOUCHSTONE REMODELERS LLC - Initial File Number: L0000056666

| Main | Reports | Trade Names | Beneficial Owners |

## Report List

| Report Year | Date Filed | File Number |
|---|---|---|
| 2012 | 11/16/2011 | 000004197152 |
| 2014 | 3/26/2014 | 000004914187 |
| 2016 | 3/14/2016 | 000005364857 |
| 2018 | 7/09/2018 | 000006030336 |
| 2020 | 3/23/2020 | 000006561384 |
| 2020 | 7/17/2020 | 000006685177 |
| 2022 | 11/30/2022 | 000007514315 |



3:53 PM   Wed May 31

🔒 egov.maryland.gov

🛜 84%

**Maryland.gov**

⊕ Help   🌐 Translate   🔒 Log In

Ask Our Business Chatbot

| General Information | Filing History | Annual Report/Personal Property |

## General Information

Options for this Business ▾

**Department ID Number:**

Z15315138

**Business Name:**

TOUCHSTONE REMODELERS LLC

**Principal Office:** ⓘ

1025 CONNECTICUT AVE.NW, STE. 615

WASHINGTON DC 20036

**Resident Agent:** ⓘ

BENJAMIN R SRIGLEY

4440 WILLARD AVE, APT 813

CHEVY CHASE MD 20815

**Status:**

FORFEITED

**Good Standing:**

THIS BUSINESS IS **NOT IN GOOD STANDING**

What does it mean if a business entity is not in good standing or forfeited?

**Business Type:**

FOREIGN LLC

**_Re:_** Touchstone Remodelers' Defense and Counterclaim to Federico M. Bandi and Angela M. Bandi vs. Touchstone Remodelers, LLC; AAA's Case Number 01-21-0018-1548.

Dear Arbitrator:

We, Touchstone Remodelers, write in response to the Bandi's (the "Clients") Demand for Arbitration claiming that we "failed to timely and properly perform the work, abandoned the project, and wrongfully terminated the contract." We strongly disagree. We have acted honestly, in good faith, and have all documents in hand to clearly demonstrate the following facts:

**_Background_**: From March 2020 to March 2021, Touchstone and the Clients conducted detailed, extensive, arms-length negotiations for the remodeling of the Clients' 3,000 sq/ft home, originally built in 1938. Renovations included a new two-story addition, back patio, and detached garage, interior renovation of all existing floors, and a front porch remodel. The Clients contracted separately with Sewell Architecture PLLC to design the project and APAC Engineering Inc. for structural engineering. On March 17, 2021, the parties signed the remodeling contract (Appendix I). And the contract's scope of work (SOW) drawings were stamped by the Clients' Architect and Engineer (Appendix II). Touchstone began construction on the next day (March 18th) and the estimated completion date was August 9, 2021 (a 19-week project schedule). A change order was then signed on June 18, 2021 that extended the completion date to November 19, 2021 (a 22-week project schedule; Appendix III).

**_Failure to Provide Design Documents_**: Unfortunately, half-way into the project, the Clients continually failed to provide design drawings for construction on critical path. The contract clearly provides that the Clients are responsible for providing the design documents, NOT Touchstone.[i] We continually informed the Clients that additional design drawings and decisions were needed. The result was a perpetual impact to the project schedule, most notably caused by the lack of an electrical plan (Appendix IV). After numerous repeated requests, the Clients outright refused to provide the design drawings, and responded with on-going, never-ending discussions, e.g., what about this, or what about that, or creating arguments.

Specifically, the Client failed to provide four design documents: (1) Electrical Plan, (2) Exterior Siding Detailed Drawings, (3) Front Door Design, and (4) Bath Accessory Layout.

**_(1) Electrical Plan_**: The contract documents included an electrical plan which was sufficient for permitting, but incomplete in design. The Clients wanted to make changes including adding new recessed lights, outlets, and switches (with dimmer upgrades) on all floors. The Clients also added/changed light fixtures in the Kitchen and Dining Room, as well as in several bathrooms and closets. The wiring layout was changed for recessed lights in the Master Bedroom, Dining Room, Kitchen, Breakfast Room, and Basement. And bath fans were added in rooms not required by scope. Together, the magnitude of these changes warranted a revision to the electrical plan. These were major changes not "minor changes", as suggested by the Client on October 28, 2021.

Electrical rough-ins are part of the critical path and directly affect the project completion date. The Clients failed to meet the electrical fixture specifications deadline (August 2, 2021) and were reminded of the overdue information on August 14, 2021, September 4, 2021, and September 11, 2021. In the September 3, 2021 communication, our Senior Project Manager commented that we are "not qualified to make lighting recommendations, this is typically done by the architect or a lighting designer."

On September 20, 2021 (seven weeks after the electrical fixture specifications deadline), the Clients provided a revised electrical plan (Appendix V). It was found to contain several omissions and ambiguities. In an attempt to clarify scope, the Senior Project Manager, Electrician, and Client met onsite on September 22, 2021 for a four-hour meeting to discuss the lighting layout. However, the change process lingered on.

The Client downplayed the magnitude of the changes on October 25, 2021, stating that "All your Client did was make some corrections to that plan, which is a normal part of the process." A change or two is expected; a complete redesign of all floors warrants a revision to the electrical plan. In response, Touchstone's Chief Executive Officer (CEO) asserted, "we insist on a single, controlling, accurate document that captures all scope of electrical work".

*(2) Exterior Siding*: The SOW for the new exterior siding included öko skin fiber cement panels (Rieder North America) and accent panels made of custom 1x cedar shiplap siding. The coursing of the siding was carefully laid out and coordinated with window and exterior door sizes. Detailed drawings were provided for the öko skin-exterior trim intersections. The 5-3/4" anthracite-colored öko skin panels were to be installed as an open joint windscreen using exposed fasteners over 5/4 pressure-treated wood furring strips and a Delta Fassa-S moisture barrier. The designed gap between öko skin panels was ¼".

On May 6, 2021, Touchstone contacted Rieder North America to obtain a final quote. On May 12, 2021, the Co-owner of the company cautioned that installing öko skin panels over wood furring strips is not widely done because of the unpredictability in wood movement during seasonal changes. In addition, the manufacturer's minimum recommended spacing between panels is ¼". If the gaps fell below ¼" and the panels failed, then the warranty would be void. Touchstone declined to warranty the installation of öko skin panels over the wood furring strips with the ¼" gaps. An alternate solution was proposed to use metal hat channels for installation which would cost an additional $9,104 before markup. The Clients wanted to explore other siding options.

The siding topic was next discussed during a June 25, 2021 virtual meeting with the CEO and Chief Operations Officer (COO). Touchstone agreed to research alternate fiber cement siding options and the Clients followed up with an email on June 28, 2021, in which they mentioned the possibility of using large fiber cement panels (e.g., 4'x8') or stucco as alternate siding options. Over the next few weeks and at no additional cost to the Clients, Touchstone team members contributed >20 hours of design services to research alternate products, source samples, and obtain stucco pricing. And we provided

the Clients with samples of two alternate siding products during our August 10, 2021 meeting.

Framing for the new addition was completed on August 27, 2021 and a final siding decision was now needed to determine the type of moisture barrier, or house wrap, that would cover the new structure. A moisture barrier is part of the critical path and required before installation of windows and exterior doors. On August 24, 2021, Touchstone informed the Clients that we were ready to order the moisture barrier if they were going to move forward with the fiber cement panels. On August 27, 2021, we reminded the Clients that the siding, referring specifically to the moisture barrier, was "on the critical path and impacting the project schedule and completion date." On August 31, 2021 the Clients were still debating fiber cement products and on September 7, 2021 they indicated that they were "with 90% likelihood" going with Cembrit or öko skin. Two days later, the Client instructed Touchstone to hold off installing the rainscreen until the stucco quotes were in. On September 26, 2021 (five weeks after our initial request for moisture barrier information), we received final confirmation of stucco as a substitute for öko skin.

In the September 26, 2021 approval of stucco, the Clients asserted that "the remaining wood finishes/trims should remain per the drawings". Changing the exterior siding from an open joint windscreen to stucco requires a redesign of the detailed drawings for the exterior siding-to-trim intersections. The Clients were also interested in changing the wood species to match their new ipe deck. The Clients were informed of the need for additional design information in the October 15, 2021 Weekly Check-in email. The architect sent sketches of the stucco siding design on October 24, 2021 (Appendix VI), but final, detailed drawings were never provided.

The timing of the intended stucco application is notable. Stucco generally requires temperatures above 40 °F, conditions, which are not possible during late fall in Washington, DC. To overcome this challenge, newly applied stucco can be covered in a protective barrier and heat applied to effect conditioning of the substrate. In other words, there would be an additional cost to apply stucco in late fall/winter.

The stucco contractor also recommended that the drywall, cabinets, and tile be installed prior to stucco application to prevent major shifting of the structure and formation of cracks in the new stucco siding. As such, we were unable to proceed with the stucco application until the interior work had progressed. However, installation of the drywall, cabinets, and tile was on pause until the electrical plan could be finalized.

***(3) Front Door***: The home renovation contract included a remodel of the front door, stoop, and walkway. The front door was to be covered by a steel canopy affixed to the brick siding. On July 28, 2021, the Architect informed Touchstone that the Client wanted to make changes.

As with the electrical plan and exterior siding topics, conversations related to front door design persisted and the Clients continually asked Touchstone to provide design input. On October 12, 2021, the Architect sent revised drawings for the front door and asked for

agreement in the general direction so that he could "provide final detailing and structural coordination." But rather than reaching agreement, on October 14, 2021, the Client informed Touchstone that "the drawings for the front door design are not really moving forward" and asked for additional design assistance. On October 25, 2021, the Client informed Touchstone that she had approved the front door design in a correspondence with the Architect, but that the approval was "conditional on the availability/cost of a custom vs. non-custom door and sidelight. I.e., if the availability/cost of a 7'9" custom door and sidelight is prohibitive, the design may need to be slightly modified to allow for a shorter non-custom door and sidelight". In other words, the Clients had yet to finalize the front door design.

The Clients failed to provide front door design documents, including final details on door, sidelite, exterior trim, canopy, electrical work, masonry work, and wood/steel framing. An engineer's stamp is required for steel structural components. The front door work had specifically prevented us from finishing framing and electrical work, and from proceeding with drywall and hardwood floor installation.

***(4) Bath Accessory Layout***: The Clients finally provided final bath accessory layouts for all five (5) bathrooms on December 6, 2021, or two weeks after the estimated completion date.

***Constant Demands for Work Outside the Contractual Scope***: The Clients have repeatedly responded to our requests for design documents with "given the scope and scale of the project this service/item should be provided to us." That is, throughout the entire process, the Clients have demanded that Touchstone provide everything to complete the project according to Clients' satisfaction. In a September 29, 2021 email, the Client stated that "given the magnitude of the job I was assuming that the system would be redone". The Clients have also wrongfully asserted Touchstone's responsibility to provide bath fans and recessed trims, which were omitted from the construction documents, and repairs to the existing roof.

The contract also specified that the plumbing fixtures were to be provided by Client and installed by Contractor, and the appliances were to be provided by Client and installed by Client or separate contractor. On October 15, 2021, the Client asked if she could send plumbing fixtures and appliances to the Touchstone warehouse, citing logistical issues for receiving the shipments. We responded that we would be willing to modify the agreement to receive the packages at our warehouse, but that we would apply a 20% contractor fee to the order to account for the additional logistical overhead needed to receive, inspect, store, and transport the items to the job site. Our offer was not accepted.

The remodeling contract clearly sets out each parties' obligations. However, regardless of the contract, the Clients have created their own interpretation of what we must supply. This has in-turn resulted in substantial time and expense.

***Constant Scope Changes***: In addition to the design delays discussed above, we incurred substantial costs regarding the Clients' constant change requests, including time

and materials needed to reframe the Master Bedroom entryway, Basement, and Laundry Room. Plumbing fixtures were also changed which affected rough-ins and positioning of the Master Bath tub. We have objectively documented and quantified our additional uncompensated efforts incurred directly from the Clients' change requests. A contractor should aim to satisfy the owner, but not at a loss. We did not want to start off badly with the Clients, so we took a lot of time and effort to address constant inquiries and changes, seeking resolution through extended discussions. This has in-turn resulted in substantial time and expense.

***Bullying Behavior***: The Clients have been difficult. They have pushed and pushed using bullying tactics to demand extra work at no additional cost. On October 28, 2021 the Client, referring to the Electrical Change Order, attacked the CEO's integrity, stating that "the evidence is clear in indicating that the reason why we are having this exchange is that we looked into the numbers in your change order and questioned them". We take our estimating responsibilities very seriously and use custom estimating software to perform quantity takeoffs and generate change orders. The change order revealed discrepancies in light fixture, switch, and outlet counts which could not be resolved without further documenting the existing conditions. Here, the Client was using assumptive language to demean the CEO and get work completed without having to finish the electrical plan.

On September 29, 2021, the Client wrote "I am not quite sure why Intex Plastering is providing a new quote but I am assuming it is going to be lower (if different from the original one). They were hired based on very specific numbers. I trust they will not bait and switch. I would appreciate it if you could convey it to them since they are now your subcontractor." A change order for the exterior siding was never prepared because of the outstanding requirement for detailed drawings for the stucco-exterior trim intersections. The subcontractor had not yet been "hired" and the site visit in question was to obtain accurate square footage numbers to lower the price. Here, the Client was using manipulative language to intimidate the COO and assert his agenda.

The Client also using bullying tactics with other members of the team. In a July 28, 2021 email to a showroom design consultant, he stated, "I asked you explicitly whether you would remember everything that we discussed. I did not expect that you would forget meeting us at all. Is it coming back?" This humiliation was intended to embarrass the design consultant and prompt her to expedite a quote.

In short, the Client's behavior was not professional. The stress was intolerable and significantly impacted the teams' mental health.

***Stop Work Notice***: On November 1, 2021, (or 19 weeks into the 22-week project) Touchstone issued a Stop Work Notification to the Clients due to their failure to provide critical design information needed to progress with the project, including the electrical plan, exterior siding details, front door design, and final bath accessory layout (Appendix VII).

We came to the point where we could no longer perform work on the property. As such, we removed company tools and job materials, photo- and video-documented the property, secured it, and issued the Stop Work Notification. We cited our requirement for outstanding design work and explained that we would resume construction after all project modifications were captured in a signed change order. In other words, our goal was to complete the project.

***Termination Notice***: On December 6, 2021 (or five weeks after the Stop Work Notice and two weeks after the estimated completion date), the Clients finally provided an electrical plan and bath accessory layout. Allowing one week for plan review and change order preparation, we estimate that we could have resumed construction on December 13, 2021. Assuming all other design details had been resolved, which they were not, the new completion date would have been March 17, 2022, or one year after the original contract signing.

The Clients requested that Touchstone meet them onsite to resume front door design discussions. The Clients continued their modus operandi of providing piecemeal design information and ignoring the critical path and project timeline arguments. It was clear that the relationship between the Clients and Touchstone had deteriorated to an irreparable state, and nothing would change. By this time, Touchstone Remodelers' field crew had been temporarily laid off due to lack of work on the project. The Senior Project Manager and COO obtained employment elsewhere; the replacement cost for these employees is significant and the damage to the company is irreparable. Furthermore, the seasonal change into deep winter (caused by the Client's delay) would incur additional expenses, particularly for foundation work and stucco siding application.

Therefore, we issued the Termination of Contract (Appendix VIII) notice and declared the Clients in default of the contract due to their inability to provide final design documents in a timely manner, their failure to meet agreed upon Due Dates in the original and revised Selections Schedules, continued irreconcilable disagreement in the interpretation of the construction document language, and no clear visibility as to a new estimated project completion date. Past performance is a clear indicator to future performance and enough is enough.

***Contractor's Counterclaim and Entitlement to Damages***: We hereby submit this Counterclaim in response to the Clients' Demand for Arbitration. The Client was in material breach of the home renovation contract. They failed to provide final design documents and decisions in a timely manner, caused unnecessary delays to the project timeline, and failed to meet contractual Due Dates in the original and revised Selections Schedules.

Touchstone has incurred $992,471 in total expenses, overhead, and damages applicable to the property directly resulting from the Client's actions (Table 1; Appendix). The Client has paid a total of $645,694, which was divided into payments for the initial deposit ($280,000), three progress payments ($329,060), and (3) change orders ($36,633.55). This entire amount has been spent on the project. By reason of the matters pleaded above,

Touchstone has suffered direct loss and damages totaling $346,777. Furthermore, the construction industry has experienced significant strain due to the Covid-19 pandemic, including galloping price increases, labor shortages, and supply chain disruptions. These factors, coupled with Clients delays, have created tremendous overhead and expense for Touchstone.[ii]

***Clients' Cost to Complete***. The Clients were invoiced for progress payments based on milestone accomplishments of work completed. The Clients have made payments through the Substantial Completion of Rough-ins (Progress Payment #3), except for $10,000 which was withheld for incomplete electrical rough-in work. We expect that the remaining balance of the contract ($236,040) is sufficient to cover expenses to complete the project, not including additional costs associated with the change in season and economic conditions (Covid-19). Furthermore, in the case of a defaulting Client, Touchstone should not be responsible for knowledge-transfer costs related to hiring a different contractor to complete the work.

***In summary***, the Clients have directly caused four critical path delay events, resulting in a perpetual impact to the schedule, and $346,777 in additional costs incurred by Touchstone. We had to dig deep into our pockets and suffered real costs. To this end, we are eager to quickly resolve this matter, ready to answer any questions, and look forward to your response.

Thank you for your consideration.


Sincerely,


Benjamin Srigley

Touchstone Remodelers, LLC

**TABLE 1. Total Expenses, Overhead, and Damages Applicable to the Property**

| Category[1] | Description | Amount |
|---|---|---|
| Employee Labor | Timesheets | $54,885 |
| Subcontractor Labor | Paid subcontractor bills | $199,854 |
| Professional Services | Inspections, engineering, etc. | $11,125 |
| Job Materials | Paid vendor bills | $131,735 |
| Overhead | Indirect expenses and labor | $106,096 |
| Additional Costs Incurred | Design fees | $16,065 |
| Lost Profits on Project [1] | 18% of the $845,100 contract amount | $152,118 |
| Employee Replacement Costs [2] | 100% of COO and Senior Project Manager annual salaries | $218,866 |
| Lost Opportunities | Profit on projects declined | $101,727 |
| **Total Expenses, Overhead, and Damages Incurred** | | **$992,471** |

[1]A detailed description of each category is provided in Appendix VIII.

**REFERENCES:**

[1]    Enrich Financial Wellness. The Cost of Replacing an Employee. 1/15/2021. https://www.enrich.org/blog/The-true-cost-of-employee-turnover-financial-wellness-enrich Accessed on 1/11/2022.

[2]    K. Mercado. Typical Contractor Overhead and Profit Margin — Calculate your Business Potential. 8/8/2021. https://www.nextinsurance.com/blog/typical-contractor-overhead-profit-margin/ Accessed on 1/11/2022.

**LIST OF APPENDICES:**

| | |
|---|---|
| I | Home Renovation Contract |
| II | Contract Drawings |
| III | Helical Pier Foundation Change Order |
| IV | Project Timelines |
| V | Revised Electrical Plan |
| VI | Stucco Sketches |
| VII | Stop Work Notification |
| VIII | Termination of Contract Notice |
| IX | Summary of Expenses, Overhead, and Damages Applicable to the Property |
| X | Relevant Emails |

i  "All work was to be completed according to Sewell Architecture's drawings 1) Construction Set titled "3606 Chesapeake Street IFC Combined" and dated 11.01.20; and 2) Garage Plans: Reduced Size Study titled "Garage_1" and "Garage_2" and dated 02.22.2021, unless otherwise noted in the proposal."

Furthermore, page 4 of the Proposal (SOW) clearly provides that "Page P1 is excluded from contract documents and the scope of work."

ii  Note Article 13 Section 1c of the contract which provides in the case of a defaulting Client, the Contractor may accept the earnest money as liquidated damages and "may make claim to the Client for all work executed and for proven loss with respect to equipment, materials, tools, construction equipment and machinery, including reasonable overhead, profit and damages applicable to the property less the earnest money".

**Appendix IX. Summary of Expenses, Overhead, and Damages Applicable to the Property**

1) Employee labor includes all hours for field crew, as reported on weekly timesheets. Hourly rates are adjusted to include general liability and workers compensation insurance.

Table 1. Employee labor expenses applicable to the property.

| Employee | Hours | Rate/Hour | Amount |
|----------|-------|-----------|--------|
| R.Shearin | 179 | $36.39 | $6,513.81 |
| A.Metzger | 476.25 | $57.44 | $27,357.08 |
| D.Fink | 227.5 | $39.65 | $9,020.05 |
| R.Barnes | 442.5 | $27.11 | $11,994.47 |
| | | **Total Amount** | **$54,885.42** |

2) Subcontractor labor includes all subcontractor bills applicable to the property.

Table 2. Subcontractor labor expenses applicable to the property.

| Subcontractor | Trade | Amount |
|---------------|-------|--------|
| ACM Services Inc. | Abatement | $1,850.00 |
| BMC Installation Heating & Air Conditioning LLC | HVAC | $22,000.00 |
| Coutts Plumbing Inc. | Plumbing | $30,500.00 |
| Daylight Construction Inc. | Roofing | $11,180.00 |
| Frank Jr Construction LLC | Masonry | $43,360.00 |
| Fuentes Renovations LLC | Carpentry | $47,015.00 |
| M Electrical LLC | Electrical | $10,420.00 |
| NV Waterproofing & Foundation Repair LLC | Foundation Work | $31,720.00 |
| Z&R Carpentry LLC | Carpentry | $1,800.00 |
| | **Total Amount** | **$199,845.00** |

3) Professional Services includes inspections, engineering, soil testing, dumpster and portable toilet fees.

Table 3. Professional service expenses applicable to the property.

| Organization | Service | Amount |
|--------------|---------|--------|
| AAH Consultants LLC | Inspections | $900.00 |
| ABC Imaging Inc. | Printing fees | $48.34 |
| APAC Engineering Inc. | Engineering | $3,300.00 |
| Institute for Building Technology Safety Inc. | Inspections | $400.00 |
| MTI Engineering and Testing Inc. | Engineering | $2,121.75 |
| Piedmont Geotechnical Inc. | Soil Testing | $900.00 |
| JP Roll Off Inc. | Dumpster | $2,162.16 |
| United Site Services Inc. | Portable Toilet | $1,292.32 |
| | **Total Amount** | **$11,124.57** |

4) Job materials included tile and window selections, floor heat construction, moisture barrier house wrap, mulch for erosion control, and construction supplies needed for framing and rough carpentry.

Table 4. Job material expenses applicable to the property.

| Vendor | Description | Amount |
|---|---|---|
| Architectural Ceramics | Tile | $45,127.68 |
| Barrons Lumber | Job Materials | $733.31 |
| Blaine Window & Door | Windows | $214.60 |
| BMC Manassas | Job Materials | $3,016.14 |
| Brookville Landscape Supply | Mulch | $346.62 |
| Cosella-Dorken Products | Moisture barrier | $2,322.27 |
| Home Depot | Job Materials | $758.29 |
| Tw Perry | Job Materials | $45,988.84 |
| Warmly Yours | Floor heat | $708.42 |
| Window and Door Showplace | Windows | $32,518.95 |
| | **Total Amount** | **$131,735.12** |

5) *Overhead Expenses.* Overhead expenses were adjusted based on the project's % of total volume over the period of the active project of March 18–December 17, 2021. Total sales for the period were $1,596,254.43, of which the project accounted for $645,693.55 in sales, or 41.5% of the total volume.

Table 5. Overhead expenses applicable to the property.

| Overhead | Category | Amount |
|---|---|---|
| Dues and Subscriptions | Indirect Expense | $4,928.56 |
| Office Overhead | Indirect Expense | $12,251.03 |
| Employee Overhead | Indirect Expense | $241.82 |
| Auto/Vehicle Overhead | Indirect Expense | $3,063.83 |
| | **Total Indirect Expenses** | **$20,485.24** |
| CEO Salary | Indirect Labor | $24,682.27 |
| COO Salary | Indirect Labor | $43,276.87 |
| Administrative Assistant Salary | Indirect Labor | $14,024.02 |
| Outside Sales Manager Salary | Indirect Labor | $3,627.25 |
| | **Total Indirect Labor** | **$85,610.41** |
| | **Total Overhead Expenses** | **$106,096.00** |

6) *Additional Costs Incurred.* Unbilled fees for design services provided by the Contractor to the Client that were outside the scope of the contract. Touchstone Remodelers bills design services at $135/hour.

Table 6. Additional costs incurred applicable to the property.

| Design Topic | Effort (Hours) | Amount |
|---|---|---|
| Siding | 48.25 | $6,513.75 |
| Windows | 31.25 | $4,218.75 |
| Electrical | 25.5 | $3,442.50 |
| Tile | 4 | $540.00 |
| HVAC | 6 | $810.00 |
| Front Door | 4 | $540.00 |
| | **Total Amount** | **$16,065.00** |

7) *Lost Profits on Project.* Projected profits were 18% of the $845,100 contract amount, or $152,118.

8) *Employee Replacement Costs.* Touchstone Remodelers lost two key employees as a result of the Clients' breach of contract. Senior Project Manager, Adam Metzger, and COO, Cindy Srigley, obtained employment elsewhere because of the lack of work and financial uncertainty of the company. Replacement costs are estimated to range from 90–200% of an employee's annual salary [2]. Mr. Metzger's annual salary was $80,000 and Dr. Srigley's was $138,866. We are conservatively estimating 100% of these salaries for replacement costs.

9) *Lost Opportunities.* Touchstone Remodelers was previously the DCRA contractor on record for a home remodel project scheduled to begin in late January 2022. This project had a contract price of $565,150. On January 21, 2022, Touchstone informed the architect that we were unable to begin construction because of the arbitration and concerns for putting client funds at risk. The Client's breach caused us the lost opportunity of profits on that project, totaling $101,727 or 18% of the contract amount. Touchstone declined to bid on two other home remodel projects during the time between the Stop Work Notice and Termination of Contract as the stress and overhead of dealing with the Clients' design delays caused tremendous strain and distress for our company. Declining to these projects has put at risk a decade of professional relationships with our architect collaborators.

# Touchstone Remodelers

### Sales by Client Summary

March 18 - December 17, 2021

|  | TOTAL |
|---|---|
| Anne Stom & Lyn Stoesen | |
| Stom-Stoesen Residence | 33,868.89 |
| **Total Anne Stom & Lyn Stoesen** | **33,868.89** |
| David Palacios | |
| Palacios Residence | 58,156.25 |
| **Total David Palacios** | **58,156.25** |
| Federico and Angela Bandi | |
| Bandi Residence | 645,693.55 |
| **Total Federico and Angela Bandi** | **645,693.55** |
| Jeff Shesol & Rebecca Epstein | |
| Shesol-Epstein Decking | 78,303.91 |
| **Total Jeff Shesol & Rebecca Epstein** | **78,303.91** |
| John and Tara Eliason | |
| Eliason Residence | 225,554.53 |
| **Total John and Tara Eliason** | **225,554.53** |
| Josh & Katie Nickerson | |
| Nickerson Residence | 432,794.69 |
| **Total Josh & Katie Nickerson** | **432,794.69** |
| Lee Pasarew and Isabel Reiff | |
| Pasarew-Reiff Attic | 30,804.52 |
| **Total Lee Pasarew and Isabel Reiff** | **30,804.52** |
| Scarboro, Fred | |
| Scarboro Residence | 440.11 |
| **Total Scarboro, Fred** | **440.11** |
| Srigley, Ben | |
| Srigley Home | 0.00 |
| **Total Srigley, Ben** | **0.00** |
| Walter and Alicia Bowen | |
| Bowen Residence Interior Renovation | 25,627.50 |
| Bowen Residence Interior Project | 24,091.95 |
| **Total Bowen Residence Interior Renovation** | **49,719.45** |
| **Total Walter and Alicia Bowen** | **49,719.45** |
| TOTAL | **$1,555,335.90** |

# Touchstone Remodelers

### Expenses by Vendor Summary

March 18 - December 17, 2021

| | TOTAL |
|---|---|
| 7-Eleven | 14.91 |
| AAH Consultants | 900.00 |
| Abc Imaging | 48.34 |
| About United Design Associates, Inc | 249.95 |
| ACM Services | 5,047.25 |
| Adobe | 477.98 |
| ADT Security Services | 451.80 |
| Advantage Trim & Lumber Company | 147.28 |
| Aerox Aviation Oxygen | 339.86 |
| Air Power | 1,890.00 |
| Aircraft Owners | 189.00 |
| Airtable | 240.00 |
| Alside Supply | 46.59 |
| Amazon | 11,709.88 |
| American Express | 3,223.64 |
| Ana L Barillas | 1,600.00 |
| APAC Engineering, Inc. | 3,300.00 |
| Apple | 415.53 |
| Arc Environmental LLC | 440.00 |
| Architectural Ceramics | 51,803.96 |
| Architecture Stones | 6,892.12 |
| Balducci's | 74.20 |
| Bank of America | 212.85 |
| Ben Professional | 307.85 |
| Bethesda Market | 36.05 |
| Betz Enterprises | 65.00 |
| Bill.com | 305.30 |
| Blaine Window & Door | 214.60 |
| BMC | 26,177.20 |
| BMC Installation Heating & Air Conditioning, LLC | 51,920.00 |
| BP | 41.30 |
| Bromwell's TFP | 1,973.00 |
| Brookville Landscape Supply | 346.62 |
| Build.com | 9,760.53 |
| Buildasign | 118.30 |
| Cameron Bes | 804.00 |
| Cameron Building Envelope Specialist | 3,729.00 |
| Capital One | 495.78 |
| Chipotle | 23.54 |
| Clarksburg | 74.20 |
| ClearMe | 0.00 |
| Cloudflare | 65.00 |
| Comcast | 1,136.76 |
| Comptroller of Maryland | 618.00 |

# Touchstone Remodelers

## Expenses by Vendor Summary

March 18 - December 17, 2021

| | TOTAL |
|---|---|
| Concrete Pond Sports | 2,304.44 |
| Congressional Iron Works, Inc. | 0.00 |
| Constant Contact | 363.00 |
| Cosella-Dorken Products | 2,322.27 |
| Coutts Plumbing Inc | 67,900.00 |
| CPO Commerce, LLC | 684.96 |
| Craig's List | 90.00 |
| Crane Service | 943.13 |
| Crate And Barrel | 71.87 |
| CVS | 24.36 |
| Daylight Construction, Inc | 48,880.00 |
| DC Gov | 808.50 |
| DC METRO | 6,055.49 |
| Dc Parking | 9.00 |
| Dc Treasurer | 200.00 |
| Degewood Contracting & Remodeling, LLC | 9,885.00 |
| Department of Inspections | 135.00 |
| District Registered Agent Services, Inc. | 140.00 |
| DMV | 417.00 |
| DriveEzMD | 250.00 |
| Dyn | 55.00 |
| Edible Arrangements | 261.02 |
| Erie Insurance | 4,077.80 |
| ESSP | 411.19 |
| Etsy | 533.22 |
| Exclaimer | 104.00 |
| Exxon | 952.15 |
| Facebook | 287.59 |
| Fire Tech | 570.00 |
| Fisher Lumber | 1,383.30 |
| FloWrestling | 150.00 |
| Frank Jr Construction, LLC | 82,135.21 |
| Fuentes Renovations | 149,985.00 |
| Giant | 107.54 |
| Glen Echo | 448.16 |
| Godaddy | 262.39 |
| Green Valley Convenient Store | 56.93 |
| Grubhub | 150.00 |
| H & H Lock & Security | 91.54 |
| Hellosign | 325.00 |
| Home Depot | 9,301.87 |
| Howard County Alpha Ridge | 232.80 |
| Hubspot | 359.12 |
| Indeed | 1,731.58 |

# Touchstone Remodelers

### Expenses by Vendor Summary

March 18 - December 17, 2021

| | TOTAL |
|---|---|
| Institute for Building Technology Safety, Inc | 800.00 |
| Intuit QuickBooks | 1,066.36 |
| iPhone CitizenOne | 256.92 |
| Iron Thor Welding | 15,257.00 |
| Ironmark | 604.20 |
| iStockPhoto | 210.94 |
| James Vito, Inc. | 0.00 |
| JOHNSTONMURPHY.COM | 540.54 |
| Jp Roll Off | 3,829.28 |
| Kellco Painting, Inc | 13,364.00 |
| Kossow Management Corporation | 719.64 |
| Labor Law Center | 37.90 |
| Lia's | 118.63 |
| Light Truck Service Co | 1,728.23 |
| Lighting by Jared | 159.36 |
| Lightology | 1,195.29 |
| Linkedin | 750.73 |
| Logmein | 229.34 |
| Lowe's | 468.39 |
| Lumens | 357.87 |
| M Electrical LLC | 57,055.00 |
| Marathon Petroleum Corporation | 640.21 |
| McMaster-Carr | 275.07 |
| MD Unemployment Insurance Fund | -0.01 |
| Mel's Power Washing & Cleaning Services, Inc. | 1,250.00 |
| Metal Supermarkets Beltsville | 167.62 |
| Microsoft | 2,518.56 |
| Montgomery County Recycling | 320.00 |
| Morris Tile Distributors | 62.99 |
| Mr. T's Contracting LLC | 52,822.50 |
| MTI Engineering and Testing, Inc. | 2,121.75 |
| MVA Gaithersburg | 390.00 |
| MyKnobs.com | 69.54 |
| Nelson & Sons Home Services LLC | 11,061.74 |
| Nothing Bundt Cakes | 43.46 |
| NV Waterproofing & Foundation Repair, LLC | 31,720.00 |
| Overstock | 40.80 |
| Park Mobile | 5.40 |
| PartsWarehouse | 25.59 |
| Patriot Crane & Rigging | 0.00 |
| Paypal | 100.00 |
| Pepco | 800.10 |
| Pete's New Haven Style Apizza | 305.80 |
| PHILLIPS 66 | 30.16 |

# Touchstone Remodelers

## Expenses by Vendor Summary

March 18 - December 17, 2021

| | TOTAL |
|---|---|
| Piedmont Geotechnical, Inc. | 900.00 |
| Porcelanosa | 2,678.60 |
| Potbelly | 29.39 |
| Quality Window & Door, Inc. | 24,172.92 |
| QuickBooks Payments | 601.26 |
| ReadyRefresh | 740.89 |
| Real World Training | 29.95 |
| Roti | 52.47 |
| RY CPAs | 9,000.00 |
| Safe Sweet | 25.00 |
| Safeway | 13.51 |
| Saltbox, LLC | 4,900.00 |
| Sameday Health | 125.00 |
| Shades of light | 1,382.52 |
| Sheetz | 67.75 |
| Shell | 1,566.96 |
| Sherwin Williams | 47.76 |
| Sigma Estimates | 31.80 |
| Signature Hardware | 2,126.36 |
| Sirius XM Holdings | 803.42 |
| Skyport Services | 98.09 |
| Smartrip | 10.00 |
| Solid Apollo | 126.40 |
| Speed Auto Service | 136.92 |
| Starbucks | 25.00 |
| Sterling Mirror & Glass | 986.86 |
| Sterling Mirror Company LLC | 3,629.18 |
| Strosniders Hardware | 187.35 |
| Sunoco | 1,135.41 |
| The Tile Shop | 14.91 |
| Thos. Somerville Co. | 452.44 |
| Tradesmen International, LLC | 3,072.00 |
| Tw Perry Chevy | 60,768.47 |
| Uber | 191.41 |
| Uber Eats | 575.04 |
| UDA Technologies | 199.96 |
| United Airlines | 150.00 |
| United Site Services | 5,570.77 |
| Universal Floors, Inc. | 18,251.00 |
| UPS | 10.71 |
| Upwork | 5,261.52 |
| Urbana Pike | 780.92 |
| US Aircraft Finance | -2,128.98 |
| US Aircraft Insurance | 2,143.00 |

# Touchstone Remodelers

### Expenses by Vendor Summary

March 18 - December 17, 2021

| | TOTAL |
|---|---|
| Venmo | 60.00 |
| Verizon Wireless | 1,800.93 |
| Virginia Department of Taxation | 0.00 |
| VistaPrint | 85.05 |
| Wall Plates | 117.91 |
| WarmlyYours | 1,261.17 |
| Washington Gas | 181.74 |
| Westelm | 347.46 |
| Window and Door Showplace | 32,518.95 |
| Youtube | 114.42 |
| Z&R Carpentry, LLC | 23,600.00 |
| ZipRecruiter | 124.00 |
| Not Specified | 195,347.07 |
| **TOTAL** | **$1,193,407.14** |

# Touchstone Remodelers

### Account QuickReport

January - December 2021

| DATE | TRANSACTION TYPE | NUM | NAME | MEMO/DESCRIPTION | ACCOUNT | CLR | AMOUNT | BALANCE |
|------|------------------|-----|------|-----------------|---------|-----|--------|---------|
| **Owner's Distributions** | | | | | | | | |
| Beginning Balance | | | | | | | | - 898,666.00 |
| 01/08/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 901,966.00 |
| 01/22/2021 | Expense | | | Online scheduled transfer to CHK 6857 Confirmation# 1516117404 | Owner's Distributions | | -3,300.00 | 905,266.00 |
| 02/05/2021 | Expense | | | Online scheduled transfer to CHK 6857 Confirmation# 1520291696 | Owner's Distributions | | -3,300.00 | 908,566.00 |
| 02/19/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 911,866.00 |
| 03/05/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 915,166.00 |
| 03/19/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 918,466.00 |
| 04/02/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 921,766.00 |
| 04/16/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 925,066.00 |
| 04/30/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 928,366.00 |
| 05/14/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 931,666.00 |
| 05/28/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 934,966.00 |
| 06/11/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 938,266.00 |
| 06/25/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 941,566.00 |
| 07/09/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 944,866.00 |
| 07/23/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 948,166.00 |
| 08/06/2021 | Transfer | | | | Owner's Distributions | | -3,300.00 | 951,466.00 |
| 08/20/2021 | Transfer | | | Online scheduled transfer to CHK 6857 Confirmation# 1574195359 | Owner's Distributions | | -3,300.00 | 954,766.00 |
| 09/03/2021 | Transfer | | | Online scheduled transfer to CHK 6857 Confirmation# 1578357283 | Owner's Distributions | | -3,300.00 | 958,066.00 |
| 09/17/2021 | Expense | | | Online scheduled transfer to CHK 6857 Confirmation# 1582058992 | Owner's Distributions | | -3,300.00 | 961,366.00 |
| 10/01/2021 | Expense | | Owner Draw | Online scheduled transfer to CHK 6857 Confirmation# 1585274550 | Owner's Distributions | | -3,300.00 | 964,666.00 |
| 10/15/2021 | Transfer | | | Online scheduled transfer to CHK 6857 Confirmation# 1589363333 | Owner's Distributions | | -3,300.00 | 967,966.00 |
| 10/29/2021 | Transfer | | | Online scheduled transfer to CHK 6857 Confirmation# 1592958816 | Owner's Distributions | | -3,300.00 | 971,266.00 |
| 11/12/2021 | Transfer | | | Online scheduled transfer to CHK 6857 Confirmation# 1597557455 | Owner's Distributions | | -3,300.00 | 974,566.00 |
| 11/26/2021 | Transfer | | | Online scheduled transfer to CHK 6857 Confirmation# 1601169084 | Owner's Distributions | | -3,300.00 | 977,866.00 |
| 12/10/2021 | Transfer | | | Online scheduled transfer to CHK 6857 Confirmation# 1605696945 | Owner's Distributions | | -3,300.00 | 981,166.00 |
| 12/24/2021 | Transfer | | | Online scheduled transfer to CHK 6857 Confirmation# 1609327187 | Owner's Distributions | | -3,300.00 | 984,466.00 |
| **Total for Owner's Distributions** | | | | | | | **$ -85,800.00** | |

## Touchstone Remodelers

Account QuickReport

January - December 2021

| DATE | TRANSACTION TYPE | NUM | NAME | MEMO/DESCRIPTION | ACCOUNT | CLR | AMOUNT | BALANCE |
|------|------------------|-----|------|------------------|---------|-----|--------|---------|
| TOTAL | | | | | | | $ -85,800.00 | |

Form **941 for 2021:** **Employer's QUARTERLY Federal Tax Return**
(Rev. March 2021)
Department of the Treasury — Internal Revenue Service

950121

OMB No. 1545-0029

**Employer identification number (EIN)** — — |2338

**Name** (not your trade name) Touchstone Remodelers, LLC

**Trade name** (if any) Touchstone Remodelers

**Address** 2214 Distribution Circle
Number    Street                              Suite or room number

Silver Spring    MD    20910
City                                State                  ZIP code

Foreign country name    Foreign province/county    Foreign postal code

**Report for this Quarter of 2021**
(Check one.)

☒ 1: January, February, March

☐ 2: April, May, June

☐ 3: July, August, September

☐ 4: October, November, December

Go to *www.irs.gov/Form941* for instructions and the latest information.

REV 04/22/21 OSP

Read the separate Instructions before you complete Form 941. Type or print within the boxes.

**Part 1:    Answer these questions for this quarter.**

| | | | |
|---|---|---|---|
| 1 | Number of employees who received wages, tips, or other compensation for the pay period including: *Mar. 12* (Quarter 1), *June 12* (Quarter 2), *Sept. 12* (Quarter 3), or *Dec. 12* (Quarter 4) | 1 | 5 |
| 2 | Wages, tips, and other compensation | 2 | 34,541.71 |
| 3 | Federal income tax withheld from wages, tips, and other compensation | 3 | 2,250.52 |

4  If no wages, tips, and other compensation are subject to social security or Medicare tax  ☐ Check and go to line 6.

| | | Column 1 | | Column 2 |
|---|---|---|---|---|
| 5a | Taxable social security wages | 34,541.71 | × 0.124 = | 4,283.17 |
| 5a (i) | Qualified sick leave wages | | × 0.062 = | |
| 5a (ii) | Qualified family leave wages | | × 0.062 = | |
| 5b | Taxable social security tips | | × 0.124 = | |
| 5c | Taxable Medicare wages & tips | 34,541.71 | × 0.029 = | 1,001.71 |
| 5d | Taxable wages & tips subject to Additional Medicare Tax withholding | | × 0.009 = | |

| | | | |
|---|---|---|---|
| 5e | Total social security and Medicare taxes. Add Column 2 from lines 5a, 5a(i), 5a(ii), 5b, 5c, and 5d | 5e | 5,284.88 |
| 5f | Section 3121(q) Notice and Demand—Tax due on unreported tips (see instructions) | 5f | |
| 6 | Total taxes before adjustments. Add lines 3, 5e, and 5f | 6 | 7,535.40 |
| 7 | Current quarter's adjustment for fractions of cents | 7 | −0.02 |
| 8 | Current quarter's adjustment for sick pay | 8 | |
| 9 | Current quarter's adjustments for tips and group-term life insurance | 9 | |
| 10 | Total taxes after adjustments. Combine lines 6 through 9 | 10 | 7,535.38 |
| 11a | Qualified small business payroll tax credit for increasing research activities. Attach Form 8974 | 11a | |
| 11b | Nonrefundable portion of credit for qualified sick and family leave wages from Worksheet 1 | 11b | |
| 11c | Nonrefundable portion of employee retention credit from Worksheet 1 | 11c | |

▶ **You MUST complete all three pages of Form 941 and SIGN it.**

Next ▶

For Privacy Act and Paperwork Reduction Act Notice, see the back of the Payment Voucher.    BAA    Form **941** (Rev. 3-2021)

950221

| Name (not your trade name) | Employer identification number (EIN) |
|---|---|
| Touchstone Remodelers, LLC | 2338 |

**Part 1:**    Answer these questions for this quarter. *(continued)*

**11d**    Total nonrefundable credits. Add lines 11a, 11b, and 11c  . . . . . . . . .    **11d** [ ]

**12**    Total taxes after adjustments and nonrefundable credits. Subtract line 11d from line 10  .    **12**    7,535.38

**13a**    Total deposits for this quarter, including overpayment applied from a prior quarter and overpayments applied from Form 941-X, 941-X (PR), 944-X, or 944-X (SP) filed in the current quarter    **13a**    7,535.38

**13b**    Reserved for future use  . . . . . . . . . . . . . . . . . . .    **13b** [ ]

**13c**    Refundable portion of credit for qualified sick and family leave wages from Worksheet 1    **13c** [ ]

**13d**    Refundable portion of employee retention credit from Worksheet 1 . . . . . .    **13d** [ ]

**13e**    Total deposits and refundable credits. Add lines 13a, 13c, and 13d  . . . . .    **13e**    7,535.38

**13f**    Total advances received from filing Form(s) 7200 for the quarter . . . . . . .    **13f** [ ]

**13g**    Total deposits and refundable credits less advances. Subtract line 13f from line 13e  . .    **13g**    7,535.38

**14**    Balance due. If line 12 is more than line 13g, enter the difference and see instructions  . . .    **14** [ ]

**15**    Overpayment. If line 13g is more than line 12, enter the difference [ ]    Check one: ☐ Apply to next return. ☐ Send a refund.

**Part 2:**    Tell us about your deposit schedule and tax liability for this quarter.

If you're unsure about whether you're a monthly schedule depositor or a semiweekly schedule depositor, see section 11 of Pub. 15.

**16**    Check one: ☐    Line 12 on this return is less than $2,500 or line 12 on the return for the prior quarter was less than $2,500, and you didn't incur a $100,000 next-day deposit obligation during the current quarter. If line 12 for the prior quarter was less than $2,500 but line 12 on this return is $100,000 or more, you must provide a record of your federal tax liability. If you're a monthly schedule depositor, complete the deposit schedule below; if you're a semiweekly schedule depositor, attach Schedule B (Form 941). Go to Part 3.

☒    You were a monthly schedule depositor for the entire quarter. Enter your tax liability for each month and total liability for the quarter, then go to Part 3.

Tax liability:    Month 1    1,822.48

Month 2    2,209.61

Month 3    3,503.29

Total liability for quarter    7,535.38    Total must equal line 12.

☐    You were a semiweekly schedule depositor for any part of this quarter. Complete Schedule B (Form 941), Report of Tax Liability for Semiweekly Schedule Depositors, and attach it to Form 941. Go to Part 3.

▶ **You MUST complete all three pages of Form 941 and SIGN it.**    REV 04/22/21 OSP    Next ▶

950921

**Name** *(not your trade name)*
Touchstone Remodelers, LLC

**Employer identification number (EIN)**
2338

| Part 3: | **Tell us about your business. If a question does NOT apply to your business, leave it blank.** |

17  If your business has closed or you stopped paying wages . . . . . . . . . . . . . . □ Check here, and

enter the final date you paid wages [                    ] ; also attach a statement to your return. See instructions.

18  If you're a seasonal employer and you don't have to file a return for every quarter of the year . . . □ Check here.

19  Qualified health plan expenses allocable to qualified sick leave wages   19 [                    ]

20  Qualified health plan expenses allocable to qualified family leave wages   20 [                    ]

21  Qualified wages for the employee retention credit  . . . . . . .   21 [                    ]

22  Qualified health plan expenses allocable to wages reported on line 21 .   22 [                    ]

23  Credit from Form 5884-C, line 11, for this quarter  . . . . . .   23 [                    ]

24  Reserved for future use . . . . . . . . . . . . .   24 [▒▒▒▒▒▒]

25  Reserved for future use . . . . . . . . . . . . .   25 [▒▒▒▒▒▒]

| Part 4: | **May we speak with your third-party designee?** |

Do you want to allow an employee, a paid tax preparer, or another person to discuss this return with the IRS? See the instructions for details.

□ **Yes.** Designee's name and phone number [                    ]  [                    ]

Select a 5-digit personal identification number (PIN) to use when talking to the IRS. [                    ]

□ **No.**

REV 04/22/21 OSP

| Part 5: | **Sign here. You MUST complete all three pages of Form 941 and SIGN it.** |

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

**X**  **Sign your name here** [                    ]

Print your name here [                    ]

Print your title here [                    ]

Date [                    ]   Best daytime phone [                    ]

**Paid Preparer Use Only**    Check if you're self-employed  . . . □

Preparer's name [                    ]   PTIN [                    ]

Preparer's signature [                    ]   Date [                    ]

Firm's name (or yours if self-employed) [                    ]   EIN [                    ]

Address [                    ]   Phone [                    ]

City [                    ]  State [        ]   ZIP code [                    ]

Page **3**    Form **941** (Rev. 3-2021)

# Instructions for E-Filing Form 941

## Quarterly Federal Tax Return

File Form 941 quarterly to report wages paid to your employees and associated tax liabilities.

## To file Form 941 electronically:

1. Review the account information on the completed form.

   If you need to edit any account information, such as your business address, you can do so in the **Setup** section. When you have saved your changes, return to e-file your 941. Also remember to complete the Federal Change of Address form. (Link easily to this form at the Help/Resources page or Help Index.)

2. Click the Submit button to file the form electronically.

You can view this form later by clicking "View forms you have saved" on the Quarterly Forms page.

## If you want to file by paper this time:

Just uncheck the box next to "File Electronically," print the form, and follow the instructions.

Form **941 for 2021:** **Employer's QUARTERLY Federal Tax Return**
(Rev. June 2021)    Department of the Treasury — Internal Revenue Service

951121

OMB No. 1545-0029

**Employer identification number (EIN)**    _ _2338

**Name** *(not your trade name)*    Touchstone Remodelers, LLC

**Trade name** *(if any)*    Touchstone Remodelers

**Address**    2214 Distribution Circle
Number    Street    Suite or room number

Silver Spring    MD    20910
City    State    ZIP code

Foreign country name    Foreign province/county    Foreign postal code

**Report for this Quarter of 2021**
(Check one.)

☐ **1:** January, February, March

☒ **2:** April, May, June

☐ **3:** July, August, September

☐ **4:** October, November, December

Go to *www.irs.gov/Form941* for
instructions and the latest information.

REV 07/21/21 OSP

Read the separate instructions before you complete Form 941. Type or print within the boxes.

**Part 1:    Answer these questions for this quarter.**

| | | |
|---|---|---|
| 1 | Number of employees who received wages, tips, or other compensation for the pay period including: *June 12* (Quarter 2), *Sept. 12* (Quarter 3), or *Dec. 12* (Quarter 4) . . . . . . . 1 | 6 |
| 2 | Wages, tips, and other compensation . . . . . . . . . . . . 2 | 87,350.17 |
| 3 | Federal income tax withheld from wages, tips, and other compensation . . . . 3 | 6,685.91 |

4    If no wages, tips, and other compensation are subject to social security or Medicare tax    ☐ Check and go to line 6.

| | | Column 1 | | Column 2 | |
|---|---|---|---|---|---|
| 5a | Taxable social security wages* . . | 87,350.17 | × 0.124 = | 10,831.42 | |
| 5a | (i)   Qualified sick leave wages* . | | × 0.062 = | | |
| 5a | (ii)  Qualified family leave wages* . | | × 0.062 = | | |
| 5b | Taxable social security tips . . . | | × 0.124 = | | |
| 5c | Taxable Medicare wages & tips . | 87,350.17 | × 0.029 = | 2,533.15 | |
| 5d | Taxable wages & tips subject to Additional Medicare Tax withholding | | × 0.009 = | | |

*Include taxable qualified sick and family leave wages for leave taken after March 31, 2021, on line 5a. Use lines 5a(i) and 5a(ii) only for wages paid after March 31, 2020, for leave taken before April 1, 2021.

| | | |
|---|---|---|
| 5e | Total social security and Medicare taxes. Add Column 2 from lines 5a, 5a(i), 5a(ii), 5b, 5c, and 5d    5e | 13,364.57 |
| 5f | Section 3121(q) Notice and Demand—Tax due on unreported tips (see instructions) . . .    5f | |
| 6 | Total taxes before adjustments. Add lines 3, 5e, and 5f . . . . . . . .    6 | 20,050.48 |
| 7 | Current quarter's adjustment for fractions of cents . . . . . . . .    7 | 0.03 |
| 8 | Current quarter's adjustment for sick pay . . . . . . . . . .    8 | |
| 9 | Current quarter's adjustments for tips and group-term life insurance . . . .    9 | |
| 10 | Total taxes after adjustments. Combine lines 6 through 9 . . . . . . .    10 | 20,050.51 |
| 11a | Qualified small business payroll tax credit for increasing research activities. Attach Form 8974    11a | |
| 11b | Nonrefundable portion of credit for qualified sick and family leave wages for leave taken before April 1, 2021 . . . . . . . . . . . . . .    11b | |
| 11c | Nonrefundable portion of employee retention credit . . . . . . . .    11c | |

▶ **You MUST complete all three pages of Form 941 and SIGN it.**    Next ▶

For Privacy Act and Paperwork Reduction Act Notice, see the back of the Payment Voucher.    BAA    Form **941** (Rev. 6-2021)

951221

| Name *(not your trade name)* | Employer identification number (EIN) |
|---|---|
| Touchstone Remodelers, LLC | _ _2338 |

**Part 1:    Answer these questions for this quarter.** *(continued)*

| | | | |
|---|---|---|---|
| 11d | Nonrefundable portion of credit for qualified sick and family leave wages for leave taken after March 31, 2021 | **11d** | |
| 11e | Nonrefundable portion of COBRA premium assistance credit (see instructions for applicable quarters) | **11e** | |
| 11f | Number of individuals provided COBRA premium assistance | | |
| 11g | Total nonrefundable credits. Add lines 11a, 11b, 11c, 11d, and 11e . . . . . . | **11g** | |
| 12 | Total taxes after adjustments and nonrefundable credits. Subtract line 11g from line 10 . | **12** | 20,050.51 |
| 13a | Total deposits for this quarter, including overpayment applied from a prior quarter and overpayments applied from Form 941-X, 941-X (PR), 944-X, or 944-X (SP) filed in the current quarter | **13a** | 20,050.51 |
| 13b | Reserved for future use . . . . . . . . . . . . . . . . . . . . | **13b** | |
| 13c | Refundable portion of credit for qualified sick and family leave wages for leave taken before April 1, 2021 | **13c** | |
| 13d | Refundable portion of employee retention credit . . . . . . . . . . . . | **13d** | |
| 13e | Refundable portion of credit for qualified sick and family leave wages for leave taken after March 31, 2021 | **13e** | |
| 13f | Refundable portion of COBRA premium assistance credit (see instructions for applicable quarters) | **13f** | |
| 13g | Total deposits and refundable credits. Add lines 13a, 13c, 13d, 13e, and 13f . . . | **13g** | 20,050.51 |
| 13h | Total advances received from filing Form(s) 7200 for the quarter . . . . . . . | **13h** | |
| 13i | Total deposits and refundable credits less advances. Subtract line 13h from line 13g . | **13i** | 20,050.51 |
| 14 | Balance due. If line 12 is more than line 13i, enter the difference and see instructions . | **14** | |
| 15 | Overpayment. If line 13i is more than line 12, enter the difference | Check one: ☐ Apply to next return.   ☐ Send a refund. |

**Part 2:    Tell us about your deposit schedule and tax liability for this quarter.**

If you're unsure about whether you're a monthly schedule depositor or a semiweekly schedule depositor, see section 11 of Pub. 15.

16   Check one: ☐   **Line 12 on this return is less than $2,500 or line 12 on the return for the prior quarter was less than $2,500, and you didn't incur a $100,000 next-day deposit obligation during the current quarter.** If line 12 for the prior quarter was less than $2,500 but line 12 on this return is $100,000 or more, you must provide a record of your federal tax liability. If you're a monthly schedule depositor, complete the deposit schedule below; if you're a semiweekly schedule depositor, attach Schedule B (Form 941). Go to Part 3.

☒   **You were a monthly schedule depositor for the entire quarter.** Enter your tax liability for each month and total liability for the quarter, then go to Part 3.

| Tax liability: | Month 1 | 8,188.52 |
|---|---|---|
| | Month 2 | 5,665.50 |
| | Month 3 | 6,196.49 |
| Total liability for quarter | | 20,050.51 | Total must equal line 12.

☐   **You were a semiweekly schedule depositor for any part of this quarter.** Complete Schedule B (Form 941), Report of Tax Liability for Semiweekly Schedule Depositors, and attach it to Form 941. Go to Part 3.

▶ **You MUST complete all three pages of Form 941 and SIGN it.**

Next ▶

REV 07/21/21 OSP   Form **941** (Rev. 6-2021)

951921

| Name *(not your trade name)* | Employer identification number (EIN) |
|---|---|
| Touchstone Remodelers, LLC | - - - 12338 |

## Part 3: Tell us about your business. If a question does NOT apply to your business, leave it blank.

**17** If your business has closed or you stopped paying wages . . . . . . . . . ☐ Check here, and

enter the final date you paid wages [                    ]; also attach a statement to your return. See instructions.

**18a** If you're a seasonal employer and you don't have to file a return for every quarter of the year . . . ☐ Check here.

**18b** If you're eligible for the employee retention credit solely because your business is a recovery startup business ☐ Check here.

| | | |
|---|---|---|
| **19** | Qualified health plan expenses allocable to qualified sick leave wages for leave taken before April 1, 2021 | **19** |
| **20** | Qualified health plan expenses allocable to qualified family leave wages for leave taken before April 1, 2021 | **20** |
| **21** | Qualified wages for the employee retention credit . . . . . . . . . . | **21** |
| **22** | Qualified health plan expenses for the employee retention credit . . . . . | **22** |
| **23** | Qualified sick leave wages for leave taken after March 31, 2021 . . . . . | **23** |
| **24** | Qualified health plan expenses allocable to qualified sick leave wages reported on line 23 | **24** |
| **25** | Amounts under certain collectively bargained agreements allocable to qualified sick leave wages reported on line 23 . . . . . . . | **25** |
| **26** | Qualified family leave wages for leave taken after March 31, 2021 . . . . | **26** |
| **27** | Qualified health plan expenses allocable to qualified family leave wages reported on line 26 | **27** |
| **28** | Amounts under certain collectively bargained agreements allocable to qualified family leave wages reported on line 26 . . . . . . . | **28** |

## Part 4: May we speak with your third-party designee?

**Do you want to allow an employee, a paid tax preparer, or another person to discuss this return with the IRS?** See the instructions for details.

☐ **Yes.** Designee's name and phone number [                    ] [                    ]

Select a 5-digit personal identification number (PIN) to use when talking to the IRS. [                    ]

☐ **No.**

REV 07/21/21 OSP

## Part 5: Sign here. You MUST complete all three pages of Form 941 and SIGN it.

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

**X**

**Sign your name here** [                    ]

Print your name here [                    ]

Print your title here [                    ]

Date [                    ]

Best daytime phone [                    ]

### Paid Preparer Use Only

Check if you're self-employed . . . ☐

| | | |
|---|---|---|
| Preparer's name | [                    ] | PTIN [                    ] |
| Preparer's signature | [                    ] | Date [                    ] |
| Firm's name (or yours if self-employed) | [                    ] | EIN [                    ] |
| Address | [                    ] | Phone [                    ] |
| City | [                    ] State [        ] | ZIP code [                    ] |

Form **941** (Rev. 6-2021)

# Instructions for E-Filing Form 941

### Quarterly Federal Tax Return

File Form 941 quarterly to report wages paid to your employees and associated tax liabilities.

## To file Form 941 electronically:

1. Review the account information on the completed form.

   If you need to edit any account information, such as your business address, you can do so in the **Setup** section. When you have saved your changes, return to e-file your 941. Also remember to complete the Federal Change of Address form. (Link easily to this form at the Help/Resources page or Help Index.)

2. Click the Submit button to file the form electronically.

You can view this form later by clicking "View forms you have saved" on the Quarterly Forms page.

## If you want to file by paper this time:

Just uncheck the box next to "File Electronically," print the form, and follow the instructions.

Form **941 for 2021:** **Employer's QUARTERLY Federal Tax Return**
(Rev. June 2021)    Department of the Treasury — Internal Revenue Service

951121

OMB No. 1545-0029

**Employer identification number (EIN)** | `*` | `.2338`

**Name** *(not your trade name)* | Touchstone Remodelers, LLC

**Trade name** *(if any)* | Touchstone Remodelers

**Address** | 2214 Distribution Circle
Number    Street    Suite or room number

Silver Spring | MD | 20910
City | State | ZIP code

Foreign country name | Foreign province/county | Foreign postal code

**Report for this Quarter of 2021**
(Check one.)

☐ **1:** January, February, March

☐ **2:** April, May, June

☒ **3:** July, August, September

☐ **4:** October, November, December

Go to *www.irs.gov/Form941* for
instructions and the latest information.

REV 10/04/21 OSP

Read the separate instructions before you complete Form 941. Type or print within the boxes.

**Part 1:** **Answer these questions for this quarter.**

| | | |
|---|---|---|
| 1 | Number of employees who received wages, tips, or other compensation for the pay period including: *June 12* (Quarter 2), *Sept. 12* (Quarter 3), or *Dec. 12* (Quarter 4) . . . . . . . 1 | 5 |
| 2 | Wages, tips, and other compensation . . . . . . . . . . . . . . . 2 | 77,582.84 |
| 3 | Federal income tax withheld from wages, tips, and other compensation . . . . . . 3 | 6,743.24 |

4  If no wages, tips, and other compensation are subject to social security or Medicare tax   ☐ **Check and go to line 6.**

| | | Column 1 | | | Column 2 | | |
|---|---|---|---|---|---|---|---|
| 5a | Taxable social security wages* . . | 77,582.84 | × 0.124 = | 9,620.27 | | |
| 5a (i) | Qualified sick leave wages* . | | × 0.062 = | | | |
| 5a (ii) | Qualified family leave wages* . | | × 0.062 = | | | |
| 5b | Taxable social security tips . . . | | × 0.124 = | | | |
| 5c | Taxable Medicare wages & tips . . | 77,582.84 | × 0.029 = | 2,249.90 | | |
| 5d | Taxable wages & tips subject to Additional Medicare Tax withholding | | × 0.009 = | | | |

*Include taxable qualified sick and family leave wages for leave taken after March 31, 2021, on line 5a. Use lines 5a(i) and 5a(ii) only for wages paid after March 31, 2020, for leave taken before April 1, 2021.

| | | |
|---|---|---|
| 5e | Total social security and Medicare taxes. Add Column 2 from lines 5a, 5a(i), 5a(ii), 5b, 5c, and 5d   5e | 11,870.17 |
| 5f | Section 3121(q) Notice and Demand—Tax due on unreported tips (see instructions) . . 5f | |
| 6 | Total taxes before adjustments. Add lines 3, 5e, and 5f . . . . . . . . . 6 | 18,613.41 |
| 7 | Current quarter's adjustment for fractions of cents . . . . . . . . . 7 | 0.03 |
| 8 | Current quarter's adjustment for sick pay . . . . . . . . . . . 8 | |
| 9 | Current quarter's adjustments for tips and group-term life insurance . . . . . 9 | |
| 10 | Total taxes after adjustments. Combine lines 6 through 9 . . . . . . . . 10 | 18,613.44 |
| 11a | Qualified small business payroll tax credit for increasing research activities. Attach Form 8974   11a | |
| 11b | Nonrefundable portion of credit for qualified sick and family leave wages for leave taken before April 1, 2021 . . . . . . . . . . . . . . . . 11b | |
| 11c | Nonrefundable portion of employee retention credit . . . . . . . . . 11c | |

▶ **You MUST complete all three pages of Form 941 and SIGN it.**

Next ▶

For Privacy Act and Paperwork Reduction Act Notice, see the back of the Payment Voucher.   BAA

Form **941** (Rev. 6-2021)

951221

| Name *(not your trade name)* | Employer identification number (EIN) |
|---|---|
| Touchstone Remodelers, LLC | 2338 |

**Part 1:** Answer these questions for this quarter. *(continued)*

**11d** Nonrefundable portion of credit for qualified sick and family leave wages for leave taken after March 31, 2021 **11d** [ ]

**11e** Nonrefundable portion of COBRA premium assistance credit (see instructions for applicable quarters) **11e** [ ]

**11f** Number of individuals provided COBRA premium assistance [ ]

**11g** Total nonrefundable credits. Add lines 11a, 11b, 11c, 11d, and 11e . . . **11g** [ ]

**12** Total taxes after adjustments and nonrefundable credits. Subtract line 11g from line 10 . **12** | 18,613.44 |

**13a** Total deposits for this quarter, including overpayment applied from a prior quarter and overpayments applied from Form 941-X, 941-X (PR), 944-X, or 944-X (SP) filed in the current quarter **13a** | 18,613.44 |

**13b** Reserved for future use . . . . . . . . . . . **13b** [ ]

**13c** Refundable portion of credit for qualified sick and family leave wages for leave taken before April 1, 2021 . . . . . . **13c** [ ]

**13d** Refundable portion of employee retention credit . . . . **13d** [ ]

**13e** Refundable portion of credit for qualified sick and family leave wages for leave taken after March 31, 2021 . . . . . . **13e** [ ]

**13f** Refundable portion of COBRA premium assistance credit (see instructions for applicable quarters) . . . . . . **13f** [ ]

**13g** Total deposits and refundable credits. Add lines 13a, 13c, 13d, 13e, and 13f . . **13g** | 18,613.44 |

**13h** Total advances received from filing Form(s) 7200 for the quarter . **13h** [ ]

**13i** Total deposits and refundable credits less advances. Subtract line 13h from line 13g **13i** | 18,613.44 |

**14** Balance due. If line 12 is more than line 13i, enter the difference and see instructions . . . **14** [ ]

**15** Overpayment. If line 13i is more than line 12, enter the difference [ ] Check one: ☐ Apply to next return. ☐ Send a refund.

**Part 2:** Tell us about your deposit schedule and tax liability for this quarter.

If you're unsure about whether you're a monthly schedule depositor or a semiweekly schedule depositor, see section 11 of Pub. 15.

**16** Check one: ☐ Line 12 on this return is less than $2,500 or line 12 on the return for the prior quarter was less than $2,500, and you didn't incur a $100,000 next-day deposit obligation during the current quarter. If line 12 for the prior quarter was less than $2,500 but line 12 on this return is $100,000 or more, you must provide a record of your federal tax liability. If you're a monthly schedule depositor, complete the deposit schedule below; if you're a semiweekly schedule depositor, attach Schedule B (Form 941). Go to Part 3.

☒ You were a monthly schedule depositor for the entire quarter. Enter your tax liability for each month and total liability for the quarter, then go to Part 3.

Tax liability: Month 1 | 6,018.26 |

Month 2 | 6,190.67 |

Month 3 | 6,404.51 |

Total liability for quarter | 18,613.44 | Total must equal line 12.

☐ You were a semiweekly schedule depositor for any part of this quarter. Complete Schedule B (Form 941), Report of Tax Liability for Semiweekly Schedule Depositors, and attach it to Form 941. Go to Part 3.

▶ You MUST complete all three pages of Form 941 and SIGN it.

Next ▶

REV 10/04/21 OSP  Form **941** (Rev. 6-2021)

951921

| Name *(not your trade name)* | Employer identification number (EIN) |
|---|---|
| Touchstone Remodelers, LLC | 4 :2338 |

**Part 3:** Tell us about your business. If a question does NOT apply to your business, leave it blank.

17  If your business has closed or you stopped paying wages . . . . . . . . . ☐ Check here, and

    enter the final date you paid wages [          ] ; also attach a statement to your return. See instructions.

18a  If you're a seasonal employer and you don't have to file a return for every quarter of the year . . . ☐ Check here.

18b  If you're eligible for the employee retention credit solely because your business is a recovery startup business ☐ Check here.

| | | | |
|---|---|---|---|
| 19 | Qualified health plan expenses allocable to qualified sick leave wages for leave taken before April 1, 2021 | 19 | |
| 20 | Qualified health plan expenses allocable to qualified family leave wages for leave taken before April 1, 2021 | 20 | |
| 21 | Qualified wages for the employee retention credit . . . . . . . | 21 | |
| 22 | Qualified health plan expenses for the employee retention credit . . . . | 22 | |
| 23 | Qualified sick leave wages for leave taken after March 31, 2021 . . . . | 23 | |
| 24 | Qualified health plan expenses allocable to qualified sick leave wages reported on line 23 | 24 | |
| 25 | Amounts under certain collectively bargained agreements allocable to qualified sick leave wages reported on line 23 . . . | 25 | |
| 26 | Qualified family leave wages for leave taken after March 31, 2021 . . . . | 26 | |
| 27 | Qualified health plan expenses allocable to qualified family leave wages reported on line 26 | 27 | |
| 28 | Amounts under certain collectively bargained agreements allocable to qualified family leave wages reported on line 26 . . . | 28 | |

**Part 4:** May we speak with your third-party designee?

Do you want to allow an employee, a paid tax preparer, or another person to discuss this return with the IRS? See the instructions for details.

☐ Yes. Designee's name and phone number [                    ] [          ]

Select a 5-digit personal identification number (PIN) to use when talking to the IRS. [          ]

☐ No.

REV 10/04/21 OSP

**Part 5:** Sign here. You MUST complete all three pages of Form 941 and SIGN it.

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

X **Sign your name here** [          ]

Print your name here [          ]

Print your title here [          ]

Date [          ]

Best daytime phone [          ]

**Paid Preparer Use Only**

Check if you're self-employed . . . ☐

| Preparer's name | [          ] | PTIN | [          ] |
|---|---|---|---|
| Preparer's signature | [          ] | Date | [          ] |
| Firm's name (or yours if self-employed) | [          ] | EIN | [          ] |
| Address | [          ] | Phone | [          ] |
| City | [          ] | State [          ] | ZIP code [          ] |

Form **941** (Rev. 6-2021)

# Instructions for E-Filing Form 941

Quarterly Federal Tax Return

File Form 941 quarterly to report wages paid to your employees and associated tax liabilities.

## To file Form 941 electronically:

1. Review the account information on the completed form.

   If you need to edit any account information, such as your business address, you can do so in the **Setup** section. When you have saved your changes, return to e-file your 941. Also remember to complete the Federal Change of Address form. (Link easily to this form at the Help/Resources page or Help Index.)

2. Click the Submit button to file the form electronically.

You can view this form later by clicking "View forms you have saved" on the Quarterly Forms page.

## If you want to file by paper this time:

Just uncheck the box next to "File Electronically," print the form, and follow the instructions.

Form **941 for 2021:** Employer's QUARTERLY Federal Tax Return
(Rev. June 2021)
Department of the Treasury — Internal Revenue Service

951121

OMB No. 1545-0029

**Employer identification number (EIN)** | 2338

**Name** (not your trade name) | Touchstone Remodelers, LLC

**Trade name** (if any) | Touchstone Remodelers

**Address** | 2214 Distribution Circle
Number    Street    Suite or room number

Silver Spring    MD    20910
City    State    ZIP code

Foreign country name    Foreign province/county    Foreign postal code

**Report for this Quarter of 2021**
(Check one.)

☐ 1: January, February, March

☐ 2: April, May, June

☐ 3: July, August, September

☒ 4: October, November, December

Go to *www.irs.gov/Form941* for instructions and the latest information.

REV 01/05/22 OSP

Read the separate instructions before you complete Form 941. Type or print within the boxes.

**Part 1:    Answer these questions for this quarter.**

| | | |
|---|---|---|
| 1 | Number of employees who received wages, tips, or other compensation for the pay period including: *June 12* (Quarter 2), *Sept. 12* (Quarter 3), or *Dec. 12* (Quarter 4) . . . . . . . . 1 | 1 |
| 2 | Wages, tips, and other compensation . . . . . . . . . . . . . . 2 | 57,799.06 |
| 3 | Federal income tax withheld from wages, tips, and other compensation . . . . 3 | 5,366.93 |

4 | If no wages, tips, and other compensation are subject to social security or Medicare tax | ☐ Check and go to line 6.

| | | Column 1 | | Column 2 | |
|---|---|---|---|---|---|
| 5a | Taxable social security wages* . . | 57,799.06 | × 0.124 = | 7,167.08 | |
| 5a (i) | Qualified sick leave wages* . . | | × 0.062 = | | |
| 5a (ii) | Qualified family leave wages* . . | | × 0.062 = | | |
| 5b | Taxable social security tips . . . | | × 0.124 = | | |
| 5c | Taxable Medicare wages & tips . . | 57,799.06 | × 0.029 = | 1,676.17 | |
| 5d | Taxable wages & tips subject to Additional Medicare Tax withholding | | × 0.009 = | | |

*Include taxable qualified sick and family leave wages for leave taken after March 31, 2021, on line 5a. Use lines 5a(i) and 5a(ii) only for wages paid after March 31, 2020, for leave taken before April 1, 2021.

| | | |
|---|---|---|
| 5e | Total social security and Medicare taxes. Add Column 2 from lines 5a, 5a(i), 5a(ii), 5b, 5c, and 5d    5e | 8,843.25 |
| 5f | Section 3121(q) Notice and Demand—Tax due on unreported tips (see instructions) . . 5f | |
| 6 | Total taxes before adjustments. Add lines 3, 5e, and 5f . . . . . . . 6 | 14,210.18 |
| 7 | Current quarter's adjustment for fractions of cents . . . . . . . 7 | −0.03 |
| 8 | Current quarter's adjustment for sick pay . . . . . . . . . 8 | |
| 9 | Current quarter's adjustments for tips and group-term life insurance . . . . 9 | |
| 10 | Total taxes after adjustments. Combine lines 6 through 9 . . . . . . 10 | 14,210.15 |
| 11a | Qualified small business payroll tax credit for increasing research activities. Attach Form 8974    11a | |
| 11b | Nonrefundable portion of credit for qualified sick and family leave wages for leave taken before April 1, 2021 . . . . . . . . . . . . . . 11b | |
| 11c | Nonrefundable portion of employee retention credit . . . . . . . 11c | |

► **You MUST complete all three pages of Form 941 and SIGN it.**

Next ►

For Privacy Act and Paperwork Reduction Act Notice, see the back of the Payment Voucher.    BAA    Form **941** (Rev. 6-2021)

951221

| Name *(not your trade name)* | Employer identification number (EIN) |
|---|---|
| Touchstone Remodelers, LLC | ••12338 |

**Part 1:    Answer these questions for this quarter.** *(continued)*

| | | | |
|---|---|---|---|
| 11d | Nonrefundable portion of credit for qualified sick and family leave wages for leave taken after March 31, 2021 | 11d | |
| 11e | Nonrefundable portion of COBRA premium assistance credit (see instructions for applicable quarters) | 11e | |
| 11f | Number of individuals provided COBRA premium assistance | | |
| 11g | Total nonrefundable credits. Add lines 11a, 11b, 11c, 11d, and 11e | 11g | |
| 12 | Total taxes after adjustments and nonrefundable credits. Subtract line 11g from line 10 . | 12 | 14,210.15 |
| 13a | Total deposits for this quarter, including overpayment applied from a prior quarter and overpayments applied from Form 941-X, 941-X (PR), 944-X, or 944-X (SP) filed in the current quarter | 13a | 14,210.15 |
| 13b | Reserved for future use . . . . . . . . . . . . . . | 13b | |
| 13c | Refundable portion of credit for qualified sick and family leave wages for leave taken before April 1, 2021 | 13c | |
| 13d | Refundable portion of employee retention credit | 13d | |
| 13e | Refundable portion of credit for qualified sick and family leave wages for leave taken after March 31, 2021 | 13e | |
| 13f | Refundable portion of COBRA premium assistance credit (see instructions for applicable quarters) . . . . . . . . . . . . . | 13f | |
| 13g | Total deposits and refundable credits. Add lines 13a, 13c, 13d, 13e, and 13f | 13g | 14,210.15 |
| 13h | Total advances received from filing Form(s) 7200 for the quarter . | 13h | |
| 13i | Total deposits and refundable credits less advances. Subtract line 13h from line 13g | 13i | 14,210.15 |
| 14 | Balance due. If line 12 is more than line 13i, enter the difference and see instructions . . | 14 | |
| 15 | Overpayment. If line 13i is more than line 12, enter the difference | | Check one: ☐ Apply to next return.  ☐ Send a refund. |

**Part 2:    Tell us about your deposit schedule and tax liability for this quarter.**

If you're unsure about whether you're a monthly schedule depositor or a semiweekly schedule depositor, see section 11 of Pub. 15.

16   Check one: ☐    Line 12 on this return is less than $2,500 or line 12 on the return for the prior quarter was less than $2,500, and you didn't incur a $100,000 next-day deposit obligation during the current quarter. If line 12 for the prior quarter was less than $2,500 but line 12 on this return is $100,000 or more, you must provide a record of your federal tax liability. If you're a monthly schedule depositor, complete the deposit schedule below; if you're a semiweekly schedule depositor, attach Schedule B (Form 941). Go to Part 3.

☒    You were a monthly schedule depositor for the entire quarter. Enter your tax liability for each month and total liability for the quarter, then go to Part 3.

| Tax liability: | Month 1 | 8,786.01 |
|---|---|---|
| | Month 2 | 4,280.93 |
| | Month 3 | 1,143.21 |
| Total liability for quarter | | 14,210.15 | Total must equal line 12.

☐    You were a semiweekly schedule depositor for any part of this quarter. Complete Schedule B (Form 941), Report of Tax Liability for Semiweekly Schedule Depositors, and attach it to Form 941. Go to Part 3.

► **You MUST complete all three pages of Form 941 and SIGN it.**

Next ►

REV 01/05/22 OSP   Form **941** (Rev. 6-2021)

951921

| Name *(not your trade name)* | Employer identification number (EIN) |
|---|---|
| Touchstone Remodelers, LLC | 2338 |

**Part 3:  Tell us about your business. If a question does NOT apply to your business, leave it blank.**

17  If your business has closed or you stopped paying wages . . . . . . . . . . .  ☐ Check here, and

enter the final date you paid wages [                    ] ; also attach a statement to your return. See instructions.

18a  If you're a seasonal employer and you don't have to file a return for every quarter of the year . . .  ☐ Check here.

18b  If you're eligible for the employee retention credit solely because your business is a recovery startup business  ☐ Check here.

| | | |
|---|---|---|
| 19 | Qualified health plan expenses allocable to qualified sick leave wages for leave taken before April 1, 2021 | 19 |
| 20 | Qualified health plan expenses allocable to qualified family leave wages for leave taken before April 1, 2021 | 20 |
| 21 | Qualified wages for the employee retention credit   . . . . . . . . . | 21 |
| 22 | Qualified health plan expenses for the employee retention credit   . . . . | 22 |
| 23 | Qualified sick leave wages for leave taken after March 31, 2021   . . . . | 23 |
| 24 | Qualified health plan expenses allocable to qualified sick leave wages reported on line 23 | 24 |
| 25 | Amounts under certain collectively bargained agreements allocable to qualified sick leave wages reported on line 23   . . . . . . . . . | 25 |
| 26 | Qualified family leave wages for leave taken after March 31, 2021   . . . . | 26 |
| 27 | Qualified health plan expenses allocable to qualified family leave wages reported on line 26 | 27 |
| 28 | Amounts under certain collectively bargained agreements allocable to qualified family leave wages reported on line 26 | 28 |

**Part 4:   May we speak with your third-party designee?**

Do you want to allow an employee, a paid tax preparer, or another person to discuss this return with the IRS? See the instructions for details.

☐ Yes.  Designee's name and phone number [                    ]  [                    ]

Select a 5-digit personal identification number (PIN) to use when talking to the IRS. [                    ]

☐ No.

REV 01/05/22 OSP

**Part 5:   Sign here. You MUST complete all three pages of Form 941 and SIGN it.**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

**X**   **Sign your name here** [                    ]

Print your name here [                    ]

Print your title here [                    ]

Date [                    ]      Best daytime phone [                    ]

**Paid Preparer Use Only**      Check if you're self-employed   . . . ☐

| | |
|---|---|
| Preparer's name [                    ] | PTIN [                    ] |
| Preparer's signature [                    ] | Date [                    ] |
| Firm's name (or yours if self-employed) [                    ] | EIN [                    ] |
| Address [                    ] | Phone [                    ] |
| City [                    ]  State [        ] | ZIP code [                    ] |

Page **3**                                      Form **941** (Rev. 6-2021)

# Instructions for E-Filing Form 941

Quarterly Federal Tax Return

File Form 941 quarterly to report wages paid to your employees and associated tax liabilities.

## To file Form 941 electronically:

1. Review the account information on the completed form.

   If you need to edit any account information, such as your business address, you can do so in the **Setup** section. When you have saved your changes, return to e-file your 941. Also remember to complete the Federal Change of Address form. (Link easily to this form at the Help/Resources page or Help Index.)

2. Click the Submit button to file the form electronically.

You can view this form later by clicking "View forms you have saved" on the Quarterly Forms page.

## If you want to file by paper this time:

Just uncheck the box next to "File Electronically," print the form, and follow the instructions.

## Touchstone Remodelers

Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|---|---|---|---|---|---|
| 03/18/2021 | Expense | SIRIUS XM RADIO INC.888-635-5144    NY XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 143.29 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 03/18/2021 | Expense | ADTSECURITY MYADT.CO800-238-2727    FL XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 73.28 | Other Operating Expenses:Office Supplies | AMEX Business Platinum (2002) |
| 03/19/2021 | Expense | R.Shearin LinkedIn Learning Premium | 237.74 | Other Operating Expenses:Education & Training | Spark Visa Business CC (8764) |
| 03/19/2021 | Expense | AMEX ASSURANCE TRAVEPHOENIX    AZ XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 32.46 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 03/20/2021 | Credit Card Credit | TARGET.COM * | -18.42 | Job Materials - COS | Spark Visa Business CC (8764) |
| 03/20/2021 | Credit Card Credit | TARGET.COM * | -9.22 | Job Materials - COS | Spark Visa Business CC (8764) |
| 03/20/2021 | Expense | Print plans | 171.08 | Other Operating Expenses:Office Supplies | AMEX Business Platinum (2002) |
| 03/20/2021 | Expense | DMV CLEANING LLC 042ALEXANDRIA    VA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 130.00 | Subcontractors - COS | AMEX Business Platinum (2002) |
| 03/20/2021 | Credit Card Credit | per client: It was a transfer from AMEX reward points to purchase airline tickets. | -531.86 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 03/20/2021 | Expense | PwP    AMERICAN EXPRCHICAGO    IL XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 499.40 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 03/21/2021 | Expense | Bandi Residence | 17.72 | Job Materials - COS | CORP (9400):Ben's BofA Mastercard |
| 03/21/2021 | Expense | iPhone CitizenOne LoBRIDGEPORT    CT XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 42.82 | Occupancy:Utilities | AMEX Business Platinum (2002) |
| 03/22/2021 | Expense | PIZZERIA DA MARCO 65BETHESDA    MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 87.13 | Other Operating Expenses:Meals | AMEX Business Platinum (2002) |
| 03/22/2021 | Expense | 2COCOM*SIGMAESTIMATES. | 6.36 | Other Operating Expenses:Dues & Subscriptions | CORP (9400):Ben's BofA Mastercard |
| 03/22/2021 | Expense | MCG DEP TRANSFER STATI | 121.80 | Other Costs - COS:Trash Removal | CORP (9400):Don's BofA Credit Card |
| 03/22/2021 | Expense | Sigma Estimates | 1,620.00 | Other Operating Expenses:Software | AMEX Business Prime (1008) |
| 03/23/2021 | Expense | Upwork Estimating | 257.50 | Other Operating Expenses:Office Supplies | AMEX Business Platinum (2002) |
| 03/23/2021 | Expense | TRAVELOCITY    SEATTLE    WA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 320.40 | Other Operating Expenses:Travel | AMEX Business Prime (1008) |
| 03/24/2021 | Expense | Seven Rivers AviatioGeorgetown    SC XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 201.20 | Other Operating Expenses:Auto/Truck:M20K Repair & Maintenance | AMEX Business Platinum (2002) |
| 03/24/2021 | Expense | TW_PERRY    GAITHERSBURG    MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 1,089.30 | Job Materials - COS | AMEX Business Platinum (2002) |
| 03/24/2021 | Expense | UBER TRIP    HELP.UBER.COM    CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 43.44 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 03/24/2021 | Expense | 7-ELEVEN 34140 | 49.00 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Marleanda's BofA Credit Card |
| 03/24/2021 | Expense | LINKEDIN-624*9647993LNKD.IN/BILL    CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 29.99 | Other Operating Expenses:Education & Training | AMEX Business Platinum (2002) |
| 03/24/2021 | Expense | UBER TRIP    HELP.UBER.COM    CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 54.04 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 03/24/2021 | Expense | BUILDERS MUTUAL  DES:8008094859 ID:2MRJVBDTWCEAJ6H INDN:TOUCHSTONE REMODELERS  CO ID:XXXXX46050 CCD | 1,064.26 | Other Operating Expenses:Insurance | BOA Platinum Checking (3252) |
| 03/25/2021 | Expense | 2COCOM*SIGMAESTIMATEALPHARETTA    GA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 534.24 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Prime (1008) |
| 03/25/2021 | Credit Card Credit | UBER TRIP    HELP.UBER.COM    CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | -19.72 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 03/25/2021 | Expense | VCN*VIRGINIASCC 0000RICHMOND    VA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 75.00 | Other Operating Expenses:Legal & Professional Fees | AMEX Business Prime (1008) |
| 03/26/2021 | Expense | COMCAST    800-COMCAST    MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 189.46 | Occupancy:Utilities | AMEX Business |

## Touchstone Remodelers

Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|------|------------------|-----------------|--------|---------|-------|
| | | SRIGLEY | | | Platinum (2002) |
| 03/26/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING          MD XXXX-XXXXXX-04016 - ADAM METZGER | 525.00 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 03/26/2021 | Expense | Pilot proficiency | 150.00 | Other Operating Expenses:Education & Training | BOA Platinum Checking (3252) |
| 03/27/2021 | Expense | UBER EATS          SAN FRANCISCO          CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 44.05 | Other Operating Expenses:Meals | AMEX Business Platinum (2002) |
| 03/27/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING          MD XXXX-XXXXXX-04016 - ADAM METZGER | 525.00 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 03/27/2021 | Expense | INTUIT QUICKBOOKS  800-446-8848          CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 74.20 | Other Operating Expenses:Payment Processing | AMEX Business Platinum (2002) |
| 03/28/2021 | Expense | UBER EATS          SAN FRANCISCO          CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 56.74 | Other Operating Expenses:Meals | AMEX Business Platinum (2002) |
| 03/29/2021 | Expense | GRASSHOPPER.COM          LOGMEIN.COM          MA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 38.26 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 03/29/2021 | Expense | UPWORK*-371187114REFSANTA CLARA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 154.50 | Other Operating Expenses:Office Supplies | AMEX Business Platinum (2002) |
| 03/30/2021 | Expense | SAFEWAY 4832 4832  WASHINGTON          DC XXXX-XXXXXX-04016 - ADAM METZGER | 8.28 | Other Operating Expenses:Meals | AMEX Business Platinum (2002) |
| 03/30/2021 | Expense | UBER TRIP          HELP.UBER.COM          CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 33.32 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 03/31/2021 | Expense | TRIMBLE INC TRIMBLE WESTMINSTER,          CO XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 316.94 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Prime (1008) |
| 03/31/2021 | Journal Entry | | 62.42 | Other Operating Expenses:Depreciation | -Split- |
| 03/31/2021 | Journal Entry | | 802.67 | Other Operating Expenses:Depreciation | -Split- |
| 03/31/2021 | Expense | READY REFRESH BY NESSTAMFORD          CT XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 13.83 | Other Operating Expenses:Office Supplies | AMEX Business Platinum (2002) |
| 04/01/2021 | Expense | CS Grubhub Gift Card | 150.00 | Marketing:Advertising | CORP (9400):Marleanda's BofA Credit Card |
| 04/01/2021 | Expense | EIG*CONSTANTCONTACT.855-229-5506          MA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 45.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/02/2021 | Expense | URBANA PIKE CMF | 36.39 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 04/02/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING          MD XXXX-XXXXXX-04016 - ADAM METZGER | 525.00 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 04/02/2021 | Expense | INDEED          (203)564-2400          CT XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 350.07 | Marketing:Advertising | AMEX Business Platinum (2002) |
| 04/03/2021 | Expense | 7-ELEVEN 34140 | 51.16 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Marleanda's BofA Credit Card |
| 04/04/2021 | Expense | UBER EATS          SAN FRANCISCO          CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 53.55 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/04/2021 | Expense | UBER TRIP          SAN FRANCISCO          CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 19.94 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/04/2021 | Expense | UBER TRIP          SAN FRANCISCO          CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 20.19 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/05/2021 | Deposit | Prfd Rwds for Bus-ATM Operator Refund of $3.50 | -3.50 | Other Operating Expenses:Bank Charges | BOA Platinum Checking (3252) |
| 04/05/2021 | Expense | SUNTRUST          04/05 #000351465 WITHDRWL          @GREEN VALLEY MONROVIA          MD          CKCD          XXXXXXXXXXXX5739 | 403.50 | Labor Cost:Contractor Labor | BOA Platinum Checking (3252) |
| 04/05/2021 | Expense | UPWORK*-372913882REFSANTA CLARA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 30.39 | Marketing:Advertising | AMEX Business Platinum (2002) |
| 04/06/2021 | Expense | CASH  * FINANCE CHARGE * | 261.39 | Other Operating Expenses:Bank Charges | BofA Line of Credit (7078) |
| 04/06/2021 | Expense | REAL WORLD TRAINING | 29.95 | Other Operating Expenses:Education & Training | Spark Visa Business CC (8764) |

## Touchstone Remodelers

Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|------|------|------|------|------|------|
| 04/06/2021 | Expense | CLOUDFLARE      (650)319-8939      CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 5.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/06/2021 | Expense | PURCHASE *FINANCE CHARGE* | 0.01 | Other Operating Expenses:Bank Charges | BofA Line of Credit (7078) |
| 04/06/2021 | Expense | BOA Finance Charge | 217.08 | Interest Expense | CORP (9400):Touchstone Remodelers' Credit Card |
| 04/07/2021 | Expense | HUBSPOT INC.      BOSTON XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 61.83 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/07/2021 | Expense | 7-ELEVEN 34140 | 51.28 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Marleanda's BofA Credit Card |
| 04/08/2021 | Expense | IN *RODGERS PRECISIOALEXANDRIA      VA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 590.28 | Job Materials - COS | AMEX Business Platinum (2002) |
| 04/08/2021 | Deposit | Prfd Rwds for Bus-ATM Operator Refund of $3.50 | -3.50 | Other Operating Expenses:Bank Charges | BOA Platinum Checking (3252) |
| 04/08/2021 | Expense | MSFT *<E0100E2X74> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 15.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/08/2021 | Expense | SUNTRUST      04/08 #000871936 WITHDRWL      @GREEN VALLEY MONROVIA   MD      CKCD   XXXXXXXXXXXX5739 | 403.50 | Labor Cost:Contractor Labor | BOA Platinum Checking (3252) |
| 04/08/2021 | Expense | UPWORK*-373422230MEMSANTA CLARA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 49.99 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/09/2021 | Expense | MONARCH PAINT CENTERS | 275.72 | Job Materials - COS | CORP (9400):Don's BofA Credit Card |
| 04/09/2021 | Expense | MSFT *<E0100E37T2> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 9.86 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/09/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING      MD XXXX-XXXXXX-04016 - ADAM METZGER | 698.80 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 04/09/2021 | Expense | MSFT *<E0100E3333> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 16.96 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/09/2021 | Expense | MSFT *<E0100E2ZM9> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 127.20 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/09/2021 | Expense | MSFT *<E0100E2ZMA> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 148.40 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/10/2021 | Expense | LINKEDIN-650*5241624LNKD.IN/BILL      CA XXXX-XXXXXX-04016 - ADAM METZGER | 29.99 | Other Operating Expenses:Education & Training | AMEX Business Platinum (2002) |
| 04/10/2021 | Expense | INTEREST CHARGE:PURCHASES | 98.96 | Interest Expense | Spark Visa Business CC (8764) |
| 04/10/2021 | Expense | UBER EATS      SAN FRANCISCO      CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 65.84 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/10/2021 | Expense | MSFT *<E0300E4ODO> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 100.70 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/10/2021 | Expense | WF WAYFAIR3556092822 | 227.60 | Job Materials - COS | Spark Visa Business CC (8764) |
| 04/11/2021 | Expense | UBER TRIP      SAN FRANCISCO      CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 8.43 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/11/2021 | Expense | PIZZERIA DA MARCO 65BETHESDA      MD XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 110.30 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/11/2021 | Expense | GOOGLE*YOUTUBEPREMIU G.CO HELPPAY# XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 19.07 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/11/2021 | Expense | Interest Charge on Pay Over Time Purchases XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 357.16 | Interest Expense | AMEX Business Platinum (2002) |
| 04/12/2021 | Expense | UPWORK*-374659533REFSANTA CLARA XXXX-XXXXXX-02002 - BENJAMIN R | 154.50 | Other Operating | AMEX Business |

## Touchstone Remodelers

Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|------|------------------|-----------------|--------|---------|-------|
| | | SRIGLEY | | Expenses:Legal & Professional Fees | Platinum (2002) |
| 04/12/2021 | Expense | WALMART.COM AX | 52.46 | Job Materials - COS | Spark Visa Business CC (8764) |
| 04/12/2021 | Expense | GROVE BEER & WINE | 37.80 | Marketing:Advertising | CORP (9400):Marleanda's BofA Credit Card |
| 04/12/2021 | Expense | Preferred Rewards-Safe Box Fee Discount of $50.00 | 107.00 | Other Operating Expenses:Office Supplies | BOA Platinum Checking (3252) |
| 04/13/2021 | Expense | LinkedIn 6308626393 | 355.73 | Marketing:Advertising | Spark Visa Business CC (8764) |
| 04/14/2021 | Expense | HELLO* HELLOSIGN   SAN FRANCISCO       CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 50.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/14/2021 | Expense | ADOBE CREATIVE CLOUDSAN JOSE       CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 56.17 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/15/2021 | Expense | URBANA PIKE CMF CARRCLARKSBURG       MD XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 70.57 | Other Operating Expenses:Auto/Truck:Gas | AMEX Business Prime (1008) |
| 04/15/2021 | Expense | EXCLAIMER LTD       FARNBOROUGH       GB XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 14.60 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/15/2021 | Expense | CHECKCARD  0414 CLYDE'S OF CHEVY CHASE       CHEVY CHASE  MD 24941501104400100000245       CKCD 5812 XXXXXXXXXXXX5835 | 50.77 | Other Operating Expenses:Meals | BOA Platinum Checking (3252) |
| 04/16/2021 | Expense | SPEED AUTO SERVICE 1SILVER SPRING       MD XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 1,113.79 | Other Operating Expenses:Repairs & Maintenance | AMEX Business Prime (1008) |
| 04/16/2021 | Expense | UBER TRIP       SAN FRANCISCO       CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 15.53 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/16/2021 | Expense | UBER TRIP       SAN FRANCISCO       CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 13.33 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/18/2021 | Expense | UBER TRIP       SAN FRANCISCO       CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 14.92 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/18/2021 | Expense | SIRIUS XM RADIO INC.888-635-5144       NY XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 143.29 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/18/2021 | Expense | UBER TRIP       SAN FRANCISCO       CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 9.58 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/18/2021 | Expense | ADTSECURITY MYADT.CO800-238-2727       FL XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 73.28 | Other Operating Expenses:Office Supplies | AMEX Business Platinum (2002) |
| 04/19/2021 | Expense | LOWE'S       FREDERICK       MD XXXX-XXXXXX-04016 - ADAM METZGER | 227.06 | Job Materials - COS | AMEX Business Platinum (2002) |
| 04/19/2021 | Expense | THE ROOF CENTER 501 | 29.73 | Job Materials - COS | CORP (9400):Don's BofA Credit Card |
| 04/20/2021 | Expense | USPS PO 2306750813 0CHEVY CHASE       MD XXXX-XXXXXX-01053 - CYNTHIA SRIGLEY | 165.00 | Other Operating Expenses:Shipping & Postage | AMEX Business Platinum (2002) |
| 04/21/2021 | Deposit | Prfd Rwds for Bus-ATM Operator Refund of $2 | -2.00 | Other Operating Expenses:Bank Charges | BOA Platinum Checking (3252) |
| 04/21/2021 | Expense | iPhone CitizenOne LoBRIDGEPORT       CT XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 42.82 | Occupancy:Utilities | AMEX Business Platinum (2002) |
| 04/21/2021 | Expense | Day Labor | 102.00 | Labor Cost:Contractor Labor | BOA Platinum Checking (3252) |
| 04/21/2021 | Expense | URBANA PIKE CMF | 40.70 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 04/22/2021 | Check | Job materials, computer accessories | 136.48 | Other Operating Expenses:Reimbursements | BOA Platinum Checking (3252) |
| 04/22/2021 | Expense | 2COCOM*SIGMAESTIMATES. | 6.36 | Other Operating Expenses:Dues & Subscriptions | CORP (9400):Ben's BofA Mastercard |
| 04/23/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING       MD XXXX-XXXXXX-04016 - ADAM METZGER | 525.00 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 04/23/2021 | Expense | GODADDY.COM       480-505-8855       AZ XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 18.17 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |

## Touchstone Remodelers

Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|------|------|------|------|------|------|
| 04/24/2021 | Expense | TW_PERRY        GAITHERSBURG        MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 10,345.83 | Job Materials - COS | AMEX Business Platinum (2002) |
| 04/24/2021 | Expense | ABC BETHESDA 0762  BETHESDA        MD XXXX-XXXXXX-04016 - ADAM METZGER | 149.07 | Job Materials - COS | AMEX Business Platinum (2002) |
| 04/24/2021 | Expense | LINKEDIN-634*6026743LNKD.IN/BILL        CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 29.99 | Other Operating Expenses:Education & Training | AMEX Business Platinum (2002) |
| 04/25/2021 | Expense | UBER EATS        SAN FRANCISCO        CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 68.85 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/26/2021 | Expense | WALMART.COM AU | 157.43 | Job Materials - COS | Spark Visa Business CC (8764) |
| 04/26/2021 | Expense | COMCAST        800-COMCAST        MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 189.46 | Occupancy:Utilities | AMEX Business Platinum (2002) |
| 04/26/2021 | Expense | UBER TRIP        SAN FRANCISCO        CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 8.44 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 04/26/2021 | Expense | BUILDERS MUTUAL  DES:8008094859 ID:2MX4I8KUSGE5SM2 INDN:TOUCHSTONE REMODELERS  CO ID:XXXX46050 CCD | 1,064.26 | Other Operating Expenses:Insurance | BOA Platinum Checking (3252) |
| 04/27/2021 | Expense | BMC #4037 0000        MANASSAS        VA XXXX-XXXXXX-11016 - CYNTHIA SRIGLEY | 3,016.14 | Job Materials - COS | AMEX Business Prime (1008) |
| 04/27/2021 | Expense | EDIBLE ARRANGEMENTS | 45.46 | Marketing:Advertising | CORP (9400):Marleanda's BofA Credit Card |
| 04/27/2021 | Expense | BMC #4037 0000        MANASSAS        VA XXXX-XXXXXX-11016 - CYNTHIA SRIGLEY | 1,820.49 | Job Materials - COS | AMEX Business Prime (1008) |
| 04/27/2021 | Expense | INTUIT QUICKBOOKS  800-446-8848        CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 74.20 | Other Operating Expenses:Payment Processing | AMEX Business Platinum (2002) |
| 04/28/2021 | Expense | BMC #4037 0000        MANASSAS        VA XXXX-XXXXXX-11016 - CYNTHIA SRIGLEY | 18.00 | Job Materials - COS | AMEX Business Prime (1008) |
| 04/28/2021 | Expense | Interest Charge on Purchases XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 88.32 | Other Operating Expenses:Bank Charges | AMEX Business Prime (1008) |
| 04/28/2021 | Expense | WALMART.COM AU | 90.63 | Job Materials - COS | Spark Visa Business CC (8764) |
| 04/28/2021 | Expense | INTUIT QUICKBOOKS  800-446-8848        CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 91.20 | Other Operating Expenses:Payment Processing | AMEX Business Platinum (2002) |
| 04/28/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING        MD XXXX-XXXXXX-04016 - ADAM METZGER | 700.38 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 04/29/2021 | Expense | GRASSHOPPER.COM        LOGMEIN.COM        MA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 38.54 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 04/29/2021 | Expense | LINKEDIN-635*7213733 | 502.54 | Marketing:Advertising | Spark Visa Business CC (8764) |
| 04/29/2021 | Expense | URBANA PIKE CMF | 38.89 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 04/30/2021 | Expense | BANYAN AIR SERVICE 2FORT LAUDERDA        FL XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 460.10 | Other Operating Expenses:Auto/Truck:M20K Repair & Maintenance | AMEX Business Platinum (2002) |
| 04/30/2021 | Journal Entry | | 62.42 | Other Operating Expenses:Depreciation | -Split- |
| 04/30/2021 | Journal Entry | | 802.67 | Other Operating Expenses:Depreciation | -Split- |
| 05/01/2021 | Expense | EIG*CONSTANTCONTACT.855-229-5506        MA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 45.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/01/2021 | Credit Card Credit | BUILD.COM | -219.57 | Job Materials - COS | Spark Visa Business CC (8764) |
| 05/02/2021 | Expense | UBER EATS        SAN FRANCISCO        CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 74.89 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 05/02/2021 | Expense | AplPay PARKMOBILE  WASHINGTON        DC XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 5.05 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/02/2021 | Expense | INDEED        (203)564-2400        CT XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 410.16 | Marketing:Advertising | AMEX Business Platinum (2002) |
| 05/03/2021 | Expense | UBER TRIP        SAN FRANCISCO        CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 41.48 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |

## Touchstone Remodelers

### Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|---|---|---|---|---|---|
| 05/03/2021 | Expense | UBER TRIP    SAN FRANCISCO    CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 11.26 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 05/04/2021 | Expense | CRAIGSLIST INC CRAIGSAN FRANCISCO    CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 45.00 | Marketing:Advertising | AMEX Business Platinum (2002) |
| 05/04/2021 | Expense | NAMEBADGE.COM | 47.97 | Other Operating Expenses:Office Supplies | Spark Visa Business CC (8764) |
| 05/04/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING    MD XXXX-XXXXXX-04016 - ADAM METZGER | 598.08 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 05/05/2021 | Expense | UBER EATS    SAN FRANCISCO    CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 51.84 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 05/05/2021 | Expense | 7-ELEVEN 34140 | 51.87 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Marleanda's BofA Credit Card |
| 05/06/2021 | Expense | BOA Finance Charge | 79.96 | Interest Expense | CORP (9400):Touchstone Remodelers' Credit Card |
| 05/06/2021 | Expense | CASH  * FINANCE CHARGE * | 248.23 | Other Operating Expenses:Bank Charges | BofA Line of Credit (7078) |
| 05/06/2021 | Expense | REAL WORLD TRAINING | 29.95 | Other Operating Expenses:Education & Training | Spark Visa Business CC (8764) |
| 05/06/2021 | Expense | CLOUDFLARE    (650)319-8939    CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 5.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/07/2021 | Expense | URBANA PIKE CMF | 37.11 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 05/07/2021 | Expense | LINKEDIN-638*0336353 | 324.75 | Marketing:Advertising | Spark Visa Business CC (8764) |
| 05/07/2021 | Expense | HUBSPOT INC.    BOSTON XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 61.83 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/07/2021 | Expense | BARRONS LUMBER-GAITHER | 733.31 | Job Materials - COS | CORP (9400):Marleanda's BofA Credit Card |
| 05/07/2021 | Expense | BARRONS LUMBER-GAITHER | 733.31 | Job Materials - COS | CORP (9400):Marleanda's BofA Credit Card |
| 05/07/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING    MD XXXX-XXXXXX-04016 - ADAM METZGER | 657.72 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 05/08/2021 | Expense | TW_PERRY    GAITHERSBURG    MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 11,891.89 | Job Materials - COS | AMEX Business Platinum (2002) |
| 05/08/2021 | Expense | UPWORK*-380711063MEMSANTA CLARA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 49.99 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/09/2021 | Expense | MSFT *<E0100EEDO1> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 127.20 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/09/2021 | Expense | MSFT *<E0100EEKQT> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 15.90 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/09/2021 | Expense | MSFT *<E0100EEKQU> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 16.96 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/09/2021 | Expense | MSFT *<E0300EG4S5> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 100.70 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/09/2021 | Expense | MSFT *<E0100EEDO2> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 10.60 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/09/2021 | Expense | MSFT *<E0100EEEVH> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 148.40 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/10/2021 | Expense | UBER EATS    SAN FRANCISCO    CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 67.64 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |

## Touchstone Remodelers

### Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|------|------------------|-----------------|--------|---------|-------|
| 05/10/2021 | Expense | GOOGLE *YOUTUBEPREMI855-836-3987          CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 19.07 | Job Materials - COS | AMEX Business Platinum (2002) |
| 05/10/2021 | Expense | JIFFY LUBE #1213 | 36.93 | Other Operating Expenses:Auto/Truck:M20K Repair & Maintenance | CORP (9400):Marleanda's BofA Credit Card |
| 05/10/2021 | Expense | LINKEDIN-660*6873994LNKD.IN/BILL          CA XXXX-XXXXXX-04016 - ADAM METZGER | 31.79 | Other Operating Expenses:Education & Training | AMEX Business Platinum (2002) |
| 05/11/2021 | Expense | LINKEDIN-639*1871423 | 100.00 | Marketing:Advertising | Spark Visa Business CC (8764) |
| 05/11/2021 | Expense | INTEREST CHARGE:PURCHASES | 100.35 | Interest Expense | Spark Visa Business CC (8764) |
| 05/11/2021 | Expense | USPS PO 2306750813 0CHEVY CHASE          MD XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 80.40 | Other Operating Expenses:Shipping & Postage | AMEX Business Prime (1008) |
| 05/11/2021 | Expense | ZIPRECRUITER, INC. | 16.00 | Marketing:Advertising | Spark Visa Business CC (8764) |
| 05/11/2021 | Expense | TW PERRY- SILVER SPRGAITHERSBURG          MD XXXX-XXXXXX-01053 - CYNTHIA SRIGLEY | 9.51 | Other Operating Expenses:Office Supplies | AMEX Business Platinum (2002) |
| 05/12/2021 | Expense | Interest Charge on Pay Over Time Purchases XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 321.61 | Interest Expense | AMEX Business Platinum (2002) |
| 05/13/2021 | Expense | UBER EATS          SAN FRANCISCO          CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 35.95 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 05/14/2021 | Expense | FOREFLIGHT LLC          HOUSTON          TX XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 399.01 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/14/2021 | Expense | Nickerson Plumbing Fixtures | 2,909.12 | Job Materials - COS | AMEX Business Platinum (2002) |
| 05/14/2021 | Expense | ADOBE CREATIVE CLOUDSAN JOSE          CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 56.17 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/14/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING          MD XXXX-XXXXXX-04016 - ADAM METZGER | 525.00 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 05/14/2021 | Expense | HELLO* HELLOSIGN   SAN FRANCISCO          CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 50.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/15/2021 | Expense | PARKWAY DELICATESSENSILVER SPRING          MD XXXX-XXXXXX-11016 - CYNTHIA SRIGLEY | 50.97 | Other Operating Expenses:Meals | AMEX Business Prime (1008) |
| 05/15/2021 | Expense | VIMEO BUSINESS          000-000-0000          NY XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 634.94 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/16/2021 | Expense | UBER TRIP          SAN FRANCISCO          CA XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 20.10 | Other Operating Expenses:Travel | AMEX Business Prime (1008) |
| 05/17/2021 | Expense | STAPLES          00106971 | 71.00 | Other Operating Expenses:Office Supplies | CORP (9400):Marleanda's BofA Credit Card |
| 05/17/2021 | Expense | URBANA PIKE CMF | 40.16 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 05/17/2021 | Expense | EXCLAIMER LTD          FARNBOROUGH          GB XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 14.60 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/18/2021 | Expense | ADTSECURITY MYADT.CO800-238-2727          FL XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 73.28 | Other Operating Expenses:Office Supplies | AMEX Business Platinum (2002) |
| 05/18/2021 | Expense | JP ROLL OFF SERVICE SILVER SPRING          MD XXXX-XXXXXX-04016 - ADAM METZGER | 608.74 | Other Costs - COS:Trash Removal | AMEX Business Platinum (2002) |
| 05/18/2021 | Credit Card Credit | WALMART.COM | -52.46 | Job Materials - COS | Spark Visa Business CC (8764) |
| 05/18/2021 | Expense | TW_PERRY          GAITHERSBURG          MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 9,921.50 | Job Materials - COS | AMEX Business Platinum (2002) |
| 05/18/2021 | Expense | SIRIUS XM RADIO INC.888-635-5144          NY XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 143.29 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/19/2021 | Expense | Customer Withdrawal Image | 11,945.52 | Other Operating Expenses:Auto/Truck:M20K Repair & Maintenance | BOA Platinum Checking (3252) |

## Touchstone Remodelers

Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | | AMOUNT | ACCOUNT | SPLIT |
|---|---|---|---|---|---|---|
| 05/19/2021 | Expense | CHECKCARD  0518 BROMWELL'S 2469029113802701339 7326 | 703-207-9800 VA CKCD 5718 XXXXXXXXXXXX5835 | 1,970.00 | Job Materials - COS | BOA Platinum Checking (3252) |
| 05/19/2021 | Expense | CLARKSBURG MARKET | | 54.66 | Marketing:Advertising | CORP (9400):Marleanda's BofA Credit Card |
| 05/19/2021 | Expense | EXPEDIA.COM TRAVEL  SEATTLE R SRIGLEY | WA XXXX-XXXXXX-02002 - BENJAMIN | 267.40 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/19/2021 | Expense | EXPEDIA.COM TRAVEL  SEATTLE R SRIGLEY | WA XXXX-XXXXXX-02002 - BENJAMIN | 267.40 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/19/2021 | Credit Card Credit | BUILD.COM | | -42.67 | Job Materials - COS | Spark Visa Business CC (8764) |
| 05/20/2021 | Expense | URBANA PIKE CMF | | 43.44 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 05/20/2021 | Expense | SAFEWAY 0945 | | 19.01 | Other Operating Expenses:Meals | CORP (9400):Don's BofA Credit Card |
| 05/20/2021 | Expense | FREDERICK LUMBER COMFREDERICK METZGER | MD XXXX-XXXXXX-04016 - ADAM | 74.25 | Job Materials - COS | AMEX Business Platinum (2002) |
| 05/21/2021 | Expense | BUILD.COM        800-375-3403 SRIGLEY | CA XXXX-XXXXXX-01053 - CYNTHIA | 2,740.47 | Job Materials - COS | AMEX Business Platinum (2002) |
| 05/21/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 15.58 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/21/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 14.70 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/21/2021 | Expense | GOOGLE *MobiSystems | | 29.99 | Other Operating Expenses:Dues & Subscriptions | CORP (9400):Katherine's BofA Credit Card (closed) |
| 05/21/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 48.37 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/21/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 38.56 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/21/2021 | Expense | UNITED AIRLINES    HOUSTON SRIGLEY | TX XXXX-XXXXXX-02002 - BENJAMIN R | 35.00 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/21/2021 | Expense | iPhone CitizenOne LoBRIDGEPORT SRIGLEY | CT XXXX-XXXXXX-02002 - BENJAMIN R | 42.82 | Occupancy:Utilities | AMEX Business Platinum (2002) |
| 05/22/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 18.49 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/22/2021 | Expense | 2CO.COM*SIGMAESTIMATES | | 6.36 | Other Operating Expenses:Dues & Subscriptions | CORP (9400):Ben's BofA Mastercard |
| 05/22/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 41.83 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/22/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 31.64 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/23/2021 | Expense | UBER EATS      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 31.37 | Other Operating Expenses:Meals | AMEX Business Platinum (2002) |
| 05/23/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 11.23 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/23/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 34.12 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/23/2021 | Expense | UBER EATS      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 65.60 | Other Operating Expenses:Meals | AMEX Business Platinum (2002) |
| 05/23/2021 | Expense | UBER TRIP      SAN FRANCISCO SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 10.38 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/23/2021 | Expense | SIGNATURE HARDWARE 0ERLANGER CYNTHIA SRIGLEY | KY XXXX-XXXXXX-01053 - | 1,025.02 | Job Materials - COS | AMEX Business Platinum (2002) |
| 05/24/2021 | Expense | LINKEDIN-643*7662193LNKD.IN/BILL SRIGLEY | CA XXXX-XXXXXX-02002 - BENJAMIN R | 31.79 | Other Operating Expenses:Education & Training | AMEX Business Platinum (2002) |
| 05/24/2021 | Expense | OCCUPATIONAL SAFETY A | | 193.95 | Other Operating Expenses:Education & Training | CORP (9400):Don's BofA Credit Card |
| 05/24/2021 | Expense | Seven Rivers AviatioGeorgetown SRIGLEY | SC XXXX-XXXXXX-02002 - BENJAMIN R | 189.23 | Other Operating Expenses:Auto/Truck:M20K Repair & Maintenance | AMEX Business Platinum (2002) |

## Touchstone Remodelers

Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|---|---|---|---|---|---|
| 05/24/2021 | Expense | UPWORK*-385088252REFSANTA CLARA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 50.65 | Marketing:Advertising | AMEX Business Platinum (2002) |
| 05/24/2021 | Expense | WESTIN FORT LAUDERDAFORT LAUDERDALE   FL XXXX-XXXXXX-01053 - CYNTHIA SRIGLEY | 326.12 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/25/2021 | Expense | BUILDERS MUTUAL  DES:8008094859 ID:2N2EJQ6I940KPWY INDN:TOUCHSTONE REMODELERS   CO ID:XXXXX46050 CCD | 1,064.26 | Other Operating Expenses:Insurance | BOA Platinum Checking (3252) |
| 05/25/2021 | Expense | 7-ELEVEN 34140 | 41.03 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Marleanda's BofA Credit Card |
| 05/25/2021 | Expense | BANYAN AIR SERVICE 2FORT LAUDERDA    FL XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 50.79 | Other Operating Expenses:Auto/Truck:M20K Repair & Maintenance | AMEX Business Platinum (2002) |
| 05/26/2021 | Expense | UBER EATS        SAN FRANCISCO    CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 67.64 | Other Operating Expenses:Meals | AMEX Business Platinum (2002) |
| 05/26/2021 | Expense | SAFEWAY 0945 | 3.17 | Other Operating Expenses:Meals | CORP (9400):Don's BofA Credit Card |
| 05/26/2021 | Expense | URBANA PIKE CMF | 33.59 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 05/26/2021 | Expense | UBER TRIP        SAN FRANCISCO    CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 34.24 | Other Operating Expenses:Travel | AMEX Business Platinum (2002) |
| 05/26/2021 | Expense | COMCAST         800-COMCAST     MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 189.46 | Occupancy:Utilities | AMEX Business Platinum (2002) |
| 05/26/2021 | Expense | Seven Rivers AviatioGeorgetown       SC XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 688.80 | Other Operating Expenses:Auto/Truck:M20K Repair & Maintenance | AMEX Business Platinum (2002) |
| 05/27/2021 | Expense | INTUIT QUICKBOOKS  800-446-8848     CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 172.78 | Other Operating Expenses:Payment Processing | AMEX Business Platinum (2002) |
| 05/27/2021 | Expense | MCG DEP TRANSFER STATI | 104.40 | Other Costs - COS:Trash Removal | CORP (9400):Don's BofA Credit Card |
| 05/27/2021 | Expense | GIANT FUEL 0327 | 61.09 | Other Operating Expenses:Auto/Truck:Gas | Spark Visa Business CC (8764) |
| 05/28/2021 | Expense | CLARKSBURG       CLARKSBURG      MD XXXX-XXXXXX-04016 - ADAM METZGER | 74.20 | Job Materials - COS | |
| 05/28/2021 | Expense | Interest Charge on Purchases XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 196.54 | Other Operating Expenses:Bank Charges | AMEX Business Prime (1008) |
| 05/28/2021 | Expense | Online Banking Transfer Conf# kipeu29jt;          Advanced Building Supplies Inc | 16,295.84 | Job Materials - COS | BOA Platinum Checking (3252) |
| 05/29/2021 | Expense | FREDERICK LUMBER COMFREDERICK     MD XXXX-XXXXXX-01053 - CYNTHIA SRIGLEY | 4,467.37 | Job Materials - COS | AMEX Business Platinum (2002) |
| 05/29/2021 | Expense | READY REFRESH BY NESSTAMFORD       CT XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 14.36 | Other Operating Expenses:Office Supplies | AMEX Business Platinum (2002) |
| 05/29/2021 | Expense | GRASSHOPPER.COM    LOGMEIN.COM    MA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 38.54 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 05/31/2021 | Journal Entry | | 62.42 | Other Operating Expenses:Depreciation | -Split- |
| 05/31/2021 | Journal Entry | | 802.67 | Other Operating Expenses:Depreciation | -Split- |
| 05/31/2021 | Journal Entry | To true up the loan balance | -254.97 | Interest Expense | -Split- |
| 06/01/2021 | Expense | HOO*HOOTSUITE INC  778-588-9767     CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 348.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 06/01/2021 | Expense | EIG*CONSTANTCONTACT.855-229-5506     MA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 45.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 06/01/2021 | Expense | URBANA PIKE CMF | 52.67 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 06/02/2021 | Expense | TW_PERRY        GAITHERSBURG     MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 537.02 | Job Materials - COS | AMEX Business Platinum (2002) |
| 06/02/2021 | Expense | TW_PERRY        GAITHERSBURG     MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 83.34 | Job Materials - COS | AMEX Business Platinum (2002) |
| 06/02/2021 | Expense | TW_PERRY        GAITHERSBURG     MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 211.32 | Job Materials - COS | AMEX Business Platinum (2002) |
| 06/02/2021 | Expense | TW_PERRY        GAITHERSBURG     MD XXXX-XXXXXX-02002 - BENJAMIN R | 16,137.31 | Job Materials - COS | AMEX Business |

## Touchstone Remodelers

Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|------|------|------|------|------|------|
| | | SRIGLEY | | | Platinum (2002) |
| 06/02/2021 | Expense | TW_PERRY        GAITHERSBURG        MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 26,057.07 | Job Materials - COS | AMEX Business Platinum (2002) |
| 06/02/2021 | Expense | TW_PERRY        GAITHERSBURG        MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 17,187.67 | Job Materials - COS | AMEX Business Platinum (2002) |
| 06/03/2021 | Expense | INDEED        (203)564-2400        CT XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 280.66 | Marketing:Advertising | AMEX Business Platinum (2002) |
| 06/04/2021 | Expense | CASH  * FINANCE CHARGE * | 163.52 | Other Operating Expenses:Bank Charges | BofA Line of Credit (7078) |
| 06/04/2021 | Expense | CHECKCARD  0603 VERIZON*RECURRING PAY        800-VERIZON FL 24692161154100174069141 RECURRING        CKCD 4814 XXXXXXXXXXX5835 | 55.89 | Occupancy:Utilities | BOA Platinum Checking (3252) |
| 06/04/2021 | Expense | BOA Finance Charge | 43.61 | Interest Expense | CORP (9400):Touchstone Remodelers' Credit Card |
| 06/05/2021 | Expense | CLOUDFLARE        SAN FRANCISCO        CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 5.00 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 06/06/2021 | Expense | UBER EATS        SAN FRANCISCO        CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 63.29 | Other Operating Expenses:Meals | AMEX Business Platinum (2002) |
| 06/07/2021 | Expense | SAFEWAY 0945 | 5.29 | Other Operating Expenses:Office Supplies | CORP (9400):Adam's BofA Mastercard |
| 06/07/2021 | Expense | HUBSPOT INC.        BOSTON XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 61.83 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 06/07/2021 | Expense | REAL WORLD TRAINING | 29.95 | Other Operating Expenses:Education & Training | Spark Visa Business CC (8764) |
| 06/08/2021 | Expense | MD DEPT OF LICENSING | 375.00 | Other Operating Expenses:Business Licenses/Permits | CORP (9400):Ben's BofA Mastercard |
| 06/08/2021 | Expense | UPWORK*-388742165MEMSANTA CLARA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 49.99 | Marketing:Advertising | AMEX Business Platinum (2002) |
| 06/08/2021 | Expense | STROSNIDERS BETHESDA | 33.90 | Job Materials - COS | CORP (9400):Don's BofA Credit Card |
| 06/09/2021 | Expense | STROSNIDERS POTOMAC | 34.96 | Job Materials - COS | CORP (9400):Adam's BofA Mastercard |
| 06/09/2021 | Expense | URBANA PIKE CMF | 51.31 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 06/10/2021 | Expense | Breads Unlimited | 22.85 | Marketing:Advertising | CORP (9400):Marleanda's BofA Credit Card |
| 06/10/2021 | Expense | GOOGLE *YOUTUBEPREMI855-836-3987        CA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 19.07 | Job Materials - COS | AMEX Business Platinum (2002) |
| 06/10/2021 | Expense | STROSNIDERS POTOMAC | 16.80 | Job Materials - COS | CORP (9400):Adam's BofA Mastercard |
| 06/10/2021 | Expense | INTEREST CHARGE:PURCHASES | 74.16 | Interest Expense | Spark Visa Business CC (8764) |
| 06/10/2021 | Expense | LINKEDIN-576*3630796LNKD.IN/BILL        CA XXXX-XXXXXX-04016 - ADAM METZGER | 31.79 | Other Operating Expenses:Education & Training | AMEX Business Platinum (2002) |
| 06/10/2021 | Expense | MSFT *<E0100EPWM1> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 15.90 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 06/11/2021 | Expense | UPWORK*-389296011REFSANTA CLARA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 92.70 | Marketing:Advertising | AMEX Business Platinum (2002) |
| 06/11/2021 | Expense | MSFT *<E0100EQSOI> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 148.40 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 06/11/2021 | Expense | MSFT *<E0100EQSOH> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 127.20 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 06/11/2021 | Expense | MSFT *<E0300ERZWN> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 100.70 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |

## Touchstone Remodelers

### Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|---|---|---|---|---|---|
| 06/11/2021 | Expense | Interest Charge on Pay Over Time Purchases XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 281.24 | Interest Expense | AMEX Business Platinum (2002) |
| 06/11/2021 | Expense | MSFT *<E0100EQ74G> MSBILL.INFO XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 10.60 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 06/11/2021 | Expense | PATIO PRODUCTS USA 0916-7363463          CA XXXX-XXXXXX-01053 - CYNTHIA SRIGLEY | 1,823.18 | Job Materials - COS | AMEX Business Platinum (2002) |
| 06/11/2021 | Expense | CAMERON BUILDING ENVELKRIDGE          MD XXXX-XXXXXX-01053 - CYNTHIA SRIGLEY | 1,051.00 | Job Materials - COS | AMEX Business Platinum (2002) |
| 06/11/2021 | Expense | MSFT * E0100EQ5PD 00MSBILL.INFO          WA XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 16.96 | Other Operating Expenses:Dues & Subscriptions | AMEX Business Platinum (2002) |
| 06/14/2021 | Expense | VIRGINIA CHEMICAL & EQ | 636.00 | Job Materials - COS | CORP (9400):Don's BofA Credit Card |
| 06/14/2021 | Expense | VIRGINIA CHEMICAL & EQ | 333.90 | Job Materials - COS | CORP (9400):Don's BofA Credit Card |
| 06/15/2021 | Expense | GIANT 0745 | 4.09 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Don's BofA Credit Card |
| 06/15/2021 | Expense | URBANA PIKE CMF | 54.06 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 06/21/2021 | Expense | CHECKCARD  0617 LINKEDIN-652*1743503          LNKD.IN/BILL CA 24692161169100552330530 RECURRING          CKCD 5968 XXXXXXXXXXXX5835 | 31.79 | Other Operating Expenses:Education & Training | BOA Platinum Checking (3252) |
| 06/22/2021 | Expense | 2COCOM*SIGMAESTIMATES. | 6.36 | Other Operating Expenses:Dues & Subscriptions | CORP (9400):Ben's BofA Mastercard |
| 06/24/2021 | Expense | 7-ELEVEN 34140 | 55.54 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Marleanda's BofA Credit Card |
| 06/24/2021 | Expense | BUILDERS MUTUAL  DES:8008094859 ID:2N88TYGLF4AZ0O7 INDN:TOUCHSTONE REMODELERS  CO ID:XXXXX46050 CCD | 1,064.32 | Other Operating Expenses:Insurance | BOA Platinum Checking (3252) |
| 06/24/2021 | Expense | URBANA PIKE CMF | 43.64 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 06/28/2021 | Expense | Interest Charge on Purchases XXXX-XXXXXX-11008 - BENJAMIN R SRIGLEY | 167.65 | Other Operating Expenses:Bank Charges | AMEX Business Prime (1008) |
| 06/28/2021 | Expense | SAFEWAY 0945 | 6.34 | Job Materials - COS | CORP (9400):Don's BofA Credit Card |
| 06/28/2021 | Expense | DC PARKING METERS | 4.60 | Other Operating Expenses:Travel | CORP (9400):Marleanda's BofA Credit Card |
| 06/29/2021 | Expense | 7-ELEVEN 28840 | 4.97 | Job Materials - COS | CORP (9400):Adam's BofA Mastercard |
| 06/30/2021 | Journal Entry | | 802.67 | Other Operating Expenses:Depreciation | -Split- |
| 06/30/2021 | Journal Entry | | 62.42 | Other Operating Expenses:Depreciation | -Split- |
| 07/01/2021 | Expense | GLEN ECHO HARDWARE | 53.59 | Job Materials - COS | CORP (9400):Adam's BofA Mastercard |
| 07/02/2021 | Expense | URBANA PIKE CMF | 46.97 | Other Operating Expenses:Auto/Truck:Gas | CORP (9400):Adam's BofA Mastercard |
| 07/31/2021 | Journal Entry | | 62.42 | Other Operating Expenses:Depreciation | -Split- |
| 07/31/2021 | Journal Entry | | 802.67 | Other Operating Expenses:Depreciation | -Split- |
| 08/11/2021 | Credit Card Credit | ACT*Active Montgomery | -170.00 | Other Operating Expenses:Entertainment | CORP (9400):Jennifer's BofA Credit Card |
| 08/11/2021 | Credit Card Credit | ACT*Active Montgomery | -100.00 | Other Operating Expenses:Entertainment | CORP (9400):Jennifer's BofA Credit Card |
| 08/27/2021 | Expense | CLYDE'S OF CHEVY CHACHEVY CHASE          MD XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 261.64 | Other Operating Expenses:Meals | AMEX Business Platinum (2002) |
| 08/27/2021 | Expense | ISPA/PIMDS     08/27 #000000312 WITHDRWL          PAI ISO          CHEVY CHASE  MD          CKCD     XXXXXXXXXXXX0442 | 202.90 | Subcontractors - COS | BOA Platinum Checking (3252) |
| 08/27/2021 | Expense | HOWARD COUNTY ALPHA RI | 130.80 | Other Costs - COS:Trash | CORP (9400):Rob's |

## Touchstone Remodelers

Transaction Report

March 18 - December 17, 2021

| DATE | TRANSACTION TYPE | MEMO/DESCRIPTION | AMOUNT | ACCOUNT | SPLIT |
|------|------|------|------|------|------|
| | | | | Removal | BofA Credit Card |
| 08/31/2021 | Journal Entry | Dep expense for August 2021 | 802.67 | Other Operating Expenses:Depreciation | -Split- |
| 08/31/2021 | Journal Entry | Dep expense for August 2021 | 62.42 | Other Operating Expenses:Depreciation | -Split- |
| 09/01/2021 | Expense | HOWARD COUNTY ALPHA RI | 29.60 | Other Costs - COS:Trash Removal | CORP (9400):Rob's BofA Credit Card |
| 09/08/2021 | Expense | REMOTE DEPOSIT MONTHLY FEE | 15.00 | Other Operating Expenses:Bank Charges | BOA Platinum Checking (3252) |
| 09/24/2021 | Expense | BUILDERS MUTUAL  DES:8008094859 ID:2NP09RB65DN8V4I INDN:TOUCHSTONE REMODELERS  CO ID:XXXXX46050 CCD | 1,043.70 | Other Operating Expenses:Insurance | BOA Platinum Checking (3252) |
| 09/30/2021 | Journal Entry | Dep expense for September 2021 | 62.42 | Other Operating Expenses:Depreciation | -Split- |
| 09/30/2021 | Journal Entry | Dep expense for September 2021 | 802.67 | Other Operating Expenses:Depreciation | -Split- |
| 10/06/2021 | Expense | CASH  * FINANCE CHARGE * | 82.13 | Interest Expense | BofA Line of Credit (7078) |
| 10/07/2021 | Expense | REMOTE DEPOSIT MONTHLY FEE | 15.00 | Other Operating Expenses:Bank Charges | BOA Platinum Checking (3252) |
| 10/26/2021 | Expense | BUILDERS MUTUAL  DES:8008094859 ID:2NUH7RNQE2K1GJC INDN:TOUCHSTONE REMODELERS  CO ID:XXXXX46050 CCD | 1,404.21 | Other Operating Expenses:Insurance | BOA Platinum Checking (3252) |
| 10/31/2021 | Journal Entry | This journal was created to write off the remaing  balance  due from Gerber Martinez according to Cindys  clarification. | 54.71 | Other Operating Expenses:Miscellaneous | -Split- |
| 10/31/2021 | Journal Entry | Dep expense for October 2021 | 802.67 | Other Operating Expenses:Depreciation | -Split- |
| 10/31/2021 | Journal Entry | Dep expense for October 2021 | 62.42 | Other Operating Expenses:Depreciation | -Split- |
| 11/05/2021 | Expense | REMOTE DEPOSIT MONTHLY FEE | 15.00 | Other Operating Expenses:Bank Charges | BOA Platinum Checking (3252) |
| 11/24/2021 | Expense | BUILDERS MUTUAL  DES:8008094859 ID:2O051P2E0NHJLQ0 INDN:TOUCHSTONE REMODELERS  CO ID:XXXXX46050 CCD | 1,404.17 | Other Operating Expenses:Insurance | BOA Platinum Checking (3252) |
| 11/30/2021 | Journal Entry | Dep expense for November 2021 | 802.67 | Other Operating Expenses:Depreciation | -Split- |
| 11/30/2021 | Journal Entry | Dep expense for November 2021 | 62.42 | Other Operating Expenses:Depreciation | -Split- |
| 12/01/2021 | Expense | 4900 WISCONSIN AVE NWASHINGTON        DC XXXX-XXXXXX-02002 - BENJAMIN R SRIGLEY | 51.18 | Other Operating Expenses:Auto/Truck:Gas | AMEX Business Platinum (2002) |
| 12/07/2021 | Expense | REMOTE DEPOSIT MONTHLY FEE | 15.00 | Other Operating Expenses:Bank Charges | BOA Platinum Checking (3252) |
| 12/08/2021 | Expense | MD TLR cash withdrawal from CHK 3252        Banking Ctr DOWNTOWN SILVER SPRING  #0000233 MD        Confirmation# 0198791157 | 4,400.00 | Uncategorized Expense | BOA Platinum Checking (3252) |
| 12/10/2021 | Expense | CHECKCARD 1209 GRAINGER        877-2022594  IL 2475542134412344316803        CKCD 5085 XXXXXXXXXXXX0442 | 17.17 | Job Materials - COS | BOA Platinum Checking (3252) |
| 12/17/2021 | Deposit | Preencoded Deposit | -2,000.00 | Job Materials - COS | BOA Platinum Checking (3252) |
| **TOTAL** | | | **$195,347.07** | | |









TOUCHSTONE
FINE HOME REMODELING

PORTFOLIO   EXPERTISE   APPROACH   ABOUT   BLOG   CONTACT

With decades of combined experience and a shared passion for our craft, the Touchstone Remodelers team consistently delivers.

**Ben Srigley**
CEO & FOUNDER

Ben founded Touchstone Remodelers in 2011 with many years of experience in residential construction and a vision for a company customtailored to service the grand homes that grace the neighborhoods of Washington, DC and surrounding areas. That vision includes not just superior quality and an exceptional customer experience, but also a professional, collaborative work environment and a supportive company culture in which everyone can perform at their best. Ben's primary mission is to ensure this vision is shared by the entire team and put into practice every day, on every project. On a given day, you may find him mentoring a team member in construction techniques, working with an architect on the finer points of materials and design, or simply visiting each of Touchstone's projects as often as he can to make sure everyone has what they need and every customer is happy.

Prior to Touchstone, Ben was a project manager at a leading residential construction and architecture firm where he oversaw complex, high-value projects. During a career in residential construction spanning almost 25 years, he worked his way up from a start in humble jobs and titled virtually every role in the industry along the way in addition to project manager, his previous job titles include managing partner, superintendent, master carpenter, and cabinet maker. Over decades of work in residential remodeling, custom home building, and high commercial construction, Ben has acquired the knowledge and skills of many different aspects of construction. These include interior and exterior carpentry, interior finishes, concrete, mechanical, electrical, plumbing, and site work. However, it was the years he spent making custom cabinets with his father that instilled in him a love of woodworking and a passion for precision craftsmanship.

Ben also has a passion for precision flying. He holds an instrument-rated, multiengine commercial pilot's license and on weekends he enjoys flying his four-seat Mooney or even an acrobatic plane on occasion. Ben and his wife live in Chevy Chase, MD where they land an active life that includes traveling, boating, scuba diving, and weight training.




**Cindy Srigley**
COO

**12:05**

< 215    **Responses**    ∧ ∨

---

**From:** Ben Srigley
<bsrigley@touchstoneremodelers.com>
**Date:** Thursday, March 18, 2021 at 11:56 AM
**To:** Federico Bandi <fbandi1@jhu.edu>
**Subject:** RE: Responses

Hi Federico,

Thanks for getting back to me, hope you find some rest after your moving day! Per your list below:

1. Permit # and Dropbox link received. Thank you!
2. I may well be able to stop by and meet Angela this afternoon and will look for her call or text, I could also swing by Sunday if that happens to work for you and/or Angela. Yes; alarm code too please, good catch! :)
3. Unfortunately, this Friday will not work to meet with Adam and Marleanda but Monday afternoon should work well, **how about 3pm**?
4. Excellent! Thank you for the update.
5. Correct; initial deposit is $280,000 -- here are the account details for the wire transfer:

   Touchstone Remodelers, LLC
   Checking Account # 446010756490
   Routing # 026009593

Best,
Ben

On Mar 20, 2021, at 9:02 AM, Ben Srigley <bsrigley@touchstoneremodelers.com>
wrote:


Good morning Angela,

Your $280k deposit is safely in our business account, unsure exactly when it posted but
it was there this morning. Thank you!

Enjoy your weekend!

Best,
Ben

**From:** Angela <angela.bandi@yahoo.com>
**Sent:** Friday, March 19, 2021 2:40 PM
**To:** Ben Srigley
**Subject:** Transfer instructions


Ben Srigley
**CEO, Touchstone Remodelers**

(202) 738-1993 ext 700   | (240) 374-9945
bsrigley@touchstoneremodelers.com
www.TouchstoneRemodelers.com


Hi Ben,

As soon as you have a few minutes, could you give me a call on my cell? The number is
773-620-1932.

I need to confirm the account information you gave me before COB today to have the transfer
released.

Thanks,
Angela

TOUCHSTONE
FINE HOME REMODELING

PORTFOLIO   EXPERTISE   APPROACH   ABOUT   BLOG   CONTACT

aerobatic plane on occasion. Ben and he wife live in Chevy Chase, MD where they lead an active life that includes traveling, boating, scuba diving, and weight training

## Cindy Srigley
**COO**

Cindy Srigley proudly serves as Chief Operations Officer at Touchstone Remodelers. Cindy's passion for learning, her eagerness to tackle new and challenging projects, and her depth of proven expertise made her a perfect fit to oversee the administrative side of Touchstone.

Cindy came into her current role at Touchstone Remodelers through a rather unconventional route. Classically trained in the life sciences, she received B.S., M.S., and Ph.D. degrees from Cornell University and a Master's Certificate in Project Management from George Washington University/Strategy Execution. Prior to joining the Touchstone team, Cindy held a 30-year appointment as a Research Chemist at the US Food and Drug Administration (FDA) and built an impressive resume, having published more than 30 original peer-reviewed journal articles and having given numerous scientific presentations throughout North America, Europe, and in South Africa. She is also the author of ISO International Standard 23349 and is considered an expert in process development. Cindy is thrilled to now be applying her broad range of skills to the residential remodeling industry.

Outside of work, Cindy pursues an athletic lifestyle. She enjoys standing, strength training, horseback riding, hiking, and skiing. Living for the summertime, she and her husband, Ben, often escape to their favorite beach destinations for long weekends of boating, scuba diving, and dining on seafood.



## Adam Metzger
**SENIOR PROJECT MANAGER**

As Senior Project Manager, Adam Metzger brings to the Touchstone Remodelers' team extensive experience in home construction, cabinet making, and historic detailing, plus finely-honed skills in project management, precision layout, and subcontractor coordination and integration.



**APPENDIX B**

From: **Federico Bandi** fbandi1@jhu.edu
Subject: CASE 23-00116-ELG
Date: June 5, 2023 at 11:31 AM
To: William Douglas White wdw@mccarthywhite.com
Cc: Angela Bandi angela.bandi@yahoo.com



Good morning Trustee White,

We attached a file which contains our reaction to Touchstone's testimony on June 1, 2023.

We also wanted to provide you with a Dropbox link to the exhibits referenced in our document of May 31, 2022.

https://tinyurl.com/2p84hcrw

As a whole, the exhibits are too large to send by email. If you prefer to receive them in another format, i.e., if there is already a link set up to receive documents in this case, please let us know.

The Dropbox link also contains the document that we sent on May 31, 2022 (Under "Response to the Petition") as well as the document attached to this e-mail (Under "Response to the testimony")

Thank you for extending the Meeting of Creditors to allow us to question Mr. Srigley. We were not satisfied with some of the responses he provided (as we discuss in the attached document). In that regard, we would like to receive all of those documents Touchstone files in connection with this case that we are entitled to receive.

We are not sure which documents you have requested from Touchstone, but we are interested in the following:

- All tax filings related to Touchstone and to Srigley Development Co LLC, such entities whose common ownership was Mr. Srigley; Srigley Development Co LLC was the former owner of the 1981 Mooney M20K aircraft which may have been depreciated on Touchstone's books and for which expenses were incurred/paid by Touchstone; the Mooney M20K, which may have had a $77,000 NBV, has been sold, but according to Mr. Srigley no portion of its proceeds was distributed to Touchstone;
- All bank statements for all checking, savings, money market or financial brokerage accounts owned or controlled by Touchstone *(note that we have bank statements for the BofA checking account ending 3252 for 3/2021 through 12/2021, but they are redacted rendering them useless; we would like post-2021 records for that account as well as those predating 3/2021, as appropriate; we would also like all statements for other - undisclosed - Touchstone accounts, at least one such account existed in March of 2021)*;
- All statements for all credit cards, lines of credit loans, or any other loans for accounts owned or controlled by Touchstone;
- All payroll records of Touchstone *(note that we have Touchstone's quarterly*

- All payroll records of Touchstone *(note that we have Touchstone's quarterly Form 941 records for 2021, but would like post-2021 records as well as those predating 2021, as appropriate)*;
- All statements of Touchstone owner draws *(again, we have a 2021 report evidencing owner draws, but would like post- and pre-2021 records, as appropriate)*;
- All statements of any other payments, distributions, transfers, loans, credits on loans or other value in any form made by Touchstone to any insider *(Touchstone has made conflicting statements under oath regarding Dr. Srigley's ownership role and her compensation)*;
- Documents of sale (e.g., sales receipts evidencing dates of sale and amounts, FAA Bill of Sale, sales-related tax records, required state or local registration records) for any and all assets sold by Touchstone or entities under common control with Touchstone, including but not limited to, the Isuzu truck and 1981 Mooney M20K;
- Ownership information and current market value of Ram truck; and
- Further, we expect all such information be provided in original, unredacted form, except for those redactions deemed appropriate for privacy purposes (e.g., social security numbers or other sensitive personal information of that nature).

As far as the time period/look-back period for which documents may be requested, we understand this is generally two years from the filing date of the Petition. That said, we will point out that Touchstone was dissolved as an entity on 11/30/2022. As discussed in the document, we also strongly believe that Touchstone engaged in fraudulent transfers. Given these two facts, we think that a look-back period of more than two years from the filing date is justified. We believe that four years from the filing date would be more appropriate, or, at a minimum, two years from Touchstone's dissolution date of 11/30/2022. Of course, we will leave this issue to your discretion.

We are not convinced that Touchstone costs and expenses exceeded its revenue in calendar year 2021. In other words, based on its representations to us, we believe Touchstone was not only profitable in 2021, but that it was profitable enough to cover the minimal expenses it should have had in 2022. We have a fair amount of information regarding its 2021 costs (again, provided to us in arbitration) and intend to compare those costs and expenses with the relevant bank and credit card statements to determine whether all 2021 revenues were deposited into disclosed Touchstone accounts and which costs/expenses are unpaid to date due to Touchstone's existing credit card debt. We would do the same for calendar year 2022 and 2023, the years during which Touchstone was not operating as a residential remodeling company or not operating at all. It would be helpful to have financial information from the year or two prior to 2021 to have a fuller understanding of Touchstone's profitability as a company, determine if there were any large pre-2021 debts, etc. In other words, we would like to understand where the money went.

Regarding the next meeting, we had to agree to the June 11th date because we did not want to reveal to Mr. Srigley that we will be traveling to see family and our

house will be unoccupied for almost a month (we return at the beginning of August). While we do not believe that he would do anything, his behavior during the arbitration hearing has been a source of worries and we feel that we should be cautious.

Our concerns with the June 11th date are the following. We will be in Europe and we are unsure that the conference call number will work there. Also, there is a chance that the documents will be provided very close to the June 11th date. If so, it will be impossible for us to review them thoroughly.

We are leaving on the 5th of June, late in the afternoon. We could even do the meeting on the morning of the 5th, a date that may not have been discussed last Thursday. Is there any chance that we could re-scheduled it for that day (or earlier)? We apologize about this request.

Thank you for your attention, Trustee White.

Kind regards,
Federico & Angela Bandi


==========================================
Federico M. Bandi
James Carey Endowed Professor
Professor of Finance
Johns Hopkins University



Touchstone's
testimony.pdf
88 KB

Case number:      **23-00116-ELG**
Debtor:            **Touchstone Remodelers, LLC**
Filed:             **4/28/2023**

**Statement of Creditors Federico M. Bandi and Angela M. Bandi in Response to Touchstone's
Testimony during the Meetings of Creditors.**

Touchstone's testimony during the Meeting of Creditors confirmed the issues that we raised in
the file "Touchstone's filing" which was sent to your attention on 5/31/2023 - the day before the
Meetings of Creditors. It also raised a host of new issues.

In essence, we believe that Mr. Srigley, as Managing Member of Touchstone, made false
statements, misrepresentations and/or material omissions, with respect to the debtor's
responses to the following items in the Petition.

- **Official Form 201**: Items 13, 15 and 17 (for reasons discussed below)
- **Official Form 202**
- **Official Form 206Sum**:
    - Part 1: Summary of Assets: Mr. Srigley's testimony revealed that he had failed to
      disclose assets. We believe the figure of $5,000.00 is a gross understatement.
- **Official Form 206A/B**:
    - Part 1: Cash and cash equivalents; Item 3: Per Mr. Srigley's testimony on 6/1/2023
      and our personal knowledge, the debtor has/had additional checking, savings,
      money market, or financial brokerage accounts other than the Bank of America
      checking account ending 3252 listed in the Petition. We provided evidence of the
      existence of at least one other account in the document "Touchstone's filing"
      dated 5/31/2023.
    - Part 3: Accounts Receivable: The response to Item 10 indicates that the debtor has
      accounts receivable and Item 11 describes the amount of these receivables as
      "Unknown." Mr. Srigley's testimony on 6/1/2023 indicated that the nature of
      these receivables was deposits paid to two subcontractors for work which was
      not completed; i.e., Touchstone overpaid these subcontractors. Mr. Srigley
      further stated that these receivables were likely offset by other amounts
      Touchstone owed to the same subcontractors. In any case, it seems that
      Touchstone should be able to determine the amount of the receivables and
      should have disclosed it.
    - Part 8: Machinery, equipment and vehicles; Item 47. Automobiles, vans, trucks,
      etc: Touchstone did not disclose ownership of any automobiles, vans or trucks in
      its Petition and Mr. Srigley initially testified (as a response to your questions, if
      our memory is correct) that Touchstone did not own any vehicles of any type.
      However, later during his testimony, Mr. Srigley acknowledged at least two such
      vehicles that apparently had been owned by Touchstone: an Isuzu truck and a
      Ram truck.

- **Isuzu truck:** Based on our understanding and recollection, Mr. Srigley testified that the Isuzu truck had been sold during Touchstone's final days (we believe he said likely early 2022). He further stated that the proceeds were around $13,000, and that they were used to fund payroll. Touchstone had laid off almost all of its employees in November of 2021; it may still have employed an administrative assistant in early 2022.
- **Ram truck:** Mr. Srigley stated that he still has possession of a Ram truck (formerly) owned by Touchstone, but that the value of the truck is lower than that of the outstanding loan balance. This is irrelevant. The existence of the truck should have been disclosed.
- **Porsche Cayenne:** Mr. Srigley has used a Porsche Cayenne in connection with Touchstone's business on our property. We do not know if either he or Dr. Srigley personally owns or leases this vehicle, or if it was owned by Touchstone or by Srigley Development Co. We also do not know if any of the expenses of the Cayenne were paid by Touchstone or if the depreciation expense discussed in Item 52 below related to it.

o **Part 8: Machinery, equipment and vehicles; Item 49. Aircraft and accessories:**

- **Mooney M20K aircraft:** As discussed above, Srigley Development Co LLC is the former owner of this aircraft. During testimony, Mr. Srigley seemed to suggest that the aircraft was not reported on the Petition as Touchstone was not its owner. That said, he admitted that a number of M20K expenses were paid by Touchstone (it is unclear what percentage of expenses). In addition, based on evidence obtained during arbitration, we believe that Touchstone may have depreciated the M20K on its books (if that is not the case, Touchstone overstated its expenses to us). We further believe that the Mooney M20K, which was sold at some point in 2022 (Mr. Srigley stated he could not recall the date), had a net book value of about $77,000 in September of 2021 (again, based on evidence received during arbitration). Mr. Srigley further stated that no portion of the M20K's sales proceeds was distributed to Touchstone. He did not disclose what the proceeds were, other than to say that he thought they were about $10,000, referencing a "loan." We believe – again based on information we obtained in arbitration – that $10,000 may not be the proceeds from the sale. Rather, $10,000 is likely the capital gain from the sale. Touchstone, Srigley Development Co or Mr. Srigley likely sold for around $90,000 a plane with a book value of $77,000. They may have paid taxes on the capital gain ($10,000) - the financial reports of either company would be revealing. Incidentally, Mr. Srigley's argument that the plane was used to scout properties around the East Coast should not apply to Touchstone based on the local nature of its business. Touchstone's charter describes its business as "Remodeling Contractor." To our knowledge, Touchstone was only licensed as a general contractor in the District of Columbia and in Maryland. The stated purpose of

Srigley Development Co, on the other hand, per its Maryland Articles of Organization is "Real estate investment and development," i.e., perhaps more suited to scouting properties. Yet, the plane was expensed and likely depreciated on Touchstone's books. In addition, we suspect that Srigley Development Co was mainly a holding company for the plane. Finally, Mr. Srigley described himself on his website as a "recreational pilot".

- o Part 8: Machinery, equipment and vehicles; Item 52. Depreciation schedule: The debtor represented that no depreciation schedule was available for property listed in Part 8. During arbitration, Touchstone provided us with reports of its expenses which included references to two monthly depreciation expenses: $62.42 and $802.67 (respectively $749.04 and $9632.04 annually). When asked to describe the assets to which these depreciation expenses pertained and on which company's books they were reported, he claimed he did not know the answer to either question. We did not raise this issue on 6/1/2023, but we will point out here that our understanding is that Mr. Srigley (possibly along with Dr. Srigley) handled all of Touchstone's accounting until approximately July of 2021, at which time Touchstone hired RY CPA LLC (See Form 207; Part 13, Item 26).

- **Official Form 206E/F:**
  - o Part 2, 3.5: Bank of America, N.A. account ending 7078: Based on information obtained in arbitration, we believe this debt relates to an unsecured line of credit loan obtained by Touchstone. The response to "Date(s) debt was incurred" was left blank. We would like to know this (these) date(s), as well as the original amounts of the loan(s) and any credit line increases. Based on its notes provided to us, Touchstone may have increased the credit line on this loan (or requested an increase) in the late summer or fall of 2021, at a time when Touchstone was already planning to close.
  - o Part 2, 3.11: Federico M. Bandi and Angela M. Bandi: With respect to our claim, we will note that the amount of the claim ($876,707.21) is inaccurate as it does not include accrued interest from 9/2/2022 through the filing date. We imagine that if assets are located, we will be able to correct this information in our proof of claim filing.

- **Official Form 207:**
  - o Part 1; Item 1. Gross revenue from business:
    - From 1/1/2023 to Filing Date: Sources of Revenue ($0.00) from "Operating a business": This is a false statement. Touchstone did not exist as a business in 2023. Mr. Srigley testified that Touchstone was dissolved on 11/30/2022.
    - From 1/1/2022 to 12/31/2022: Sources of Revenue ($4,115.80) from "Operating a business". Mr. Srigley confirmed that $4,115.80 was for work corrected by a subcontractor in connection with a 2021 home renovation contract. He stated that Touchstone did not engage in any other home renovation work in 2022. We believe Touchstone's costs and

expenses for 2022 should reflect the fact that Touchstone was no longer pursuing or performing work as a remodeling company as of the end of 2021 (Mr. Srigley admitted to this fact) and had laid off almost all of its employees.

- From 1/1/2021 to 12/31/2021: Touchstone reported gross revenue of $1,708,116.00. It is not clear what sources of income this figure includes. Mr. Srigley testified that the source of Touchstone's 2021 revenue was home renovation contracts. He also disclosed that Touchstone received two PPP loans, of approximately $40,000 and $70,000, possibly in 2021 (actual amounts may be $47,520 and $71,951). He stated that both loans were forgiven, but said that he did not know whether they were reported in Touchstone's gross revenues. Mr. Srigley also testified that Touchstone's costs for the year (excluding payroll) were around $1,200,000. Based on the information we have on payroll expenses, Touchstone may have had sizeable profits in its last year in operation (i.e., 2021). Their financial reports and/or tax forms will be revealing.

- Part 2; Item 4. Payments or other transfers of property made within 1 year before filing this case that benefited any insider: Touchstone claimed "None." We believe that if Touchstone transferred any property of substantial value to insiders (i.e., cash), the transfer likely occurred before April 28, 2022. That said, from Mr. Srigley's testimony, we understand that he now has possession of a Ram truck formerly owned by Touchstone and the proceeds from an Isuzu truck, again formerly known by Touchstone (date of sale unknown, but likely in 2022 or later). In addition, the Mooney M20K was sold in 2022; it is not clear whether Touchstone should have received any or all of the proceeds of this sale. See above discussion of Form 206A/B, Part 8.

- Part 3: Legal Actions or Assignments; Item 7:

  - 7.1 Bandi, et al. v Touchstone Remodelers, LLC, Confirmation of Arbitration Award: Touchstone states that the status of the case is pending. It is not. The Order of Judgment confirming the award was entered as of March 10, 2023.

  - In addition, we understand that the owner of the warehouse Touchstone formerly leased (see 3.12 of Form 206E/F), initiated an eviction action in the District Court of Montgomery County against Touchstone for its failure to pay rent. *See* Investors Warren Street Limited Partnership vs. Benjamin Srigley, et al. D-061-LT-23-001080 (filed 1/23/2023). https://casesearch.courts.state.md.us/casesearch/inquiryDetail.jiscaseId=D061LT23001080&loc=23&detailLoc=ODYCIVIL Investors Warren Street Limited Partnership is apparently an affiliate of Kossow Management Company. https://egov.maryland.gov/BusinessExpress/EntitySearch/Business

This information was not revealed by Mr. Srigley either in the Petition or during the Meeting of Creditors.

o   <u>Part 6; Item 13. Transfers not already listed on this statement (within 2 years before the filing of this case)</u>: Touchstone responded "None." We do not yet have firm evidence of this, but believe this to be a false statement. We just do not understand how Touchstone can report $0.00 in assets given, e.g., its revenues vs. costs in 2021, its last year in operation.

o   <u>Part 10; Item 18. Closed financial accounts</u>: We strongly believe that Touchstone had accounts which were closed, moved or transferred, but do not know if any of these occurred *within 1 year before filing*. If Touchstone did close, move or transfer any accounts, we think it would have been done in the fall of 2021 or the early part of 2022, at or around the time they stopped operating as a remodeling company. Again, we know for certain of a checking account in Touchstone's name which was not reported in the Petition (see our 5/31/2022 document), but existed in March of 2021.

o   <u>Part 13; Items 28 and 29</u>: Touchstone listed Benjamin Srigley, Managing Member and Sole Member, as the sole person in control of the debtor at the time of the filing of this case. Touchstone further claimed that, within 1 year before the filing of the Petition, it did not have any officers, directors, managing members or members in control of the debtor who no longer hold these positions. Technically (i.e., within 1 year of the filing date) this may be a true statement, however, it is not an accurate statement with respect to the spirit of the question. Touchstone ceased to exist as an entity on 11/30/2022 when it was dissolved. On 11/30/2021, one year prior to Touchstone's dissolution date, Cynthia Srigley was indisputably Touchstone's Chief Operating Officer. We also believe she was an owner of Touchstone.

o   During our arbitration, Touchstone represented to us, under oath and in writing, that Cynthia Srigley was the Chief Operating Officer and an owner of Touchstone through late December 2021. We suspect that she resigned from her position as COO in early January 2022, when she returned to the FDA from her leave of absence. We do not know if or when she relinquished her position as owner, or whether she received any compensation when she did so (our understanding and based on Touchstone's Form 941 filings, Dr. Srigley did not receive a salary from Touchstone during 2021). On 6/1/2023, Mr. Srigley testified that Dr. Srigley was absolutely not an owner of Touchstone and that he had never represented to us during arbitration that she was an owner of the company. The latter is a false statement which we can prove by documentary evidence.

o   <u>Part 13; Item 30 Payments, distributions, or withdrawals credited or given to insiders</u>: Touchstone represented that within 1 year prior to the filing date, the debtor only provided the following value to any insider: a $3300 draw provided to Mr. Srigley on 4/29/2022 and an $864.86 transfer to Mr. Srigley on 9/6/2022

from Touchstone's "corporate bank account" (presumably the BofA account
ending in 3252). Again, for the reasons discussed above, this may be a technically
accurate statement. We strongly believe that it is a false statement, however, if
Touchstone's dissolution date of 11/30/2022 is used.

- o <u>Part 13; Item 31</u>: Touchstone represented that it has not been a member of any
  consolidated group for tax purposes within 6 years before filing this case. While
  this may be an accurate statement, we will point out that at least one other entity
  shares (shared) common ownership with Touchstone: Srigley Development Co
  LLC. Mr. Srigley testified on 6/1/2023 that he is a Managing Member for both
  Touchstone and Srigley Development Co. We further understood from his
  testimony that Touchstone, and presumably Srigley Development Co, are pass-
  through businesses both reporting on Mr. Srigley's individual tax return.

We believe that Mr. Srigley made false statements in certain responses to your questions, as
well as ours, during the Meeting of Creditors. We have referenced some of these statements
above. Others we are less comfortable re-stating without a transcript.

Suffice it to say, we strongly feel that further investigation is necessary to ensure that the
interests of the creditors in this case are protected.

**APPENDIX C**

# APPENDIX C: PROPOSED DRAFT COMPLAINT*

Federico M. Bandi
Angela M. Bandi
3606 Chesapeake Street, NW
Washington, DC 20008
Telephone: 773.620.1932
Email: fbandi1@jhu.edu
        angela.bandi@yahoo.com

*Unsecured Judgment Creditors of Touchstone Remodelers, LLC, filing Pro Se*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | &#124; | |
| | &#124; | |
| TOUCHSTONE REMODELERS, LLC, | &#124; | Case No. 23-00116-ELG |
| Debtor. | &#124; | Chapter 7 |
| ———————————————— | &#124; | |
| | &#124; | |
| FEDERICO M. BANDI and | &#124; | |
| ANGELA M. BANDI, | &#124; | |
| Plaintiffs, | &#124; | |
| | &#124; | |
| vs. | &#124; | Adversary No. _____ |
| | &#124; | |
| BENJAMIN ROBERT SRIGLEY, | &#124; | |
| CYNTHIA TYBURCZY SRIGLEY, | &#124; | |
| TOUCHSTONE REMODELERS, LLC and | &#124; | |
| SRIGLEY DEVELOPMENT COMPANY, | &#124; | |
| LLC, | &#124; | |
| Defendants. | &#124; | |
| ———————————————— | &#124; | |

## COMPLAINT

Federico M. Bandi and Angela M. Bandi, Plaintiffs and creditors of the above-named

Debtor, Touchstone Remodelers, LLC, state the following in support of this Complaint against

Benjamin Robert Srigley, Cynthia Tyburczy Srigley, Touchstone Remodelers, LLC (the

**\* Appendices and exhibits are not attached to this proposed draft complaint.**

*DRAFT*

"**Debtor**"), and Srigley Development Company, LLC (collectively, the "**Defendants**"):

## PRELIMINARY STATEMENT

1.     Touchstone Remodelers, LLC was a sham used by Benjamin Robert Srigley and

Cynthia Tyburczy Srigley to enrich themselves well beyond what was justifiable given the

Debtor's financial condition.

2.     The Srigleys' scheme is clear: use the Debtor as a piggy bank and extract all of its

available assets (owned and borrowed), such that, when it was no longer convenient for the

Srigleys to continue the Debtor's business operations, they could shut down the entity at any

time and walk away. This strategy permitted them to maximize their personal gain and use the

LLC status of the Debtor to shield assets from potential creditors. This was a scheme the Srigleys

carried out over time, in other words, it was the way in which they ran the Debtor's business

generally, not solely their behavior in the months immediately prior to the commencement of the

Debtor's Chapter 7 case.[1]

3.     During at least the two- to four-year time period prior to the Petition Date, the

Debtor was in a perpetual state of insolvency. Upon information and belief, this indebtedness

was due, in part, to the Srigleys' use of the Debtor's business to fraudulently obtain funds by

taking out loans or otherwise obtaining credit in the Debtor's name, even though they were well

aware the Debtor had no means to repay the debts.

4.     The entity was also insolvent due to the Srigleys' pattern and practice of over-

compensating themselves by draining the Debtor of its cash assets and of using the Debtor's

---

[1] On April 28, 2023 (the "**Petition Date**"), the Debtor commenced its Chapter 7 case by filing a voluntary
petition for relief under Chapter 7 of Title 11 of the United States Code (the "**Petition**").

*DRAFT*

assets and credit for their personal expenditures.

5.     Upon information and belief, from early January of 2020 through the Petition

Date,[2] the Srigleys caused the Debtor to fraudulently transfer not less than **[$456,128.10]**[3] in cash

assets or other value to the Srigleys (the "**Avoidable Transfers**"). The Avoidable Transfers are

listed on the attached **Appendix A**.

6.     The **[$456,128.10]** in Avoidable Transfers does not include an additional

**[$14,166.82]** in credit card purchases made by the Srigleys during the same period for which

further discovery is needed to determine which, if any, of these purchases were made for a

legitimate business purpose.[4] *See* **Appendix A-1**.

7.     The tactics the Srigleys used to carry out their scheme were varied and several.

First, they withdrew cash from the Debtor's cash accounts on a constant basis, irrespective of the

Debtor's solvency at the time. Through at least 72 separate transactions from January 10, 2020

through September 6, 2022, the Srigleys withdrew from or transferred out of the Debtor's

accounts, approximately **[$357,116.18]** in cash assets. *See* ¶¶ 36-54, *infra* and **Appendix A**.

8.     Of course, as the Debtor was perpetually insolvent, this behavior only occurred

when the Debtor had immediate possession of liquid cash assets. Typically, the Srigleys

---

[2] This is the period commencing approximately three years and four months prior to the Petition Date. To date, we have very limited information relating to the Debtor's financial activity during the period of more than two but less than four years prior to the Petition Date (i.e., between April 28, 2019 and April 28, 2021). Further discovery is needed.

[3] This is the sum of: $357,116.18 in withdrawals or transfers of cash assets; $60,275.29 in credit card purchases, checks and direct purchases from the Debtor's cash accounts; and $38,736.63 in net proceeds from the airplane sale. Of this sum, approximately $209,781.80 in cash or other value was fraudulently transferred during the two-year period prior to the Petition Date.

[4] These include purchases made from amazon.com, Amazon Marketplace, apple.com and Uber Trip, among other vendors.

*DRAFT*

withdrew cash after the Debtor received large customer deposits. Other times, the Srigleys took out loans in the Debtor's name, in some cases further increasing the entity's indebtedness, then subsequently withdrew portions of the loan proceeds.

9.      The Srigleys also siphoned the Debtor's cash assets for their personal use by using the Debtor's bank or credit accounts for personal purchases. Plaintiffs have identified approximately **[$60,275.29]** in expenditures made by the Srigleys that seem to be of a personal nature, such as purchases relating to entertainment, meals, travel, camera and electronics equipment, and apparel. *See infra* ¶¶ 74-80 and **Appendix A**.

10.     Perhaps the most egregious example of these personal expenditures is the Srigleys' use of the Debtor's assets and accounts to finance and maintain a personal airplane, specifically a 1981 Mooney M20K '231' (Aircraft Registration Number: N233JB; Serial Number: 25-0598) (the "**M20K Aircraft**"). From January of 2020 through the sale of the M20K Aircraft in early 2022, the Srigleys used the Debtor's accounts to pay for not less than **[$55,334.35]** in expenses relating to the airplane. These expenses included, but were not limited to, the cost of financing, maintaining and insuring the M20K Aircraft, as well as expenses relating to Mr. Srigley's activity as a pilot. *See infra* ¶¶ 81-86 and **Appendix B**.

11.     Upon information and belief, the Debtor also claimed the full amount of depreciation allocable to the M20K Aircraft in its 2021 Schedule C, and likely in other tax years as well. *See* ¶¶ 133-135, *infra*.

12.     Despite the fact that the Debtor's assets seem to have been used to finance the M20K Aircraft, upon information and belief, when it was sold on or about February 22, 2022, the

*DRAFT*

Debtor did not receive the **[$121,837.59]** in apparent proceeds from the sale, or even the

**[$38,736.63]** in apparent proceeds net of the payoff amount. Plaintiffs suspect that, instead, the

Srigleys received the full amount of the proceeds. *See* ¶¶ 87-93, *infra*.

13.    Yet, the Debtor was not the registered owner of the M20K Aircraft. Rather, in this

instance, the Srigleys perpetrated an additional calculated scheme to shield the airplane from the

Debtor's creditors. They created Srigley Development Company, LLC ("**Srigley Development**

**Company**"), which would be the airplane's registered owner. *See* ¶¶ 82 and 143, *infra*.

14.    Given the Srigleys' pattern and practice of withdrawing cash and taking out credit,

a reasonable person would assume that the Debtor was either sufficiently profitable to support

such withdrawals and maintain such a level of debt, or that it was so well capitalized the entity

was able to pay its debts as they came due and the withdrawals could be justified as return of

excess equity. The facts, however, indicate that neither scenario was the case.

15.    The 2020 and 2021 federal tax filings relating to the Debtor, namely its Schedule

Cs, claim a combined net loss of $138,782.00 in those two operating years.[5] The Debtor has not

provided copies of its 2022 tax filings to the Plaintiffs, but according to the Petition, its 2022

revenue was $4,115.80. Its 2022 documented expenses far exceed this figure.

16.    With respect to the Debtor's known cash assets: as of December 31, 2020, its cash

accounts showed a combined balance of **[$50,288.13]**; as of December 31, 2021, the combined

balance was **[$14,284.56]**; and as of December 31, 2022, the balance in the Debtor's Bank of

America, N.A. checking account ending in 3252 (the "**Operating Account**"), was a deficit of

---

[5] The 2020 Schedule C shows a claimed net loss of $186,875.00 and the 2021 Schedule C shows a
claimed net income of $48,093.00.

*DRAFT*

[**$11.05**].[6] In contrast, the Debtor's known loan and credit liabilities in each of those years was:

[**$188,850.48 as of December 31, 2020; $118,319.05 as of December 31, 2021; and**

**$215,295.43 as of December 31, 2022**]. *See infra* ¶¶ 45-49.

17.     The Srigleys' scheme continued until they apparently determined that it had

reached the point of diminishing returns. In the fall of 2021, when the Debtor was in the midst of

renovating the Plaintiffs' home, the Srigleys started taking steps to shut down the Debtor. Their

actions continued in earnest once they anticipated arbitration.

18.     In late 2021, the Plaintiffs' renovation was the Debtor's only project with

substantial work remaining, but the fact that the Debtor had contractual obligations to satisfy was

apparently irrelevant to the Srigleys. So, on or about December 17, 2021, the Srigleys caused the

Debtor to wrongfully terminate its contract with the Plaintiffs. The Debtor's wrongful behavior,

directed by the Srigleys, set in motion an arbitration action, filed by the Plaintiffs on December

28, 2021 with the American Arbitration Association (AAA Case No. 01-21-0018-1548) (the

"**Arbitration Action**"). *See infra* ¶¶ 107-109.

19.     Even before the Srigleys caused the Debtor to improperly terminate its contract

with the Plaintiffs, they had begun ceasing the Debtor's business activities. On or about

November 19, 2021, the Srigleys caused the Debtor to lay off all of its field crew. According to

the Srigleys, between approximately November of 2021 and January of 2022, the Debtor

declined to bid on certain home remodeling projects and chose not to begin construction on

another. By the end of calendar year 2021 when the arbitration commenced, the Debtor had

---

[6] As of December 31, 2022, Plaintiffs believe that the balances in the Debtor's other two cash accounts, the Bank of America, N.A. checking accounts ending in 6487 and 6490 were $0.00.

*DRAFT*

effectively shut down its business and stopped operating as a residential remodeling contractor altogether. *See* ¶¶ 110-119, *infra.*

20.     The Srigleys' instigation of the Debtor's contract breach resulted in an arbitration award and eventual judgment in favor of the Plaintiffs, in the amount of $876,734.21 plus post-judgment interest. *See* ¶ 109, *infra* and Plaintiffs' Proof of Claim, filed on June 25, 2024. The Debtor has not paid the Plaintiffs any portion of this debt.

21.     Despite the fact that the Debtor was no longer a functioning business but rather was in the process of winding down, the Srigleys maximized the Debtor's insolvency, continuing to use its credit cards and take out new loans without regard to the Debtor's ability to pay, incurring new debt of not less than **[$139,467.41]**. They continued to withdraw cash assets from the Debtor's cash accounts, until the fall of 2022, when there was nothing left to take.

22.     Here again, the Srigleys' behavior was calculated. They used the facade of the Debtor's business to further enrich themselves, and in the process, wasted the Debtor's remaining assets. The staggering cost to the Debtor's creditors did not matter to the Srigleys. They were focused solely on their personal gain, seemingly without concern that their actions were not only unethical, but also fraudulent.

## JURISDICTION AND VENUE

23.     This is an adversary proceeding pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") to, among other things, recover money or property for the estate and avoid and recover fraudulent transfers.

*DRAFT*

24.     This Court has jurisdiction over the subject matter of this adversary proceeding

pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409, as this adversary proceeding arises under and in connection with a case under Chapter 7 of

Title 11 of the United States Code (the "**Bankruptcy Code**") that is pending in the United States

Bankruptcy Court District of Columbia.

25.     On **[DATE]**, the Plaintiffs were granted derivative standing by this Court to

pursue this action.[7]

## PARTIES

26.     This case arises from the alleged business failure of Touchstone Remodelers, LLC

(the "**Debtor**"), a limited liability company organized under the laws of the District of Columbia,

with a former principal place of business in Montgomery County, Maryland. Its stated business

purpose was residential remodeling. The Debtor was dissolved as an entity in the District of

Columbia on or about November 30, 2022.[8]

27.     On April 28, 2023, the Debtor commenced its Chapter 7 case by filing the

Petition, thereby initiating bankruptcy case number 23-116-ELG in the United States Bankruptcy

Court District of Columbia (the "**Case**"). The Debtor's commencement of the Case as of the

Petition Date created an estate as defined pursuant to 11 U.S.C. § 541(a) (the "**Estate**"). William

---

[7] On October __, 2024, Plaintiffs filed a *Motion for an Order Granting Derivative Standing to Prosecute on Behalf of the Estate, Claims Against the Debtor, Benjamin Robert Srigley, Cynthia Tyburczy Srigley and Srigley Development Company, LLC* (the "**Motion for Derivative Standing**").

[8] Upon information and belief, its ability to do business in Maryland was forfeited by department action on or about November 20, 2022, and its status as a business in Virginia was deemed "Inactive" as of May 31, 2022. *See* relevant screenshots, attached in **Appendix C**.

*DRAFT*

Douglas White was appointed to serve as the Chapter 7 trustee in the Case (the "**Trustee**").

28.     Upon information and belief, the Debtor was owned by Benjamin Robert Srigley

and Cynthia Tyburczy Srigley.[9] Benjamin Srigley was the Chief Executive Officer and founder

of the Debtor, and at the time the Petition was filed, represented himself as its sole managing

member, officer and authorized representative.[10] In addition to her ownership role, Cynthia

Srigley, the spouse of Benjamin Srigley, held several positions with the Debtor at relevant times

herein: she was the Chief Operations Officer from May of 2021 through the end of December

2021, the Director of Business Development (unofficial) from August of 2019 to May of 2021,

and the Office Manager from December of 2021 to May of 2021.[11] Upon information and belief,

she was also the signatory on all checks written out of the Debtor's Bank of America, N.A.

account ending in 3252 (the "**Operating Account**"), from approximately February 10, 2021 until

August 3, 2022, the date of the last check apparently written out of that account. Cynthia

Srigley's relationship with the Debtor was not disclosed in the Petition except as the source of

compensation paid to the Debtor's attorney.[12]

29.     Besides the Debtor, Benjamin Srigley and Cynthia Srigley were apparently

---

[9] *See* Debtor's Responses to Interrogatory No. 19 and Table 2 in Touchstone Remodelers' Response to
Interrogatories (AAA Case No. 01-21-0018-1548), dated April 14, 2022 ("**Touchstone Remodelers'
Response to Interrogatories**"), attached in **Appendix D**.

[10] *See* Petition at Official Form 201, Item 17; Debtor's Resolution; Official Form 202; Official Form 207,
Part 14; and List of Creditors and Mailing Matrix. *See also Motion for Entry of an Order Pursuant to
Rule 2004 Authorizing Examinations and for the Production of Documents*, filed in this Case on October
18, 2023 (the "**Rule 2004 Motion**") at ¶ 1.

[11] See Debtor's Responses to Interrogatory No. 19 in Touchstone Remodelers' Response to Interrogatories
and screenshot of Cynthia Srigley's bio from the Debtor's former website, both attached in **Appendix D**.
*See also* Motion for Derivative Standing at ¶ 7.

[12] *See* Petition at Official From 102, Disclosure of Compensation of Attorney for Debtor(s).

*DRAFT*

owners, members and/or officers of another entity, Srigley Development Company, LLC

("**Srigley Development Company**"), a limited liability company organized under the laws of the

State of Maryland. Its stated business purpose was real estate investment and development.

Srigley Development Company was dissolved as an entity in Maryland on or about May 2, 2023,

several days after the Petition Date.[13] Upon information and belief, Srigley Development

Company was an affiliate or subsidiary of the Debtor, or the two entities were otherwise under

common ownership and control. The two entities also apparently shared the address at 2214

Distribution Circle, Silver Spring, Maryland 20910. The existence of Srigley Development

Company was not disclosed in the Petition.

30.     Plaintiff Federico M. Bandi and Plaintiff Angela M. Bandi, as unsecured

judgment creditors of the Debtors, are parties in interest in the Case.

## **FACTUAL BACKGROUND**

**A.     The Srigleys Are the Alter Egos of the Debtor**

31.     Benjamin Srigley and Cynthia Srigley, as owners, members, managers and

officers of the Debtor, exercised complete day to day operational and financial control of and

domination over the entity. They made all decisions relating to the Debtor, owned and controlled

all of its assets, managed all of its financial accounts, and were the sole beneficiaries of any

potential profits.

32.     The Srigleys did not respect the fact that the Debtor owned the business. Rather,

there existed a unity of interest and ownership between the Debtor and the Srigleys such that

---

[13] *See* true and correct copy of Srigley Development Company's Articles of Cancellation and related
screenshots from Maryland SDAT website, attached in **Appendix C**.

*DRAFT*

there was no real separation between the Debtor's business and the Srigleys' personal financial affairs.

33.     The Srigleys inadequately capitalized the Debtor; they extensively commingled assets; they shielded the Debtor's assets from creditors by fraudulently transferring assets to themselves, directly and indirectly; they did not bother to maintain corporate formalities or deal with the Debtor at arm's length, as they viewed the Debtor as an extension of themselves. The Srigleys took all of these actions for their sole personal financial benefit. The Debtor, and its associated status as a limited liability company, was just a sham used by the Srigleys to disguise their fraudulent or otherwise wrongful conduct.

34.     The Srigleys' actions were not without harm to either the Debtor or to third parties. They abused the LLC form of the Debtor to an unjust outcome, damaging the Debtor to the point of insolvency, and consequently causing substantial financial injury to the Debtor's creditors.

**1.     The Srigleys Did Not Adequately Capitalize the Debtor**

35.     With respect to the relevant timeframe herein, the Srigleys did not adequately capitalize the Debtor. They siphoned its assets, so that it never had sufficient funds to function as a separate entity. Upon information and belief, the Srigleys engaged in a pattern and practice of alternately looting the Debtor, then returning funds to it only as immediately necessary to assist with the entity's cash flow and keep the business running.

36.     From early January 2020 through the Petition Date, the Srigleys caused the Debtor to transfer or withdraw from its cash accounts, a total of not less than **[$357,116.18]**:

11

*DRAFT*

[**$141,410.38**] of this amount was transferred or withdrawn during the two-year period prior to

the Petition Date, the remaining [**$215,705.80**] was transferred or withdrawn between January of

2020 and April of 2021. *See* "Bank Transfers" listed in **Appendix A**. These transfers were made

or withdrawals taken in three forms:

    (1) scheduled cash transfers from the Operating Account to a Bank of America, N.A. checking account ending in 6857 (the "**Owner Draw Account**"),[14] which, upon information and belief, was not an account owned or controlled by the Debtor;

    (2) unscheduled cash transfers from the Debtor's cash accounts to accounts apparently not owned or controlled by the Debtor, including the Owner Draw Account and a Bank of America, N.A. savings account ending in 6378 ("**Non-Debtor Owned BofA 6378**" or "**BofA 6378**");[15] and

    (3) occasional ATM or teller cash withdrawals.

37.    Among other factors discussed *infra*, the Srigleys caused the Debtor to make

these transfers or take these withdrawals when the Debtor was insolvent and these withdrawals

and transfers were fraudulent transfers.

38.    Upon information and belief, as a result of the Srigleys' causing the Debtor to

fraudulently transfer its cash assets to themselves during the period from early January 2020

through the Petition Date, funds totaling [**$357,116.18**] are not available for distribution to

Debtor's unsecured creditors, including the Plaintiffs.

---

[14] *See* footnotes 19 and 20, *infra*.

[15] Upon information and belief, in addition to the Operating Account, which was the sole cash account disclosed in the Petition, the Debtor owned or controlled two other cash accounts: a Bank of America savings account ending in 6487 ("**BofA 6487**"), and a Bank of America checking account ending in 6490 ("**BofA 6490**"). With respect to the Owner Draw Account and Non-Debtor Owned BofA 6378, Plaintiffs do not yet know who owns or controls each of these accounts, and thus, who received the transferred assets. We suspect that the accounts were owned or controlled by either Benjamin Srigley, Cynthia Srigley or jointly by the Srigleys. As such, the descriptor "the Srigleys" is used to refer to either Benjamin Srigley or Cynthia Srigley individually and to the Srigleys jointly.

*DRAFT*

### a.   The Debtor's Scheduled Cash Transfers to the Srigleys

39.     On a regular basis, the Srigleys caused the Debtor to transfer funds in $3,300.00

increments (the "**Owner Draws**"), from the Operating Account to the Owner Draw Account.[16] In

both calendar years 2020 and 2021, these transfers were made approximately every two weeks,

for a total of 26 payments of $3,300.00, or $85,000.00 in each year. In calendar year 2022, six

payments of $3,300.00 each were made, for a total of $19,800.00. *See* **Appendix A**.

40.     In less than four years prior to the Petition Date, the Srigleys caused the Debtor to

transfer a total of $191,400.00 in Owner Draws. Of this amount, $79,200.00 was transferred in

the two-year period prior to the Petition Date. *See* **Appendix A**.

41.     The Srigleys seem to have taken these Owner Draws irrespective of their existing

equity in the Debtor and of the Debtor's poor financial health, or rather state of insolvency. Upon

information and belief, the Debtor was not sufficiently capitalized to justify these draws.

42.     The Srigleys' behavior persisted until the end of April 2022, several months after

the Debtor had stopped doing business as a residential remodeling company and receiving

revenue altogether. In other words, the Srigleys only stopped taking cash assets out of the Debtor

once there was nothing left to take.

43.     While Plaintiffs do not yet have all of the documents needed to analyze the

complete financial picture of the Debtor on any given date, we can point to certain general

factors which demonstrate the Debtor's consistently poor financial health.

---

[16] The term "Owner Draws" or "Owner's Distributions" is nomenclature used in documents produced by
the Debtor in connection with the Arbitration Action. In the Petition, the Debtor uses the phrase "Member
Draw." *See* Petition at Official Form 207, Part 13, Item 30.

*DRAFT*

44.    With respect to its profitability in calendar year 2020, the 2020 Schedule C

relating to the Debtor and filed with the Srigleys' federal income tax returns,[17] evidences a

claimed net loss of $186,875.00. Yet, the Srigleys took $85,000.00 in Owner Draws in 2020.

45.    As of December 31, 2020, the combined balance of the Operating Account, BofA

6487, and BofA 6490 (collectively, the "**Debtor's Known Cash Accounts**") was approximately

$50,288.13. In contrast, the Debtor's 2020 end-of-year liabilities due to its loan and credit card

debt were 3.75 times the value of its apparent cash assets: $188,850.48.[18]

46.    In calendar year 2021, the Debtor's Schedule C shows a claimed net income of

$48,093.00.[19] This claimed net income is about 56% of the $85,500.00 the Srigleys took as

Owner Draws in 2021.

47.    At the end of December 2021, the combined balance of the Debtor's Known Cash

Accounts was apparently $14,284.56. On the other hand, the Debtor's 2021 end-of-year loan and

credit liabilities were $118,319.05,[20] more than eight times the value of its known cash assets.

48.    The Debtor's financial picture only worsened in 2022. Plaintiffs have not received

a copy of the Debtor's 2022 Schedule C, so we do not know for certain whether the Debtor

---

[17] Upon information and belief, the Debtor was a pass-through entity whose tax filing obligations were
indicated on Schedule C of the Srigleys' tax returns. Additionally, as we have not seen the full tax returns,
we are relying on the Trustee's verbal representations that the 2020 and 2021 federal tax returns were
filed jointly by the Srigleys (rather than solely by Mr. Srigley). *See* true and correct copy of the Debtor's
apparent 2020 Schedule C, attached hereto in **Appendix E**.

[18] As of December 31, 2020, the balance on each known credit or loan account was as follows:
$106,331.85 (AmEx 02002); $66,683.95 (BofA 7078 Loans); and $15,834.68 (BofA 9400).

[19] *See* true and correct copy of the Debtor's apparent 2020 Schedule C, attached hereto in **Appendix E**.

[20] As of December 31, 2021, the balance on each known account was as follows: $79,673.80 (AmEx
02002); $14,978.84 (AmEx 11008); $17,076.04 (BofA 7078 Loans); -$320.61 (BofA 9400); and
$6,910.98 (Capital One 8764).

*DRAFT*

claimed net income or a net loss. That said, in its Petition, the Debtor stated that its gross revenue

in 2022 was $4,115.80 and, upon information and belief, its 2022 expenses far exceeded this

amount. Still, the Srigleys took $19,800.00 in Owner Draws in 2022, or 4.8 times the Debtor's

2022 revenue.

49.    As of December 31, 2022, the remaining balance in the Operating Account was an

$11.05 deficit, and the Debtor's loan and credit liabilities were $215,295.43[21] In addition, the

Debtor owed to the Plaintiffs, an arbitration award in the amount of $876,707.21, plus post-

judgment interest. For more detail regarding the Debtor's financial condition, *see* **Appendix F**.

50.    Upon information and belief, as a result of the Srigleys' direction of the Debtor to

fraudulently transfer its cash assets to themselves in the form of Owner Draws during the period

from early January of 2020 through the Petition Date, funds totaling **[$191,400.00]** are not

available for distribution to Debtor's unsecured creditors, including the Plaintiffs.

**b.    The Debtor's Unscheduled Cash Withdrawals and Transfers
        to the Srigleys**

51.    In addition to the Owner Draws discussed in part A.1.a. *supra*, from time to time,

the Srigleys also caused the Debtor to make other transfers out of the Operating Account or BofA

6490 and into accounts presumably owned by the Srigleys, namely the Owner Draw Account or

Non-Debtor Owned BofA 6378, and to make occasional ATM or other cash withdrawals.

Consistent with the manner in which they handled Owner Draws, the Srigleys caused the Debtor

---

[21] As of December 31, 2022, the balance on each known account was as follows: $89,490.25 (AmEx
02002); $21,578.67 (AmEx 11008); $74,105.48 (BofA 7078 Loans); $19,721.43 (BofA 9400); and
$10,399.60 (Capital One 8764).

*DRAFT*

to make these transfers and take these withdrawals with a complete and total disregard of the

Debtor's insolvency at the time. *See* **Appendix F**.

52.     As evidenced in Table 1 *infra*, between early 2020 and the Petition Date, the

Srigleys caused the Debtor to make approximately 14 separate, unexplained transfers or

withdrawals out of the Debtor's Known Cash Accounts, totaling **[$165,716.18]**.[22] *See* Table 1,

*infra* and **Appendix A**. This figure does not include five additional ATM withdrawals made

during the same period totaling $1,611.90, described as "Contractor Labor" or "Day Labor" in

documents received to date, but otherwise uncorroborated.[23]

53.     With respect to the larger transfers described in Table 1, the timing of all but one

seems to coincide with the Debtor's receipt of substantial cash assets from third parties. These

are the transfers ranging from $5,000.00 to $40,000.00, made on or about March 12, 2020,

March 26, 2020, February 16, 2021, April 19, 2021, January 24, 2022 and February 10, 2022.

**[TABLE 1 OMITTED]**

54.     Upon information and belief, as a result of the Srigleys causing the Debtor to

fraudulently transfer its cash assets to themselves in the form of unscheduled transfers made and

withdrawals taken during the period from early January of 2020 through the Petition Date, funds

totaling **[$165,716.18]** are not available for distribution to Debtor's unsecured creditors,

including the Plaintiffs.

------

[22] Of these $165,716.18 in transferred cash assets, $62,210.38 was transferred during the two-year period prior to the Petition Date.

[23] Further discovery is needed to determine whether any of these ATM withdrawals should be considered fraudulent transfers.

*DRAFT*

c.    <u>The Srigleys Caused the Debtor to Obtain Loans for the Purpose of
Enriching Themselves</u>

55.    To counter their gross undercapitalization of the Debtor, the Srigleys caused the

Debtor to obtain loans from third parties. During period relevant to this Complaint, these loans

came from two sources: (1) the United States government, in the form of U.S. Small Business

Administration Paycheck Protection Program loans (the "**PPP Loans**"); and (2) Bank of

America, N.A., specifically from account ending in 7078, described in account statements as a

"Bank of America Business Advantage Credit Line" ("**BofA 7078 Loans**").

56.    Upon information and belief, during the period from January 2020 through the

Petition Date, the Debtor received combined loan proceeds of $315,392.23. *See* Tables 2 and 3

*infra*, and **Appendix G**.

57.    As detailed in Table 2, below, the Debtor apparently received combined proceeds

of $119,471.00 from two separate PPP Loans. According to information received to date, these

loans were ultimately forgiven.[24]

**[TABLE 2 OMITTED]**

58.    Upon information and belief, during the period from January 2020 through the

Petition Date, the Debtor received combined proceeds (or advances) from eight separate BofA

7078 Loans totaling $195,921.23. *See* Table 3, below.

**[TABLE 3 OMITTED]**

59.    With respect to the BofA 7078 Loan proceeds of $17,076.04 the Debtor received

on or about December 17, 2021, it seems that they were used to pay off the December 17, 2021

---

[24] Whether the PPP Loans were properly obtained by the Srigleys on behalf of the Debtor and/or whether
the Debtor properly met the conditions of loan forgiveness requires further discovery.

*DRAFT*

existing balance of $17,076.04 on the Debtor's BofA 9400 account.[25] In other words, it seems

that the Srigleys caused the Debtor to take out a loan from Bank of America, N.A. to repay Bank

of America, N.A.

60.    As the BofA 7078 Loan account was described as a "Business Advantage Credit

Line," the terms of the Debtor's agreement with Bank of America, N.A. may have mandated that

the BofA 7078 Loans were to be used solely for business purposes.[26]

61.    However, based upon information received to date, Plaintiffs believe that the

Srigleys used at least some of these loan proceeds to enrich themselves rather than in furtherance

of the Debtor's business. In particular, of the $45,000.00 in BofA 7078 Loan proceeds apparently

received by the Debtor into the Operating Account on or about January 21, 2022, $40,000.00 was

transferred out of the Operating Account and into Non-Debtor Owned BofA 6378 just three days

later. *See supra* Tables 1 and 3 and related discussion.

62.    Upon information and belief, absent receipt of the $45,000.00 BofA Loan

proceeds, the Debtor would not have had sufficient cash assets in the Operating Account to allow

for the $40,000.00 transfer made out of the Operating Account on January 24, 2022. As of

January 18, 2022,[27] the ledger balance in the Operating Account was only $15,134.16 (of this

amount, $10,000.00 were the proceeds of another BofA 7078 Loan, taken on or about January

11, 2022).

---

[25] *See* true and correct copies of BofA 7078 and BofA 9400 statements, both dated January 6, 2022 and attached in **Appendix G**.

[26] Further discovery is needed to make this determination.

[27] No daily ledger balance was reported between January 18 and January 21, 2022 in the relevant Operating Account statement. *See* true and correct copy of Operating Account statement dated January 31, 2022 (the "**January 2022 Operating Account Statement**"), attached in **Appendix G**.

*DRAFT*

63.    As discussed *infra* in ¶¶ 74-80, the Srigleys also relied heavily on the use of credit cards to keep the Debtor's business going and allow them to continue to use the Debtor to obtain value for their personal benefit and enjoyment. In the Petition, the Debtor reported claims of $213,883.48 in unpaid credit card and loan debt alone. *See* Petition at Schedule E/F, items 3.2 - 3.5 and 3.7.

64.    Had the Srigleys not continued to improperly strip the Debtor of its cash assets, some (or all) of these loans may not have been necessary. This same argument applies to the Srigleys' extensive use of credit cards to support the Debtor's business. *See* **Appendix F**.

65.    The impact of the BofA 7078 Loans as well as the Debtor's unfettered use of credit cards, all at the Srigleys' direction, was not neutral to the Debtor. Rather, the Srigleys' actions caused substantial harm to the Debtor by creating indebtedness that was beyond the Debtor's ability to pay.

66.    Moreover, the Srigleys' poor management of the Debtor's credit and loan accounts caused the Debtor to frequently pay less than the full balances due, to not make payments in a timely manner, or to not make payments at all. Upon information and belief, this behavior resulted in the Debtor incurring finance charges and late fees of not less than **[$48,714.67]**[28] during the period from January 2020 through the Petition Date, further deepening the Debtor's insolvency.

### 2.    The Srigleys Commingled Assets

67.    As part of their undercapitalization scheme, the Srigleys shuttled funds back and

---

[28] The breakdown is as follows: (1) AmEx 02002 - $23,956.17; (2) AmEx 11008 - $7,723.16; (3) BofA 7078 Loans - $7,547.19; (4) BofA 9400 - $6,001.31; and (5) Capital One 8764 - $3,486.84.

*DRAFT*

forth between Debtor-owned accounts and accounts which were not owned by the Debtor and were presumably their personal accounts, namely the Owner Draw Account and BofA 6378, commingling their assets with those of the Debtor. The Srigleys used the Debtor's assets to support their lifestyle, paying for personal meals, entertainment and travel, and making purchases for personal items such as video camera equipment, electronics and apparel, all with the Debtor's credit card and cash accounts. The most egregious example of this is the Srigleys' siphoning of the Debtor's assets to finance a recreational plane and pay for its associated expenses and maintenance. *See* discussion of the M20K Aircraft in ¶¶ 81-86, *supra*.

> a.   **The Srigleys Shuttled Funds Back and Forth Between the Debtor's Accounts and Their Personal Accounts**

68.   Upon information and belief, the Srigleys kept the Debtor so perpetually undercapitalized, that, when the Debtor lacked sufficient funds to pay its immediate debts and was unable to obtain cash from third party sources, the Srigleys' pattern and practice was to return to the Operating Account a portion of the Debtor's cash assets they had previously withdrawn, in an amount sufficient to satisfy the Debtor's debts at the time. *See* Table 4 *infra*.

69.   This behavior continued until the Srigleys apparently decided the Debtor no longer served them and they walked away, shutting the business down completely and leaving the Debtor's creditors holding the bag. The date of their last transfer into the Operating Account was July 27, 2022, which roughly coincides with the conclusion of the Debtor's arbitration proceedings with the Plaintiffs. *See* ¶ 109, *supra*.

**[TABLE 4 OMITTED]**

*DRAFT*

70.     Between January 2020 and September 2022, including Owner Draws, the Srigleys moved cash into and out of the Debtor on approximately 87 separate occasions. *See* Tables 1 and 4 and related discussion, *supra.*

71.     During the Arbitration Action, on or about July 1, 2022, the Srigleys were apparently prepared to move cash assets to the Debtor in amount sufficient to allow the Debtor to purchase the Plaintiffs' home in Northwest Washington, DC.[29] As of that same date, the Debtor's Operating Account balance was only $1,574.15 and its credit card and loan debt was approximately $203,659.50.[30]

72.     According to the document entitled "Touchstone Remodelers LLC's Damages," submitted by the Srigleys in connection with the Arbitration Action:[31]

> Alternate Resolution: Touchstone Remodelers is putting forward an alternate resolution to AAA Case No. 01-21-0018-1548. The Bandi Residence project still requires significant design work and many months ahead of construction. The Bandis mentioned that they are in a "permanent solution" regarding their housing arrangement. ***Therefore, Touchstone would like to make a cash offer on the property,*** which would allow the Bandis to walk away from the property and the stress associated with completing the project. To do so, Touchstone would require a inspection to confirm conditions of the property (based on 11/1/21 status), and engagement with an attorney for negotiations related to property acquisition. (emphasis added)

73.     If on July 1, 2022, the Srigleys were ready to return cash, or otherwise make a cash contribution to the Debtor, to purchase the Plaintiffs' home, why were they unwilling to use

---

[29] Based on third party sources such as Zillow, as of that date, the market value of the Plaintiffs' home exceeded the $1,102,001.10 total in creditors' claims declared in the Petition.

[30] This is the sum of the following account balances as of July 1, 2022: AmEx 02002 - $83,045.08; AmEx 11008 - $18,040.52; BofA 7078 Loans - $73,338.72; BofA 9400 - $19,303.97; and Capital One 8764 - $9,931.25.

[31] *See* Touchstone Remodelers LLC's Damages (AAA Case No. 01-21-0018-1548) dated July 1, 2022, attached in **Appendix D**.

*DRAFT*

that cash to satisfy the existing debt owed to the Debtor's creditors?

> **b.** **The Srigleys Used the Debtor's Assets for Personal Purposes**

74.     The Srigleys commingled assets in another notable way as well: by using the Debtor's assets to purchase items for their personal benefit. Most frequently, they used the Debtor's credit card accounts to achieve this goal. Other times, the Srigleys made personal purchases directly through the Operating Account, using checks or online bill payment services. With respect to the latter situation, most of these purchases related to the M20K Aircraft.

75.     Upon information and belief, the relevant credit card accounts were business accounts owned by the Debtor and not the Srigleys' personal accounts.[32] These accounts, all of which relate to debts owed to unsecured creditors of the Debtor and which are listed in the Petition (collectively the "**Business Card Accounts**"), are:

> (1)  the American Express "Business Platinum Card"[33] account ending in 02002 ("**AmEx 02002**");
> (2)  the American Express "Amazon Business Prime Card" account ending in 11008 ("**AmEx 11008**");
> (3)  the "Bank of America Business Advantage" Mastercard account ending in 9400 ("**BofA 9400**"); and
> (4)  the Capital One Spark Business "Spark Cash Select credit card | Visa Signature Business" account ending in 8764 ("**Capital One 8764**").

76.     The use of these Business Card Accounts for personal rather than business expenses may have been in direct violation of the agreements between the credit card issuer and the Debtor, some or all of which may have included a provision restricting use of the cards to

---

[32] According to the Petition at Official Form 206H, item 2, Benjamin Srigley was a codebtor.

[33] The card name descriptions are as they appear on the relevant account statements.

*DRAFT*

business purposes.[34]

77.    Between January of 2020 and the Petition Date, upon information and belief, the Srigleys used the Business Card Accounts or the Operating Account to make expenditures of not less than **[$60,275.29]**[35] that seem to be of a personal nature, including but not limited to, purchases relating to entertainment, meals, travel, camera equipment, electronics, apparel, and the M20K Aircraft. *See* **Appendix A** for a list of individual transactions.

78.    Of the **[$60,275.29]** in personal expenditures, **[$9,932.17]** of them were made in 2022 alone, after the Debtor had stopped operating as a residential remodeling company altogether. *See infra* ¶¶ 110-119 and **Appendix A**. This amount is more than 2.4 times the Debtor's 2022 gross revenue of $4,115.80, as reported in the Petition.

79.    The figure of **[$60,275.29]** does not include an additional **[$14,166.82]** in credit card purchases made using the Business Card Accounts during the period between January of 2020 and the Petition Date for which further discovery is needed to determine which, if any, of these purchases were made for a legitimate business purpose and which were personal (the "**Potentially Avoidable Transfers**").[36] *See* **Appendix A-1** for a list of individual transactions.

80.    Upon information and belief, any and all payments that were made to the issuing banks for charges incurred using these Business Card Accounts were made from the Operating Account.

---

[34] Further discovery is needed to make this determination.

[35] Of this amount, $29,634.79 were made during the two-year period prior to the Petition Date.

[36] Of the Potentially Avoidable Transfers, **[$9,816.26]** of these purchases were made in the two-year period prior to the Petition Date and **[$1,145.64]** were made in 2022 alone.

*DRAFT*

c.   **The Srigley's Used the Debtor's Funds to Finance and Maintain the M20K Aircraft**

81.   Of the **[$60,275.29]** in personal expenditures discussed in section A.2.b., *supra*,

the Srigleys used the Debtor's assets to pay not less than **[$43,388.83]** in loan payments and

miscellaneous expenses for their recreational airplane, the M20K Aircraft. An additional

$11,945.52 was withdrawn directly from the Operating Account, allegedly for "M20K Repair &

Maintenance," for a total of **[$55,334.35]**[37] in expenditures relating to the M20K during the

period from January 2020 through the Petition Date. *See* **Appendix B**.

82.   Even though the M20K Aircraft was their personal airplane, and although its

registered owner was Srigley Development Company,[38] the Srigleys have treated the M20K

Aircraft as an asset of the Debtor, most likely since its purchase in late August or early

September of 2017, and demonstrably during the period between January 2020 and the Petition

Date. The Debtor's cash assets were also likely used to make the initial purchase deposits of the

M20K Aircraft, totaling approximately $24,000.00.[39]

83.   The remaining purchase price of the aircraft was apparently financed through an

agreement between Srigley Development Company and US Aircraft Finance (the "**M20K**

---

[37] Of this amount, **[$30,671.69]** in expenditures were made during the two-year period prior to the Petition Date.

[38] *See* true and correct copy of screenshot from FAA website, attached in **Appendix H**.

[39] Upon information and belief, the Debtor's assets were used to make the initial purchase deposits for the M20K, in the approximate amounts of $5,000.00 on or about August 30, 2017 and $19,000.00 on or about September 5, 2017. As the Plaintiffs do not yet have any of the Debtor's cash account statements for the period from August 2017 through December 2019, we cannot confirm whether the Debtor's assets were also used to make loan installment payments during that period, however, we believe it was very likely the case. *See* true and correct copy of relevant communications, attached in **Appendix H**.

*DRAFT*

Loan").[40] Despite the fact that Srigley Development Company was listed as the borrower on the

loan statements, it was the Debtor's assets which were used to pay the M20K Loan.

84.      Upon information and belief, from January 2020 through December 2021, 25

payments of $647.03 each were made out of the Operating Account to US Aircraft Finance, for a

total of [**$16,175.75**]. These were apparently payments made on the M20K Loan.[41] *See also*

**Appendix B**.

85.      In addition to financing the M20K Aircraft, during the period from January of

2020 through the sale of the M20K Aircraft in early 2022, approximately [**$39,158.60**] of the

Debtor's assets were used to pay for expenses relating to the airplane. Upon information and

belief, these expenses included, but were not limited to, [**$17,672.02**] in hangar space/aircraft

storage expenses,[42] [**$12,358.33**] in repair and maintenance expenses, [**$4,520.00**] in insurance,

fuel and miscellaneous costs, as well as expenses relating to Benjamin Srigley's activities as a

pilot. *See* **Appendix B**.

86.      Upon information and belief, the [**$17,672.02**] in purchases related to storing the

M20K Aircraft were initially made using a Synchrony Bank account ending in 1267, described

as a "Phillips 66® Aviation Card" ("**Phillips 66 Account**"). The apparent owner of the Phillips

---

[40] *See* US Aircraft Finance Borrower Statement of Account, dated January 4, 2022, attached in **Appendix
H**.

[41] *Id.*

[42] Upon information and belief, the Srigleys rented hangar space for the M20K Aircraft from DC Metro
Aviation Services, located at Montgomery County Airpark in Gaithersburg, MD. Its website shows
monthly rates for hangar and tie-down space ranging from $115.00 to $614.00. The figure of $614.00
corresponds with regular payments made through the Operating Account to Synchrony Bank. *See*
screenshot from DC Metro Aviation Services website, attached in **Appendix H**; *see also* **Appendix B**.

*DRAFT*

66 Account was Benjamin R. Srigley.[43] The Debtor then apparently paid the balances on the

Phillips 66 Account through the Operating Account. *See* **Appendix B**.

### d.    The Debtor Did Not Receive the Sale Proceeds of the M20K Aircraft

87.    Despite the fact that the Debtor's cash assets were used to finance the M20K

Aircraft, the Debtor apparently did not receive the proceeds from its sale. Upon information and

belief, on or about February 22, 2022, the M20K Aircraft was sold for a purchase price of

$121,837.59.[44] Srigley Development Company was listed as the seller.

88.    According to the M20K Bill of Sale, the proceeds were apparently paid in the

following forms: (i) a wire transfer in the amount of $25,030.00 (made on or about February 22,

2022); and (ii) a check in the amount of $96,807.59 (Check 0099 N233JB LLC).

89.    Upon information and belief, none of the statements of the Debtor's Known Cash

Accounts evidence receipt of either a $25,030.00 wire transfer or a $96,807.59 deposit in

calendar year 2022 or at any time thereafter through the Petition Date. Plaintiffs believe the

Srigleys received the $121,837.59 in proceeds.

90.    As discussed *supra in* ¶¶ 83-84, the M20K Aircraft was encumbered by a loan,

payments of which were made using the Debtor's cash assets (at least from the period of January

2020 through December 2021). *See* **Appendix B**.

91.    On or about January 25, 2022 (the "**Payoff Date**"), the M20K Loan was

---

[43] *See* true and correct copy of February 2022 Phillips 66 Account statement, attached in **Appendix H**.

[44] *See* true and correct copy of "Aircraft Purchase/Sales Agreement," dated February 22, 2022 ("**M20K Bill of Sale**"), attached in **Appendix H**.

*DRAFT*

apparently paid off by a wire transfer in the approximate amount of $83,100.96.[45] The

originating account from which this wire transfer was made does not appear to be the Operating

Account.[46]

92.    The January 2022 Operating Account Statement does show, however, that on

January 21, 2022, the Debtor obtained proceeds of $45,000.00 from a BofA 7078 Loan. It also

shows that, on January 24, 2022, the day prior to the Payoff Date, the Srigleys caused the Debtor

to transfer $40,000.00 out of the Operating Account into Non-Debtor Owned BofA 6378. *See*

Tables 1 and 3 *supra.*

93.    Upon information and belief, the Debtor, whose assets were fraudulently

transferred to purchase and finance the M20K Aircraft and to pay for its related expenses, is the

de facto owner of the airplane. As such, the proceeds of the M20K Aircraft's sale, i.e.,

$121,837.59, offset as appropriate, should be made part of the Estate.

**3.    The Debtor Failed to Maintain Corporate Formalities**

94.    As indicated by the behavior described herein, the Debtor failed to observe proper

corporate formalities and did not deal with either Srigley Development Company or the Srigleys

personally at arm's length.

95.    Moreover, it seems that the Debtor did not keep virtually any business records, or

did not properly maintain its business records. At the outset of the Case, the Debtor should have

surrendered to the Trustee "all property of the estate and any recorded information, including

---

[45] *See* true and correct copy of US Aircraft Finance Borrower Statement of Account (Account No. C17501), dated January 25, 2022 ("**Borrower Statement of Account**"), attached in **Appendix H**.

[46] *See* January 2022 Operating Account Statement, attached in **Appendix G**.

*DRAFT*

books, documents, records, and papers, relating to property of the estate." *See* 11 U.S.C. § 521(a)

(4). However, based on Plaintiffs' personal experience during the § 341(a) meeting process as

well as the representations of the Trustee, the Debtor turned over very little information relating

to its 11-year old business.[47] Of course, it is also possible that the Debtor just refused to comply

with section 521(a)(4) of the Bankruptcy Code.

### 4. The Srigleys Used the LLC Form of the Debtor to Perpetrate Fraud and/or to Achieve an Unjust Result

96. The Srigleys used the Debtor in various ways to potentially commit financial

fraud or otherwise engage in wrongdoing. As such, the Debtor's limited liability protection

should not apply. The balance of the Srigleys' personal cash accounts (as well as any other of

their cash or non-cash assets), up to the amount of creditor claims for which proofs of claim have

been properly filed in this Case, should be made property of the Estate.

97. Based upon information obtained to date and our personal experience with the

Debtor and with the Srigleys, Plaintiffs believe that the Srigleys engaged in a pattern and practice

of withdrawing, transferring, usurping and/or wasting the cash assets of the Debtor, that they

maximized the debt obligations of the Debtor to increase the availability of cash assets or other

value for their personal use and enjoyment, and that they maintained the Debtor in a perpetually

undercapitalized state.

98. The Srigleys behavior was intentional. They did all of this so that they could walk

away from the Debtor's business at any time, maximizing their personal gain and leaving nothing

for the Debtor's creditors. And so they did.

---

[47] Our understanding during the September 8, 2023 § 341(a) meeting was that 73 pages of documents were initially turned over to the Trustee.

*DRAFT*

99.    As discussed in sections A.1.a. and b, *supra*, and A.4.b. and c., *infra*, the Srigleys fraudulently transferred assets in various forms, from the Debtor to themselves, to shield those assets from creditors of the Debtor. This occurred while the Debtor was engaged in business operations as a residential remodeling contractor as well as thereafter.

100.    From December 2021 through September 2022, during the time the Srigleys were winding down the Debtor, they incurred approximately **[$139,467.41]** in additional debt on the Debtor's behalf, in the form of bank loans and other credit, for which the Debtor had no means to pay. They caused the Debtor to fraudulently transfer **[$76,664.86]** from the Operating Account and into likely personal accounts.

101.    Both while the Debtor was still operating as a business, while its operations were being shut down by the Srigleys and possibly thereafter, Plaintiffs believe the Srigleys used the Debtor to improperly claim in their tax filings certain of their personal expenses as deductible business expenses, including but not limited to depreciation expense deductions.

102.    In its Petition and during the administration of this Case, the Debtor, at the direction of the Srigleys, as well as Benjamin Srigley directly, may have made false or misleading statements in, or omitted material information from, the Petition or in his testimony during the § 341(a) meetings.

103.    Again at the direction of the Srigleys, the Debtor apparently did not properly turn over its business records to the Trustee, nor produce relevant business records requested during the § 341(a) meeting process, and the Debtor refused to respond to the Plaintiffs' Rule 2004 subpoena.

*DRAFT*

104.   Even the addresses provided in the Petition for the Debtor and for Benjamin

Srigley are apparently no longer valid. However, to the best of Plaintiffs' knowledge, the Srigleys

have not provided current contact information for either the Debtor or for Benjamin Srigley. The

Debtor and the Srigleys took, or failed to take, all of these actions for the purpose of concealing

assets and information in this Case.

105.   Creditors were harmed as a result of the Srigleys' and the Debtor's actions. The

Plaintiffs, who did business with the Debtor, are left with an unpaid court judgment. A number of

other creditors who did business with the Debtor are left with unpaid bills.

106.   It should be emphasized, however, that the existing evidence is not limited to the

fact that creditors of the Debtor will not get paid. Rather, evidence exists that the LLC of the

Debtor was used to potentially perpetrate fraud and to accomplish other wrongful purposes. The

Court should correct this injustice by finding that the Srigleys are the alter egos of the Debtor

and by piercing the veil.

        a.   **The Srigleys Intentionally Shut Down the Debtor's Business to Avoid
Paying Its Creditors**

107.   The Srigleys' pattern and practice of inadequately capitalizing the Debtor,

commingling funds, and fraudulently transferring the Debtor's assets continued until they were

ready to walk away. Plaintiffs believe the Srigleys started taking steps to shut down the Debtor in

the late summer to early fall of 2021, when the Debtor was in the midst of renovating the

Plaintiffs' home, and continued in earnest once the Srigleys anticipated arbitration.

108.   On March 17, 2021, the Debtor and the Plaintiffs entered into a contract, whereby

Debtor agreed to perform renovation work on Plaintiffs' home (the "**Contract**"). Despite its

*DRAFT*

contractual obligations to the contrary, on or before November 1, 2021, the Debtor improperly

stopped work on the Plaintiffs' residential renovation project, and on December 17, 2021, the

Debtor wrongfully terminated the Contract altogether.

     109.    On December 28, 2021, Plaintiffs commenced the Arbitration Action against the

Debtor.[48] In June of 2022, a hearing was held in connection with the Arbitration Action, and the

arbitrator entered the final award on September 2, 2022, finding in favor of Plaintiffs on their

claims and against Debtor on its counterclaims, and awarding Plaintiffs the sum of $852,503.52

plus post-judgment interest and an additional amount of $24,203.69 for administrative fees, for a

combined total of $876,707.21 (the "**Arbitration Award**"). Or about March 10, 2023, the

Arbitration Award was confirmed as a judgment in the Superior Court of the District of

Columbia (the "**Judgment**").[49]

     110.    However, on or about November 19, 2021, even before improperly terminating its

contract with the Plaintiffs, the Debtor apparently laid off all of its field crew,[50] effectively

leaving it with no means to perform the duties of its renovation business.

     111.    Around the same time, the Debtor also apparently halted its business development

activities and stopped looking for new clients. In the Srigleys' own words, during the period

between November 1, 2021 and December 17, 2021, the Debtor declined to bid on certain new

---

[48] On or about January 19, 2022, the Debtor filed its answer and counterclaim.

[49] The Petition is inaccurate in that it describes the Arbitration Award Confirmation Action as pending, when, in fact, it had concluded prior to the filing of the Petition. *See* Amended Order of Judgment (Case No. 2022 CAB 005162, filed in the Superior Court of the District of Columbia, dated March 10, 2023) attached in **Appendix D.**

[50] *See* Debtor's Responses to Interrogatory No. 3 and Interrogatory No. 13, in Touchstone Remodelers' Response to Interrogatories; relevant payroll records, all attached in **Appendix D.**

*DRAFT*

home remodeling projects and, on or about January 21, 2022, allegedly chose not to begin

construction on a home remodeling project for which it was the "DCRA contractor on record."[51]

By the end of calendar year 2021, the Debtor was effectively no longer operating as a residential

remodeling contractor.

112.    In early 2022, the Srigleys started winding down the Debtor's operations,

apparently canceling certain of its business insurance policies and selling its assets or de facto

assets such as vehicles, equipment, and tools. In March of 2022, they described the Debtor as

"non-operational while going through arbitration" and stated that, at that time, the Debtor was

not making any effort to replace either the field employees it had laid off in November or its

Chief Operations Officer, Cynthia Srigley.[52]

113.    Upon information and belief, on or about February 8, 2022, the Debtor sold a

2004 Isuzu NPR dump truck ("**Isuzu Truck**") of which it was the apparent owner, for

$18,500.00.[53]

114.    On or about February 9, 2022, two Zelle transfers of $300.00 each were

apparently made from an Edwin Zeballos into the Operating Account. Upon information and

belief, these two $300.00 payments were for the purchase of "Project Tools." *See* **Appendix I**.

---

[51] *See* Appendix IX, Item 9 to the Debtor's Defense and Counterclaim in AAA Case No. 01-21-0018-1548
(Federico M. Bandi and Angela M. Bandi v. Touchstone Remodelers, LLC) dated February 2, 2022; *see
also* Debtor's Response to Interrogatory No. 4 in Touchstone Remodelers' Response to Interrogatories,
both attached in **Appendix D**.

[52] The Debtor further stated that Cynthia Srigley had left her Chief Operations Officer position at the end
of 2021 and returned to her previous career as a Research Chemist for the Food and Drug Administration.
*See* Debtor's response 38g. to Document Request No. 38, Touchstone Remodelers' Production of
Requested Documents (AAA Case No. 01-21-0018-1548) dated March 23, 2022, attached in **Appendix
D**.

[53] Plaintiffs first became aware of the Isuzu Truck's existence at the Initial § 341(a) Meeting; it was not
disclosed in the Petition. *See* Isuzu Bill of Sale, dated February 8, 2022, attached in **Appendix I**.

*DRAFT*

115.    As discussed *supra* in ¶¶ 87-93, on or about February 22, 2022, the Srigleys sold the M20K aircraft.

116.    On or about February 23, 2022, the Srigleys transferred $5,000.00 from the Owner Draw Account into the Operating Account, which may have been for the Srigleys' purchase of "Project Tools" from the Debtor. *See* **Appendix I**.

117.    On or about March 8, 2022, a Zelle transfer in the amount of $55.00 was apparently made from a Carlos Samper into the Operating Account. Upon information and belief, this $55.00 was for the purchase of "Office Equipment." *See* **Appendix I**.

118.    At some point in March or April of 2022, it appears that the Srigleys may have caused the Debtor to cancel certain of its business insurance policies. On or about April 8, 2022, two pre-encoded deposits of $646.00 and $213.10 with the references "Erie Insurance" and "Builder FirstSource, Inc." were made into the Operating Account. The $213.10 deposit was described as "a premium refund for canceling our Erie umbrella insurance policy. " A pre-encoded deposit of $252.45 made into the Operating Account on or about March 28, 2022 was referenced as "Builders Mutual."[54]

119.    Also in the spring of 2022, the Srigleys failed to timely file the Debtor's required biennial report with the District of Columbia Department of Licensing and Consumer Protection ("**DLCP**"), leading the DLCP to apparently revoke the Debtor's ability to do business in the District of Columbia. On or about November 30, 2022, the Debtor was administratively

---

[54] *See* true and correct copy of [relevant documents] attached in **Appendix I**. However, Builders Mutual Insurance Company is listed as a creditor with an unsecured claim of $6,675.21 at item 3.6 in Schedule E/F of the Petition.

*DRAFT*

dissolved in the District of Columbia. The Debtor did not notify the Plaintiffs, its largest creditor,

of its dissolution. Five months later, on April 28, 2023, the Debtor filed its Petition.

      b.     **The Debtor, at the Direction of the Srigleys, Fradulently Incurred
Additional Debt While Insolvent and While Winding Down Its
Business and Facing Arbitration**

120.    By the end of 2021, the Debtor had stopped operating as a remodeling business,

was effectively no longer receiving revenue[55] and did not apparently have the means or the

intention to obtain new work. The Debtor was also facing an Arbitration Action and a very real

risk of associated loss.

121.    During the period from late 2021 through mid-2022, the Srigleys knew full well

that the Debtor had no means with which to pay its current debts as they came due, let alone

future debts.

122.    As of December 31, 2021, the combined balance of the Debtor's Known Cash

Accounts was only $14,284.56; the Debtor's credit card and loan debt was $118,319.05. The

Debtor was insolvent and had been for some time. *See* ¶ 47, *supra.*

123.    Yet, despite the Debtor's state of insolvency, the fact that it had terminated its

business activities, and the pending risk of a sizeable arbitration loss, the Srigleys willfully and

fraudulently caused the Debtor to incur not less than **[$139,467.41]**[56] in new debt. This debt

includes **[$75,921.23]** in BofA 7078 Loans, **[$5,771.34]** in finance charges and late fees on the

---

[55] The Debtor states in the Petition that its 2022 gross revenue was $4,115.80. A deposit for this amount
was received in the Operating Account on or about January 11, 2022. *See* January 2022 Operating
Account Statement, attached in **Appendix G**.

[56] This figure does not include any of the finance charges and late fees associated with the credit card
charges made during this period.

*DRAFT*

BofA 7078 Loans, and [**$57,774.84**] in credit card charges on the Business Card Accounts and

the Phillips 66 Account (paid out of the Operating Account). *See* ¶¶ 120-128, *infra* and section

A.1.c., *supra*.

124.    The Srigleys caused the Debtor to obtain four additional BofA 7078 Loans

between December of 2021 and June of 2022: (1) a loan in the amount of $17,076.04, on or

about December 17, 2021, the very same date the Debtor notified the Plaintiffs that it was

terminating the Contract;[57] (2) a loan in the amount of $10,000.00 on or about January 11, 2022;

(3) a loan in the amount of $45,000.00 on or about January 21, 2022;[58] and (4) a loan in the

amount of $3,845.19 on or about June 6, 2022, described as an "Overdraft Advance." The

[**$75,921.23**] in combined proceeds of these loans were received in the Operating Account. *See*

section A.1.c. and Table 3, *supra*.

125.    The Srigleys caused the Debtor to pay only the minimum amount due on the

[**$75,921.23**] in BofA Loans, for a total of [**$4,316.65**], until on or about June 2, 2022, after

which time the Debtor apparently made no further payments. As a result of this payment

practice, during 2022 and 2023, the Srigleys caused the Debtor to incur not less than [**$5,771.34**]

in finance charges and late fees on the BofA 7078 Loans.

126.    Also, the Srigleys willfully and intentionally harmed the Debtor by continuing to

make purchases using its credit card accounts, knowing the Debtor did not have the means to

---

[57] Upon information and belief, the Srigleys caused the Debtor to use these proceeds to pay off the
balance on BofA 9400. *See* ¶ 59, *supra*.

[58] Upon information and belief, three days later, on or about January 24, 2022, the Srigleys caused the
Debtor to transfer $40,000.00 from the Operating Account into Non-Debtor Owned BofA 6378. The
following day, on or about January 25, 2022, the M20K Aircraft was apparently paid off in full. *See* ¶¶
61-62 and 92, *supra*.

*DRAFT*

repay the debt. The Srigleys caused the Debtor to incur a total of approximately **[$57,774.84]** in new debt from purchases made during calendar year 2022, listed below by each account:[59]

|  |  |
|---|---|
| (1) AmEx 02002: | **[$25,840.15]** |
| (2) AmEx 11008: | **[$5,533.86]** |
| (3) BofA 9400: | **[$20,986.15]** |
| (4) Capital One 8764: | **[$3,572.68]** |
| (5) Phillips 66 Account:[60] | **[$1,842.00]** |

127.    The figure of **[$57,774.84]** is net of any related credits and excludes the additional debt incurred by the Debtor due to the associated finance charges and late payment fees relating solely to those 2022 purchases. However, total finance charges and late payment fees incurred by the Debtor on the balances of the Business Card Accounts during the period from January 2022 through April 2023 were **[$26,983.29]**, allocated by account as follows:

|  |  |
|---|---|
| (1) AmEx 02002: | **[$14,998.93]** |
| (2) AmEx 11008: | **[$5,944.95]** |
| (3) BofA 9400: | **[$3,480.98]** |
| (4) Capital One 8764: | **[$2,558.43]** |

*See* **Appendix F**.

128.    Upon information and belief, the Srigleys engaged in the above-described behavior with no intention of satisfying the Debtor's financial obligations and with willful and reckless disregard for the harm it would cause to the Debtor and to the Debtor's existing and future creditors. The Srigleys just let the debts of the Debtor pile up, intending to use the Debtor's LLC as a shield to protect themselves from personal liability.

---

[59] *See* **Appendix A** for individual charges.

[60] Plaintiffs believe this is an account owned by Benjamin Srigley personally. However, the balances of this account were apparently paid out of the Operating Account. *See supra* ¶ 86.

*DRAFT*

**c.    The Debtor, at the Direction of the Srigleys, Fradulently Transferred Assets While Shutting Down Its Business and Arbitrating**

129.    Even after the Debtor had stopped doing business as a residential remodeling contractor, apparently had had no new signed contracts and thus no future work, no anticipated revenue of substance, was already substantially in debt, had no means of paying its existing obligations let alone new debt, and was facing a substantial arbitration loss, the Srigleys continued their practice of causing the Debtor to transfer cash assets out of the Operating Account.

130.    From December 2021 through September 2022, the Srigleys caused the Debtor to withdraw as cash and/or transfer out of the Operating Account and into accounts not owned by the Debtor (presumably the Srigleys' personal accounts), a combined total of $76,664.86.[61] *See* sections A.1.a. and b., *supra.*

**d.    The Srigleys May Have Used the Debtor's Business to Engage in Tax Improprieties to Benefit Themselves**

131.    The Srigleys may have used the Debtor's business improperly so that they could claim as deductible business expenses in their tax filings certain of their personal expenses. Upon information and belief, this behavior occurred both while the Debtor was operating as a business, while its operations were being shut down by the Srigleys, and possibly after the Debtor had been dissolved.

132.    In particular, the level of the Debtor's depreciation and section 179 expense deductions claimed by the Srigleys in the Debtor's 2020 and 2021 Schedule Cs seems

---

[61] This is the sum of $50,264.86 in unscheduled withdrawals made from December 8, 2021 through September 6, 2022 and $26,400.00 in Owner Draws taken from December 10, 2021 through April 29, 2022.

*DRAFT*

extraordinarily high given the Debtor's claimed lack of non-cash assets. Apart from $5,000.00 in

miscellaneous tools left in the Debtor's former warehouse space,[62] Benjamin Srigley stated in the

Petition that the Debtor did not own or lease any real or personal property, such as machinery,

equipment, vehicles, office furniture, fixtures, or inventory, in other words, that the Debtor did

not own or lease any apparently depreciable property.

133.    Yet, in the 2020 and 2021 Schedule Cs of the Debtor, the Srigleys claimed

depreciation expense deductions of $32,931.00 and $66,857.00, respectively.[63]

134.    Despite requesting this information multiple times, the Plaintiffs have not

received from the Debtor, or from any other party, any supporting documentation for the

information contained or referenced in its 2020 and 2021 Schedule Cs, including but not limited

to, IRS Form 4652 (Depreciation and Amortization), and Statements 3, 4 and 5. As such,

Plaintiffs are not able to fully determine which property was the subject of the depreciation

expense deductions claimed by the Debtor or to understand the magnitude of the deductions

given the claimed lack of depreciable property.

135.    Upon information and belief, a portion of these claimed deductions likely related

to the M20K Aircraft. For calendar year 2021, depreciation expenses relating to the M20K

Aircraft in the amount of $9,632.00 were apparently recorded in the Debtor's books. Prior to

2021, depreciation expenses for the M20K Aircraft seem to have been recorded as follows:

---

[62] In its response to Item 50 of the Petition, the Debtor stated that it was unclear of these items were
"legally abandoned."

[63] To date, the Debtor has refused to provide a copy of its 2022 Schedule C. *See* true an correct copies of
the Debtor's apparent 2020 and 2021 Schedule Cs, attached in **Appendix E**.

*DRAFT*

$2,666.67 in 2017; $8,000.00 in 2018; $8,000.00 in 2019; and $8,000.00 in 2020.[64] These figures seem to represent the full amount of depreciation expense deductions claimed for the M20K Aircraft in total.

136.    Upon information and belief, a portion of these depreciation expenses also likely related to the Isuzu Truck. It seems that approximately $2,600.00 in 2020 and $749.00 in 2021 were recorded as depreciation deduction expenses in the Debtor's books. *See* footnote 64.

137.    During the §341(a) meetings, Benjamin Srigley revealed the existence of a 2021 Dodge Ram pickup truck (the "**Ram Truck**"). The Debtor later produced a title to this vehicle, which was dated December 9, 2021 and was in the name of Benjamin Srigley.[65] Based his testimony, the full amount of allowable depreciation expenses relating to the Ram Truck may have been included in the Debtor's 2021 Schedule C, however, Plaintiffs have not been able to independently verify whether this is the case.

138.    Without further discovery, Plaintiffs are unable to account for the remaining depreciation and section 179 expense deductions claimed by the Srigleys in the Debtor's Schedule Cs. Assuming the figures in ¶¶ 135-136 are accurate, the remaining amounts are $22,331.00 in 2020, and $56,476.00 in 2021.

139.    Tax reporting relating to the M20K Aircraft may be additionally problematic. Upon information and belief, it was the Debtor who apparently claimed the full amount of the

---

[64] *See* true and correct copy of Fixed Asset True up Entries as of 12-31-2020, attached in **Appendix C**.

[65] *See* true and correct copy of Title to 2021 Dodge Ram, attached in **Appendix C**.

*DRAFT*

airplane's deductions on its Schedule C, however, the M20K Aircraft was not owned by the

Debtor, but by Srigley Development Company.[66]

140.    More importantly, to date, the Plaintiffs have seen no evidence establishing that

the M20K Aircraft was used for any business purpose of any kind, let alone the Debtor's

business. To the contrary, upon information and belief, the M20K Aircraft was used solely for the

Srigleys' personal enjoyment.

141.    In that regard, Mr. Srigley has presented himself to the public as a recreational

pilot and as the owner of a Mooney aircraft. His bio from the Debtor's former website provides,

in pertinent part:

> Ben also has a passion for precision flying. He holds an instrument-rated, multiengine
> commercial pilot's license and *on weekends he enjoys flying his four-seat Mooney* or
> even an acrobatic plane on occasion. (emphasis added)[67]

142.    Further discovery is needed to ascertain whether Srigley Development Company

engaged in any business activity and, if so, what relationship existed between the use and

ownership of the M20K Aircraft as a business expense and the business's alleged purpose of real

estate investment and development. Additional discovery is also needed to determine whether

Srigley Development Company received any revenue, had its own accounts, or was operated as

an entity separate and distinct from the Debtor or from the Srigleys.

143.    If instead, as Plaintiffs strongly suspect, Srigley Development Company was not

an active business, but was simply a shell company devised to hold the M20K Aircraft, it may

---

[66] Plaintiffs do not know if Srigley Development Company was the subject of a separate Schedule C filed
with the Srigleys' tax returns. Further discovery is needed to verify this.

[67] *See* true and correct copy of screenshot of Benjamin Srigley's Bio from the Debtor's former website,
attached in **Appendix D**. As noted *supra* in ¶ 10, the M20K Aircraft is a Mooney airplane.

*DRAFT*

have served a dual purpose for the Srigleys:

> (1) it allowed them to claim their recreational airplane as a business expense for tax purposes, making them the recipients of tax benefits they would not otherwise have received;[68] and

> (2) it enabled them to shield the plane (and the proceeds of the M20K Aircraft's eventual sale) from present and future creditors of the Debtor.

144.    Similarly, if the Srigleys claimed any other non-business related expenses, such as those relating to the M20K Aircraft or any other of their personal expenditures purchased using the Debtor's cash assets or accounts, as business expenses on the Debtor's Schedule Cs, this practice would also have resulted in potentially decreasing the Srigleys' personal tax liability. *See* sections A.2.b. and c., *supra* and **Appendix A**.

145.    Additional discovery is required to determine whether potential tax implications associated with the Srigleys' behavior warrant further investigation.

> e.    **The Srigleys May Have Intentionally Concealed Assets and Information During This Case**

146.    Notice in the Case was provided on Official Form 309C and no proof of claim deadline was initially set.[69] In Schedule A/B of the Petition, the Debtor disclosed cash assets of $0.00, claiming ownership of or control over a single account, the Operating Account. Discovery in connection with the Plaintiffs' Rule 2004 Motion revealed that the Debtor owned at least two

---

[68] As the Debtor was a pass-through entity, the Srigleys would have been the direct beneficiaries of claimed depreciation expense deductions on the Debtor's Schedule Cs, which would likely have had the effect of reducing their tax liability.

[69] Creditors were subsequently notified of possible dividends and a proof a claim date was set for July 1, 2024.

*DRAFT*

additional accounts with Bank of America, N.A.: BofA 6487 and BofA 6490 (the balances of both of these accounts as of the Petition Date were likely $0.00).

147.    Also in Schedule A/B, the Debtor claimed that it had no interest in any other assets, except in response to Items 10 and 11, which referenced $0.00 in "Unknown" accounts receivable, and in response to Item 50, which referred to the existence of $5,000.00 in tools which may have been "legally abandoned" by the Debtor.

148.    In addition, among other items, none of the following were disclosed in the Petition:

(1)   the fact that the Debtor likely had (or had within the two years prior to the Petition Date) another owner, member and manager, Cynthia Srigley;
(2)   the existence of Srigley Development Company and its common ownership with the Debtor;
(3)   the existence of the M20K Aircraft and its relationship to the Debtor;
(4)   the amount of the Debtor's assets used to purchase and finance the M20K Aircraft and pay for its associated expenses;
(5)   the M20K Aircraft's related sale and the amount of the proceeds;
(6)   the identity of the individual(s) or entity who received the M20K Aircraft proceeds; and
(7)   the location of the M20K Aircraft proceeds as of the Petition Date.

*See, e.g.*, the Debtor's negative responses to Items 13, 25 and 31 in Official Form 207 of the Petition.

149.    Plaintiffs believe that the Srigleys, acting for the Debtor, intentionally attempted to conceal this information from the Trustee and, consequently, from this Court. As discussed in detail in Plaintiffs' *Motion for Derivative Standing*, we informed the Trustee immediately of our concerns in two separate writings provided to him at the commencement of the Case. *See id.* at ¶¶ 3-5.

*DRAFT*

150.    Again at the direction of the Srigleys, the Debtor has scoffed at the bankruptcy
process altogether. The Debtor did not provide certain business records to the Trustee, which
should have been kept in the ordinary course of business. *See* section A.3., *supra.* It is not clear
whether the Debtor just did not maintain the records, whether they were willfully destroyed, or
whether they were concealed from the Trustee and its creditors.

151.    As discussed in detail in Plaintiffs' Rule 2004 Motion,[70] over a period of more
than five months from the commencement of the Case, and upon the urging of the Plaintiffs, the
Trustee continued to request certain documents from the Debtor relating to its acts, conduct,
property, liabilities and financial condition. The Debtor has refused to produce most of the
requested documents, and has continued to refuse to produce these documents even in response
to the Rule 2004 subpoena issued by the Plaintiffs pursuant to this Court's January 25, 2024
order. *See* Motion for Derivative Standing, at ¶¶ 14-15.

152.    The Debtor is not even willing to maintain current contact information, including
a valid address, throughout this proceeding. *See* ¶104, *supra*; Motion to Amend Rule 2004
Motion at ¶ 1; Motion for Derivative Standing, at ¶ 17.

153.    Further, the Srigleys concealed the Debtor's assets by fraudulently transferring
not less than **[$456,128.10]** in cash or other value during at least the period from January 2020
through the Petition Date. *See* **Appendix A**.

154.    Of course, all of this behavior is consistent with the Srigleys' scheme, which is to

---

[70] The Rule 2004 Motion was amended by Plaintiffs' *Motion to Amend Motion for Entry of an Order
Pursuant to Rule 2004 Authorizing Examinations and for the Production of Documents to Revise
Certificate of Service, to Extend the Date upon which Objection to Motion Must Be Filed, and to Add
Signature Page and Service List to Proposed Order*, filed on October 23, 2023 (the "**Motion to Amend
Rule 2004 Motion**").

*DRAFT*

make it as difficult as possible for others to hold the Debtor, and them personally, responsible under the law. To date, they have largely succeeded.

## COUNT ONE [I]

### (Avoidance of Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code Against Benjamin Srigley, Cynthia Srigley and Srigley Development Company)

155.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

156.   The Avoidable Transfers, as detailed on **Appendix A,** were transfers of interest of the Debtor in property or obligations incurred by the Debtor.

157.   The Avoidable Transfers were made or incurred on or within two (2) years prior to the Petition Date.

158.   The Avoidable Transfers were made with actual intent of the Defendants to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

159.   Benjamin Srigley, Cynthia Srigley and Srigley Development Company were not good faith transferees or obligees, and therefore are not entitled to offset rights under Section 548(c) of the Bankruptcy Code and applicable non-bankruptcy law.

160.   Each Avoidable Transfer was accompanied by at least three badges of fraud indicating the fraudulent nature of such transfer, including but not limited to the following:

> (i)   the transfers made or obligations incurred were to, or for the benefit of, Benjamin Srigley, Cynthia Srigley and/or the Srigleys jointly, insiders of the Debtor,[71] who exercised dominion and control over the Debtor;

---

[71] *See* 11 § U.S.C. 101(31).

*DRAFT*

(ii) the transfers made or obligations incurred were to, or for the benefit of, Srigley Development Company, an entity under common ownership or control with the Debtor;

(iii) the transfers were made or obligations were incurred at the same time (or shortly before or after) new liabilities and debts were being incurred by the Debtor;

(iv) the Debtor was or became insolvent at the time of the Avoidable Transfers (or shortly thereafter); and

(v) before or at the time the transfer was made or obligation was incurred, there was an arbitration action pending against the Debtor, or the imminent threat of such arbitration action.

161.    As a result of the Avoidable Transfers, creditors of the Debtor sustained significant damages.

162.    The Avoidable Transfers are avoidable as fraudulent transfers under Section 548(a)(1)(A) of the Bankruptcy Code.

163.    The Plaintiffs reserve the right to seek the avoidance and recovery of any and all additional avoidable transfers that they later discover.

164.    The Avoidable Transfers are recoverable jointly and individually from Benjamin Srigley and Cynthia Srigleys as alter egos of the Debtor and of Srigley Development Company.

165.    The Plaintiffs are entitled to recover, for the benefit of the Estate, the full amount of the Avoidable Transfers, totaling not less than **[\$209,781.80]**, to be distributed to the Debtor's unsecured creditors as appropriate under the provisions of the Bankruptcy Code.

166.    The Plaintiffs are entitled to their reasonable costs, and all other relief the Court deems just and proper for their efforts to avoid and recover these fraudulent transfers.

*DRAFT*

## COUNT TWO [II]

**(Avoidance of Fraudulent Transfers Under Section 548(a)(1)(B) of the Bankruptcy Code Against Benjamin Srigley, Cynthia Srigley and Srigley Development Company)**

167.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

168.    The Avoidable Transfers, as detailed on **Appendix A**, were transfers of interest of the Debtor in property or obligations incurred by the Debtor.

169.    The Avoidable Transfers were made or incurred on or within two (2) years prior to the Petition Date.

170.    The Debtor did not receive reasonably equivalent value in exchange for the Avoidable Transfers.

171.    The Debtor was insolvent on the dates of each of the Avoidable Transfers, or became insolvent as a result of the Avoidable Transfers.

172.    At the time of, or as a result of the Avoidable Transfers, the Debtor was engaged in a business or transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

173.    At the time of the Avoidable Transfers, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

174.    The transfers made or obligations incurred were to, or for the benefit of, Benjamin Srigley, Cynthia Srigley, and/or the Srigleys jointly, insiders of the Debtor, who exercised dominion and control over the Debtor, or to Srigley Development Company, an entity under common ownership or control with the Debtor.

*DRAFT*

175.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of Bankruptcy Code section 502.

176.    The Avoidable Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

177.    The Plaintiffs reserve the right to seek the avoidance and recovery of any and all additional avoidable transfers that they later discover.

178.    The Avoidable Transfers are recoverable jointly and individually from Benjamin Srigley and Cynthia Srigleys as alter egos of the Debtor and of Srigley Development Company.

179.    The Plaintiffs are entitled to recover, for the benefit of the Estate, the full amount of the Avoidable Transfers, totaling not less than **[$209,781.80]**, to be distributed to the Debtor's unsecured creditors as appropriate under the provisions of the Bankruptcy Code.

180.    The Plaintiffs are entitled to their reasonable costs, and all other relief the Court deems just and proper for their efforts to avoid and recover these fraudulent transfers.

## <u>COUNT THREE (III)</u>

**(Avoidance of Fraudulent Transfers Under Section 544(b) and Section 550 of the Bankruptcy Code and Under D.C. Code § 28-3104(a)(1) and Other Applicable Provisions Against Benjamin Srigley, Cynthia Srigley and Srigley Development Company)**

181.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

182.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable within the meaning of Bankruptcy Code section 502.

*DRAFT*

183.    Plaintiffs were granted derivative standing on **[DATE]**, to prosecute, on behalf of

the Estate, claims against the Debtor, the Srigleys and Srigley Development Company, and are,

in essence, "standing in the shoes of" the Trustee.

184.    The Avoidable Transfers were transfers of interest in the Debtor's property to, or

for the benefit of, the Defendants.

185.    At all relevant times, the Debtor had at least one creditor with claims that arose

before or after the transfer was made or the obligation was incurred.

186.    The Defendants entered into each Avoidable Transfer with the actual intent to

delay, hinder, or defraud any creditor of the Debtor.

187.    Each Avoidable Transfer was accompanied by at least three badges of fraud

indicating the fraudulent nature of such transfer, including but not limited to the following:

(i)    the transfers made or obligations incurred were to, or for the benefit of, Benjamin Srigley, Cynthia Srigley and/or the Srigleys jointly, insiders of the Debtor, who exercised dominion and control over the Debtor;

(ii)    the transfers made or obligations incurred were to, or for the benefit of, Srigley Development Company, an entity under common ownership or control with the Debtor;

(iii)    the transfers were made or obligations were incurred at the same time (or shortly before or after) new liabilities and debts were being incurred by the Debtor;

(iv)    the Debtor was or became insolvent at the time of the Avoidable Transfers (or shortly thereafter); and

(v)    before or at the time the transfer was made or obligation was incurred, there was an arbitration action pending against the Debtor, or the imminent threat of such arbitration action.

188.    The primary purpose of the Avoidable Transfers was to take cash from the Debtor,

*DRAFT*

or otherwise use the Debtor to obtain value, for the benefit of the Srigleys or Srigley Development Company so that these assets would not be made available to the Debtor's other creditors.

189.     The Srigleys were not good faith transferees, and therefore are not entitled to the defenses or protections under D.C. Code § 28-3108 or other applicable law.

190.     The Avoidable Transfers were made within the four (4) years before the Petition Date and should be avoided pursuant to Sections 544(b) and 550 of the Bankruptcy Code and D.C. Code §§ 28-3107 through 28-3109, as applicable.

191.     The Plaintiffs reserve the right to seek the avoidance and recovery of any and all additional avoidable transfers that they later discover.

192.     The Avoidable Transfers are recoverable jointly and individually from Benjamin Srigley and Cynthia Srigleys as alter egos of the Debtor and of Srigley Development Company.

193.     The Plaintiffs are entitled to recover, for the benefit of the Estate, the full amount of the Avoidable Transfers, totaling not less than **[$456,128.10]**, to be distributed to the Debtor's unsecured creditors as appropriate under the provisions of the Bankruptcy Code.

194.     The Plaintiffs are entitled to their reasonable costs, and all other relief the Court deems just and proper for their efforts to avoid and recover these fraudulent transfers.

*DRAFT*

## COUNT FOUR (IV)

**(Avoidance of Fraudulent Transfers Under Section 544(b) and Section 550 of the Bankruptcy Code and and Under D.C. Code § 28-3104(a)(2) and Other Applicable Provisions Against Benjamin Srigley, Cynthia Srigley and Srigley Development Company)**

195.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

196.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable within the meaning of Bankruptcy Code section 502.

197.    Plaintiffs were granted derivative standing by this Court on **[DATE]**, to prosecute on behalf of the Estate, claims against the Debtor, the Srigleys and Srigley Development Company, and are, in essence, "standing in the shoes of" the Trustee.

198.    The Avoidable Transfers were transfers of interest in the Debtor's property to, or for the benefit of, the Defendants.

199.    At all relevant times, the Debtor had at least one creditor with claims that arose before or after the transfer was made or the obligation was incurred.

200.    The Debtor did not receive reasonably equivalent value in exchange for each of the transfers or obligations.

201.    At the time of, or as a result of the Avoidable Transfers, the Debtor was engaged in or was about to be engaged in a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the transaction.

202.    At the time of the Avoidable Transfers, the Debtor intended to incur, or believed

*DRAFT*

or reasonably should have believed that it would incur, debts beyond the Debtor's ability to pay as they became due.

203.    The Srigleys were not good faith transferees, and therefore are not entitled to the defenses or protections under D.C. Code § 28-3108 or other applicable law.

204.    The Avoidable Transfers were made within the four (4) years before the Petition Date and should be avoided pursuant to Sections 544(b) and 550 of the Bankruptcy Code and D.C. Code §§ 28-3107 through 28-3109, as applicable.

205.    The Plaintiffs reserve the right to seek the avoidance and recovery of any and all additional avoidable transfers that they later discover.

206.    The Avoidable Transfers are recoverable jointly and individually from Benjamin Srigley and Cynthia Srigleys as alter egos of the Debtor and of Srigley Development Company.

207.    The Plaintiffs are entitled to recover, for the benefit of the Estate, the full amount of the Avoidable Transfers, totaling not less than **[$456,128.10]**, to be distributed to the Debtor's unsecured creditors as appropriate under the provisions of the Bankruptcy Code.

208.    The Plaintiffs are entitled to their reasonable costs, and all other relief the Court deems just and proper for their efforts to avoid and recover these fraudulent transfers.

<u>**COUNT FIVE (V)**</u>

**(Breach of Fiduciary Duties to the Debtor Pursuant to D.C. Code § 29-804.09, and Other Applicable Provisions Against Benjamin Srigley and Cynthia Srigley)**

209.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

*DRAFT*

210.    At all relevant times described herein, as managers and managing members of the Debtor, Benjamin Srigley and Cynthia Srigley breached their fiduciary duties of loyalty and care, and obligation of good faith and fair dealing owed to the Debtor and its creditors.

211.    The Srigleys engaged in self-dealing and failed to act in the best interests of the Debtor, rather than in their own personal interests. They used the Debtor's assets for personal gain and exploited opportunities of the Debtor for personal advantage.

212.    The Srigleys failed to act with the care an ordinarily prudent person in a like position would exercise under similar circumstances. They failed to act in good faith and with honesty of purpose in all dealings related to the Debtor.

213.    The Srigleys directly benefited from breaching their fiduciary duties and engaging in self-dealing by reaping financial rewards to which they were not entitled. They knew, or had reason to know, that the Debtor and its creditors would be harmed by their breaches of such duties.

214.    As a direct and proximate result of the Srigleys breaching their fiduciary duties and engaging in self-dealing, the Debtor and its creditors sustained significant damages, including but not limited to damages resulting in the deepening insolvency of the Debtor.

215.    As a result of the Srigleys' breaches of fiduciary duty, Plaintiffs are entitled to recover, on behalf of the Estate, the damages suffered by the Debtor in an amount to be proved at trial, in an amount totaling not less than [$_____].

*DRAFT*

## COUNT SIX (VI)

### (Liability for Improper Distributions Made By the Debtor in Violation of D.C. Code §§ 29-804.05(a) and 29-804.09 and Pursuant to D.C. Code § 29-804.06, Against Benjamin Srigley and Cynthia Srigley)

216.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

### [TO BE COMPLETED]

217.    As a result of the Debtor's improper distributions, Plaintiffs are entitled to recover, on behalf of Estate, the damages suffered by the Debtor in an amount to be proved at trial, in an amount totaling not less than [$_____].

## COUNT SEVEN (VII)

### (Common Law Conspiracy Against Benjamin Srigley and Cynthia Srigley Pursuant to Applicable D.C. Law)

218.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

219.    At all relevant times described herein, Benjamin Srigley and Cynthia Srigley acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

220.    The unlawful, illegal, and/or oppressive acts include, but are not limited to, conspiring to breach the fiduciary duties they, as officers, etc., owed to the Debtor and its creditors by, among other things, causing or deepening the indebtedness of the Debtor by obtaining unnecessary credit and loans in the Debtor's name, and facilitating fraudulent transfers.

*DRAFT*

221.    Benjamin Srigley and Cynthia Srigley intentionally combined to accomplish these purposes, which were unlawful, or even if determined to be lawful purposes, were accomplished through illegal and unlawful means.

222.    As a direct and proximate result of the conspiracy and agreement between the Srigleys, the Debtor and the Debtor's creditors sustained significant damages, including but not limited to more than a million dollars of unpaid obligations.

223.    As a result of the conspiracy, Plaintiffs are entitled to recover, on behalf of Estate, the damages suffered by the Debtor and its creditors in an amount to be proved at trial, but likely totaling not less than [$1,___,___.__].

## COUNT EIGHT (VIII)

### (Alter Ego Liability Against Benjamin Srigley and Cynthia Srigley)

224.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

225.    Benjamin Srigley and Cynthia Srigley, jointly and severally, were alter egos of the Debtor..

226.    There existed a unity of interest and ownership between the Debtor and the Srigleys such that the separate affairs and personalities of the company and the individuals no longer existed.

227.    Benjamin Srigley was the CEO of the Debtor, and Cynthia Srigley, was its COO. They were the sole members, owners, managers and officers of the Debtor. The Srigleys exercised complete and total domination and control over the Debtor.

*DRAFT*

230.    The Srigleys failed to keep the Debtor adequately capitalized. Rather, they kept

the Debtor in a perpetual state of insolvency by constantly withdrawing cash from the entity and

transferring it to themselves, irrespective of the Debtor's overall financial condition and of the

fact that the Srigleys had insufficient equity in the Debtor to justify the withdrawals. Rather, their

equity in the company was negative.

231.    The Srigleys extensively intermingled the Debtor's funds and assets with their

personal funds and assets, or with those of the Debtor's sister entity, Srigley Development

Company. They used the Debtor's assets for their personal benefit, including but not limited to

the financing and maintenance of the M20K Aircraft, of which Srigley Development Company

was the registered owner.

232.    The Srigleys wrongfully used the LLC to protect the Debtor's assets from the

claims of creditors by, among other things, fraudulently transferring assets out of the Debtor's

accounts and converting the Debtor's assets for their personal use, directly or indirectly, so that

those assets would not be available to satisfy the claims of the Debtor's creditors.

233.    The Srigleys disregarded corporate formalities, failing to maintain records that

should be prudently kept in the ordinary course of business.

234.    The Srigleys have acted in concert to intentionally abuse and disregard the LLC

form of the Debtor in order to defeat justice, perpetrate actual or constructive fraud, violate

statutory obligations, and evade contractual responsibility on preexisting liabilities, *inter alia*.

235.    As such, the Srigleys operated the Debtor as a device or sham used to disguise the

Srigleys' wrongful conduct.

*DRAFT*

236.    As a result of their fraudulent or otherwise improper actions, the Srigleys have

substantially benefited personally, unjustly enriching themselves to the detriment of the Debtor

and its creditors.

237.    Consequently, all funds or other assets that the Debtor is required to return to the

Estate should be enforced against the Srigleys.

238.    The Plaintiffs, on behalf of the Estate to be distributed appropriately to the

creditors of the Debtor, are entitled to recover all damages asserted in the Complaint, jointly and

severally from Benjamin Srigley and Cynthia Srigley, who acted as the Debtor's alter egos.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs, Federico M. Bandi and Angela M. Bandi,

respectfully request that the Court enter an order and judgment substantially in the form attached

hereto as **Exhibit A**, as follows:

(a)   On Counts I and II, awarding judgment to the Plaintiffs, on behalf of the
Estate, pursuant to Section 548 of the Bankruptcy Code, in an amount of the
Avoidable Transfers, and directing the Defendants to pay the Estate an
amount to be determined at trial, totaling not less than **[$209,781.80]**, plus
the Plaintiffs' reasonable costs, pursuant to section 550(a) of the Bankruptcy
Code;

(b)   On Counts III and IV, awarding judgment to the Plaintiffs, on behalf of the
Estate, pursuant to Sections 544 and 550 of the Bankruptcy Code, D.C. Code
§§ 28-3104, 28-3105 and 28-3107 through 28-3109, or pursuant to other
applicable state fraudulent conveyance or fraudulent transfer law, in an
amount to be proven at trial, totaling not less than **[$456,128.10]**, plus the
Plaintiffs' reasonable costs, pursuant to Section 550(a) of the Bankruptcy
Code;

(c)   On Count V, awarding judgment to the Plaintiffs, on behalf of the Estate, for
damages caused to the Debtor and its creditors, as a result of the Srigleys'
breaches of fiduciary duties and self-dealing, pursuant to D.C. Code §

*DRAFT*

29-804.09 or other applicable provisions of the Uniform Limited Liability Company Act of 2010, D.C. Code § 29-801.01, *et seq.* or applicable common law, in an amount to be proven at trial, but totaling not less than $_____$;

(d) On Count VI, awarding judgment to the Plaintiffs, on behalf of the Estate, in the amount of the improper distributions made by the Srigleys in violation of D.C. Code §§ 29- 804.05 and 29-804.09 and pursuant to D.C. Code § 29-804.06, and directing the Defendants to pay the Estate an amount to be determined at trial, totaling not less than $_____$;

(e) On Count VII, awarding judgment to the Plaintiffs, on behalf of the Estate, for damages caused to the Debtor and its creditors, as a result of the civil conspiracy of the Srigleys, in an amount to be proven at trial, but totaling not less than $_____$;

(f) On Count VIII, finding that Benjamin Srigley and Cynthia Srigley, jointly and severally, are the alter egos of the Debtor and that the Srigleys are jointly and severally liable for all damages resulting from this Adversary Proceeding, and that the assets of the Srigleys, up to the total amount of allowable claims pursuant to 11 U.S.C. § 502, or [**$1,\_\_\_,\_\_\_.\_\_**], are property of the Estate;

(g) Awarding the Plaintiffs their reasonable costs incurred in connection with this Adversary Proceeding;

(h) Awarding post-judgment interest at the maximum legal rate running from the date of the judgment until the date the udgment is paid in full, plus costs;

(i) Directing the Defendants to pay forthwith all amounts awarded; and

(j) Granting such other and further relief as this Court deems just and proper.

*DRAFT*

Dated: _____, 202_                          Respectfully submitted:


_____

FEDERICO M. BANDI
3606 Chesapeake Street, NW
Washington, DC. 20008
Telephone: 773-612-4163
Email: fbandi1@jhu.edu

-and-


_____

ANGELA M. BANDI
3606 Chesapeake Street, NW
Washington, DC. 20008
Telephone: 773-620-1932
Email: angela.bandi@yahoo.com

*Unsecured Judgment Creditors of*
*Touchstone Remodelers, LLC,*
*Filing Pro Se*

**APPENDIX D**

From: **Mac VerStandig** mac@mbvesq.com
Subject: RE: Deposition of Touchstone Remodelers, LLC - Case Number 23-00116-ELG
Date: April 7, 2024 at 12:09 PM
To: Federico Bandi fbandi1@jhu.edu, Angela Bandi angela.bandi@yahoo.com
Cc: William Douglas White wdw@mccarthywhite.com

Mr. Bandi,

Thank you for the e-mail. However, insofar as Touchstone Remodelers, LLC is a Chapter 7 debtor, Mr. White – as the trustee – is the sole representative of the debtor's estate. Mr. White has not sought to engage my firm as counsel, nor do I have any reason to believe he is so inclined; as such, any deposition request would be properly directed to him.

Regards,

Maurice "Mac" VerStandig, Esq.
The VerStandig Law Firm, LLC
Phone: (301) 444-4600
Cell: (240) 351-6442
Facsimile: (301) 444-4600
mac@mbvesq.com

Nevada Mailing Address:
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012

Maryland Mailing Address:
9812 Falls Road, #114-160
Potomac, Maryland 20854

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**TAX ADVICE NOTICE**
Any tax advice included in this communication may not contain a full description of all relevant facts or a complete analysis of all relevant tax issues or authorities.  This communication is solely for the intended recipient's benefit and may not be relied upon by any other person or entity.

**From:** Federico Bandi <fbandi1@jhu.edu>
**Sent:** Sunday, April 7, 2024 5:42 AM
**To:** Mac VerStandig <mac@mbvesq.com>; Angela Bandi <angela.bandi@yahoo.com>
**Cc:** William Douglas White <wdw@mccarthywhite.com>
**Subject:** Deposition of Touchstone Remodelers, LLC - Case Number 23-00116-ELG

Good morning Mr. VerStandig

Good morning Mr. VerStandig,

Thank you for your response. It is, however, not addressing the subpoena - resulting from our Rule 2004 motion - which is explicitly directed to your client, Touchstone Remodelers, LLC.

We are following up to schedule Touchstone's deposition. We previously suggested the week of April 8th. Please let us know when your client is available for a deposition over the next couple of weeks.

Kind regards,
Federico Bandi

===========================================
Federico M. Bandi
James Carey Endowed Professor
Professor of Finance
Johns Hopkins University

---

**From:** Mac VerStandig <mac@mbvesq.com>
**Date:** Wednesday, March 20, 2024 at 3:17 AM
**To:** Federico Bandi <fbandi1@jhu.edu>, Angela Bandi <angela.bandi@yahoo.com>
**Cc:** William Douglas White <wdw@mccarthywhite.com>
**Subject:** RE: Deposition of Touchstone Remodelers, LLC - Case Number 23-00116-ELG

Mr. Bandi,

Thank you for the e-mail.

Inasmuch as Mr. White is the trustee and representative of Touchstone's estate, I believe it would be more appropriate to coordinate deposition details with him.

Regards,

Maurice "Mac" VerStandig, Esq.
The VerStandig Law Firm, LLC
Phone: (301) 444-4600
Cell: (240) 351-6442
Facsimile: (301) 444-4600
mac@mbvesq.com

Nevada Mailing Address:
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012

Maryland Mailing Address:
9812 Falls Road, #114-160

Potomac, Maryland 20854

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

**TAX ADVICE NOTICE**
Any tax advice included in this communication may not contain a full description of all relevant facts or a complete analysis of all relevant tax issues or authorities.  This communication is solely for the intended recipient's benefit and may not be relied upon by any other person or entity.

**From:** Federico Bandi <fbandi1@jhu.edu>
**Sent:** Tuesday, March 19, 2024 10:15 PM
**To:** Mac VerStandig <mac@mbvesq.com>; Angela Bandi <angela.bandi@yahoo.com>
**Subject:** Deposition of Touchstone Remodelers, LLC - Case Number 23-00116-ELG

Good evening Mr. VerStandig,

I am getting in touch to find a mutually agreeable time for Touchstone's deposition.

The week of April 8 would work for us (with the exception of Monday afternoon, Thursday morning and Friday).

Please let us know what works for your client.

Kind regards,
Federico Bandi


========================================
Federico M. Bandi
Johns Hopkins University

**From:** **Angela Bandi** angela.bandl@yahoo.com  🖉
**Subject:** In re: Touchstone Remodelers, LLC (Case No. 23-00116-ELG; Chapter 7)
**Date:** February 14, 2024 at 10:58 AM
**To:** Mac VerStandig mac@mbvesq.com
**Cc:** Federico Bandi fbandi1@jhu.edu



Dear Mr. VerStandig,

In connection with service of certain documents in the above-referenced case, it has come to our attention that the address provided for Mr. Srigley in Touchstone's chapter 7 petition may no longer be his current address. The address is:

203 Fishburne Street
Unit A
Charleston, SC 29403

The apartment at that address was advertised on Zillow as available for rent, with a move-in date of February 15, 2024 (screenshots attached below).

Would you be able to confirm whether or not the above address is the correct address for Mr. Srigley? If it is not, would you please provide us with the correct one?

Thank you.

Kind regards,
Angela Bandi


203 Fishburne –
Zillow...ts .pdf

**APPENDIX E**

July 5, 2024

William Douglas White
McCarthy & White, PLLC
8205 Pettit Court
McLean, VA 22102

RE:   Request of unsecured creditors Federico M. Bandi and Angela M. Bandi, for consent for
derivative standing to file an adversary complaint in *In re Touchstone Remodelers, LLC*
(Case No. 23-00116-ELG; Chapter 7)

Dear Trustee White:

In connection with the above-referenced bankruptcy case (the "**Case**"), we, Federico M.
Bandi and Angela M. Bandi, as unsecured creditors of Touchstone Remodelers, LLC (the
"**Debtor**"), are requesting that you, as trustee in the Case, consent to derivative standing so that
we may file an adversary complaint of the nature described herein.

We realize that, "[t]ypically, only the trustee of a bankruptcy estate has standing to pursue
claims on behalf of the bankruptcy debtor." *Plan Committee v. Pricewaterhousecoopers LLP*,
Civ. No. 02-01487 (TFH) at 11 (D.D.C. Apr. 20, 2007) (citing, *inter alia, Plan Committee v.
Price WaterhouseCoopers, LLP*, 335 B.R. 234, 242 (D.D.C. 2005)).

However, we understand that the case law of this jurisdiction has recognized an exception
to this general rule, which is to authorize derivative standing for creditors' committees and
individual creditors under the following strict conditions:

'A creditors' committee [or secured creditor] may acquire standing to pursue the
debtor's claims if (1) the committee [or creditor] has the consent of the debtor in
possession or trustee, and (2) the court finds that suit by the committee [or creditor] is
(a) in the best interest of the bankruptcy estate, and (b) is necessary and beneficial to
the fair and efficient resolution of the bankruptcy proceedings.'

*Plan Committee v. Pricewaterhousecoopers LLP*, Civ. No. 02-01487 (TFH) at 11-12 (citing *In re
Baltimore Emergency Services II, Corp.*, 432 F.3d 557, 561 (4th Cir. 2005) (alterations in
original) (quoting *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001))). *See also In re
Smith*, No. 04-01581, 2006 WL 1234965 at *4 (Bankr. D.D.C. Feb. 27, 2006) (recognizing
circumstances under which derivative standing may be granted to creditors).

As you know, we were active participants throughout the § 341(a) meeting process and
we filed, on October 18, 2023, a Motion for Entry of an Order Pursuant to Rule 2004
Authorizing Examinations and for the Production of Documents (the "**Rule 2004 Motion**"),
amended on October 23, 2023, granted in part on January 25, 2024, and granted in full on March
21, 2024. The Court's order granting our Rule 2004 Motion authorized us to issue certain

subpoenas for Rule 2004 Examinations to the Debtor, as well as to relevant third party entities (the "**Rule 2004 Subpoena(s)**").

We have since received document responses from certain of the third party entities. However, the Debtor, through its counsel, has refused to cooperate with our requests to schedule the Rule 2004 deposition of its authorized representative. Further, the Debtor never produced any documents in response to the requests contained in the Rule 2004 Subpoena nor provided any explanation for not producing them. In short, the Debtor ignored the Rule 2004 Subpoena altogether.

That said, we have amassed sufficient information from documents obtained through the § 341(a) meeting process and pursuant to the responses of third party entities to the Rule 2004 Subpoenas to provide us with a very strong factual basis for the claims set out below. We are now ready to move forward with filing a complaint in this Case.

We are interested in pursuing claims that would advance the interests of the entire estate, not solely our personal interests at the expense of those of other creditors. These claims[1] include, but are not necessarily limited to, the following:

(1)     Avoidance of fraudulent transfers under 11 U.S.C. § 548(a)(1)(A);

(2)     Avoidance of fraudulent transfers under 11 U.S.C. § 548(a)(1)(B);

(3)     Avoidance of fraudulent transfers under D.C. Code §§ 28-3101, *et seq.*;

(4)     Breach of fiduciary duties to the Debtor pursuant to D.C. Code § 29-804.09, and other applicable provisions of the Uniform Limited Liability Company Act of 2010, D.C. Code §29-801.01, *et seq.*; and

(5)     Any other applicable federal or state common law claims, as well as equitable remedies such as alter ego liability.

In that regard, we have identified potential fraudulent transfers made during the two-year period prior to April 28, 2023 (the "**Petition Date**") of not less than $223,736.30. These potentially avoidable fraudulent transfers include the following categories:

(1)     $141,410.38 in cash withdrawals or transfers made from the Debtor's Bank of America, N.A. checking account ending in 3252, the sole cash account disclosed in the Debtor's Chapter 7 petition (the "**Operating Account**") to two other, apparently non-Debtor owned accounts;

---

[1] The claims would be made against the Srigleys (the members, managers, owners and officers of the Debtor), the Debtor and the Debtor's apparent sister entity, Srigley Development Company, LLC, as appropriate.

2

(2)    $43,589.29 in credit card charges or payments made out of the Debtor's Operating Account for the Srigleys' personal expenses ($31,947.69 of this amount relates solely to the 1981 Mooney M20K aircraft ("**M20K Aircraft**"), of which Srigley Development Company, LLC was the registered owner); and

(3)    $38,736.63 in net proceeds from the sale of personal property of which the Debtor was the de facto owner, i.e., the M20K Aircraft, which was purchased, financed and maintained using the Debtor's cash assets.

Applying the four-year "look back" period applicable to fraudulent conveyances pursuant to District of Columbia law, we have identified additional potentially avoidable fraudulent transfers of not less than $246,163.78. We only have a limited portion of the relevant documents, none of which recorded behavior which occurred more than 3 years and 4 months prior to the Petition Date. As the Srigleys' pattern and practice during this longer look-back period was not inconsistent with their later behavior, the actual figure is undoubtedly larger.

In sum, we have identified potentially avoidable fraudulent transfers made from the Debtor to the Srigleys (or otherwise for their personal benefit) in the less than four years prior to the Petition Date of at least $469,900.08.

However, upon information and belief, the overarching basis for recovery on behalf of the estate is that the Debtor was the alter ego of the Srigleys. The Srigleys, who exercised complete day to day operational and financial control of and domination over the entity, inadequately capitalized the Debtor, such that it was in a persistent state of insolvency; they extensively commingled assets; they shielded the Debtor's assets from creditors by fraudulently transferring assets to themselves; they did not bother to maintain corporate formalities or deal with the Debtor at arm's length, as they viewed the Debtor as an extension of themselves. All of these actions were taken by the Srigleys to their sole personal financial benefit.

The Debtor, and its associated status as a limited liability company, was just a sham used by the Srigleys to disguise their fraudulent or otherwise wrongful conduct. In addition to the fraudulent transfers referenced above, the Srigleys' potentially fraudulent behavior includes taking out additional credit in the Debtor's name with full knowledge and understanding that the Debtor no longer had incoming revenue, the means to obtain new revenue, or any other means of repaying its debt, as well as potential tax improprieties.

Moreover, the Srigleys' actions were not without harm to either the Debtor or to its creditors. They willfully abused the LLC form of the Debtor to an unjust outcome, siphoning the Debtor's assets for their personal benefit and enjoyment, damaging the Debtor to the point of irreconcilable insolvency, and consequently causing substantial financial injury to the Debtor's creditors. As such, we believe that the Srigleys' personal assets should be made property of the estate, up to the full amount of the Debtor's unpaid debt.

The action we intend to bring would be "in the best interest of the bankruptcy estate" and "necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings."Given our particular familiarity with the facts of this Case and the relevant parties to an adversary proceeding, we believe we are in a unique position to bring a complaint addressing the issues described above. Moreover, as we would be pursuing this action in a *pro se* capacity, potential costs to the estate would be minimal to none.

Please contact us in writing at your earliest convenience to let us know if you are willing to consent to derivative standing so that we may file a complaint in this Case.

Thank you.

Kind regards,

Federico M. Bandi

Angela M. Bandi

3606 Chesapeake Street, NW
Washington, DC 20008
Telephone: 773-620-1932
Email: angela.bandi@yahoo.com

**From:** Angela Bandi angela.bandi@yahoo.com 🖉 
**Subject:** Letter requesting consent for derivative standing to file an adversary complaint (In re Touchstone Remodelers, LLC (Case No. 23-00116-ELG; Chapter 7))
**Date:** August 10, 2024 at 11:05 AM
**To:** William Douglas White wdw@mccarthywhite.com
**Cc:** Federico Bandi fbandi1@jhu.edu

Dear Mr. White,

As made clear in our letter to you of July 5, 2024 ("**7/5/24 Correspondence**"), attached for your convenience, we recognize that - typically - only the trustee of a bankruptcy estate has standing to pursue claims (such as avoidance actions) on behalf of the estate. However, to date, we have received no indication that you intend to bring any such actions (or similar ones) in the above-referenced case ("**Case**"). In number 3 of your email response dated July 28, 2024 ("**7/28/24 Response**"), you raise the issue of abandonment. Are you stating that you have abandoned all assets (and claims) of the estate? If not, are you intending to file an adversary proceeding in this case?

With respect to our 7/5/24 Correspondence, we strongly believe that the approach we outlined therein is the most efficient and cost-effective option for the estate to fairly resolve the present bankruptcy proceedings. Simply put, we intend to file a motion requesting the Court to approve derivative standing such that we may file an adversary complaint in this Case. The goal of our adversary proceeding is to recover assets for the benefit of the entire estate. If judgment is in our favor, the assets obtained will go to the estate to be divided appropriately among all creditors who have properly filed a proof of claim.

We will not be hiring an attorney and will be representing ourselves *pro se*. We will not be requesting compensation for attorney's fees from the estate (we may request compensation for minor costs allowable under section 503(b)(3)(B) of the Bankruptcy Code, presuming the Court agrees). Thus, at effectively no cost to the estate, we will bear the burden of litigation for the benefit of all creditors.

Further, as noted in 7/5/24 Correspondence, we are in a unique position to bring an adversary proceeding in this case as we know the facts of this case inside and out. We have known the principals of the Debtor, Benjamin and Cynthia Srigley, for a number of years. We have previously arbitrated against the Debtor. In the course of the arbitration as well as this bankruptcy proceeding, we have reviewed every single page of every document relating to the Debtor that we have been able to obtain. As such, we thoroughly understand the nature of the Debtor's business and we know much about how the business was run, how money received by the Debtor was paid out, and where certain assets of the Debtor went. In other words, we have investigated the financial affairs of the Debtor as thoroughly as we possibly could have done, particularly given the Debtor's constant obstruction and refusal to provide its business records and other relevant documents to the estate and to us pursuant to our 2004 examination.

In number 2 of your 7/28/24 Response, you asked whether there exists case law authorizing derivative standing in a Chapter 7 context as well as in a Chapter 11 context. The three cases cited in our 7/5/24 Correspondence were those that seemed to best define the conditions which would likely be considered by a court in this jurisdiction in making a determination to authorize derivative standing. The concept of derivative standing is an exception to the general rule that only the trustee has standing to pursue claims on behalf of the estate. None of the three cases we cited indicates that the concept of derivative standing would not be appropriate in a Chapter 7 case, and indeed, *In re Smith*, No. 04-01581, 2006 WL 1234965 (Bankr. D.D.C. Feb. 27, 2006) was a

Chapter 7 case (derivative standing was not granted to the plaintiff in *In re Smith* not because it was a Chapter 7 case - rather than a Chapter 11 case – but because, *inter alia*, the plaintiff had not first sought approval for derivative standing from the bankruptcy court). A number of courts have permitted individual creditors to pursue derivative avoidance actions in the context of a Chapter 7 proceeding, or have recognized that derivative standing should be available under such circumstances, including but not limited to, courts in the Second, Sixth, Eighth and Ninth Circuits.

As for your suggestions in number 4 and number 6, frankly, we find them highly inappropriate. More importantly, we do not believe they are in the best interests of the estate as compared to the course of action we have proposed for maximizing the benefit to the estate. We are a family who is owed more than $950,000.00 by the Debtor; we are not one of the largest banks in the world, as are the next three largest creditors. The cost of funding an attorney for the estate would almost certainly be in the six-figure range (given the necessary hours of document review alone). Assuming judgment in our favor, the cost of such attorney's fees would dramatically reduce the size of the estate available for distribution. As far as a sale of causes of action, it is not clear what you have in mind, how you would price the causes of action, whether an auction would be held, etc. In any case, we are not interested in buying causes of action from the estate. Again, we are proposing to spend substantial amounts of our personal time and resources in pursuit of litigation to recover assets for the benefit of the entire estate (including those three large creditor banks).

Regarding your question in number 8 about the Srigleys' failure to respond to our discovery requests, all options are still on the table. This said, sometimes one may make a determination that a certain form of enforcement may not be the most efficient course of action. We can only assume that you made – for other reasons - a similar determination when you decided not to use any of the tools at your disposal to obtain information from the Debtor before we filed a motion for Rule 2004 examination. On this note, we still have not heard back from you regarding the Debtor's documents you have in your possession. As in your March 22, 2024 email you expressed uncertainty as to whether you had shared with us all of the documents in your possession, on March 25, 2024 and – again - on April 8, 2024, we asked you for a list of all documents given to you by the Debtor for the purpose of comparing it with the documents that we have obtained from you. We have yet to receive an answer from you.

Returning to the purpose of our 7/5/24 Correspondence, what we are asking of you as trustee in this Case is whether you are willing to consent to our filing of a complaint in this Case. Our next step would then be to file a motion with the Court to formally request derivative standing.

Thank you.

Kind regards,
Angela and Federico Bandi

Letter
reques...G).pdf
512 KB

From: William Douglas White <wdw@mccarthywhite.com>

**Date:** July 28, 2024 at 10:36:59 PM EDT
**To:** Angela Bandi <angela.bandi@yahoo.com>, Federico Bandi <fbandi1@jhu.edu>
**Subject: Touchstone Remodeling**

    I reviewed your correspondence and cases cited. I have identified several issues on these questions.

1. At the outset, the specific language of the provisions of chapter 5 of the Bankruptcy Code only authorizes a trustee to bring avoidance actions on behalf of the estate. This seems like an important concept that comes into play in several of the cases.

2. The caselaw that has permitted third parties to file derivative actions it appeared that they have usually occurred where a statutory creditors committee was acting pursuant to a chapter 11 plan of reorganization. Of course on the other hand, this case is a chapter 7 liquidation. Did your research happen to come across a list of cases where chapter 7 trustees were authorized to transfer an avoidance action to a third party?

3. When a bankruptcy estate abandons an asset, section 554 of the Bankruptcy Code did not specifically provide that the asset can be abandoned to a third party.

4. The estate could seek to transfer or sell certain causes of action under Section 363(b) of the Bankruptcy Code to a creditor. However, the authority I reviewed was not prevalent in selling or transferring statutory avoidance actions. It would be helpful to see a trustee's sale (particularly in the District of Columbia) under section 363(b) of the Bankruptcy Code selling an avoidance action.

5. Even if an effort is undertaken, I suspect that the debtor might object aggressively, and having good supporting authority would be important.

6. Have you considered at all that you might be willing to fund the efforts of the bankruptcy estate to file an avoidance action? I am fairly sure that there are several attorneys in the area that would be capable for such a role if the facts and law justified.

7. Another option could be to employ you under Section 327(c) of the Bankruptcy Code to authorize you to act as special counsel (as a member of the D.C. bar) for the bankruptcy estate to bring avoidance actions. It is unclear if this approach however could run into an objection because you could be argued as a counsel representing yourself.

8. As an aside, I was curious whether you intend to pursue further against Srigleys for failing to respond to your discovery?

    I would be willing to address this and other issues at your convenience.

William Douglas White
McCarthy & White, PLLC
8205 Pettit Court
McLean, VA 22102
Voice: 703-770-9265

Fax:  703-770-9266
Email: wdw@mccarthywhite.com
Admitted only in DC, MD & FL
Confidentiality Notice: This electronic mail transmission is intended for the use of the individual
or entity to which it is addressed and may contain confidential information belonging to the
sender that is protected by the attorney-client privilege. If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution, or the taking of any action in
reliance on the contents of this information is strictly prohibited. If you have received this
transmission in error, please notify the sender immediately by e-mail and delete the original
message. Thank you for your cooperation.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we
inform you that any U.S. federal tax advice contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of (a)
avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

On Jul 23, 2024, at 10:14 AM, William Douglas White <wdw@mccarthywhite.com> wrote:

Mr. Bandi
I have been occupied on other matters recently.  I am reviewing your letter and will try to
get back to you this week.

William Douglas White
McCarthy & White, PLLC
8205 Pettit Court
McLean, VA 22102
Voice: 703-770-9265
Fax:  703-770-9266
Email: wdw@mccarthywhite.com
Admitted only in DC, MD & FL
Confidentiality Notice: This electronic mail transmission is intended for the use of the individual
or entity to which it is addressed and may contain confidential information belonging to the
sender that is protected by the attorney-client privilege. If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution, or the taking of any action in
reliance on the contents of this information is strictly prohibited. If you have received this
transmission in error, please notify the sender immediately by e-mail and delete the original
message. Thank you for your cooperation.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we
inform you that any U.S. federal tax advice contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of (a)
avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

**From:** Federico Bandi <fbandi1@jhu.edu>
**Sent:** Monday, July 22, 2024 6:00 AM
**To:** Angela Bandi <angela.bandi@yahoo.com>; William Douglas White
<wdw@mccarthywhite.com>

~wdw@mccarthywhite.com~

**Subject:** Re: Letter requesting consent for derivative standing to file an adversary complaint (In re Touchstone Remodelers, LLC (Case No. 23-00116-ELG; Chapter 7))

Good morning Mr. White,

I am following up on our previous e-mail to you (below) dated July 5, 2024. A hard copy of the letter was also mailed to you on that date.

It has been more than two weeks since we requested your consent for derivative standing to file an adversary complaint in *In re Touchstone Remodelers, LLC* (Case No. 23-00116-ELG; Chapter 7).

Could you please give us the courtesy of an acknowledgment? If you need more time, please be so kind as to let us know. Thank you.

Kind regards,
Federico M. Bandi


==========================================
Federico M. Bandi
Johns Hopkins University

---

**From:** Angela Bandi <angela.bandi@yahoo.com>
**Date:** Friday, July 5, 2024 at 6:31 PM
**To:** William Douglas White <wdw@mccarthywhite.com>
**Cc:** Federico Bandi <fbandi1@jhu.edu>
**Subject:** Letter requesting consent for derivative standing to file an adversary complaint (In re Touchstone Remodelers, LLC (Case No. 23-00116-ELG; Chapter 7))

Dear Trustee White,

Please find attached our letter requesting consent for derivative standing to file an adversary complaint in *In re Touchstone Remodelers, LLC* (Case No. 23-00116-ELG; Chapter 7). You will also be receiving a hard copy of the letter via U.S. Mail.

Please let us know at your earliest convenience. Thank you.

Kind regards,
Angela Bandi



**From:** **William Douglas White** wdw@mccarthywhite.com
**Subject:** RE: Letter requesting consent for derivative standing to file an adversary complaint (In re Touchstone Remodelers, LLC (Case No. 23-00116-ELG; Chapter 7))
**Date:** September 13, 2024 at 6:14 PM
**To:** Federico Bandi fbandi1@jhu.edu, Angela Bandi angela.bandi@yahoo.com

Federico and Angela Bandi

As I mentioned in my earlier email, I believe the large number of documents I sent to you included all the documents turned over by Mr. Srigley with the exception of documents containing personally identified information. In those instances, my understanding at the time was that those documents were to be provided directly to you by Mr. Srigley in redacted form. If there are additional documents that you believe that I may have, please let me know what those documents are and I will go through the estate's copies again to see.

As I recall at the time of the creditor meetings, I did not find assets that I thought would be of value to the estate <u>except</u> for any undisclosed assets or avoidance actions that you all might identify pursuant to the 2004 discovery. You recently identified potential causes of actions pursuant to your discovery that you believe could generate recoveries for the benefit for the estate. At this point I have not formally abandoned any assets of the estate.

Further to your request that I consent for derivative standing, I reviewed Judge Teel's decision again in the Smith case that you cited in support of your position. It appeared that the Court raised several options but did not rule on the issue of derivative standing. Interestingly, the last option discussed by the Court noted that the whole dispute regarding derivative standing could be resolved by the creditor's agreement to be retained as special counsel for the bankruptcy estate. However, when I raised this possibility earlier, you indicated that you did not want to pursue an appointment of special counsel. In addition, my understanding from the Office of the U.S. Trustee is that currently the use of derivative standing is not permitted in cases in the District of Columbia.

I am happy to discuss these issues with you again. Please let me know if you decide to pursue a special counsel role. Thanks.

William Douglas White
McCarthy & White, PLLC
8205 Pettit Court
McLean, VA 22102
Voice: 703-770-9265
Fax:  703-770-9266
Email: wdw@mccarthywhite.com
Admitted only in DC, MD & FL

Confidentiality Notice: This electronic mail transmission is intended for the use of the individual or entity to which it is addressed and may contain confidential information belonging to the sender that is protected by the attorney-client privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please notify the sender immediately by e-mail and delete the original message. Thank you for your cooperation.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we

inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Federico Bandi <fbandi1@jhu.edu>
**Sent:** Friday, August 23, 2024 6:12 PM
**To:** William Douglas White <wdw@mccarthywhite.com>; Angela Bandi <angela.bandi@yahoo.com>
**Subject:** Letter requesting consent for derivative standing to file an adversary complaint (In re Touchstone Remodelers, LLC (Case No. 23-00116-ELG; Chapter 7))

Good evening Mr. White,

I am following up on the e-mail (below) that we sent you two weeks ago.

We addressed your questions and (re-)emphasized the issues on which we are hoping to obtain answers from you. In short,

(1) What are the Debtor's documents in your possession?
(2) Have you abandoned the assets/claims of the estate (or do you intended to do so)?
(3) Do you consent to (our petitioning the Court for) derivative standing?

Would you be so kind as to let us know? Thank you.

Kind regards,
Federico Bandi


========================================
Federico M. Bandi
Johns Hopkins University